## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JEFFREY H. BATTER and CHERYL BATTER, on behalf of themselves and all others similarly situated,<br><br>    Plaintiffs,<br><br>  vs.<br><br>HECLA MINING COMPANY, PHILLIPS S. BAKER, JR., LINDSAY A. HALL, and LAWRENCE P. RADFORD,<br><br>    Defendants. | Case No.: 19-cv-4883<br><br>CLASS ACTION<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

Jeffrey H. Batter and Cheryl Batter ("Plaintiffs"), by their attorneys, on behalf of themselves and all others similarly situated, allege the following based upon the investigation of Plaintiffs' counsel, except as to allegations specifically pertaining to Plaintiffs, which are based on personal knowledge. The investigation of counsel included, among other things, a review of Hecla Mining Company ("Hecla" or the "Company") public filings with the United States Securities and Exchange Commission ("SEC"), press releases issued by the Company, media, news and analyst reports about the Company, conference calls with Company executives and investors, and other publicly available data, including, but not limited to, publicly available trading data relating to the price and trading volume of Hecla's common stock.

## I.  **INTRODUCTION**

1.  This action is a securities fraud action brought under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder by the SEC brought by Plaintiffs on behalf of a class of all persons and entities who

purchased the publicly traded common stock of Hecla between March 19, 2018 and May 8, 2019, inclusive (the "Class Period").

2.      Founded in 1891, Hecla purports to discover, acquire, develop, and produce silver, gold, lead and zinc. The Company produces lead, zinc and bulk concentrates, which Hecla sells to custom smelters and brokers, and unrefined precipitate and bullion bars (doré) containing gold and silver, which are further refined before sale to precious metals traders.  Prior to the start of the Class Period, the Company was organized and managed in four segments that encompassed its operating units: the Greens Creek, Lucky Friday, Casa Berardi, and San Sebastian units.

3.      On March 19, 2018, Hecla announced it was acquiring three high-grade Nevada gold mines through the acquisition of Klondex Mines Ltd. ("Klondex") for a mix of cash and stock worth $462 million.  Defendant Phillips S. Baker, Jr. ("Baker"), Hecla's President and Chief Executive Officer, represented that "Klondex's three operating mines – Fire Creek, Midas and Hollister – are some of the highest-grade gold mines in the world" and that "[a]fter extensive due diligence, we see significant opportunity to improve costs, throughput and recoveries over time with our expertise."  Fire Creek, which started production in 2014, was the primary driver of the acquisition.  Hollister was important for the prospective development and mining of the Hatter Graben, a large system of veins Hecla said it could reach from Hollister.  Midas was an older mine that had been in production for decades but was still purportedly providing production and cash flow.

4.      After the acquisition closed in July 2018, the Nevada operations became a fifth operating segment.

5.      During the Class Period, Defendants, as defined below, falsely and misleadingly represented that the Nevada operations would be "accretive" and cash flow positive, or at the very least "self-funding", but this was not true.  As admitted by the Defendants at the end of the Class Period, the Defendants knew from their extensive due diligence that the Nevada mines faced many undisclosed material problems that would prevent the operations from being cash flow positive, or even cash flow neutral.  Specifically, Defendants were aware from their extensive due diligence that the Nevada operations had material problems in terms of excessive water, equipment availability, achieving enough development to have consistent production, and lack of characterization of ore types, among other things.

6.      On May 9, 2019, Hecla shocked investors when, before the market opened, the Company issued a press release entitled "Hecla Reports First Quarter Results Nevada operations under review" (the "May 9 Press Release"), in which the Company disclosed a "comprehensive review" of its Nevada operations that it characterized during the ensuing conference call as "really just asking the question, are we going to get the return for the investment we're making." Indeed, Defendants admitted that the Nevada operations suffered from negative cash flow and other negative operating metrics, that Defendants were not sure if Hecla would ever get a positive return on its investment in the Nevada operations and that they might write off the Nevada operations.  Additionally, the Company reported a net loss of over $25 million for the first quarter of 2019 based in large part on a gross loss of $13.8 million from its Nevada operations.

