**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

---

**JEFFREY H. BATTER et al,**

                    **Plaintiffs,**

          **-against-**

**HECLA MINING CO. et al ,**

                    **Defendants.**

**19-cv-4883 (ALC)**

---

**ARUN BHATTACHARYA et al ,**

                    **Plaintiff,**

          **-against-**

**HECLA MINING CO. et al,**

                    **Defendants.**

**19-cv-05719 (ALC)**

**OPINION & ORDER**

---

**ANDREW L. CARTER, JR., United States District Judge:**

Before the Court are two securities class actions—*Batter et al. v. Hecla Mining Co. et al.* and *Bhattacharya v. Hecla Mining Co. et al.*—against Hecla Mining Company and several of its officers and directors. Plaintiffs in both suits are persons or entities who allege that Defendants made materially false and misleading statements and failed to disclose material adverse facts regarding Hecla's business, operations, and prospects. According to the complaints, disclosure of these acts and omissions caused Hecla's stock price to plummet. (ECF No. 1 at ¶¶ 1, 6, 7; ECF 1 at ¶¶ 1, 32,37). Both suits were "brought by Plaintiffs on behalf of a class of all persons and entities who purchased the publicly traded common stock of Hecla between March 19, 2018 and May 8, 2019, inclusive" (the "Class Period'). (ECF No. 1 at ¶¶ 1–2).

1

The *Batter* action was filed first on May 24, 2019, followed by *Bhattacharya*, which was filed on June 19, 2019. Eight plaintiffs timely moved to consolidate the cases and for appointment as lead plaintiff and approval of lead counsel. In fact, they all filed on the same day, July 23, 2019. (ECF Nos. 28, 31, 34, 35, 44, 47, 51).

Of those original eight, only four have not withdrawn their motions. Of those four, only one, James Hughes, did not submit a memorandum opposing the competing movants' lead plaintiff applications. Rather, his attorney submitted a declaration "affirm[ing] his Motion, contingent upon this Court's determination that those movants claiming larger losses fail to satisfy" the requirements of Rule 23, reserving the right to file a reply memorandum of law and providing that Hughes is "ready, willing, and able to fulfill the duties of Lead Plaintiff should the Court determine him to be the most adequate plaintiff." (ECF No. 59 at 1–2).

The three other competing movants are Ahmed Hussein ("Hussein"), the Gluck Family (comprised of Dr. Robert Gluck and his two daughters, Emma and Sarah Gluck) (the "Glucks"), and the City of Birmingham Retirement and Relief System ("BRRS").

For the reasons that follow, the Court consolidates the actions, appoints the Gluck Family as lead plaintiffs, and approves the Gluck Family's choice of counsel.

## I. Consolidating Cases

Pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA"), I will resolve the question of consolidation first. "The PSLRA provides that '[i]f more than one action on behalf of a class asserting substantially the same claim or claims arising under this chapter has been filed,' the Court shall not make the determination of the most adequate plaintiff 'until after the decision on the motion to consolidate is rendered.'" *Janbay v. Canadian Solar, Inc.*, 272 F.R.D. 112, 118 (S.D.N.Y. 2010) (quoting 15 U.S.C. § 78u–4(a)(3)(B)(ii)).

Various plaintiffs move to consolidate the two cases presently before the court. No party

objects to consolidation, and I conclude that consolidation is appropriate here.

Where "actions before the court involve a common question of law or fact[,]"

consolidation is appropriate. Fed. R. Civ. P. 42(a)(2). Under Rule 42(a), "[t]he Court enjoys

'broad discretion to determine whether consolidation is appropriate.'" *Ku-Kardos v. VimpelCom*,

*Ltd.*, 151 F. Supp. 3d 471, 475 (S.D.N.Y. 2016) (quoting *Johnson v. Celotex Corp.*, 899 F.2d

1281, 1284–85 (2d Cir. 1990)).

Consolidation is appropriate here because the two related actions involve the same or

similar parties, arise out of the same or similar courses of misconduct during substantially similar

class periods, and concern substantially similar alleged issues of fact and law. Consolidating

these suits promotes judicial economy and efficiency and these concerns are not outweighed by

any prejudice or confusion. *See Rosi v. Alcaris Therapeutics, Inc.*, 19-cv-7118, 2019 WL

5778445, at *2 (S.D.N.Y. Nov. 6, 2019) (slip copy) ("In securities class actions, consolidation is

particularly appropriate where the actions are based on the same public statements and reports so

long as there are common question of law and fact and the defendant will not be prejudiced.")