7.      On May 9, 2019, following the disclosures that the Nevada operations were cash flow negative and subject to a comprehensive review to determine the best path forward for its Nevada operations given the poor economics, including the possibility of an

impairment charge, the price of Hecla's common stock declined by 23.5% over two trading days, from a closing price of $2.04 per share on May 8, 2019, to close at $1.56 per share on May 10, 2019.  The stock price has not recovered and on May 23, 2019 closed at $1.38 per share.

## II.    JURISDICTION AND VENUE

8.    The claims asserted arise under Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.  Jurisdiction is conferred by Section 27 of the Exchange Act.  Venue is proper because Hecla's common stock traded on the New York Stock Exchange ("NYSE") in this district throughout the Class Period and Defendants made materially false and misleading representations to investors that were disseminated to investors in this District.

9.    In connection with the material misrepresentations of facts and omissions alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.   PARTIES

10.    Plaintiffs purchased Hecla common stock on the NYSE as detailed in the certification attached hereto and were damaged thereby.

11.    Defendant Hecla is headquartered in Coeur D'Alene, Idaho.  Hecla's common stock trades on the NYSE under the symbol "HL".

12.    Defendant Baker was the Company's President and Chief Executive Officer throughout the Class Period.  Defendant Baker made materially false and misleading statements

and material omissions in Hecla SEC filings, press releases and on public conference calls throughout the Class Period.

13.     Defendant Lindsay A. Hall ("Hall") was the Company's Senior Vice President, Chief Financial Officer and Treasurer throughout the Class Period. Defendant Hall made materially false and misleading statements and material omissions in Hecla SEC filings and on public conference calls throughout the Class Period.

14.     Defendant Lawrence P. Radford ("Radford") was the Company's Senior Vice President – Operations during the Class Period. Defendant Radford made materially false and misleading statements and material omissions on public conference calls throughout the Class Period.

15.     The individuals named as Defendants in ¶¶ 12-14 are referred to herein as the "Individual Defendants".  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Hecla's press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  Each Defendant was provided with copies of the Company's press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them but not to the public, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations which were being made were then materially false and misleading.

16.     Hecla and the Individual Defendants are collectively referred to as the "Defendants".

**IV.**    **CLASS ACTION ALLEGATIONS**

17.    Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of a class of all persons and entities who purchased the publicly traded common stock of Hecla during the Class Period.

18.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at the present time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds of members of the Class located throughout the United States.  As of February 19, 2019, Hecla had over 482 million common shares outstanding and the average daily trading volume for Hecla's common stock on the NYSE during the Class Period was over 5.5 million shares.

19.    Plaintiffs' claims are typical of the claims of the members of the Class.  Plaintiffs and all members of the Class have sustained damages because of Defendants' unlawful activities alleged herein.  Plaintiffs have retained counsel competent and experienced in class and securities litigation and intends to pursue this action vigorously.  The interests of the Class will be fairly and adequately protected by Plaintiffs.  Plaintiffs have no interests which are contrary to or in conflict with those of the Class that Plaintiffs seek to represent.

**V.**    **FALSE AND MISLEADING STATEMENTS**

20.    The Class Period begins on March 19, 2018, the date that Hecla issued a press release announcing the acquisition of Klondex, including three high-grade Nevada gold mines. The March 19, 2018 press release stated, in part:

> Hecla Mining Company (NYSE:HL) (Hecla) and Klondex Mines
> Ltd.   (NYSE American: KLDX; TSX:KDX) (Klondex) today
> announced Hecla will acquire all the outstanding shares of
> Klondex, a high-grade Nevada underground gold producer with its
> Fire Creek, Midas and Hollister mines, through a plan of

6

arrangement (the Transaction). Klondex's Canadian assets will be spun out to its existing shareholders.