(internal citations and quotation marks omitted)).

## II. Appointing Lead Plaintiffs

Under the PSLRA, the Court is to "appoint as lead plaintiff the member or members of

the purported plaintiff class that the court determines to be most capable of adequately

representing the interests of class members." 15 U.S.C. § 78u-4(a)(3)(B)(i). "The PSLRA creates

a rebuttable presumption that the lead plaintiff should be the plaintiff who (a) has either filed a

complaint or [timely] moved for lead plaintiff status; (b) has the largest financial interest in the

relief sought; and (c) otherwise satisfies the typicality and adequacy requirements of Federal

Rule of Civil Procedure 23." *Phuong Ho v. NQ Mobile, Inc.*, 2014 WL 1389636, at *1 (S.D.N.Y.

Apr. 9, 2014) (citing 15 U.S.C. § 78u-4(a)(3)(B)(iii)(1)). "The presumption that a movant is the

most adequate may be rebutted 'only upon proof by a member of the purported plaintiff class'

that the presumptive lead plaintiff 'will not fairly and adequately protect the interests of the

class' or 'is subject to unique defenses that render such plaintiff incapable of adequately

representing the class.'" *Seidel v. Noah Educ. Holdings Ltd.,* No. 08 Civ. 9203, 2009 WL

700782, at *4 (S.D.N.Y. Mar. 9, 2009) (quoting 15 U.S.C. § 78u–4(a)(3)(B)(iii)(II)).

**A. Hussein is Presumptive Lead Plaintiff**

Mr. Hussein is the presumptive lead plaintiff. Hussein timely moved for lead plaintiff

appointment, has the largest financial interest, and otherwise satisfies the typicality and adequacy

requirement of Rule 23.

**1. Timeliness**

Hussein, like all lead plaintiff candidates, timely moved for consolidation and lead plaintiff

appointment. (ECF No. 28). Pursuant to the PSLRA, within 20 days of the filing of an action, the

plaintiff is required to publish notice of the action "in a widely circulated national business-

oriented publication or wire service…advising members of the purported plaintiff class…of the

pendency of the action, the claims asserted therein, and the purported class period[.]" 15 U.S.C.

§ 78u-4(a)(3)(B)(i). The notice must also inform that within 60 days of its publication, "any

member of the purported class may move the court to serve as lead plaintiff of the purported

class." *Id.* at § 78u-4(a)(3)(B)(ii).

On May 24, 2019, notice of the *Batter* class action was published over PRNewswire, a

widely circulated national business-oriented wire service. (ECF No. 32 at 7). The Notice advised

members of the proposed class of their right to move the Court to serve as lead plaintiff no later

than 60 days from the date of the Notice's publication. Accordingly, members had until July 23, 2019 to file. (*Id.*) Hussein filed his motion on July 23, 2019. (ECF No. 28).

Hussein also attached to his motion a "sworn certification, which…[he] personally signed" and which satisfied the requirements of § 78u-4(a)(2)(A)(i)–(vi).

## 2. Financial Interest

Courts in this district consider the following factors to determine which party has the largest financial interest:

> (1) the total number of shares purchased during the class period; (2) the net shares purchased during the class period (in other words, the difference between the number of shares purchased and the number of shares sold during the class period); (3) the net funds expended during the class period (in other words, the difference between the amount spent on purchase shares and the amount received for the sale during the class period); and (4) the approximate losses suffered.

*Peters v. Jinkosolar Holding Co., Ltd.,* No. 11 Civ. 7133, 2012 WL 946875, at \*5 (S.D.N.Y. March 19, 2012) (quoting *Kaplan v. Gelfond*, 240 F.R.D. 88, 93 (S.D.N.Y. 2007)). "Of these factors, the fourth is viewed as the most important." *Janbay*, 272 F.R.D. at 118-119.

Hussein asserts the greatest financial loss of any plaintiff moving for lead plaintiff appointment. Below is a chart representing the competing plaintiffs' asserted losses.

| | Total Shares Purchased | Net Shares Purchased | Net Funds Expended | Approximate Total Losses |
|---|---|---|---|---|
| **Hussein** | 8,000,000 | 7,000,000 | $24,028,474.28 | $9,767,505.07 |
| **The Glucks (collectively)** | 2,897,066 | 2,692,066 | $7,529,876.03 | $2,672,717.24 |
| **Dr. Robert Gluck** | 2,471,310 | 2,391,310 | $6,447,875.39 | $2,380,249.19 |
| **Emma Gluck** | 228,378 | 197,378 | $578,958.92 | $149,088.69 |
| **Sarah Gluck** | 153,378 | 147,378 | $503,041.72 | $143,379.36 |
| **Hughes** | 436,706.41 | 208,349.18 | $639,269.71 | $300,301.62 |
| **BRRS** | 362,110 | 0 | $268,642.30 | $268,642.30 |