Under the Transaction, Hecla will acquire Klondex for consideration of US $462million with a mix of cash and shares of Hecla common stock and the newly formed company (Klondex Canada). Klondex's shareholders will receive US$2.47 per share in cash or shares of Hecla, which represents a 59% premium to Klondex's 30-day volume-weighted average price, as at March 16, 2018, on the NYSE American.

* * *

***After extensive due diligence, we see significant opportunity to improve costs, throughput and recoveries over time with our expertise. . . .We expect this transaction to be accretive on many important financial and credit metrics***, with potentially significant synergies.

(Emphasis added).

21.     Also, on March 19, 2018, during a conference call that followed the press

release, Defendant Baker stated, among other things:

The first thing I want you to know is ***these assets are not new to us***. About a decade ago, we actually owned a box within Hollister. . . ***It's a great low capital and potentially high return strategy similar to what we are doing in Mexico***. So periodically, we reached out to Paul, and then ***about four months ago, we began our due diligence. As part of this work, we were granted access to the properties and key people, which gave us significant insights into the properties, particularly Fire Creek.***

* * *

[T]he principal driver for this deal is Fire Creek and the hundred thousand plus ounces of gold it produces a year.  ***It has a great cost profile and it's the highest grade gold mine of significant scale in North America.***

***

***Paul and his team have done a really good job of understanding the geology. . . .***

7

\*\*\*

> [W]hile Fire Creek is the driver of the transaction, ***we're also excited about the prospects for Hollister and Midas***. ***At Hollister, it's primarily about the prospective Hatter Graben project*** with over 1,400 vertical feet of veins and over 2,000 feet of strike. . . . While Midas has a short mine life, there is a big resource position that gives us optionality to higher prices and we're going to probably continue the exploration that Klondex has started on the Trinity.

(Emphasis added).

22.     Also, on March 19, 2018, in response to an analyst that asked what the ongoing maintenance capital expenditures for the Nevada mines would be, Defendant Baker represented that factoring in exploration and development costs at Fire Creek, Midas and Hollister, the operations would be cash flow positive:

> [B]ut all of this stuff is relatively small capital. That was one of the things that struck us is we can acquire this. ***Nevada itself will be cash flow positive for us. There is no capital outlay that we're looking to, in Nevada, that's going to consume all of the cash flow that will be generated from the three mines.***

(Emphasis added).

23.     On May 10, 2018, during the conference call to discuss first quarter financial results, Defendant Baker stated, in part, with respect to the deal that "***[e]verything is on track.***" (Emphasis added).

24.     On July 23, 2018, Hecla issued a press release announcing that the Company had completed the acquisition of Klondex.   The July 23, 2018 press release stated, among other things:

> "With this acquisition, Hecla now has three high-grade mines in Nevada, one of the best mining districts in the world," said Phillips S. Baker, Jr., President and CEO. ***"These assets immediately add production and cash flow,*** and because they are a good fit with

Hecla's expertise, we believe there is significant opportunity for improvement in the mines' productivity and consistency.

(Emphasis added).

25.   On August 9, 2018, the Company reported financial results for the second quarter

of 2018 ended June 30, 2018.  The August 9, 2018 press release stated, among other things:

> "We have now closed the acquisition of the high-grade Nevada mines, and are beginning their integration into Hecla," Mr. Baker added. "Our plan is to operate the mines and mill as one unit, allocating the workforce and capital to generate margins and ***focus on profitability, not just on production for production's sake, Fire Creek has the best margin of the 3 mines by a* considerable amount,** so ramping it up is our priority…"

(Emphasis added).

26.   Also, on August 9, 2018 during the conference call to discuss second quarter

financial results, Defendant Hall stated, among other things:

> As is our mantra at Hecla, all operations need to generate positive cash flows in their mine plans and we expect Nevada will be no different. ***The Nevada assets are basically self-funding.***  The cash flow from production pays for the $11 million in development and definition drilling expenditures in the last half of the year, and as well, $5 million related to the completion of the new tailings, facility, plus the CIO planned improvements,

(Emphasis added).