The Glucks dispute the accuracy of Hussein's purported losses. Hussein submitted a loss chart showing all his transactions during the class period. (ECF No. 30-2). The Glucks argue that according to data they collected from Thomson Reuters, 81% of Hussein's transactions cannot be verified. (ECF No. 62 at 13). In support of this accusation, the Glucks provided the Court with a link showing price and volume "tick-by-tick" trade data for trading in Hecla for the days on which Hussein represented that he purchased or sold Hecla common stock. (*Id.*). The link the Glucks submitted had "expired" and was not operational when the Court tried to view it.

The Glucks argue that "[o]nly two conclusions can be drawn" from this issue with Hussein's data: either Hussein did not provide accurate data in his sworn certification and loss chart, or the data is correct, meaning that Hussein did not make the trades in question on the open market. (*Id.* at 13–14). The Glucks contend that either explanation is disqualifying. If Hussein's data is inaccurate, his certification cannot be trusted and his adequacy as lead plaintiff should be questioned, and if he made the trades off of the public market, he is not a typical class member.

The strongest case for the Glucks is *Irving Firemen's Relief and Ret. Fund v. Tesco PLC*, 2015 WL 1345931, (S.D.N.Y. Mar. 19, 2015). In *Tesco,* the judge considered competing motions for consolidation and appointment of lead plaintiff in a securities class action. One movant, The National Pension Fund, claimed the largest financial loss, but another, Stephen Klug, argued that "based upon publicly available historical trading data…National Pension Fund's loss [was] overstated because it list[ed] various trades that either [fell] outside of the daily price range (below the daily low) or constitute[d] more shares traded on a given day than the total trading volume on the over-the-counter ("OTC") market for the stock on such days." *Tesco*, 2015 WL 1345931, at *3 (internal quotation marks omitted). The Court reviewed publicly available trading

data and confirmed that Klug was right about the discrepancies in National Pension Fund's submission. *Id.*

The Court provided the National Pension Fund with an opportunity explain the apparent discrepancies identified by Klug. *Id.* The National Pension Fund declined the offer because it believed that its already submitted bank statements, trade confirmations and supplemental brief "addressed and disproved any purported discrepancies." *Id.* The Court disagreed and concluded that its inability "to verify [The National Pension Fund's] claimed losses" undermined the adequacy of the Fund to serve as lead plaintiff. *Id.* (citing *Bhojwani v. Pistiolis*, No. 06 Civ. 14761, 2007 WL 9228588, at *3 (S.D.N.Y. July 31, 2007) ("[T]he fact that the data still do not quite add up indicates a certain carelessness about detail that undermines the adequacy of Mr. Cole (and his associated group) as lead plaintiff.). The Court disqualified the Fund.

Hussein responded to the Glucks' arguments. (ECF No. 68). He argued that the Glucks could not locate some of the trades listed on his loss chart because the output formula on his loss chart rounds to the nearest two decimal places, and some of the transactions he listed were traded at prices reported to the third or fourth decimal place. (*Id.* at 2–3). Hussein points out that the Glucks' certifications and loss charts are similarly rounded. He also submitted his trading records during the class period, which support the accuracy of his Certification and loss chart. (ECF No. 69-1).

Based on the information provided, I cannot determine that Hussein's trading data is inaccurate. The Glucks' link showing the trading inaccuracies is not operational and Hussein's account statements confirm his loss chart.

### 3. Typicality and Adequacy

"When moving for appointment as lead plaintiff, 'the moving plaintiff must only make a preliminary showing that the adequacy and typicality requirements have been met.'" *Kux-Kardos*, 151 F. Supp. 3d at 477 (quoting *Janbay,* 272 F.R.D. at 120). With respect to typicality, courts consider whether the claims of the proposed lead plaintiff "arise from the same conduct from which the other class members' claims and injuries arise." *Li Hong Cheng v. Canada Goose Holdings Inc.*, 2019 WL 6617981, at *3 (S.D.N.Y. Dec. 5, 2019) (slip copy) (quoting *In re Initial Pub. Offering Sec. Litig.*, 214 F.R.D. 117, 121 (S.D.N.Y. 2002) (citation omitted). Here, Hussein, like other putative class members, claims to have acquired Hecla common stock during the class period and at prices artificially inflated by Defendants' false and misleading statements and was financially damaged as a result.