27.   Also, on August 9, 2018 during the question and answer portion of the conference

call, Defendant Baker reiterated that the Nevada operations would be self-funding from the start:

> **John Bridges**: Good morning, Phil, everybody. I just want to dig into cash flows. Your intention is to have the Nevada assets being cash flow neutral to you as soon as possible. When is that likely to be? And then, when will they be contributing to the portion of debt that they've – that you are sort of – you have taken on in the form of the revolver to run those just to start with?
>
> **Phillips S. Baker, Jr.**: Well, I guess two things. ***One is the expectation is this year that for the five months, it will be self-funding. We're not anticipating needing to contribute additional***

> *capital into it*. And two, we haven't drawn on the revolver. Our net cash position is positive.

(Emphasis added).

28.     On November 8, 2018, the Company reported financial results for the third quarter of 2018 ended September 30, 2018.  In connection with reporting third quarter financial results, the Company held a conference call during which Defendant Radford stated, in part:

> *[O]ur goal for Nevada operations is that the operations are cash-neutral*, including Hatter Graben development and the Fire Creek development ramp-up.

29.     Also, on November 8, 2018 during the question and answer session of the conference call to discuss third quarter financial results, Defendant Baker stated, among other things, in response to analyst questions regarding the cash costs of the Nevada operations:

> But essentially*, this thing is going to generate the cash flow necessary for it to do the ramp up of development in 2019. . . .*
>
> * * *
>
> [W]e're not anticipating the need to make significant contributions into Nevada, right? We see Nevada being able to largely pay for the Hatter Graben, to pay for the development within Fire Creek. *We think we can run it pretty close to cash flow neutral. And that is what we have suggested we would be able to do.*

(Emphasis added).

30.     On December 4, 2018, the Company held a conference call at the Bank of America Merrill Lynch Leveraged Finance Conference during which Defendant Hall stated, in part:

> *There's no major capital expenditures that we can't fund out of the Nevada operations*. So we're really quite pleased with the transaction.

(Emphasis added).

31.     On February 22, 2019, Hecla filed its Annual Report with the SEC on Form 10-K for the year ending December 31, 2018 ("2018 10-K").  The 2018 10-K, which was signed by

Defendants Baker and Hall, purported to warn that the anticipated benefits from the recent acquisition of Klondex might not materialize:

> **We may not realize all of the anticipated benefits from our acquisitions, including our recent acquisition of Klondex.**
>
> We may not realize all (or any) of the anticipated benefits from any acquisition, such as increased earnings, cost savings and revenue enhancements, for various reasons, including difficulties integrating operations and personnel, higher than expected acquisition and operating costs or other difficulties, unknown liabilities which may be significant, inaccurate reserve estimates, unrealized exploration potential, mill recoveries that are lower than required for portions of the orebodies to be economic, and fluctuations in market prices.

(Emphasis in original).

32.     The statements contained in ¶¶ 20-31, were materially false and misleading or omitted to state the following material facts: (a) that the Nevada operations were hemorrhaging cash due to a multitude of material problems identified by Defendants during Hecla's extensive due diligence of the Nevada mines before the Class Period, and (b) that as a result of these material problems, Defendants had no reasonable basis for their representations that the Nevada operations would be in a position to have positive or self-funding cash flow.

## VI.     THE TRUTH BEGINS TO EMERGE

33.     On May 9, 2019 Hecla shocked investors when, before the market opened, the Company issued a press release entitled "Hecla Reports First Quarter Results Nevada operations under review", in which the Company disclosed a comprehensive review of its Nevada operations and the suspension of annual production and cost estimates for its Nevada operations. Specifically, the May 9 Press Release finally admitted that the Nevada operations were cash flow negative:

Mr. Baker continued, "While Nevada operations had better development advance rates, *the operating metrics, including* cost, grade and *negative cash flow, were unacceptable.* We are reviewing our Nevada operations to determine the best path forward and expect results of this review in the second quarter. In the meantime, we are suspending our annual Nevada estimates for production and cost.