The Glucks again assert that the discrepancies in Hussein's loss chart potentially indicate that Hussein purchased the majority of his Hecla shares off the public market, which would make him an atypical class member. However, as discussed above, Hussein has provided records of his Hecla common stock transactions and the Glucks have not submitted functional evidence to dispute them. Thus, Hussein's claims appear to "'arise[] from the same course of events' as those of other class members and [Hussein] will 'make[] similar legal arguments to prove the defendant[s'] liability' under the Securities Exchange Act, and thus, [he] satisfied the typicality requirement." *Kux-Kardo*s, 151 F. Supp. 3d at 477 (quoting *In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 291 (2d Cir. 1992)).

Hussein also satisfies the adequacy requirement. "The adequacy requirement is satisfied where: (1) class counsel is qualified, experienced, and generally able to conduct the litigation; (2) there is no conflict between the proposed lead plaintiff and the members of the class; and (3) the proposed lead plaintiff has a sufficient interest in the outcome of the case to ensure vigorous

advocacy." *Foley v. Transocean Ltd.*, 272 F.R.D. 126, 131 (S.D.N.Y. 2011). Hussein retained

Kahn, Swick & Foti, LLC ("KSF") as its lead counsel. KSF is experienced and qualified and has

successfully served as lead, co-lead, or executive committee counsel in other securities class

actions. (ECF No. 29 at 15; ECF No. 30-4 (providing firm's resume)). "Further, [Hussein's]

'significant financial interest should ensure vigorous advocacy on behalf of the class.'" *Kux-*

*Kardos*, 151 F. Supp. 3d at 478 (quoting *Foley*, 272 F.R.D. at 131).

As to conflicts, the Glucks argue that Hussein's "checkered" business and litigation history

could subject him to unique defenses and render him an untrustworthy and thereby inadequate

fiduciary for the class. (ECF No. 62 at 15-19). I agree that these issues are relevant to the lead

plaintiff inquiry. However, the Rule 23 adequacy showing is only preliminary at this stage. "In

fact, a 'wide ranging analysis under Rule 23 is not appropriate [at this initial stage of the

litigation] and should be left for consideration of a motion for class certification.'" *Pirelli*

*Armstrong Tire Corp. Retiree Med. Benefits Tr. v. LaBranche & Co., Inc.*, 29 F.R.D. 395, 412

(S.D.N.Y. 2004) (quoting *Weinberg,* 216 F.R.D. at 252) (quoting *In re Party City Sec. Litig.,* 189

F.R.D. 91, 106 (D.N.J. 1999)). "There is no indication in the papers submitted on this motion by

[Hussein] that [he] has interests antagonistic to the proposed class." *Id.* at 413. Hussein made the

requisite, preliminary showing of adequacy under Rule 23. The Glucks' arguments are

considered more appropriately as rebutting Hussein's status as presumptive lead plaintiff.

**B. Rebutting the Presumption**

Hussein is entitled to presumptive lead plaintiff status, but the Glucks successfully

rebutted that presumption. To reiterate, "[t]he presumption that a movant is the most adequate

may be rebutted 'only upon proof by a member of the purported plaintiff class that the

presumptive lead plaintiff 'will not fairly and adequately protect the interests of the class' or 'is

subject to unique defenses that render such plaintiff incapable of adequately representing the class.'" *Seidel,* 2009 WL 700782, at *4 (quoting 15 U.S.C. § 78u–4(a)(3)(B)(iii)(II)).

In their briefing, the Glucks cite six events in Hussein's past that they argue disqualify him. The first is his handling of the discretionary account of an elderly couple, the Frotas. Hussein exercised control over this account when he was a stockbroker with Prudential-Bache Securities in the early 1980s. The Frotas sued Prudential and Hussein for mismanaging the account after its balance significantly decreased. They alleged RICO violations and violations of the Exchange Act. After Defendants were denied summary judgment, *Frota v. Prudential-Bache Sec., Inc.*, No. 85 Civ. 9698, 1987 WL 4925, (S.D.N.Y. May 15, 1987), the case settled. (ECF No. 62). The American Stock Exchange also brought a regulatory action against Hussein for the same conduct. (ECF No. 64-5 at 25). To resolve this proceeding, Hussein, without admitting or denying the allegations contained in the Stock Exchange's Statement of Charges, entered into a Stipulation of Facts and Consent to Penalty in which he consented to findings that he "violated Exchange Rules 924(c) and 422 by abusing his discretionary authority," he "engaged in conduct inconsistent with just and equitable principal of trade in violation of Exchange Rule 345 by misrepresenting the status of" the account in question to the Frotas, and that he "violated Article V, Section 4(i)…in that he willfully engaged in a course of fraudulent conduct in violation of Section 10(b) of the Securities Act of 1934, and Rule 10(b)-5 thereunder by: excessively trading and churning the Customer…account, while vested with discretionary authority for the purpose of generating commission income…misrepresenting the status of the account to Customer…[and] providing Customer…with materially false information about the status of his account." (ECF 64-5 at 14–16, 27–30; ECF No. 68 6–7).