\* \* \*

The annual production and cost outlook have been suspended for Nevada pending the results of the comprehensive review.

34.     Also, on May 9, 2019, during a conference call with investors, investors learned that Hecla was likely facing a large write-down of its recently acquired Nevada assets due to uncertainty as to whether Hecla would ever see a return on its investment in the Nevada mines. Defendant Baker made the following statements concerning the rationale for the review of the Nevada operations and suspension of outlook for those operations:

> *A year ago when doing the due diligence, we recognized certain problems* with Fire Creek dealing with the tough material, managing the water, equipment availability, getting enough development to have consistent production, lack of characterization of ore types. And while we've made progress in dealing with the issues we saw the short answer is it's not been enough. The advance rate has increased, but the mill tonnage decreased by a similar percentage in the last quarter. And while we've done things to manage the water, the amount of water has increased, making the conditions worse.
>
> \* \* \*
>
> This process is really maintaining our discipline and capital allocation, *we're really just asking the question, are we going to get the return for the investment we're making. Since we don't know the outcome of the review, we are suspending guidance until we do.* I'm going to stop there on Nevada because Larry and Lindsay will both have more to say.

(Emphasis added).

35.     Further, a number of analysts posed questions indicating their surprise and astonishment at the severity of the problems that had not previously been disclosed.  For example, a J.P. Morgan analyst asked the following:

> **John Bridges**:  Just wondered if you could give us a bit of color on what the problems actually are in Nevada? We heard about the water.
>
> You're waiting on some permits, is that part of it? And you say you've demobilized the contract. ***Does that mean that you stopped advancing the exploration terminals which were related to the upbeat comments that you've been giving as on exploration success? I'm just a bit confused here.***
>
> **Phillips Baker***:*  Sure. With respect to the water, what it has done is it's limited places that we're able to go in the mine because ***we cannot deal with the water fast enough to be able to effectively move forward***.

(Emphasis added).

36.     On May 9, 2019, the price of Hecla's common stock declined by $0.27 per share, or 13.24%, to close at $1.77 per share.

37.     Following the May 9, 2019 disclosures, at least two analyst reports indicated surprise over the disclosed problems and potential complete shutdown of the Nevada operations.

38.     A Cantor Fitzgerald report dated May 9, 2019 stated as follows:

> **Pencils Down in Nevada** – A plethora of challenges are facing Hecla at its Nevada operations.  These range from extra dewatering requirements, poor grade reconciliation relative to the mine plan, metallurgical challenges with refractory ore, and underperformance of the mining contractor, among several others. ***Hecla is in the process of completing a comprehensive review of its Nevada Operations that may result in a complete production shutdown across Fire Creek, Hollister, and Midas.***

(Emphasis added).

39.     A J.P. Morgan report dated May 9, 2019 stated:

**Buyer's Remorse: Comprehensive Review of Nevada Operations Under Way; Negative**

The key takeaway from this result is the suspension of guidance for the newly acquired Nevada mines. ***We expect intense questioning of management to determine if this is a teething problem with the ramp back up of production or something more serious. Hecla said it had the opportunity to do extensive due diligence on the assets before the purchase, so it should just be the former***. However, at a time when the company is preparing to refinance its high-yield debt, this uncertainty needs to be resolved quickly. The combination of the earnings miss and the suspended forecasts for Nevada will likely cause the stock to open sharply lower.

(Emphasis added).