The second is a tax dispute Hussein had with the IRS concerning the collectability of certain taxes from 1983 and 1984. The IRS alleged that Hussein had failed to pay approximately $700,000 in federal income taxes. *See Hussein v. U.S.*, No. 94 Civ. 0605, 1994 WL 48836, at *1 (S.D.N.Y. Feb. 14, 1994). The parties consented to a stipulation and dismissal but failed to resolve the matter without further litigation, so the U.S. government filed suit against Hussein in September 1996 "to reduce to judgment assessments of Hussein's liabilities for tax years 1983 and 1984." No. 96 Civ. 7391, 1998 WL 142335, at *1 (S.D.N.Y. Mar. 27, 1998, *aff'd in part, vacated in part*, 178 F.3d 125 (2d Cir. 1999). The parties entered into a consent judgment ordering Hussein to pay $675,138.99 in outstanding tax liabilities for 1983 and 1984, but preserved Hussein's right to appeal based on a statute of limitations argument. Hussein appealed. 178 F.3d 125, 128 (2d Cir. 1999). The Second Circuit agreed that the statute of limitation had expired for the 1983 taxes, but not the 1984 taxes. *Id.* at 130–31. According to Hussein, he ended up settling with the IRS for $22,255.18. (ECF No. 68 at 5).

The third event involved Hussein's role as chairman of the Board of the Middle East Paper Company, a role he assumed in 1998. According to research done by the Glucks, before Hussein's appointment, the Company was "working profitably" and "in reasonable financial condition." (ECF No. 62 at 7). However, after Hussein became chairman, the Company's "financial position deteriorated" and it incurred significant losses. (*Id.* at 7–8). Hussein was ultimately removed from his position and replaced by a government appointed CEO, which improved the "loss making position" of the Company. (*Id.* at 8).

The fourth event concerned Hussein's proxy fights with Quality Systems Inc. Hussein accumulated shares of the publicly traded Quality Systems Inc. (QSI). In 1999, he voted himself onto the company's Board of Directors and "re-elected himself to QSI's Board every year from

1999 until his resignation in 2013." (*Id.* at 8). In 2005 and 2012, Hussein led proxy fights to take over QSI. (*Id.*). Hussein claims these fights were in response to him learning about the fraudulent conduct of the Company's then-current Board and management. (ECF No. 68 at 4). The Glucks, however, submitted documents indicating that Hussein was accused of violating QSI's insider trading policy as a director by holding his shares of QSI stock in margin accounts. (ECF No. 64-5 at 6). When the value of the QSI stocks declined, Hussein's margin lender informed him that they were no longer sufficient collateral for his outstanding margin loans and began selling his QSI shares on the open market. (ECF No. 62 at 10). The QSI Board censured Hussein for the violation. (ECF No. 64-1).

The Glucks pulled a complaint filed in New York state court against Hussein alleging that he failed to pay his lawyers for their work in connection with the 2012 proxy battle for control of QSI. (ECF 62 at 11; ECF 64-10). The Glucks stated that they believed the case had settled in 2013. (ECF No. 62 at 11).

In 2013, Hussein sued QSI and certain of its directors and officers for fraud, constructive fraud, negligent misrepresentation, and breach of fiduciary duty. QSI filed a counterclaim alleging that Hussein breached his fiduciary duty. *See Razin v. Hussein*, No. 20-2013-00676900, 2018 WL 825862, *1 (Cal. Sup. Jan. 9, 2018). The court granted the Defendants summary judgment on Hussein's claim, and QSI's counter-claim went to trial, where QSI lost. *Id.* Both sides appealed, and arguments were heard in July 2019. *See Hussein v. Quality Systems, Inc. et al.*, No. G055891, 2019 WL 4942091 (Cal. Ct. App. Oct. 8, 2019).