40.     On May 10, 2019, before the market opened, Hecla filed its quarterly report on Form 10-Q for the period ending March 31, 2019, which stated, in part:

We are currently undertaking a review of spending at the Nevada operations which may result in the following changes at the Fire Creek mine: a reduction in capital spending; ceasing current production and only developing to spirals 9,10 and 11; or a temporary cessation of all mine operations at Fire Creek. As a result, the values of certain components of properties, plants, equipment and mineral interests could be adjusted in the second quarter of 2019 when we expect to finalize the allocation of the Klondex purchase price. The outcome of the review may constitute a triggering event requiring assessment of the carrying value of our long-lived assets at Fire Creek with the potential to impact near-term estimated cash flows. The mineral interests at Fire Creek have a preliminary carrying value of approximately $220 million, of which approximately $46 million is depletable. We may recognize an impairment, which could be material, if the carrying value of the assets exceeds the estimated future undiscounted cash flows expected to result from their use and eventual disposition.

41.     On May 10, 2019, Hecla's common stock declined $0.21 per share, or 11.86%, to close at $1.56 per share on May 10, 2019.

14

## VII.   LOSS CAUSATION/ECONOMIC LOSS

42.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Hecla's common stock and operated as a fraud or deceit on Class Period purchasers of Hecla common stock by misrepresenting the Company's operating condition and future business prospects.  Defendants achieved this by making positive statements about Hecla's business and Nevada operations while they knew, or recklessly disregarded, that the Nevada operations faced a multitude of material problems as alleged herein. Later, however, when Defendants' prior misrepresentations were disclosed and became apparent to the market, the price of Hecla's common stock fell precipitously as the prior artificial inflation came out of the price of Hecla's common stock.  As a result of their purchases of Hecla common stock during the Class Period, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages under the federal securities laws.

43.     As a direct result of the public revelations regarding the truth about the condition of Hecla's business and the negative adverse factors that had been impacting Hecla's business during the Class Period, the price of Hecla's common stock materially declined.  This drop removed the inflation from the price of Hecla's common stock, causing real economic loss to investors who purchased Hecla common stock during the Class Period.

44.     The decline in the price of Hecla's common stock at the end of the Class Period was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of Hecla's share price declines negate any inference that the loss suffered by Plaintiffs and other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to the Defendants' fraudulent conduct.

## VIII.   FRAUD-ON-THE-MARKET DOCTRINE

45.     At all relevant times, the market for Hecla's common stock was an efficient market for the following reasons, among others:

(a)     The Company's common stock met the requirements for public listing and were listed and actively traded on the NYSE, a highly efficient market;

(b)     As a regulated issuer, the Company filed periodic public reports with the SEC;

(c)     The Company regularly issued press releases which were carried by national news wires.  Each of these releases was publicly available and entered the public marketplace; and

(d)     A number of securities analysts regularly followed and analyzed the Company and issued reports.

46.     As a result, the market for the Company's publicly traded common stock promptly digested current information with respect to Hecla from all publicly available sources and reflected such information in the price of the Company's common stock.  Under these circumstances, all purchasers of the Company's common stock during the Class Period suffered similar injury through their purchase of the publicly traded common stock of Hecla at artificially inflated prices and a presumption of reliance applies.

## IX.   ADDITIONAL SCIENTER ALLEGATIONS

47.     As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced

in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  By virtue of their receipt of information reflecting the true facts regarding Hecla, including Defendants' admitted extensive due diligence prior to the acquisition of the Nevada mines during which a multitude of problems were identified, Defendants participated in the fraudulent scheme alleged herein.

48.     Defendants knew or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public.  The ongoing fraudulent scheme described in this complaint could not have been perpetrated over a substantial period, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants.

49.     Defendants had the motive and opportunity to perpetrate the fraudulent scheme and course of business described herein because the Individual Defendants were the most senior officers of Hecla, issued statements and press releases on behalf of Hecla and had the opportunity to commit the fraud alleged herein.  Among other things, during the Class Period the Defendants had the motive to misrepresent the Klondex acquisition in order to increase the Company's ratings with the ratings agencies for the purpose of refinancing its debt.  Indeed, from the start of and throughout the Class Period, the Defendants represented that the acquisition and integration of the Nevada assets would improve the Company's credit metrics and bond ratings.