The fifth event is Hussein's alleged conducting of business through a defunct New York Corporation. (ECF No. 62 at 12). Hussein conducts personal investing business through a company called National Investments Co., which the Glucks contend was registered as a foreign

corporation in the New York in 1996 but dissolved by proclamation in 2000 because Hussein

failed to renew the Company's registration. (*Id.*)

Sixth and finally, the Glucks assert that Hussein was sued in New Jersey state court in

connection with a gambling debt in Atlantic City. An Atlantic City casino alleged that Hussein

"signed and issued Counter Checks drawn on [his] bank in exchange for chips/cash while at

[Bally's Atlantic City] casino…[which were] dishonored by the bank upon which they were

drawn…" *Bally's Atlantic City v. Ahmed Hussein*, No. ATL-DC-003306-19 (N.J. Super. Ct.

2019); *see* (ECF No. 64-13). According to the Glucks, the case settled in June 2019. (ECF No.

62 at 13).

Although all these events raise concerns about Hussein's ability to serve as a fiduciary for the

class, the most troubling conduct involves the Frotas matter, specifically the Stipulation Hussein

agreed to with the American Stock Exchange. Hussein consented to the finding that that he

engaged in a course of fraudulent conduct that violated Section 10(b) of the Securities Exchange

Act of 1934 and Rule 10(b)((5) thereunder, the same provisions which he, along with the other

putative class members, now claim that the Hecla Defendants disregarded. (ECF No. 1 at ¶¶ 51–

55).

Hussein argues that his conduct in the matter is irrelevant to his ability to serve as lead

plaintiff because he never admitted to the allegations contained in the Statement of Charges

leveled against him. (ECF No. 68 at 13). In support of this position, Hussein cites several cases

in which courts have refused to allow unproven allegations or contested settlements to rebut the

presumption that someone or some entity was adequate. Although Hussein is correct that he did

not admit to the illegal conduct through this Stipulation, his consent still renders him susceptible

to defenses that are not applicable to other class members. *See Zemel Family Tr. v. Philips*

*Intern. Realty Corp.*, 205 F.R.D. 434, 435–36 (S.D.N.Y. 2002) (disqualifying lead plaintiff

candidate who conducted tender offers through two entities which were subject to an SEC cease

and desist order for violating Section 14(e) of the Exchange Act, a violation which "call[ed] to

mind the nature of the very claim that plaintiff alleges in [the instant case*"*); *In re Surebeam*

*Corp. Sec. Litig.*, No. 03 CV 1721, 2004 WL 5159061, at *7 (S.D. Cal. Jan. 5, 2004) (lead

plaintiff inadequate because he was "subject to over sixty complaints to securities regulators

including misrepresentation…[and] had his National Association of Securities Dealers

("NASD") membership terminated"; it was unclear to the court whether these accusations "bear

any relation to the present action" but the court still determined, "[w]ithout comment or

consideration of [Candidate's] guilt or innocence as to the underlying charges," that there was

the potential for Candidate to be subject to unique defenses"); *Newman v. Eagle Bldg. Techs.*,

209 F.R.D. 499 (S.D. Fla. 2002).

"[T]he proof needed to rebut the presumption need not establish a plaintiff's inadequacy with

absolute certainty; instead it is enough that it presents a colorable risk of inadequacy." *Schaffer v.*

*Horizon Pharma PLC*, No. 16-cv-1763, 2016 WL 3566238 (S.D.N.Y. June 3, 2016). Where

"there is at least a potential that the presumptively most adequate lead plaintiff will be subject to

unique defenses and will not fairly and adequately protect the interests of the class"

disqualification is appropriate. *Surebeam*, 2004 WL 5159061, at *7. Hussein's past misconduct

creates the potential for him to be subject to unique defenses that could jeopardize the

certification of a class in this matter. It also suggests that Hussein "lacks the 'honesty,

conscientiousness, and other affirmative personal qualities required of a class representative'"

who, "[a]s a fiduciary for the class" must "adhere to the highest standards of honesty and

integrity." *Weisman v. Darnielle*, 78 F.R.D. 669, 671 (S.D.N.Y. 1978) (internal quotation marks omitted). Based on these findings, I conclude that Hussein is not an adequate lead plaintiff.

**C. The Glucks**

Given the successful rebuttal of the presumption in favor of Hussein, and for the reasons that follow, I conclude that the Glucks are the most adequate lead plaintiff.

### 1. Timeliness

Like the other candidates for lead plaintiff status, the Glucks timely filed their motion on July 23, 2019. (ECF No. 31).