## X.     NO SAFE HARBOR

50.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false and misleading statements pleaded in this complaint.  Many of the specific statements pleaded herein were not identified as "forward-

looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Hecla who knew that those statements were false when made.

### FIRST CLAIM FOR RELIEF
### For Violation of Section 10(b) of the 1934 Act
### and Rule 10b-5 Against All Defendants

51.     Plaintiffs incorporate ¶¶ 1-50 by reference.

52.     During the Class Period, Defendants disseminated or approved the false and misleading statements specified above, which they knew or recklessly disregarded were materially false and misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

53.     Defendants violated Section 10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     Employed devices, schemes and artifices to defraud;

(b)     Made untrue statements of material facts or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made not misleading; or

(c)    Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Hecla's publicly traded common stock during the Class Period.

54.    Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Hecla's publicly traded common stock. Plaintiffs and the Class would not have purchased Hecla's common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

55.    As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Hecla common stock during the Class Period.

## SECOND CLAIM FOR RELIEF
### For Violation of Section 20(a) of the 1934 Act
### Against the Individual Defendants

56.    Plaintiffs incorporate ¶¶ 1-50 by reference.

57.    The Individual Defendants acted as controlling persons of Hecla within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other

statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

58.     In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein and exercised the same.

59.     As set forth above, Hecla and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions each as a controlling person, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Hecla's and the Individual Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows: declaring this action to be a proper class action; awarding damages, including interest; awarding reasonable costs, including attorneys' fees; and such equitable/injunctive relief as the Court may deem proper.

## JURY DEMAND

Plaintiffs demands a trial by jury.

Dated: May 24, 2019                          **KAPLAN FOX & KILSHEIMER LLP**

By: _/s/_____ _Jeffrey P. Campisi_____

Jeffrey P. Campisi
Robert N. Kaplan
Pamela A. Mayer
850 Third Avenue, 14th Floor
New York, NY 10022

Tel: (212) 687-1980
Fax: (212) 687-7714
jcampisi@kaplanfox.com
rkaplan@kaplanfox.com
pmayer@kaplanfox.com

*Attorneys for Plaintiffs*

## <u>CERTIFICATION</u>

Jeffrey H. Batter and Cheryl Batter hereby certify as follows:

1.  We have each reviewed a complaint prepared against Hecla Mining Company ("Hecla") and others alleging violations of the federal securities laws and authorize the filing of a complaint.

2.  We are willing to serve as representative parties on behalf of a class, or to be members of a group representing a class, including providing testimony at deposition and trial, if necessary.

3.  Within the 3-year period preceding the date hereof, we have not individually or jointly sought to serve or served as a representative party on behalf of a class in any action brought under the federal securities laws.

4.  Our transactions in Hecla common stock during the proposed class period are set forth in Schedule A, which is attached hereto.

5.  We did not purchase Hecla common stock at the direction of our counsel, or in order to participate in any private action under the federal securities laws; and

6.  We will not accept any payment for serving as a representative party on behalf of a class beyond our pro rata share of any recovery, except as ordered or approved by the Court.

We declare under penalty of perjury that the foregoing is true and correct.

Date: May 23, 2019

_____
Jeffrey H. Batter

_____
Cheryl Batter

**Schedule A**

**Transactions in Hecla Mining Company for the Period March 19, 2018 through May 8, 2019**

| Security Description | CUSIP | Transaction | Trade Date | Quantity | Price |
|---|---|---|---|---|---|
| Hecla Mining Company | 422704106 | Sale | 2/20/2019 | (9,000) | $2.98 |
| Hecla Mining Company | 422704106 | Sale | 2/20/2019 | (600) | $2.98 |
| Hecla Mining Company | 422704106 | Buy | 3/4/2019 | 11,000 | $2.30 |