### 2. Financial Interest

BBRS argues that the Glucks have not satisfactorily justified aggregating their losses, and therefore, they are not entitled to assert a collective loss amount. (ECF No. 66 at 5). I disagree.

"The Court has the discretion to appoint more than one lead plaintiff and can aggregate the losses suffered by the members of a group of investors." *In re McDermott Intern., Inc. Sec. Litig.*, 2009 WL 579502, at \*2 (S.D.N.Y. March 6, 2009). "[I]n this District…unrelated investors [may] join together as a group seeking lead-plaintiff status on a case-by-case basis, if such a grouping would best serve the class…" *Varghese v. China Shenghuo Pharm. Holdings, Inc.*, 589 F. Supp. 2d 388, 391–92 (S.D.N.Y. 2008). "Determination of whether the grouping would best serve the class…hinges on whether the members of the group can function cohesively and effectively manage the litigation apart from their lawyers." *Fries v. N. Oil & Gas, Inc.,* No. 16-civ-6543, 2017 WL 1880819, at \*2 (S.D.N.Y. May 8, 2017). "A group consisting of persons that have no pre-litigation relationship may be acceptable as a lead plaintiff candidate so long as the group is relatively small and therefore presumptively cohesive." *Janbay*, 272 F.R.D. at 119.

Accordingly, a proposed group must proffer an evidentiary showing that unrelated members of a group will be able to function cohesively and to effectively manage the litigation apart from their lawyers before its members will be designated as presumptive lead plaintiffs. Factors that courts have considered when evaluating whether a group's members will function cohesively and separately from their lawyers include evidence of:

(1) the existence of a pre-litigation relationship between group members; (2) involvement of the group members in the litigation thus far; (3) plans for cooperation; (4) the sophistication of its members; and (5) whether the members chose outside counsel, and not vice versa.

*Varghese,* 589 F. Supp. 2d at 392.

BRRS's argument is that the Glucks have not made the requisite showing. However, as the Glucks persuasively counter, they are not a group of "unrelated investors" and therefore do not have to proffer evidence of cohesiveness. (ECF No. 70 at 7–8); *see In re McDermott Intern., Inc.*, 2009 WL 579502, at *4 (appointing the Adams family—comprised of a married couple and their son—as lead plaintiff and concluding that because they are not "unrelated investors," the family was not required to "proffer an evidentiary showing").

I find that it is appropriate for the Glucks to aggregate their losses and that, aside from Hussein, they have the greatest financial interest in the outcome of this action.

### 3. Typicality

The Glucks claims are typical of the other putative class members. The Family purchased shares of Hecla securities at prices inflated by Defendants' false and misleading statements and suffered damages as a result.

### 4. Adequacy

Hussein and BRRS argue that Glucks failed to comply with the PSLRA's certification requirements. Specifically, because Dr. Gluck signed his daughters' original certifications on

their behalves, Emma and Sarah Gluck failed to abide by the PSLRA's mandate that "[e]ach plaintiff seeking to serve as a representative party on behalf of a class shall provide a sworn certification, which shall be personally signed by such plaintiff and filed with the complaint…" 15 U.S.C.S. §78u-4(a)(2)(A)). Because Dr. Gluck either made an error or perjured his daughters' documents, Hussein and BRRS argue that he is not an adequate representative of the class. (ECF No. 76).

Hussein cites several out-of-district cases in support of his certification argument. (*See* ECF No. 76 at 2–3) (citing *In re Enzymotec Ltd. Sec. Litig.*, No. 14-5556, 2015 WL 918535 (D.N.J. Mar. 3, 2015); *Steamfitters Local 449 Pension Fund v. Cent. European Distrib. Corp.*, No. 11-6247 (D.N.J. Aug. 22, 2012). In *In re Enzymotec Ltd. Securities Litigation*, the District Judge considered whether Plaintiffs collectively known as the Enzymotec Investor Group ("EIG") had successfully rebutted the presumption in favor of Plaintiff 3B Communications ("3B") as lead plaintiff. 2015 WL 918535 at *1–2. "EIG argue[d] that 3B's certification, which was filed with its motion pursuant to 15 U.S.C. §78u–4(a)(2)(A), is defective because it fails to demonstrate the authority of the signer to take action on 3B's behalf" and that the "deficient certification will subject "3B to a unique defense that renders 3B 'incapable of adequately representing the class[.]" *Id.* at *2 (quoting 15 U.S.C. § 78u–4(a)(3)(B)(iii)(ll)(bb)). The District Judge agreed, noting that 3B's certification "provid[ed] no indication that its signer, Ami Baksis, is authorized to sign the certification on 3B's behalf. Indeed, nowhere in 3B's certification does Mr. Baksis identify himself or provide any indication of his role within 3B." *Id.* at *3.

In *Steamfitters*, related investment entities (collectively "The Prosperity Group") sought lead plaintiff appointment. Four of the accounts in the group were managed by one discretionary investment manager, PCM. Each of the PCM-managed funds had a wholly-owned subsidiary. *Id.*

at \*3. The managing director of PCM executed the certification stating that the Prosperity Group was competent to serve as lead plaintiff. *Id.*. However, the only entities within the Prosperity Group injured by the alleged conduct of the class action Defendant were the Subsidiaries. *Id.* "PCM had the authority to bring a lawsuit, but lacked ownership interest in the claims…Therefore, the court found that five of the entities (PCM and the managed funds) had unique standing defenses." *Roby*, 2015 WL 1334320, at \*8 (citing *Steamfitters*, 2012 WL 3638629, at \*3, \*11). The subsidiaries had also not timely filed under the PSLRA. *Steamfitters*, 2012 WL 3638629 at \*12. Additionally, the Court determined that the Group's certification was problematic because it did not state that the Subsidiaries alone were willing to serve as the representative parties. *Id.*. Thus, the Court concluded, "there [was] substantial likelihood that the Subsidiaries would be subject to a unique defense regarding invalid or lack of certification." *Id.*

Both cases are distinguishable because here, there is an indication that Dr. Gluck had permission to sign certifications on behalf of his daughters. Specifically, Dr. Gluck submitted a declaration to that effect providing that he has "full discretion" and makes "all of the investment decisions for Emma and Sara's account," and that he signed his daughters' certifications "with permission and on their behalf." (ECF No. 71-2 at ¶¶ 3–4). In their reply memorandum for lead plaintiff status, the Glucks also offered to submit declarations signed by Emma and Sara with the Court's permission. (ECF No. 78 at 4). They attached the amended, personally signed declarations to their memo. (ECF Nos. 78-1, 78-2).

Courts in this District have considered and found sufficient similar supplemental declarations to remedy similar deficiencies in PSLRA certifications. (*See Kux-Kardos*, 151 F. Supp. 3d at 478) (Westway Corporation's certification was signed by an attorney who other lead plaintiff candidates argued had no authority to bind Westway, but Court accepted and considered a

supplemental declaration from attorney, explaining that he had full authority to bring the suit on Westway's behalf); *Khunt v. Alibaba Grp. Holding Ltd.*, 102 F. Supp. 3d 523, 537–39 (S.D.N.Y. 2015) (Christine Asia Co., Ltd. ("CAC") submitted certification signed by its owner and sole director, William Tai, in the first person singular and other lead plaintiff contenders claimed the certification was inadequate because Tai did not indicate that he had authority to execute the certification on CAC's behalf; the Court rejected this argument, considering Tai's subsequent declaration providing that he had the requisite authority.")).

I find that the supplemental certifications and declaration submitted by the Glucks overcome the deficiencies in their original certifications, such that these deficiencies do not render them unable to serve as adequate fiduciaries for the class. Further, the Glucks otherwise satisfy the adequacy requirements of Rule 23. Kaplan-Fox & Kilsheimer represents the Glucks, and the firm and counsel are competent and have experience prosecuting securities class actions. The Glucks also have a sufficient financial interest in the case to ensure strong advocacy on behalf of the class.

## III. Approval of Counsel

"The PSLRA vests authority in the lead plaintiff to select lead counsel, subject to approval by the Court." *Khunt*, 102 F. Supp. 3d at 540 (citing 15 U.S.C. § 78u–4(a)(3)(B)(v)). "There is a strong presumption in favor of approving a properly-selected lead plaintiff's decision as to counsel." *Id*. As discussed, Kaplan Fox has extensive experience litigating securities class actions (ECF No. 33-4). The Court approves Kaplan Fox as & Kilsheimer as lead counsel.

### CONCLUSION

For the foregoing reasons, the Court grants the motions to consolidate. The Court also grants the Gluck Family's motion for appointment as lead plaintiff and approves Kaplan Fox & Kilsheimer

as lead counsel. The remaining motions for lead counsel appointment are denied. This terminates

ECF Nos. 28, 31, 34, 35, 41, 44, and 47.


**SO ORDERED.**

Dated: March 25, 2020

      New York, New York                          **ANDREW L. CARTER, JR.**

                                         **United States District Judge**