## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROBERT GLUCK, EMMA GLUCK and SARA GLUCK, on behalf of themselves and all others similarly situated, | Case No.: 19-cv-4883 (ALC) |
| Plaintiffs, | CLASS ACTION |
| vs. | JURY TRIAL DEMANDED |
| HECLA MINING COMPANY, PHILLIPS S. BAKER, JR., LINDSAY A. HALL, LAWRENCE P. RADFORD, and DEAN W.A. MCDONALD, | |
| Defendants. | |
| ARUN BHATTACHARYA, Individually, and On Behalf of All Others Similarly Situated, | Case No.: 19-cv-5719(ALC) |
| Plaintiffs, | |
| vs. | |
| HECLA MINING COMPANY, PHILLIPS S. BAKER, JR., LINDSAY A. HALL, and LAWRENCE P. RADFORD, | |
| Defendants. | |

## CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

**KAPLAN FOX & KILSHEIMER LLP**
Robert N. Kaplan
Jeffrey P. Campisi
Jason A. Uris
850 Third Avenue, 14th Floor
New York, NY 10022

*Lead Counsel for Lead Plaintiffs and the Proposed Class*

Dated: September 9, 2020

## TABLE OF CONTENTS

Page(s)

I.      SUMMARY OF THE CASE .......................................................................... 1

II.     INTRODUCTION ....................................................................................... 2

III.    JURISDICTION AND VENUE .................................................................. 11

IV.     PARTIES .................................................................................................. 11

V.      CLASS ACTION ALLEGATIONS ............................................................. 13

VI.     DEFENDANTS' KNEW OR RECKLESSY DISREGARDED THAT THE
        NEVEADA MINES WERE PLAGUED FROM THE START OF THE
        CLASS PERIOD BY MATERIAL NEGATIVE OPERATIONAL
        PROBLEMS AND WERE NOT AND WOULD NOT BE CASH FLOW
        POSITIVE ............................................................................................... 14

VII.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING
        STATEMENTS .......................................................................................... 26

VIII.   THE TRUTH BEGINS TO EMERGE THROUGH A SERIES OF PARTIAL
        DISCLOSURES ......................................................................................... 43

IX.     POST CLASS PERIOD EVENTS ............................................................. 53

X.      LOSS CAUSATION/ECONOMIC LOSS ................................................... 57

XI.     FRAUD-ON-THE-MARKET DOCTRINE ................................................. 58

XII.    ADDITIONAL SCIENTER ALLEGATIONS ............................................. 59

XIII.   NO SAFE HARBOR ................................................................................ 62

FIRST CLAIM FOR RELIEF  For Violation of Section 10(b) of the Exchange Act and
Rule 10b-5 Against All Defendants ............................................................... 63

SECOND CLAIM FOR RELIEF For Violation of Section 20(a) of the Exchange Act
Against the Individual Defendants ................................................................ 64

PRAYER FOR RELIEF ................................................................................ 65

JURY DEMAND .......................................................................................... 65

Lead Plaintiffs Robert Gluck, Emma Gluck and Sara Gluck ("Plaintiffs"), by their attorneys, on behalf of themselves and all others similarly situated, allege the following based upon the investigation of Plaintiffs' counsel, except as to allegations specifically pertaining to Plaintiffs, which are based on personal knowledge.   The investigation of counsel included, among other things: 1) a review of Hecla Mining Company's ("Hecla" or the "Company") public filings with the United States Securities and Exchange Commission ("SEC"); 2) press releases issued by the Company, and media, news and analyst reports about the Company; 3) conference calls with Company executives, analysts and investors; 4) information obtained from confidential informants ("CIs"); 5) information based on consultation with experts in loss causation, economic loss and the mining industry; and 6) publicly available data, including, but not limited to, publicly available trading data relating to the price and trading volume of Hecla's common stock. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

I.    **SUMMARY OF THE CASE**

1.    In March 2018, Hecla announced that it would acquire certain gold mines in Nevada from Klondex Mines Ltd. ("Klondex") for $462 million in cash and shares of Hecla stock, and closed the acquisition in July 2018.   Defendants (defined below) represented that, based on their extensive due diligence, the Nevada Mines (defined below) were a turnkey operation which were immediately cash flow positive and would be accretive to the Company's financial metrics.   Indeed, after Defendants announced the acquisition and made their false representations, credit agencies increased Hecla's credit rating, which was important to Defendants because they had $500 million of bonds to refinance.   And also, based on their false representation, banks increased Hecla's credit facility from $100 million to $250 million.

2.     After the Class Period (March 19, 2018 through May 8, 2019) ended, Defendant Phillips S. Baker, Jr. ("Baker"), Hecla's President and Chief Executive Officer ("CEO"), admitted that Defendants' Class Period representations were false when he admitted that the acquisition of the Nevada Mines was an attempt "to take this plane that was flying and ***redesign it and rebuild it*** in the air, and it was just ***costing us way too much money***".  (Emphasis added).  Defendant Baker further admitted that the Nevada Mines were never cash flow positive during the Class Period: "so in this third quarter [ended September 30, 2019], for the first time since the acquisition of Klondex a year ago, our plans show us generating more cash than we spend . . .".

3.     Indeed, as set forth hereafter, the Nevada Mines had a myriad of serious problems from the outset, including water issues, insufficient equipment, defections of key employees and others which were known to Defendants and not disclosed.   Even assuming, *arguendo*, that Defendants thought that they could turn around the Nevada Mines in mid-air, and make them cash flow positive, investors had the right to be apprised of the true facts which Defendants hid. After the facts were disclosed through a series of partial disclosures, the price of Hecla stock declined materially and investors were damaged. Moreover, the credit agencies, which based on Defendants' false statements had increased Hecla's credit rating, reduced the ratings, and the banks, which following Defendants' false representations had increased Hecla's credit line to $250 million, reduced the line to $150 million. Defendants should be accountable for these clear violations of the federal securities laws.

## II.    <u>INTRODUCTION</u>

4.     This action is a securities fraud action brought under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder by the SEC brought by Plaintiffs on behalf of themselves and a class of all persons

and entities who purchased the publicly traded common stock of Hecla between March 19, 2018 and May 8, 2019, inclusive (the "Class Period").

5.      Founded in 1891, Hecla purports to discover, acquire, develop, and produce silver, gold, lead and zinc.  The Company produces lead, zinc and bulk concentrates, which Hecla sells to custom smelters and brokers, and unrefined precipitate and bullion bars (doré) containing gold and silver, which are further refined before sale to precious metals traders.  Before the Class Period, the Company was organized and managed in four segments that encompassed its operating units: the Greens Creek (Alaska), Lucky Friday (Idaho), Casa Berardi (Quebec, Canada), and San Sebastian units (Mexico).

6.      On March 19, 2018, Hecla announced it was acquiring three purportedly high-grade Nevada gold mines through the acquisition of Klondex for a mix of cash and Hecla stock worth $462 million.  Defendant Baker, represented that "Klondex's three operating mines – Fire Creek, Midas and Hollister – are some of the highest-grade gold mines in the world" and that "[a]fter extensive due diligence, we see significant opportunity to improve costs, throughput and recoveries over time with our expertise."[1]  Fire Creek, which started production in 2014, was the primary driver of the acquisition due to its reportedly robust positive cash flows.  Hollister was important for the prospective development and mining of the Hatter Graben, a large system of veins that Hecla said it could reach from Hollister.  Midas was an older mine that had been in production for decades, but was still purportedly providing production and cash flow. Materials mined at Fire Creek and Hollister were processed at the Midas mine. After the acquisition closed in July 2018, the Nevada Mines became a fifth operating segment of the Company.

---

[1] The Fire Creek, Hollister and Midas mines and operations that Hecla acquired from Klondex are collectively referred to throughout the complaint as the "Nevada Mines."

7.     Hecla's due diligence and senior management team during the Class Period, was led by Defendant Baker, along with Defendant Lindsay A. Hall ("Hall"), Hecla's Vice President, Chief Financial Officer ("CFO") and Treasurer; Defendant Lawrence P. Radford ("Radford"), the Company's Senior Vice President – Operations; and Defendant Dean W.A. McDonald ("McDonald"), the Company's Senior Vice President – Exploration.[2]   As part of Defendants' due diligence, they conducted onsite physical inspections of the Nevada Mines, and had access to key personnel and reports that provided them significant insight into the Nevada Mines, particularly Fire Creek.  Both before and after Hecla announced the acquisition at the start of the Class Period, Defendants monitored the operations at the Nevada Mines, including regular visits to the Nevada Mines in March and April 2018 and thereafter, and meetings where conditions at the Nevada Mines were discussed.

8.     During the Class Period, Defendants falsely represented that the Nevada Mines were and would continue to be cash flow positive, or at the very least "self-funding." Defendants' representations created the misimpression that the acquisition would be accretive to Hecla's financial and credit metrics and, at a minimum, the positive cash flow from the ongoing production at the Nevada Mines would cover any required investment or capital expense by the Company.  In essence, Defendants represented that the transaction was a turn-key, transformative acquisition that was and would continue to produce positive cash flows.

9.     Indeed, Defendants false representations of positive cash flow from the Nevada Mines resulted in a concrete benefit to Defendants by causing two rating agencies to increase the Company's credit rating, and the Company's lenders to significantly increase the Company's line

---

[2] Defendants Baker, Hall, Radford and McDonald are referred to throughout this complaint as the "Individual Defendants."   The Individual Defendants and Hecla are collectively referred to throughout this complaint as "Defendants."

of credit by 150%, from $100 million to $250 million.

10.    Furthermore, while Defendants falsely represented the purported benefits of the acquisition of the Nevada Mines, they failed to disclose to investors material, negative conditions and material risks at the Nevada Mines that Defendants knew of, or at least recklessly disregarded, that were then negatively affecting operations and preventing the generation of positive cash flows from the Nevada Mines during the Class Period.

11.    As Defendant Baker admitted after the Class Period, (which contradicted representations he made during the Class Period), "when doing the due diligence [in November 2017 through March 2018], we recognized certain problems with Fire Creek dealing with the tuff material,[3] managing the water, equipment availability, getting enough development to have consistent production, lack of characterization of ore types."  After the Class Period, contrary to statements he made during the Class Period, Defendant Baker described the acquisition of the Nevada Mines as an attempt "to take this plane that was flying and *redesign it and rebuild it* in the air, and it was just *costing us way too much money*".  (Emphasis added).

12.    Information provided by CIs corroborate Defendants' knowledge, or reckless disregard, of the material, negative conditions at the Nevada Mines by the beginning of the Class Period. For example, 12 CIs (*see infra* ¶¶57-75) observed excess water at the Nevada Mines at the time Hecla announced the acquisition in March 2018, and several CIs noted the lack of proper equipment (*see infra* ¶¶ 61, 65-66, 68-70), uneconomic refractory ore (*see infra* ¶¶ 58, 70), and lack of permits needed to manage excess water (*see infra* ¶¶ 61, 69, 72).

13.    These problems and, in particular, Defendants' material difficulties managing excess water, persisted and grew worse during the Class Period, but were not disclosed by

---

[3] "Tuff" material is a type of rock that contains clay.

Defendants who continued to represent that the Nevada Mines were cash flow positive, enhanced the Company's financial results and credit rating, and were not a drain on its capital when, in fact, the Company's production and costs were being negatively affected and its capital was being drained.

14.     Indeed, the conditions at the Nevada Mines were so poor throughout the Class Period that its operations were never in a position to deliver positive cash flows.  Defendant Baker admitted after the Class Period that Defendants' internal mine plans during the Class Period showed the Nevada Mines were never cash flow positive. Rather, only after the Class Period, when Defendants effectively shut down operations at the Nevada Mines, did Defendants staunch the bleeding of cash at the Nevada Mines.

15.     Defendants repeatedly made representations throughout the Class Period that were materially false and misleading at the time Defendants made them, as confirmed by multiple CIs. And many of the representations made by Defendants during the Class Period were contradicted by statements made by Defendants after the end of the Class Period:

| **Defendants' Representations During the Class Period** | **The Undisclosed Truth** |
|---|---|
| Defendant Baker on March 18, 2018: "from the get-go, the Nevada assets are going to be cash flow positive" (*see infra* ¶ 91); | Defendant Baker on May 9, 2019: "we have not seen the relative productivity that we were anticipating . . . what it comes down to is we're not getting enough tons moved for the dollars . . . ." (*see infra* ¶ 150). |
| Defendant Baker on March 18, 2018: "Nevada itself will be cash flow positive for us. There is no capital outlay that we're looking to, in Nevada, that's going to consume all of the cash flow that will be generated from the three mines" (*see infra* ¶ 91); | Defendant Baker on August 7, 2019: "so in this third quarter [after the Class Period], for the first time since the acquisition of Klondex a year ago, our plans show us generating more cash than we spend . . . .";  (*see infra* ¶ 166). |
| Defendant Baker on March 18, 2018: "our mine plans is that we will, basically the downside is we get all of our money back" (*see infra* ¶ 91); | Defendant Baker on December 3, 2019 described the acquisition of the Nevada Mines as an attempt "to take this plane that was flying and redesign it and rebuild it in the air, and it |
| Defendant Baker on July 23, 2018: "These | |

| **Defendants' Representations During the Class Period** | **The Undisclosed Truth** |
|---|---|
| assets immediately add production and cash flow" (*see infra* ¶ 102);<br><br>Defendant Baker on August 9, 2018: "One is the expectation is this year that for the five months, it will be self-funding. We're not anticipating needing to contribute additional capital into it. . . ." (*see infra* ¶ 109);<br><br>Defendant Hall on August 9, 2018: "The Nevada assets are basically self-funding" (*see infra* ¶ 107);<br><br>Defendant Baker on November 8, 2018: "we're not anticipating the need to make significant contributions into Nevada . . . . . . We think we can run it pretty close to cash flow neutral." (*see infra* ¶ 123);<br><br>Defendant Radford on November 8, 2018: "[O]ur goal for Nevada operations is that the operations are cash-neutral" (*see infra* ¶ 121);<br><br>Defendant Hall on December 4, 2018: "There's no major capital expenditures that we can't fund out of the Nevada operations" (*see infra* ¶ 129);<br><br>Defendant Baker on February 21, 2019: "we're right at positive cash flow from Nevada" (*see infra* ¶ 138); | was just costing us way too much money"; (*see infra* ¶ 168).<br><br>Undisclosed material facts according to multiple CIs: throughout the Class Period, the Nevada Mines suffered from a multi-faceted material problem with excess water, lack of both equipment and proper permits, and low grade or uneconomic refractory ore. *See infra* ¶¶ 57-86. As a result of these material negative problems, Defendants had no reasonable basis for their representations that the Nevada Mines were or would be cash flow positive or self-funding, or accretive to important Hecla financial metrics. |
| Defendants Baker and Hall on May 10, 2018: "Uncertainties associated with the acquisition may cause a loss of management personnel and other key employees of Klondex which could adversely affect the future business and operations of the combined company following the acquisition" (*see infra* ¶ 97). | Undisclosed material facts according to multiple CIs: starting in March 2018, undisclosed to investors, key personnel resigned from their positions at the Nevada Mines, harming production and productivity. (*see infra* ¶ 75). |

7

| Defendants' Representations During the Class Period | The Undisclosed Truth |
|---|---|
| Defendant McDonald on August 9, 2018, regarding permits for the Nevada Mines, "We've got everything we need." (*see infra* ¶ 111). | Defendant Baker on May 9, 2019: "the amount of water has increased, making the conditions worse. This has limited our access . . . they will require quarters to construct some infrastructure and get some permit limits changed." (*see infra* ¶ 149).<br><br>Defendant Baker on June 6, 2019: "With water discharge from Fire Creek higher than it was a year ago, work is underway to increase discharge permits, expected to be obtained in the near future and increase non-consumptive water rights, expected within approximately one year." (*see infra* ¶¶ 159, 165); and<br><br>According to CIs 5, 10 and 11, the Nevada Mines lacked permits to handle water discharge. (¶¶ 61, 69, 72). |

16.     On February 21, 2019, before the market opened, Defendants partially disclosed the truth concerning the conditions at the Nevada Mines when they disclosed Hecla's financial results for the quarter and year-ended December 31, 2018.  Defendants reported lower than anticipated production and higher costs at the Nevada Mines, and that Defendants were focusing on ways of maintaining development "in all ground conditions."  During a conference call with investors and analysts, Defendants Baker and Hall further disclosed that Hecla had experienced certain "challenges" with the Nevada Mines, including "reserve losses" and "higher costs while we worked through what we believe are transitional issues."  Furthermore, Defendant Hall disclosed that "[w]e have a goal of financial discipline in which each of our mines should produce free cash flow and clearly that didn't happen with our Nevada operations that we acquired effective July of this last year."

17.     On February 21, 2019, Hecla stock declined from a closing price on February 20, 2019 of $2.93 per share, to close at $2.74 per share, a decline of $0.19 per share or approximately

7% on heavier than usual volume.

18.     However, Hecla stock continued to trade at artificially inflated prices because Defendants continued to falsely represent that the Nevada Mines were cash flow positive and failed to disclose that the ongoing material, negative conditions then affecting the Nevada Mines were having a material, adverse effect on the Company's operations and cash flow.

19.     On April 18, 2019, at the opening of the market, Defendants partially disclosed, contrary to prior representations, that the Fire Creek mine lacked necessary permits when Defendants disclosed "[a] minor amendment to the water discharge permit for Fire Creek is expected in the second quarter which should enable a higher discharge rate."  On April 18, 2019, Hecla shares declined from a price at the opening of the market of $2.28 per share, to close at $2.15 per share, a decline of $0.13 per share of approximately 6% on heavier than usual volume.

20.     However, Defendants' partial disclosure was materially false and misleading because Defendants created the misimpression that Defendants' water discharge problems were minor, and further, failed to disclose that the Nevada Mines had been experiencing material problems with excess water that grew worse throughout the Class Period and negatively affected cash flow.

21.     Then, on May 9, 2019, before the market opened, Hecla shocked investors when the Company issued a press release entitled "Hecla Reports First Quarter Results[;] Nevada operations under review", in which the Company disclosed a "comprehensive review" of its Nevada operations that it further characterized during the ensuing conference call as "really just asking the question, are we going to get the return for the investment we're making." Furthermore, Defendants disclosed that the material, negative operational issues at the Nevada Mines were so severe that Defendants were not sure if Hecla would ever get a positive return on

its investment in the Nevada Mines, and that the Company might write off the Nevada Mines. Additionally, the Company reported a loss of $13.8 million from its Nevada Mines.

22.     On May 9, 2019, the price of Hecla's common stock declined from a closing price on May 8, 2019 of $2.04 per share to close at $1.77 per share, a decline of $0.27 per share, or 13.24% on heavier than usual volume.

23.     On May 10, 2019, before the market opened, Hecla filed its quarterly report with the SEC on Form 10-Q for the period ending March 31, 2019 that disclosed, among other things, that the Company's review of the Nevada Mines may result in "a temporary cessation of all mine operations at Fire Creek" and a potential material impairment to the "assets at Fire Creek with the potential to impact near-term estimated cash flows."  Also on May 10, 2019, *Bloomberg News* reported that "Hecla Mining slumped almost 14% intraday Friday, touching the lowest since January 2016, as at least three analysts downgraded their investment opinion after the precious metal miner posted a lQ loss and failed to provide forward guidance for its Nevada operations."

24.     On May 10, 2019, Hecla's common stock declined from a closing price on May 9, 2019 of $1.77 per share, to close at $1.56 per share, a decline of $0.21 per share, or 11.86% on heavier than usual volume.

25.     On June 6, 2019, Defendants caused Hecla to issue a press release titled "Hecla Reduces Spending For Nevada Operations" that stated, in part, changes were being made at the Nevada Mines with the goal of turning it into a positive cash flow unit, including a shutdown of the Midas and Hollister mines, curtailed development of the Hatter Graben, and plans for managing excess water and low-grade refractory ore at Fire Creek.

26.     On June 14 and 20, 2019, S&P and Moody's, respectively, disclosed downgrades on the Company's credit rating, and in July 2018, Hecla's line of credit was reduced by 40%,

10

from $250 million to $150 million.

27.     On August 7, 2019, Hecla disclosed that Defendant McDonald would resign from the Company effective September 30, 2019, and that Defendant Radford had resigned his position to become the Company's Senior Vice President and Chief Technical Officer.  In December 2019, Defendant Radford resigned from the Company.

28.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock, Plaintiffs and other Class members have suffered significant losses and damages.

## III.     <u>JURISDICTION AND VENUE</u>

29.     The claims asserted arise under Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.  Jurisdiction is conferred by Section 27 of the Exchange Act. Venue is proper because Hecla's common stock has traded on the New York Stock Exchange ("NYSE") in this District throughout the Class Period, Defendants made materially false and misleading representations to investors that were disseminated to investors in this District, and Company executives attended meetings in this District.  For example, on April 12, 2018, Defendant Baker met with certain investors in New York City in this District, where a presentation was given that discussed the Company's acquisition of the Nevada Mines from Klondex.

30.     In connection with the material misrepresentations of facts and omissions alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## IV.     <u>PARTIES</u>

31.     Lead Plaintiffs purchased Hecla common stock on the NYSE as detailed in the

certification previously filed with the Court and were damaged thereby.  ECF Nos. 33-1; 78-2; 78-3.

32.     Defendant Hecla is headquartered in Coeur D'Alene, Idaho.  Hecla's common stock trades on the NYSE under the symbol "HL".

33.     Defendant Baker was the Company's President and Chief Executive Officer throughout the Class Period.  He has been Hecla's Chief Executive Officer since May 2003 and has served as its President and a director since 2001.  Defendant Baker made materially false and misleading statements and omitted material facts in Hecla's SEC filings, press releases and on public conference calls during the Class Period.

34.     Defendant Hall was the Company's Senior Vice President, CFO and Treasurer throughout the Class Period. He has served as Senior Vice President and CFO since July 2016. Defendant Hall made materially false and misleading statements and omitted material facts in Hecla's SEC filings and on public conference calls during the Class Period.

35.     Defendant Radford served as Vice President – Operations of the Company from October 2011 to June 2013; Senior Vice President – Operations from July 2013 to May 2018; and he was appointed Senior Vice President and Chief Operating Officer in May 2018.  On or around August 5, 2019, he resigned as Senior Vice President and Chief Operating Officer, and continued as the Company's Senior Vice President and Chief Technical Officer.  On December 11, 2019, he retired from the Company.  Defendant Radford made materially false and misleading statements and omitted material facts on public conference calls during Class Period.

36.     Defendant McDonald was the Company's Senior Vice President – Exploration during the Class Period.  On September 30, 2019, he retired from the Company.  Defendant

McDonald made materially false and misleading statements and omitted material facts on public conference calls during the Class Period.

37.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Hecla's press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e*., the market.  Each of the Individual Defendants was provided with copies of the Company's press releases alleged herein to be misleading before or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, but not to investors, each of the Individual Defendants knew, or at least recklessly disregarded, that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations which were being made were then materially false and misleading.

## V.     CLASS ACTION ALLEGATIONS

38.     Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of a class of all persons and entities who purchased the publicly traded common stock of Hecla during the Class Period.

39.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at the present time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds of members of the Class located throughout the United States.  As of February 19, 2019, Hecla had over 482 million common shares outstanding and the average daily trading volume for Hecla's common stock on the NYSE during the Class Period was over 5.5 million shares.

40.     Plaintiffs' claims are typical of the claims of the members of the Class.  Plaintiffs and all members of the Class have sustained damages because of Defendants' unlawful activities

13

alleged herein.  Plaintiffs have retained counsel competent and experienced in class and securities litigation and intend to pursue this action vigorously.  The interests of the Class will be fairly and adequately protected by Plaintiffs.  Plaintiffs have no interests which are contrary to or in conflict with those of the Class that Plaintiffs seek to represent.

## VI.    DEFENDANTS' KNEW OR RECKLESSY DISREGARDED THAT THE NEVEADA MINES WERE PLAGUED FROM THE START OF THE CLASS PERIOD BY MATERIAL NEGATIVE OPERATIONAL PROBLEMS AND WERE NOT AND WOULD NOT BE CASH FLOW POSITIVE

41.    In or around November 2017, Defendants began technical due diligence of the Nevada Mines regarding the Company's potential acquisition of them.  As part of this work, Defendants were granted access to the Nevada Mines and key people, which provided what Defendants Baker described as "significant insights into the properties, particularly Fire Creek." Defendants' due diligence involved an onsite physical inspection of the condition of the property, interviews with key personnel, as well as access to various documents, including all mining permits, equipment lists and maintenance records, production records, test results and analysis of samples of material produced at the time, operating budgets, existing business plan projections and financial statements.

42.    The Class Period begins on March 19, 2018, the date that Defendants caused Hecla to issue a press release announcing the acquisition of the Klondex, including three purportedly high-grade Nevada gold mines.[4]

43.    A gold mine characterized as high-grade indicates that, compared to a lower-grade mine, it costs relatively less to extract an ounce of gold from the ground because less ore has to be

---

[4] Through the acquisition, various Klondex subsidiaries, through which the Nevada Mines operated, became wholly-owned subsidiaries of Hecla that continued operating the Nevada Mines after Defendants closed the acquisition.

extracted, thus reducing operational costs and increasing margin.

44.     Defendants represented that in light of their "extensive" due diligence, the acquisition of the Nevada Mines would be accretive to many of the Company's financial metrics and that the Fire Creek mine was producing "robust" and "strong" cash flows.

45.     Also, on March 19, 2018, during a conference call with analysts that followed the press release, Defendant Baker represented, among other things:

> about four months ago, we began our due diligence. As part of this work, we were granted access to the properties and key people, which gave us significant insights into the properties, particularly Fire Creek.

46.     Furthermore, based on Defendants' due diligence, Defendant Baker indicated that Klondex had done "a good job of running" the Nevada Mines, that Klondex management did a "really good job of understanding the geology", that it "was clear" that there was "excess value", and that Defendants' mine plans found that "the downside is we get all of our money back. So we don't have a view that we're relying upon a big increase in the grade to have this thing be economic for us."  Defendant Baker further represented that the acquisition of the Nevada Mines would not present financial stress on Hecla's balance sheet because the Nevada Mines were "self-funding", meaning all of the capital expenses and production costs incurred in maintaining and operating the Nevada Mines would be paid for from existing cash flow produced by the sale of minerals from the Nevada Mines.

47.     While Defendant Baker represented the purported benefits of the acquisition of the Nevada Mines, he failed to disclose to investors material risks and material, negative conditions at the Nevada Mines that Defendants knew of, or at least recklessly disregarded, that were negatively affecting operations since the beginning of the Class Period and that continued to plague the Company throughout the Class Period.

15

48.     As Defendant Baker admitted on May 9, 2019, after the Class Period, at the time Defendants announced the acquisition of the Nevada Mines, "when doing the due diligence, we recognized certain problems with Fire Creek dealing with the tuff material, managing the water, equipment availability, getting enough development to have consistent production, lack of characterization of ore types."

49.     Tuff material is a type of rock formation that contains clay.  Characterization of ore types refers to an understanding of the mineral contents of geological formations.

50.     Furthermore, Defendants knew since at least the beginning of the Class Period, or at least recklessly disregarded: (i) that the rapid infiltration basins ("RIB") at the Fire Creek mine, which is key infrastructure used to treat wastewater, were experiencing water management issues and were slow and ineffective in treating waste water; (ii) that the geological structure at Fire Creek contained compartmentalized water; (iii) that dewatering rates were anticipated to increase with future development; (iv) that after clearing sediment from Fire Creek's Dewatering Storage Pond 1 in 2017, a key element of Fire Creek's water treatment infrastructure, it developed a leak and that water flow from the leak was beyond the amount allowed by permit; and (v) that excess amounts of water had been discharged into the tailings pond at the Midas mine and were reaching capacity.

51.     In or around June 2018, additional underground water was encountered at the Fire Creek mine.  The source of the water was identified and excess water flow was expected to continue for the foreseeable future.

52.     In or around January 21, 2019, the leak at Fire Creek's Dewatering Storage Pond, which was leaking since 2017, began leaking even more water.  Kevin Shiell ("Shiell")[5], Hecla's

---

[5] Shiell was appointed Vice President and General Manager – Nevada Operations effective July 20, 2018. He was General Manager – Midas and Hollister mines with Klondex Gold & Silver

VP and General Manager of the Nevada Mines, was aware of these material, negative conditions. In order to make repairs to the pond, Hecla planned to drain the pond to identify and repair any leaks. However, draining the pond would exceed all available surface storage capacity available at Fire Creek. As a result, Hecla began to ship water from the dewatering storage pond at Fire Creek to the Midas mine as a short term solution, while Hecla developed new water management strategies at the Fire Creek mine. Hecla contracted PDQ Trucking to ship the water in tanker trucks to the Midas mine.

53.    By no later than February 14, 2019, Fire Creek's reverse osmosis water treatment plant began to experience difficulties treating the flow of the mine-dewatering.

54.    In or around April 2019, Hecla contracted with Watertectonics to install a temporary water treatment plant at the Fire Creek mine to treat water that exceeded the legal limits for toxic arsenic and antimony.

55.    By the end of the Class Period, Defendants finally admitted that the RIBs needed to be redesigned and rebuilt, which was a major capital expense and drain on cash flow.

56.    Defendants' knowledge or reckless disregard of these and other material, negative conditions at the Nevada Mines is confirmed by numerous confidential informants.

57.    According to CI 1,[6] the Nevada Mines were experiencing major problems by early 2018. Water built up at each of the Nevada Mines. For example, material excavated at the Fire Creek mine had a high degree of clay content, while material excavated at the Midas and Hollister mines had a high degree of carbon, conditions that were a known problem throughout 2018. The

_____

(January 2017 to June 2018), and General Manager – Fire Creek Project (November 2015 to December 2016).

[6] CI 1 was a miner at the Nevada Mines during the period from 2017 through June 2019 who worked at each of the Nevada Mines.

amount of water used to process material containing such unusable sediments, coupled with lack of sizeable pools to capture the waste water, left the Nevada Mines with excess water.

58.     Yet another problem was that miners lacked equipment needed to excavate and process material.  For example, the Nevada Mines had few semi-trailers, not enough pumps for the ponds, old haulers and loaders, and did not own a single autoclave or roaster.  Roasting is a stage in processing used to process low-quality refractory gold, or ultra fine gold particles, amenable to cyanidation, a process used to extract gold.  By the end of the Class Period, Hecla had yet to purchase this equipment.

59.     At the Midas mine, water was used in the mining and milling operations.  However, excess amounts of water had been discharged into the tailings facilities at the Midas mine.  According to CI 2,[7] CI 2 observed high water levels of the tailing pond at the Midas Mill.  According to CI 3,[8] CI 3 worked with geologists, engineers and surveyors at the Hollister and Midas mines.  Throughout CI 3's employment, CI 3 observed that the Midas mine experienced a severe water issue that grew worse during the Class Period.  Further, in early 2018 at the time Hecla was conducting due diligence, CI 3 learned that Klondex reopened abandoned mines that did not yield high grade or self-funding product.

60.     According to CI 4,[9] since approximately 2017, there was a substantial water buildup problem at the Fire Creek mine that continued throughout CI 4's employment at the Nevada Mines.  CI 4 attributed the water build up to excessive amount of clay content in the excavated material.  Water needed to process material containing worthless waste rock, coupled

---

[7] CI 2 was a miner at the Midas mine from 2017 through March 2018.

[8] CI 3 was a surveyor and miner from 2017 through November 2018 at the Hollister and Midas mines.

[9] CI 4 was a miner from approximately 2014 through June 2018 who worked at the Fire Creek mine.

with a lack of sizeable pools to capture and process the material, left the Company with significantly more material for which the Company did not have the equipment, infrastructure or permits to remediate.  In addition, CI 4 learned that excavated material at Fire Creek was also found to have a higher pH balance in the wash plant where ore is extracted from worthless rock.  This was a problem because acidic solutions are required to extract gold ore.  To lower the pH in the wash plant, additional chemicals were needed, which increased the cost of extraction.

61.     According to CI 5,[10] by early 2018, the Midas mine tailings pond was about to overflow due to too much processing of material from Midas and neighboring mines, Hollister and Fire Creek. The water buildup was easy to see by January 2018.  A tailing pond or dam is where waterborne refuse material was pumped into a pond to allow separation of solids from the water.   Ken Leader ("Leader"), Process Manager at the Midas and Hollister mines who was responsible for production operation and maintenance, acknowledged to CI 5 that the water problem was not improving.  CI 5 attended weekly meetings run by Leader and held within the Midas mill lunchroom (typically on Monday afternoons).  Several mine workers, along with two crush operators, also attended these weekly meetings.  Leader informed employees that the Midas mine was seeking to install additional equipment to handle the water overflow issue, but that there were permit problems.  CI 5 understood that production at the Midas mill would be severely hampered until the water problem was corrected.

62.     According to CI 6,[11] by early 2018, there were numerous problems with the ore characteristics at Midas, Hollister, and Fire Creek.  Specifically, Fire Creek ore had a high degree of clay content, while the ore at Midas and Hollister mines had a high degree of carbon.  The

[10] CI 5 was a crusher operator at the Midas mine during the period 2014 through April 2019.

[11] CI 6 worked in the information technology department at the Nevada Mines 2017 through October 2019 and was responsible for providing IT support for employees at the Nevada Mines properties and worked with management at the Nevada Mines.

amount of water needed to process material at these facilities containing unusable sediments, coupled with lack of sizeable pools to capture and process the material, left the Nevada Mines with a sizeable amount of excess water. Fire Creek's water issue became so serious that by approximately July 2018, the Company retained outside contractors, including Sandvik Mining, to assist with the escaping ground water.

63.     According to CI 7,[12] Jimmy Schmidt was the general foreman at the Midas mine and Leader was the process manager for the Midas and Hollister mines. CI 7 observed that the ore from Fire Creek trucked to the Midas mine for processing was wet due to water exposure coming from within the mine and contained a high level of clay. Due to these problems with the ore, mill operators had to process the material through the mill several times, costing the Company more time and money than budgeted.

64.     According to CI 7, material excavated from the Hollister mine was known to have a high content of carbon and oil. Rock mined at Hollister needed to be processed separately from Fire Creek and Midas rock because it required the addition of hypochlorite to remove the carbon. CI 7 knew when Hollister material was being processed because the addition of hypochlorite to the Hollister material burned employees' eyes.

65.     Furthermore, CI 7 observed that essential excavating and processing equipment was either unavailable or needed to be upgraded in order to efficiently process gold ore. In response to complaints about the poor condition of the equipment, Leader and Schmidt informed CI 7 that this essential equipment was not in Hecla's budget.

66.     According to CI 8,[13] at the time of Hecla's announcement of its acquisition of the

---

[12] CI 7 worked as a crusher, mill operator and refinery operator at the Midas mine during the period from 2016 through the end of 2019.

[13] CI 8 worked as a process operator at the Nevada Mines during the period from 2017 through

Nevada Mines, management and employees at the Nevada Mines were experiencing material production problems with excess water that continued throughout CIs 8's tenure. Excessive water discharge within the Fire Creek facility forced the Company to use tanker trucks to transport water to the Midas mill. Furthermore, excessive sediments in the material caused the Company to use chemicals to clean the water prior to evaporation from the pond. This process placed strain on the water pumps that caused many of them to malfunction and need replacement. These measures constrained production and increased costs for the Company.

67. According to CI 8, throughout 2018-19, Fire Creek material was known to have a high degree of clay content which was costly to process and required more water to properly run and operate hydrocyclones, which separate gold from waste rock.

68. According to CI 9,[14] starting in March 2018, CI 9 witnessed Defendants Baker and Radford walking around the Nevada Mines' facilities and milling areas on a regular basis. The Hollister mine had a long-standing water problem within the mine. Due to its elevation, water frequently flooded at the bottom of the mine. This problem was clear at the time Hecla announced the acquisition in March 2018. The Company needed pumps to remove the excess water. Since the ore was heavy in carbon and silt, the pumps were frequently clogging and needing repair. At the bottom of the mine, someone at the Company needed to monitor the pumps, which negatively affected production and Company revenues.

69. According to CI 10,[15] at the time Hecla disclosed the acquisition of the Nevada Mines, Fire Creek had been experiencing a perfect storm of negative events, including a

---

June 2019 at the Midas mine and was responsible for operating machinery within the Midas processing plant.

[14] CI 9 worked as a mine superintendent at the Hollister and Midas mines from 2014 through August 2019 and, among other responsibilities, prepared operational budgets.

[15] CI 10 was a geologist at the Fire Creek mine between 2013 and December 2019.

significant problem with water collecting at the bottom of the mine.  Limitations in permitting and an under equipped water treatment plant slowed the discharge of water from the mine.  Removing the water would take considerable time to pump out, clean and rehabilitate, which slowed removal of ore and waste from the mine.  Furthermore, in approximately late 2017, the Company ceased to conduct exploratory drilling which is a fundamental process to identify gold prospects to be excavated in the following one to two years.

70.     In addition, CI 10 was aware of a refractory ore problem which existed at the time Hecla announced the acquisition of the Nevada Mines.  CI 10 conducted both the testing and modeling of these veins which CI 10 determined held refractory ore.  The failure of having a working roaster at the Nevada Mines impeded the ability to process the material.

71.     In early 2018, CI 10 learned from John Spring ("Spring"), chief geologist at Fire Creek, and others that Hecla was going to acquire the Nevada Mines and Hecla's due diligence team would be on site for several months reviewing the Company's procedures and production. CI 10 participated in a mine tour with Defendant Radford and McDonald, Kurt Allen ("Allen"), Director New Projects, and Keith Blair ("Blair"), Chief Resource Geologist.   From March through July 2018, water issues at Fire Creek were constant.

72.     According to CI 11,[16] in the months before Hecla announced the acquisition of the Nevada Mines, the Fire Creek mine experienced multiple problems, including water seepage, underground mine workings that filled with water, reduced water storage capacity, and failure to meet the State of Nevada water treatment regulations.  The tailings pond at the Midas mine had too much water and Hollister produced acidic waste rock. CI 11 assisted in preparing files that included information on all air, water, waste permits for the Nevada properties on file with state

---

[16] CI 11 was an environmental coordinator and environmental engineer at the Nevada Mines from 2014 through April 2019.

and federal regulatory agencies.  CI 11 prepared weekly environmental reports that discussed the water discharge needs as well as other environmental concerns of the Nevada Mines, including the need for water discharge permits.

73.    In approximately January 2018, CI 11 learned that Hecla was seeking to acquire the Nevada Mines.  Shortly thereafter, CI 11 witnessed Defendant Radford, Shiell, and Luke Russell, VP External Affairs ("Russell"), touring the Fire Creek facility approximately three to four times per month through July 2018.

74.    According to CI 12,[17] in early 2018, excessive water discharge became problematic for the Company.

75.    According to CIs 1, 3, 6 and 10, during the period from the start of the Class Period, through the fall of 2018, key personnel that worked at the Nevada Mines resigned due to the poor conditions at the Nevada mines:

- According to CI 10, from March through July 2018, there was a growing number of defections of employees at the Nevada Mines who were growing discouraged by management's failure to address equipment problems as well as failure to conduct exploratory excavating.

- CI 1 observed mass defections of talented and experienced employees, as management failed to provide basic essentials, such as tools and hard hats.

- CI 3 observed numerous resignations of key employees due to concerns that management of the Nevada Mines was not doing enough to address development problems at the Midas and Hollister mines, and failing to provide basic essentials, such as tools and hard hats for

---

[17] CI 12 was a senior mine engineer from 2017 through June 2018 and worked at the Fire Creek mine and whose duties included planning and management of the water treatment plant.

employees.  Several senior geologists, including Matt Burgess, repeatedly stated there was no high-grade gold ore at the Hollister and Midas mines.

- CI 6 observed that, by the fall of 2018, there were several resignations of senior geologists who were upset with management of the Nevada Mines for not properly addressing ongoing production problems, as well as not conducting enough core sample drilling for future development at these mines.

76.     According to CI 12, in or around April 2018, CI 12 participated in a working session meeting with Defendant Radford, Graeme Hendricks ("Hendricks"), Chief Engineer at Fire Creek through August 2018, Sid Tolbert ("Tolbert"), the General Manager at Fire Creek, and other senior management at Hecla's office in Winnemucca, Nevada.  At the April 2018 meeting, several metrics of the Fire Creek mine and various reports and plans were discussed, including budgets, life of mine reports, production schedules, operating costs, and anticipated versus actual production reports.

77.     According to CI 10, following the closing of Hecla's acquisition of the Nevada Mines on July 20, 2018, Spring told CI 10 that he had a meeting with the Hecla management team during which Spring raised the drilling, refractory ore and water issues.

78.     According to CI 9, shortly after the acquisition closed in July 2018, CI 9 attended a meeting with Defendant Radford and employees of the Nevada Mines.  At this meeting, Defendant Radford acknowledged problems with the ore body and water buildup at the mill. Moreover, after the acquisition closed in July 2018, CI 9 attended weekly production meetings held in a conference room at the Midas facility for managers among the Company's operations, maintenance, geology and engineering departments.  Defendant Radford was a regular attendee at these production meetings, and Defendant Hall occasionally participated.  During these weekly

meetings, internal production reports were discussed which showed actual versus projected production at the Hollister and Midas mines. Occasional power point presentations and spreadsheets were also prepared and distributed. Water problems, including issues with the mills and tailings pond, and ore characteristic problems, including the buildup of carbon at Hollister and Midas, were regularly discussed at production meetings. On several occasions, Defendant Radford acknowledged to participants the strain these issues were having on production.

79.      According to CI 9, after the weekly production meetings, there was a management meeting, which Defendant Radford, Leader, and Shiell attended. Through conversations with Leader, CI 9 learned that ore taken from the Fire Creek facility was found to be heavy in clay which was plugging up the mill. Leader informed CI 9 that ore characteristic problems at all the Company's Nevada properties were regularly discussed during these management meetings.

80.      On or around August 1, 2018, Defendant Baker visited the Nevada Mines and he spoke with almost all of the supervisory and management personnel. In late October 2018, Defendant Baker again visited the Nevada Mines and observed how the material, negative conditions were then affecting production and cash flows.

81.      According to CI 8, in the fall of 2018, CI 8 attended a planning meeting at Hecla's Reno, Nevada office. The meeting was held in a large conference room and attended by approximately 25-40 Hecla employees from the Nevada Mines. According to CI 8, Defendant Radford participated via video. During this meeting, CI 8 learned of production problems at the Fire Creek mine, specifically the build-up of excessive water within the mine. Additionally, based on a survey of veins within Fire Creek, there was significantly more ore body to drill to reach profitable, high-grade material. Maps were shown to meeting participants highlighting these findings. Given the lack of high-grade ore and excess water, Hecla management further

explained to attendees that positive cash flow and profitability from the Fire Creek mine was now at least a year or more away.

82.     According to CI 10, during the fall of 2018, Hecla began to further explore the Joyce and Vonnie veins at Fire Creek.  Though these veins were represented by Defendants as high grade (i.e. visible gold), upon commencement of mining the top two layers, staffers concluded the high grade ore was not there, which meant these veins were not then able to produce profitable material.

83.     According to CI 6, in early 2019, while at Fire Creek, CI 6 learned of production delays at Fire Creek.  According to CI 6, Sara Bowl ("Bowl"), senior Geologist, and Allen, each was aware of these problems.

84.     According to CI 9, by January 2019, due to an influx of additional water, water was being trucked from the Company's Fire Creek facility to Midas on a rolling basis.

85.     In February 2019, Defendant Baker again visited the Nevada Mines and observed how the material, negative conditions were then affecting production and cash flows.

86.     According to CI 6, poor ore characteristics of the ore excavated at the Nevada Mines was damaging the processing plant at the Midas mine.  By May 2019, processing delays at the Midas mine became so problematic, instead of processing material at the Midas mine mill, the Company began shipping materials to a processing mill at Aurora located several hundred miles away from the Midas, Hollister and Fire Creek mines.

## VII.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

87.     During the Class Period, Defendants made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and Defendants knew, or disregarded with at least recklessness, that their representations were false and misleading at the time they

made their representations, for the following reasons: 1) that, far from being self-funding or cash flow positive during the Class Period, the Nevada Mines needed to be redesigned and rebuilt before they could produce positive cash flows; 2) that Defendants' mine plans for the Nevada Mines were never cash flow positive during the Class Period; 3) throughout the Class Period, the Nevada Mines suffered from a multi-faceted material problem with excess water.  Defendants encountered underground water while excavating, which increased costs to discharge and caused production delays.  Further, due to the excessive clay and carbon, additional water was needed to process and extract the ore from the waste rock.  However, the Company did not have the permits, equipment or infrastructure required to manage water discharge and, as a result, the Nevada Mines experienced the buildup of excess water that impeded ore production and increased costs; 4) that throughout the Class Period, the Nevada Mines lacked sufficient equipment, had inadequate infrastructure and development, and lacked permits needed to manage excess water; 5) that throughout 2018, key personnel resigned from their positions at the Nevada Mines, which negatively affected production and productivity at the Nevada Mines; and 6) as a result of these material negative problems, Defendants had no reasonable basis for their representations that the Nevada Mines were or would be cash flow positive or self-funding, or accretive to Hecla's financial and credit metrics.[18]

88.    The Class Period begins on March 19, 2018, the date that Defendants caused Hecla to issue a press release announcing the acquisition of the Nevada Mines for a mix of cash

---

[18] The statements quoted in Section VII and VIII in ***bold and italicized*** typeface are materially false and misleading for the reasons set forth herein. Additionally, as specifically indicated below, many of the identified statements are alleged to have been false and misleading by omission. Thus, additional text is provided for context and in support of these statements' allegedly omissive nature.

and stock worth $462 million.[19]  The March 19, 2018 press release stated, in part, the following:

> After extensive due diligence, we see significant opportunity to improve costs, throughput and recoveries over time with our expertise. . . .***We expect this transaction to be accretive on many important financial and credit metrics,*** with potentially significant synergies. . . .
>
> A Further Transformation of Hecla . . . Well capitalized pro - forma company with strong cash flow and solid balance sheet – Hecla expects to improve financial metrics with the Nevada mines' cash flow. . .
>
> Benefits to Hecla Shareholders . . . Fire Creek is a cornerstone producing asset with ***robust cash flows*** and significant opportunities for exploration, mine life expansion, and increased throughput.

89.     Defendants represented that they were motivated to acquire the Nevada Mines to improve the Company's credit metrics and bond ratings through the increased earnings of the purportedly accretive acquisition and low capital requirements of the Nevada Mines:

> one of Hecla's long-term goals is to become investment grade and we think this transaction [acquisition of the Nevada Mines] helps us move in that direction. . . our credit metrics are going to improve dramatically as a result of the acquisition. We're going to have more EBITDA, we're going to see those metrics continue to – that improvement that we've seen over the last five years. And I can't emphasize to you enough that the objective we have is to go from B to BB, BB to BBB. And we think that this is a huge step in that direction ***given the small amount of capital that these projects are going to require***.

90.     Increasing Hecla's credit rating was materially important to Defendants because they were planning to refinance the Company's outstanding $500 million 6.78% senior notes and an increase in its credit rating would reduce the Company's borrowing costs, and further, the

---

[19] Klondex shareholders could elect to receive either $2.47 in cash or 0.6272 of a Hecla share, each full Hecla share being valued at $3.94, subject in each case to pro-ration based on a maximum cash consideration of $157.4 million and a maximum number of Hecla shares issued of 77.4 million.

purportedly accretive acquisition allowed the Company to increase its line of credit from $100 million to $250 million and relaxed restrictive covenants concerning the Company's leverage ratio.

91.     On March 19, 2018, during a conference call with investors and analysts in which Defendant Baker participated, in response to an analyst who asked what the ongoing maintenance capital expenditures for the Nevada Mines would be, Defendant Baker represented that factoring in exploration and development costs at the Nevada Mines, and based on Defendants' extensive due diligence, the operations were and would continue to be cash flow positive at that time:

> [B]ut *all of this stuff is relatively small capital*. That was one of the things that struck us is we can acquire this. ***Nevada itself will be cash flow positive for us. There is no capital outlay that we're looking to, in Nevada, that's going to consume all of the cash flow that will be generated from the three mines*** . . .
>
> ***
>
> "We would anticipate seeing that higher grade. But ***even if it's not, what we find with our mine plans is that we will, basically the downside is we get all of our money back***. So we don't have a view that we're relying upon a big increase in the grade to have this thing be economic for us."
>
> ***
>
> ***And then from the get-go, the Nevada assets are going to be cash flow positive.*** So we don't see any sort of financial stress as a result of the transaction. . . we put to good use the cash that we have on our balance sheet. It's sitting there and hasn't – it doesn't generate any returns for us and instead we're now acquiring 160,000 plus of production, and immediate cash flow.

92.     Defendants' representations in paragraphs 88-89, and 91 were materially false and misleading and failed to disclose material adverse facts because the Nevada Mines were not cash flow positive "from the get-go" or producing "robust cash flows" because Defendants' undisclosed mine plans found that Hecla needed to invest significant capital before the Nevada Mines could be cash flow positive.  As Defendant Baker admitted after the Class Period, the Company's mine plans showed that the Nevada Mines were cash flow negative since the time

29

Hecla acquired them, and, in contrast to the representation that the Nevada Mines required "small capital", in truth, the Nevada Mines needed to be redesigned and rebuilt through significant investment of capital that exceeded the current cash flows.  Moreover, as alleged in paragraphs 48 and 50, and as confirmed by CIs 1-12 (¶¶ 57-75), the Nevada Mines were plagued with ongoing material, negative problems that were negatively affecting operations at the time Baker made these false representations.  As a result of these undisclosed material, negative problems, the Nevada Mines were cash flow negative at the time the acquisition was announced.  Defendants had no reasonable basis to represent that the Nevada Mines were cash flow positive from "the get-go" or producing "robust cash flows", that the Nevada Mines required a "small amount of capital", that Nevada Mines would be cash flow positive during the Class Period, or that the acquisition of the Nevada Mines would be accretive to Hecla "on many important financial and credit metrics". In fact, Defendants knew, or recklessly disregarded, that the acquisition was and would be dilutive to the Company's financial results and important financial metrics due to the material, negative conditions that were plaguing the Nevada Mines.

93.     On May 10, 2018, during a conference call with investors and analysts in which the Individual Defendants participated, Defendant Baker represented that concerning the Nevada Mines "[w]e saw three large, in this case, Nevada properties as big as those that we already have, and *we saw extraordinary grades*."

94.     Defendant Baker's representations were materially false and misleading and failed to disclose material adverse facts because the Nevada Mines did not possess "extraordinary grades".  In truth, according to CIs 1, 4, 6-8 and 10, the Nevada Mines comprised uneconomic ore bodies with excess clay, uneconomic refractory ore, and were plagued by ongoing material problems, including excess water, and therefore were not high-grade because the cost of

extraction was exceeding the value of the mined gold, and according to CI 3, Klondex reopened abandoned mines that did not yield high-grade or self-funding product.

95.     Also on the conference call on May 10, 2018, Defendant Baker, following up on his statements that indicated Defendants were motivated to acquire the Nevada Mines in order to bolster the Company's credit rating, stated "we're talking to rating agencies to make sure they understand what Hecla looks like with these assets [the Nevada Mines]."

96.     On May 10, 2018, Defendants caused Hecla to file its quarterly report for the quarter ended March 31, 2018 with the SEC on Form 10-Q (the "Q1 2018 10-Q"), which was signed by Defendants Baker and Hall.  Item 303 of SEC Regulation S-K, 17 C.F.R. 929.303 ("Item 303") required the Q1 2018 10-Q's Management Discussion and Analysis ("MD&A") section to disclose: (i) unusual events, transactions or significant economic changes that materially affected the amount of Hecla's reported income from continuing operations and the extent of such changes; and (ii) known trends or uncertainties reasonably expected to have a material impact on the Company's net sales or revenues or income from continuing operations. The ongoing material, negative problems that were negatively affecting operations and that were growing worse at the Nevada Mines, as alleged in paragraphs 50, 57-76, were unusual events and transactions and known trends and uncertainties that were required to be disclosed under Item 303 because they were known to Defendants by at least the beginning of the Class Period and likely to (and did) have a material unfavorable impact on the Company's net sales, revenues and income from continuing operations.

97.     The Q1 2018 10-Q represented that certain risks "may" or "could" adversely impact Hecla's business in the future:

- Uncertainties associated with the acquisition ***may cause*** a loss of management personnel and other key employees of Klondex which ***could***

*adversely affect* the future business and operations of the combined company following the acquisition;

- We *may* not realize all of the anticipated benefits from our acquisitions, including the potential acquisition of Klondex.

  We *may* not realize all (or any) of the anticipated benefits from the acquisition of Klondex, if consummated, or any future acquisitions, such as increased earnings, cost savings and revenue enhancements, for various reasons, including difficulties integrating operations and personnel, higher than expected acquisition and operating costs or other difficulties, unknown liabilities, inaccurate reserve estimates and fluctuations in market prices.

- The Klondex properties and any others we may acquire *may* not produce as expected and *may* not generate additional reserves, and *may* come with liabilities beyond those known at the time of acquisition.

  The properties we acquire in the acquisition of Klondex, if consummated, or in other acquisitions *may* not produce as expected, *may* not generate reserves beyond those known at the time of acquisition, *may* be in an unexpected condition and we *may* be subject to increased costs and liabilities, including environmental liabilities. Although we review properties prior to acquisition in a manner consistent with industry practices, such reviews are not capable of identifying all potential adverse conditions. Generally, it is not feasible to review in depth every individual property involved in each acquisition. Even a detailed review of records and properties *may* not necessarily reveal existing or potential problems or permit a buyer to become sufficiently familiar with the properties to fully assess their condition, any deficiencies, and development potential.

98.    The Q1 2018 10-Q also incorporated by reference the risk warnings set forth in the Company's annual report for the year ended December 31, 2017, filed with the SEC on Form 10-K, which represented that certain risks "may" or "could" adversely impact Hecla's business in the future:

- We *may* be subject to a number of unanticipated risks related to inadequate infrastructure.

  Mining, processing, development, exploration and other activities depend on adequate infrastructure. Reliable roads, bridges, ports, power sources, internet access and water supply are important to our operations, and their availability and condition affect capital and operating costs. . . amount or complexity of required investment, or other interference in the

maintenance or provision of such infrastructure . . . ***could*** adversely affect our mining operations.

- Our business depends on availability of skilled miners and good relations with employees.

    We are dependent upon the ability and experience of our executive officers, managers, employees, contractors and their employees, and other personnel, and there can be no assurance that we will be able to retain such employees or contractors. We compete with other companies both in and outside the mining industry in recruiting and retaining qualified employees and contractors knowledgeable about the mining business. From time to time, we have encountered, and may in the future encounter, difficulty recruiting skilled mining personnel at acceptable wage and benefit levels in a competitive labor market, and may be required to utilize contractors, which can be more costly. Temporary or extended lay-offs due to mine closures may exacerbate such issues and result in vacancies or the need to hire less skilled or efficient employees or contractors. The loss of these persons or our inability to attract and retain additional highly skilled employees and contractors ***could*** have an adverse effect on our business and future operations.

99.     Defendants Baker and Hall's representations that warned of future, potential risks that "may" or "could" adversely affect Hecla's business and operations were materially false and misleading because these risks had already materialized, as alleged in paragraphs 50, 57-76. Indeed, as Defendants admitted after the Class Period, and as confirmed by CIs 1-12, by the beginning of the Class Period and throughout the Class Period, the Nevada Mines were plagued by ongoing, known material, negative conditions, including inadequate infrastructure, that were negatively affecting operations, and according to CIs 1, 3, 6 and 10, at that time, Defendants had experienced and continued to experience loss of key personnel that negatively affected production and productivity.

100.     On May 24, 2018, Defendants caused Hecla to issue a press release that stated, in part, that Defendant Radford:

    has been appointed Chief Operating Officer of the Company effective immediately, a promotion from his previous role of Senior Vice President

– Operations, overseeing Hecla's operations, development projects, pre-development initiatives.

"Throughout his career Larry has demonstrated a strong ability to optimize operations, and you can see this in the improved performance of Greens Creek and Casa Berardi since he joined Hecla," said Phillips S. Baker, Jr., Hecla's President and Chief Executive Officer. "With the expected addition of the Klondex assets, Hecla is growing again and his talents will continue to be an important part of our strong team as it integrates and optimizes these new mines."

101.    On July 16, 2018, based upon the supposedly accretive nature of the acquisition of the Nevada Mines, Hecla entered into a $200 million senior secured revolving credit facility that replaced the Company's previous $100 million credit facility, which would increase to $250 million in November 2018.   Furthermore, the new credit facility relaxed certain financial covenants, including increasing the Company's leverage ratio (total debt less unencumbered cash/EBITDA).   Under the new credit facility, the leverage ratio would improve to 4.50:1 on September 30, 2018 from 4.00:1.

102.    On July 23, 2018, Defendants caused Hecla to issue a press release announcing that the Company had closed the acquisition of the Nevada Mines from Klondex for approximately $153 million and 75 million shares of Hecla common stock valued at $3.94 per share.  The July 23, 2018 press release stated, among other things:

"With this acquisition, Hecla now has **three high-grade mines** in Nevada, one of the best mining districts in the world," said Phillips S. Baker, Jr., President and CEO. ***"These assets immediately add*** production and ***cash flow,*** and because they are a good fit with Hecla's expertise, we believe there is significant opportunity for improvement in the mines' productivity and consistency.

103.    Defendant Baker's representations were materially false and misleading at the time he made them because the Nevada Mines did not immediately add positive cash flow and the Nevada Mines were not high-grade.  In contrast, the Nevada Mines were cash flow negative at

that time, as Defendant Baker admitted after the Class Period (¶¶ 11, 14, 166, 168). At that time the Nevada Mines were experiencing ongoing material, negative problems that were negatively affecting operations as described by CIs 1-12.  (¶¶ 50, 57-76). Contrary to containing high-grade ore, according to CIs 1, 4, 6, 7, 8 and 10, the Nevada Mines comprised uneconomic ore bodies with excess clay or uneconomic refractory ore, and were plagued by material problems that hampered production, such as excess water, and therefore were not high-grade because the cost of extraction was exceeding the value of the mined gold, and according to CI 3, Klondex reopened abandoned mines that did not yield high-grade or self-funding product.

104.    On July 24, 2018, S&P raised Hecla's issuer-credit rating and credit rating on its $500 million 6.875% senior notes due 2021 from B to B+, based, in material part, on the cash flows that Defendants falsely represented the Nevada Mines were producing and would continue to produce.  On July 24, 2018, S&P Global Market Intelligence issued a press release, that stated, in part, the following:

> The upgrade reflects the rating agency's view that the U.S. silver producer's acquisition of junior gold-silver miner Klondex Mines Ltd. will significantly enhance its scale, adding three high-grade Nevada mines to increase its total to seven. . .
>
> In addition, S&P Global Ratings estimates that its full-year production will increase between 15% and 16% to 579,000 gold equivalent ounces, which will help in achieving a revenue uptick ranging from 40% to 45% to US$824 million. Further, it also forecasts the combined entity to generate EBITDA of between US$275 million and US$290 million over the next two years.
>
> The addition of the Klondex mine assets in Nevada also lessens the impact of potential disruptions at any one mine, the rating agency added.

105.    On August 9, 2018, Defendants caused Hecla to issue a press release that reported the Company's financial results for the second quarter ended June 30, 2018.  The August 9, 2018

35

press release stated, among other things:

> "We have now closed the acquisition of *the high-grade Nevada mines*, and are beginning their integration into Hecla," Mr. Baker added. "Our plan is to operate the mines and mill as one unit, allocating the workforce and capital *to generate margins* and *focus on profitability, not just on production for production's sake, Fire Creek has the best margin of the 3 mines by a considerable amount*, so ramping it up is our priority…"

106.    Defendant Baker's representations were materially false and misleading and failed to disclose material adverse facts because he failed to disclose that at that time the Nevada Mines, including Fire Creek, were not profitable and were not margin producing assets.  In sharp contrast, the Nevada Mines were cash flow negative and plagued by material, negative problems, as alleged in paragraphs 50-51 and described by CIs 1-12 (¶¶ 57-80), that negatively affected operations, production and costs, and caused the Nevada Mines to hemorrhage cash.  In contrast to Defendant Baker's representation that Fire Creek was profitable and had the best margin, Defendant Baker failed to disclose that excess water, clay and refectory ore was encountered at Fire Creek, which diminished returns and increased production costs, which made it unprofitable. Defendant Baker's representation that the Nevada Mines were "high grade" was materially false and misleading for the reasons delineated in paragraph 103.

107.    Also on August 9, 2018, during the conference call with analysts to discuss second quarter financial results in which the Individual Defendants participated, Defendant Hall stated, among other things:

> As is our mantra at Hecla, all operations need to generate positive cash flows in their mine plans and we expect Nevada will be no different. *The Nevada assets are basically self-funding.*  The cash flow from production pays for the $11 million in development and definition drilling expenditures in the last half of the year, and as well, $5 million related to the completion of the new tailings, facility, plus the CIL planned improvements,

108.     Defendant Hall's representations were materially false and misleading and failed to disclose material adverse facts because the Nevada assets were not self-funding at that time, but in fact, were cash flow negative and plagued by material, negative problems that were negatively affecting operations, production and costs, as alleged in paragraphs 50-51 and described by CIs 1-12 (¶¶ 57-80).  Furthermore, as revealed by Defendants Baker after the Class Period, Defendants' mine plans for the Nevada Mines showed that they were cash flow negative and were not self-funding at the time Defendant Hall made this false statement.

109.     Furthermore, on August 9, 2018, during the question and answer portion of the conference call, Defendant Baker represented that the Nevada Mines were currently self-funding:

> [J.P. Morgan Analyst John Bridges]: Good morning, Phil, everybody. I just want to dig into cash flows. Your intention is to have the Nevada assets being cash flow neutral to you as soon as possible. When is that likely to be? And then, when will they be contributing to the portion of debt that they've – that you are sort of – you have taken on in the form of the revolver to run those just to start with?

> [Defendant Baker]: Well, I guess two things. ***One is the expectation is this year that for the five months, it will be self-funding. We're not anticipating needing to contribute additional capital into it***.

110.     Defendant Baker's representations were materially false and misleading and failed to disclose material adverse facts because he failed to disclose that the Nevada Mines at that time were not self-funding and would not be in 2018, but, in fact, were cash flow negative, as reflected in Defendants' mine plans for the Nevada Mines, and were plagued by material, negative problems, as alleged in paragraphs 50-51 and described by CIs 1-12 (¶¶ 57-80). Indeed, as Defendants attempted to increase production, they encountered uneconomic material with high degrees of carbon, clay and refractory ore, and unmanageable excess water, which caused production to be at a loss.

111.    During the August 9, 2018 conference call, in response to an analyst's question concerning permits for the Nevada Mines, Defendant McDonald made the following representation:

> [CIBC analyst]: Then have you – do you have all the permits in place, do you for even like say the ventilation shafts and everything else that you need?
>
> [Defendant McDonald]: **_Yeah. We've got everything we need_**.

112.    Defendant McDonald's representation was materially false and misleading and failed to disclose material adverse facts because, as confirmed by CIs 5, 10 and 11 (¶¶ 61, 69, 73), and as admitted by Defendant Baker after the Class Period, Defendants did not have the permits required to manage the excess water conditions that were growing worse throughout the Class Period.  Defendants' inability to manage the excess water materially hampered exploration and production at the Nevada Mines, and caused costs to materially increase.

113.    On August 9, 2018, during the conference call with investors and analysts, Defendant Baker again represented the purportedly positive effect the acquisition of the Nevada Mines had on Hecla's credit rating, stating that the "**_margin_**" from the Nevada Mines "should not only improve our equity value, but also our credit metrics and the rating agencies are beginning to take notice of this as exemplified by our bond rating upgrade by S&P. . . ."

114.    Defendant Baker's representations were materially false and misleading and failed to disclose material adverse facts because he failed to disclose that the Nevada Mines at that time were not generating positive margin, but in fact were cash flow negative, as reflected in Defendants' mine plans for the Nevada Mines as Defendant Baker admitted after the Class Period.

115.     On August 9, 2018, Defendants caused Hecla to file its quarterly report for the quarter ended June 30, 2018 with the SEC on Form 10-Q (the "Q2 2018 10-Q"), which was signed by Defendants Baker and Hall.  Item 303 required the Q2 2018 10-Q's MD&A section to disclose: (i) unusual events, transactions or significant economic changes that materially affected the amount of Hecla's reported income from continuing operations and the extent of such changes; and (ii) known trends or uncertainties reasonably expected to have a material impact on the Company's net sales or revenues or income from continuing operations.  The material negative problems that were negatively affecting operations, production and costs, and that were growing worse, as alleged in paragraphs 50-51 and 57-80, were unusual events and transactions and known trends and uncertainties that were required to be disclosed under Item 303 because they were known to Defendants at that time and likely to (and did) have a material unfavorable impact on the Company's net sales, revenues and income from continuing operations.

116.     The Q2 2018 10-Q incorporated by reference the risk warnings set forth above in the Q1 2018 10-Q.

117.     Defendants Baker and Hall's purported warnings about future potential risks were materially false and misleading because at this time these risks had already materialized as alleged in paragraph 99.

118.     On November 8, 2018, Defendants caused Hecla to issue a press release in which it disclosed the Company's reported financial results for the third quarter of 2018 ended September 30, 2018.

119.     The November 8, 2018 press release represented that at Fire Creek "[t]he mining of select high-grade zones has been moved from Q3 2018 into 2019 as the ore extended vertically farther than expected, and development is needed for full extraction of the ore panels."

120.    Defendants' representations were materially false and misleading and failed to disclose material adverse facts because, while Defendants announced mining of certain zones was being moved to 2019, Defendants failed to disclose the true reasons for the delay. In truth, Defendants had encountered uneconomic, low grade ore and were experiencing material production problems as a results of excess water, as alleged in paragraphs 50-51 and 57-80. Indeed, as observed by CI 8 (¶ 81), during a meeting in which Defendant Radford participated, CI 8 learned that mining of certain areas at Fire Creek was delayed, that the cause of such delay was the build-up of excessive water within the mine and uneconomic ore, and that given the lack of high-grade ore and excess water, positive cash flow and profitability from the Fire Creek mine was at least a year or more away.

121.    In connection with reporting third quarter financial results, the Company held a conference call with analysts in which the Individual Defendants participated.  Defendant Radford represented "we encountered existing poor ground conditions, many development phases were in unconsolidated tuff, which is basically clay-rich, had *a little bit of water* and the conditions turned to mush", and that "*[O]ur goal for Nevada operations is that the operations are cash-neutral*, including Hatter Graben development and the Fire Creek development ramp-up. . . ".

122.    Defendant Radford's representations were materially false and misleading because he falsely downplayed the severity of the material excess water problems that Defendants encountered and that were negatively affecting production by representing that the Company was "managing" the conditions, and further, he failed to disclose that, far from "a little bit of water", Defendants were experiencing material production problems as a result of excess water, as alleged in paragraphs 50-51 and 57-81.  Moreover, contrary to Defendant Radford's representation that the Nevada Mines were expected to be cash-neutral as the Company ramped up production, given

40

the lack of high-grade ore and excess water, positive cash flow and profitability from the Fire Creek mine was at least a year or more away as confirmed by CI 8, and further, Defendants' internal mines plans showed the Nevada Mines were cash flow negative.

123.   Also on the November 8, 2018 conference call, Defendant Baker falsely represented that the Nevada Mines were "***going to generate the cash flow necessary for it to do the ramp up of development in 2019***. . . ." and that "we're not anticipating the need to make significant contributions into Nevada, right? ***We see Nevada being able to largely pay for the Hatter Graben, to pay for the development within Fire Creek. We think we can run it pretty close to cash flow neutral.*** And that is what we have suggested we would be able to do."

124.   Defendants Baker's representations were materially false and misleading and failed to disclose material adverse facts because he failed to disclose that material, negative problems were negatively affecting operations (¶¶ 50-51, 57-81), that the excess water problem was growing worse and had caused production delays, that Defendants did not have the required permitting and infrastructure to handle the excess water, and that Defendants' internal mines plans showed the Nevada Mines were cash flow negative. As a result, Defendant Baker had no reasonable basis to represent that the Nevada Mines would operate cash-flow neutral or that the cash flow from the Nevada Mines could pay for the exploration and production of Hatter Graben.

125.   During the November 8, 2018 conference call with investors and analysts, Defendant Hall explained that in early November 2018, the Company's revolving line of credit "increased to $250 million from $200 million, as per our agreement with the banks when we acquired the Nevada operations."

126.   On November 8, 2018, Defendants caused Hecla to file its quarterly report for the quarter ended September 30, 2018 with the SEC on Form 10-Q (the "Q3 2018 10-Q"), which was

41

signed by Defendants Baker and Hall.  Item 303 required the Q3 2018 10-Q's MD&A section to disclose: (i) unusual events, transactions or significant economic changes that materially affected the amount of Hecla's reported income from continuing operations and the extent of such changes; and (ii) known trends or uncertainties reasonably expected to have a material impact on the Company's net sales or revenues or income from continuing operations.  The material negative problems, as alleged in paragraphs 50-51 and 57-81, that were negatively affecting operations and growing worse were unusual events and transactions and known trends and uncertainties that were required to be disclosed under Item 303 because they were known to Defendants at that time and likely to (and did) have a material unfavorable impact on the Company's net sales, revenues and income from continuing operations.

127.    The Q-3 2018 10-Q incorporated by reference the risk warnings set forth above in the Q1 2018 10-Q.

128.    Defendants Baker and Hall's purported warnings about future potential risks were materially false and misleading because at this time these risks had already materialized as alleged in paragraph 99.

129.    On December 4, 2018, the Company held a conference call at the Bank of America Merrill Lynch Leveraged Finance Conference during which Defendant Hall stated, in part:

> ***There's no major capital expenditures that we can't fund out of the Nevada operations***. So we're really quite pleased with the transaction.

(Emphasis added).

130.    Defendants Hall's representations were materially false and misleading and failed to disclose material adverse facts.  By this point in time, Defendants had been operating the Nevada Mines for several months and encountered material negative problems that were

42

negatively affecting operations, production and costs, and were growing worse, as alleged in paragraphs 50-51 and according to CIs (¶¶ 57-81).  Indeed, according to CI 8, Defendants delayed mining at Fire Creek due to excess water conditions, thereby materially reducing cash flows from production.  Furthermore, as Defendant Baker admitted after the Class Period, Defendants' mine plans for the Nevada Mines showed that they were cash flow negative at this time.  Therefore, Defendant Hall had no reasonable basis to represent Hecla could fund major capital expenditures from the Nevada Mines' operations.  In truth, as Defendant Baker admitted after the Class Period, the Nevada Mines required major capital investment and needed to be redesigned and rebuilt.

## VIII.   THE TRUTH BEGINS TO EMERGE THROUGH A SERIES OF PARTIAL DISCLOSURES

131.    On February 21, 2019, before the market opened, Defendants caused Hecla to issue a press release that was filed with the SEC on Form 8-K reporting the Company's financial results for the quarter and year ended December 31, 2018.  Also on February 21, 2019, Defendants conducted a conference call with investors and analysts.  In the February 21, 2019 press release and during the conference call with investors in which Defendants Baker, Hall, Radford and McDonald participated, Defendants partially disclosed the undisclosed material adverse facts concerning the Nevada Mines that existed since the beginning of the Class Period. Defendants Baker and Hall reported that Defendants had experienced "challenges" with the conditions at the Nevada Mines, including "reserve losses" and "higher costs while we worked through what we believe are transitional issues."

132.    In particular, Defendants identified challenges where Defendants encountered "tuff" material, or soft clay, that when combined with water, required additional support and higher costs from additional equipment.

133.    Furthermore, Defendant Hall disclosed that "[w]e have a goal of financial

discipline in which each of our mines should produce free cash flow and clearly that didn't happen with our Nevada operations that we acquired effective July of this last year."

134.   On February 21, 2019, Hecla stock declined from a closing price on February 20, 2019 of $2.93 per share, to close at $2.74 per share, a decline of $0.19 per share or approximately 7% on heavier than usual volume.

135.   However, as alleged below, Hecla's stock continued to trade at artificially inflated prices because Defendants failed to disclose many of the material negative problems then plaguing the Nevada Mines that were negatively affecting operations, production and costs, including lack of permits to handle the water discharge and inadequate infrastructure, as alleged in paragraphs 50-52 and as confirmed by CIs 1-12 (¶¶ 57-86).

136.   The February 21, 2019 press release represented that "[u]nderground drilling at Fire Creek *is identifying extensions to the Vonnie, Joyce*, Karen and Honey Runner *high-grade veins/structures* in the Spiral 2, 3 and 4 areas" and "[t]he drill targeting the southern up-dip extents of the *Vonnie, Vein 6, Joyce, and Vein 8 has defined multiple narrow, gold-bearing structures that persist into the upper extents of the Spiral 4 area*."

137.   Defendants representations were materially false and misleading and failed to disclose material adverse facts because the Vonnie and Joyce veins/structures did not contain high grade gold ore and were uneconomic.  According to CI 10 (¶ 82), during the fall of 2018, Hecla began to further explore the Joyce and Vonnie veins at Fire Creek, and upon commencement of mining the top two layers, staffers concluded the high grade ore was not there, which meant these veins were not able to produce profitable material at that time.

138.   Furthermore, on the February 21, 2019 conference call, Defendant Baker falsely represented "what we've said is, is that the operations will be cash flow positive with exception of

44

the exploration and the development for the Hatter Graben. So when you look at – and so basically we're saying that ***we're right at positive cash flow from Nevada***. And if you look at the all-in sustaining costs, you'll see that."  Furthermore, Defendant Hall represented "[w]e expect in 2019, the Nevada mining operations ***will be cash flow positive***, but we'll invest those cash flows and more in exploration around the various Nevada mine sites and the development of the Hatter Graben decline."

139.    Defendants Baker and Hall's representations were materially false and misleading and failed to disclose material adverse facts because Defendants failed to disclose that they did not possess the permitting and infrastructure needed to remediate the excess water, that the Nevada Mines did not possess the equipment and infrastructure needed to generate positive cash flows, and that Defendants' mine plans showed that the Nevada Mines were not cash flow positive at this time.

140.    Also on the February 21, 2019 conference call, Defendant Radford's representation that "we're looking at a bit more of a mobile dewatering plant, so that we're not managing the water underground" was materially false and misleading because he failed to disclose that by that time, Fire Creek's reverse osmosis water treatment plant was experiencing difficulties treating the flow of the mine-dewatering (¶ 53).  Additionally, Defendant Radford failed to disclose that in or around January 21, 2019, the leak at Fire Creek's Dewatering Storage Pond, which was leaking since 2017, began leaking more water than allowed by permit (¶¶ 50, 52).  In order to make repairs to the pond, Hecla planned to drain the pond to identify and repair tears and holes.  However, draining the pond would exceed all available surface storage capacity available at Fire Creek.  As a result, Hecla began to ship water at great expense from the dewatering storage pond at Fire Creek to the Midas mine.

141.   During the February 21, 2019 conference call, one analyst asked whether Defendants were going to have a "site visit" to make it "simpler to understand some of the stuff that's been discussed on the call."  Defendant Baker suspiciously responded:

> We haven't made any specific plans at the moment.  I want Larry and his team to have the opportunity to get their SOPs for the development and the different conditions resolved before we start bringing people on to the site.  So while we're still in the learning phase, it's probably better to wait.

142.   On February 22, 2019, Hecla filed its Annual Report with the SEC on Form 10-K for the year ending December 31, 2018 ("2018 10-K"), which was signed by Defendants Baker and Hall.  Item 303 required the 2018 10-K's MD&A section to disclose: (i) unusual events, transactions or significant economic changes that materially affected the amount of Hecla's reported income from continuing operations and the extent of such changes; and (ii) known trends or uncertainties reasonably expected to have a material impact on the Company's net sales or revenues or income from continuing operations.  The ongoing material, negative problems that were negatively affecting operations, productions and costs, and that were growing worse, as alleged in paragraphs 50-53 and 57-86, were unusual events and transactions and known trends and uncertainties that were required to be disclosed under Item 303 because they were known to Defendants by at least the beginning of the Class Period and likely to (and did) have a material unfavorable impact on the Company's net sales, revenues and income from continuing operations.

143.   In addition, the 2018 10-K represented that certain risks "may" or "could" adversely impact Hecla's business in the future, including the following potential risks that had already occurred:

- "Our costs of development of new orebodies and other capital costs *may* be higher and provide less return than we estimated"; and

- "We *may* not realize all of the anticipated benefits from our acquisitions,

including our recent acquisition of Klondex".

144.    These representations were materially false and misleading at the time they were made because while Defendants purported to warn that these risks "*may*" occur in the future, the 2018 10-K failed to disclose that these potential risks had *already* occurred.  The 2018 10-K's failure to disclose the material negative problems plaguing the Nevada Mines and that the Nevada Mines were cash flow negative, which rendered Hecla's boilerplate disclosures of potential adverse events that could occur in the future, and which applied to virtually any company, materially misleading.  By this point in time, in light of the ongoing material negative conditions plaguing the Nevada Mines, Defendants knew, or recklessly disregarded, that the acquisition of the Nevada Mines was a disaster for the Company, and rather than providing any benefit, the acquisition of the Nevada Mines saddled the Company with assets that were cash flow negative and that drained capital, and required major capital investment to rehabilitate.

145.    On April 18, 2019, at the opening of the market, Defendants caused Hecla to issue a press release that stated, in part, that "[a] *minor amendment to the water discharge permit for Fire Creek is expected in the second quarter which should enable a higher discharge rate*."

146.    On April 18, 2019, Hecla shares declined from a price at the opening of the market of $2.28 per share, to close at $2.15 per share, a decline of $0.13 per share of approximately 6% on heavier than usual volume.

147.    However, Defendants' partial disclosure was materially false and misleading because Defendants' created the misimpression that Defendants water discharge problems were minor.  On the contrary, Defendants at this time knew, or recklessly disregarded, and failed to disclose, that the Nevada Mines had been experiencing material problems with excess water that grew worse throughout the Class Period and would require major capital investment to repair and

build, as alleged in paragraphs 57-86.  Indeed, by this time: 1) Fire Creek's reverse osmosis water treatment plant was experiencing difficulties treating the flow of the mine-dewatering (¶ 53); 2) Fire Creek's Dewatering Storage Pond, which was leaking since 2017, had been leaking more water than allowed by permit (¶¶ 50, 53-54).  In order to make repairs to the pond, Hecla planned to drain the pond to identify and repair any tears and holes.  However, draining the pond would exceed all available surface storage capacity available at Fire Creek.  As a result, Hecla had been shipping water at great expense from the dewatering storage pond at Fire Creek to the Midas mine; and 3) the RIBs at Fire Creek were in poor condition, were ineffective in managing excess water, and needed to be redesigned and rebuilt, a major capital expense (¶ 50).

148.    Then, on May 9, 2019 Hecla shocked investors when, before the market opened, Defendants caused the Company to issue a press release entitled "Hecla Reports First Quarter 2019 Results" with the subheading, "Nevada operations under review," in which the Company disclosed a comprehensive review of its Nevada Mines and the suspension of annual production and cost estimates for its Nevada operations.  Specifically, the May 9, 2019 press release disclosed that the Nevada Mines were cash flow negative:

> Mr. Baker continued, "While Nevada operations had better development advance rates, **the operating metrics, including cost, grade and negative cash flow**, were unacceptable.  We are reviewing our Nevada operations to determine the best path forward and expect results of this review in the second quarter.  In the meantime, **we are suspending our annual Nevada estimates for production and cost.**
> * * *
> The annual production and cost outlook have been suspended for Nevada pending the results of the comprehensive review.

(Emphasis added).

149.    Also, on May 9, 2019, during a conference call with investors in which Defendants Baker, Hall and Radford participated, Defendant Baker made the following

disclosures concerning the rationale for the review of the Nevada Mines and suspension of

outlook for those operations:

> **A year ago when doing the due diligence, we recognized certain problems with Fire Creek dealing with the tuff material, managing the water, equipment availability, getting enough development to have consistent production, lack of characterization of ore types.**
>
> And while we've made progress in dealing with the issues we saw the short answer is it's not been enough. The advance rate has increased, but the mill tonnage decreased by a similar percentage in the last quarter.
>
> And while we've done things to manage the water, **the amount of water has increased, making the conditions worse. This has limited our access**, and while they're not insurmountable and not a large amount of dollars, **they will require quarters to construct some infrastructure and get some permit limits changed.**
>
> **Characterization of ore types has taken certain areas out of the plant**, so we will determine the best way to process them.
>
> We still believe in the potential of Fire Creek, but given the **ongoing challenges**, we're evaluating if there is a better way to go forward since our original plan is not making enough progress fast enough.
>
> So over the next few weeks or months, **we are reviewing the Nevada operations to determine how we can improve the economics** in both the short and the long term.
>
> This process is really maintaining our discipline and capital allocation, we're really just asking the question, **are we going to get the return for the investment we're making**. Since we don't know the outcome of the review, we are suspending guidance until we do. . . .

(Emphasis added).

150.   Several analysts posed questions indicating their surprise and astonishment at

the severity of the problems that had not previously been disclosed.  For example:

[J.P. Morgan Analyst John Bridges]:  Just wondered if you could give us a bit of color on what the problems actually are in Nevada? We heard about the water.  You're waiting on some permits, is that part of it?

And you say you've demobilized the contractor. Does that mean that you stopped advancing the exploration terminals which were related to the upbeat comments that you've been giving as on exploration success? I'm just a bit confused here.

[Defendant Baker]:  Sure. With respect to the water, what it has done **is it's limited places that we're able to go in the mine because we cannot deal with the water fast enough to be able to effectively move forward**. So our advance rate really slows down and our ability to mine in those areas slows down. . . .

[Defendant Radford]: Well **we are working on expanding our permitted water discharge limit** and . . . Right now we're using reverse osmosis, which is slow and expensive and very sensitive to fines.  **We're looking at an alternative process which could increase our discharge without a lot of expense.** There's a lot of work going on behind the scenes on the water. . . .

[Defendant Baker]: I think certainly water is a big element of it, and it's not a huge amount of water, **but it's enough where there is inadequate infrastructure to deal with it.  And it has grown from where it was when we were doing the due diligence.** So that would be number one.

And number two, **we have not seen the relative productivity that we were anticipating** . . . what it comes down to is **we're not getting enough tons moved for the dollars that we're spending**. . . .

[Defendant Baker]: **we still had a problem with dealing with the RIBs** and the back and some of the problem of getting the advanced rate that we were looking for. And then you couple that with the fact that **these inferred areas did not upgrade as we were anticipating that they would upgrade**.  And so those two things costs -- **you had more cost and you had less revenue is really how it came out**. . . .

(Emphasis added).

151.    Regarding  the  ore  types  Defendants  encountered  at  Fire  Creek,  Defendant

McDonald explained that Defendants had encountered uneconomic ore bodies that contained high amounts of clay:

> But what we're starting to see is, call it, a mixed stone.  We're now getting into or at least in the areas where the basalt is mixed with other volcanics. **And so what happens is that the tenor of the mineralization changes. It's less discrete veins. It's more clay alteration,** a bit amorphous sulphides, and **so that's the area that we're coming to terms with in terms of recoveries continuity of grade.**

(Emphasis added).

152.   On May 9, 2019, the price of Hecla's common stock declined from a closing price on May 8, 2019 of $2.04 per share to close at $1.77 per share, a decline of $0.27 per share, or 13.24% on heavier than usual volume.

153.   Following the May 9, 2019 disclosures, analyst reports indicated surprise over the disclosed material problems at the Nevada Mines.  For example, a Cantor Fitzgerald report dated May 9, 2019 stated as follows:

> **Pencils Down in Nevada** – A plethora of challenges are facing Hecla at its Nevada operations.  These range from extra dewatering requirements, poor grade reconciliation relative to the mine plan, metallurgical challenges with refractory ore, and underperformance of the mining contractor, among several others.  Hecla is in the process of completing a comprehensive review of its Nevada Operations that may result in a complete production shutdown across Fire Creek, Hollister, and Midas.

154.   On May 10, 2019, before the market opened, Hecla filed its quarterly report on Form 10-Q for the period ending March 31, 2019, which stated, in part, that because total production and capital costs exceeded sales at the Nevada Mines:

> We are currently undertaking a review of spending at the Nevada operations which may result in the following changes at the Fire Creek mine: a reduction in capital spending; ceasing current production and only developing to spirals 9, 10 and 11; or a temporary cessation of all mine operations at Fire Creek. As a

result, the values of certain components of properties, plants, equipment and mineral interests could be adjusted in the second quarter of 2019 when we expect to finalize the allocation of the Klondex purchase price. The outcome of the review may constitute a triggering event requiring assessment of the carrying value of our long-lived assets at Fire Creek with the potential to impact near-term estimated cash flows. . . . We may recognize an impairment, which could be material, if the carrying value of the assets exceeds the estimated future undiscounted cash flows expected to result from their use and eventual disposition. . . .

155.   On May 10, 2019, Scotiabank issued an analyst report titled "Fire Creek Flames Out: Downgrading" that stated, in part, the following:

> **Hecla reported its Q1 results, an adjusted loss of $18.5 million, and announced suspension of estimates for its Nevada operations pending a comprehensive review.** This represents a complete reversal since the company paid $462 million for the high-grade assets from Klondex . . . .
>
> **We are not confident the review over the next few months will change the prospects of Nevada as a self-funding entity.** In our opinion, the company needs to find alternative funding and not depend on Fire Creek with its year's worth of reserves. As to the issues at the mine, we think there was not enough focus on how things might go wrong. . . .

(Emphasis in original).

156.   On May 10, 2019, *Bloomberg News* reported that "Hecla Mining slumped almost 14% intraday Friday, touching the lowest since January 2016, as at least three analysts downgraded their investment opinion after the precious metal miner posted a lQ loss and failed to provide forward guidance for its Nevada operations."

157.   On May 10, 2019, Hecla's common stock declined from a closing price on May 9, 2019 of $1.77 per share, to close at $1.56 per share, a decline of $0.21 per share, or 11.86% on heavier than usual volume.

158.   Over two trading days, May 9-10, 2019, the price of Hecla's common stock

declined by $0.48 per share, or approximately 24%, from a closing price of $2.04 per share on

May 8, 2019, to close at $1.56 per share on May 10, 2019 on heavier than usual volume.

## IX.    POST CLASS PERIOD EVENTS

159.    On June 6, 2019, Defendants caused Hecla to issue a press release titled "Hecla

Reduces Spending For Nevada Operations" that stated, in part, the following:

> A review has been conducted of the Nevada operations and changes
> are being made with the goal of turning it into a positive cash
> flowing unit.
>
> The new approach is to mine the currently developed ore at Fire
> Creek. Mining at Midas is expected to continue through the end of
> the year, but Hollister will be shut down. . . .
>
> Third-party ore processing arrangements are also being pursued to
> try and reduce the transportation and milling costs. **This could
> include mills that can process ore that is considered refractory.
> With water discharge from Fire Creek more than double of a
> year ago, work is underway to increase discharge permits and
> change how the water is treated.**
>
> The Company is still committed to the exploration and definition of
> Hatter Graben, which is one of the key reasons the Nevada
> operations were acquired. However, **the level of development
> activity is being curtailed to reduce the cash consumption** . . . .

160.    On June 6, 2019, Cantor Fitzgerald issued an analyst report that stated, in part, the

following concerning Defendants' disclosure:

> Stopping all excess mine development in 2019 is a desperate move,
> and is effectively just deferring this cost until a later time. As such,
> we are reducing our 2020 production estimates and increasing our
> 2020 cost estimates for the Nevada operations.

161.    On June 14, 2019, recognizing that Defendants' representations concerning the

Nevada Mines cash flows had been presented falsely, S&P downgraded Hecla issuer-credit rating

and its credit rating on its senior notes due to, in material part, the decrease in development at the

Nevada Mines.  According to S&P Global Market Intelligence:

S&P Global Ratings on June 14 downgraded Hecla Mining Co.'s issuer credit rating and its issue-level rating for its senior notes to B- from B+ after the company scaled back development at its Nevada operations on the back of lower-than-expected production.

The ratings agency's negative outlook reflects its expectation that the silver and gold producer's leverage at a now forecast 5x, previously 2.5x, would make it difficult for Hecla to refinance its US$500 million in senior notes due in May 2021.

S&P Global Ratings reduced Hecla's liquidity assessment to less than adequate from adequate based on these potential refinancing challenges.

Additionally, the rating agency expects the company to face diminishing profitability at the end of 2019 due to rising costs.

162.    Similarly, on June 20, 2019, Moody's downgraded Hecla's credit rating because, far from being accretive, Hecla's operating and credit metrics deteriorated substantially as a result of acquiring the Nevada Mines, issuing a press release that stated, in part, the following:

Moody's Investors Service ("Moody's") downgraded the Corporate Family Rating of Hecla Mining Company (Hecla) to Caa1 from B2, the probability of default rating to Caa1-PD from B2-PD and senior unsecured notes to Caa2 from B3. Moody's also downgraded the Speculative Grade Liquidity rating to SGL-3 from SGL-2. . .

The rating takes into account a substantial uncertainty over the economic viability of the company's Nevada assets . . . Hecla's operating and credit metrics deteriorated substantially since the July 2018 $414 million acquisition of Klondex Mines with its properties in Nevada. The acquisition consumed a substantial portion of Hecla's cash and raised the company's overall cost profile. Since the acquisition, Hecla invested a significant amount of capital into Nevada assets aiming to develop the underground infrastructure, upgrade resources into reserves, and improve productivity, mining rates and mill throughput. However, the company has encountered a number of unexpected operating issues, particularly at the Fire Creek mine, including high water discharge levels, lower than expected grades and recoveries, slower than planned development rates and higher than anticipated amount of refractory ore, amongst other challenges.

163.     In July 2019, Hecla entered into an amendment to its credit facility that, among other things, lowered the amount available that Hecla could borrow to $150 million.

164.     On August 7, 2019, the Company issued two reports filed with the SEC on Form 8-K disclosing that Defendant Radford resigned as Senior Vice President and Chief Operating Officer, effective August 5, 2019, and would continue as the Company's Senior Vice President and Chief Technical Officer, and that Defendant McDonald notified the Company that he intends to retire as Senior Vice President – Exploration of the Company as of September 30, 2019.  By the end of 2019, Defendant Radford resigned from the Company.

165.     Also on August 7, 2019, Defendants caused Hecla to file a report with the SEC on Form 8-K and issue a press release reporting the Company's financial results for the quarter ended June 30, 2019.  The press release stated, in part, the following concerning the Nevada Mines:

> **With water discharge from Fire Creek higher than it was a year ago, work is underway to increase discharge permits**, expected to be obtained in the near future and increase non-consumptive water rights, **expected within approximately one year**. These changes, combined with changing how the water is treated, are important steps towards addressing the increase in water inflow expected when the mine expands north and southwards.

(Emphasis added).

166.     Also on August 7, 2019, the Individual Defendants conducted a conference call with investors and analysts to discuss the Company's financial results for the quarter ended June 30, 2019.  Defendant Baker admitted that the Nevada Mines were hemorrhaging cash since Hecla acquired the properties and essentially admitted that Defendants' representations that the Nevada Mines were self-funding were false and misleading at the time they were made:

> [Defendant Baker] . . . So in this third quarter, **for the first time since the acquisition of Klondex a year ago, our plans show us**

**generating more cash than we spend** . . . .

[Defendant Radford]:  . . . we have nearly stopped all development. Our plan is to mine out Fire Creek by the middle of next year . . . .

Among the issues we face in Nevada is water. . . **We are more focused on ensuring that our permits are sufficient to match the expected water outflow**. . . **The process of obtaining this water right is expected to take 12 months.**

(Emphasis added).

167.    On August 8, 2019, Defendants caused the Company to file its quarterly report for the quarter ended June 30, 2019 with the SEC on Form 10-Q ("Q2 2019 10-Q") that stated "total production and capital costs have exceeded sales at our Nevada operations **since the acquisition** . . .". (Emphasis added).  Further, the Q2 2019 10-Q stated that the Company's changes to the operational plans at the Nevada Mines "represented a triggering event requiring an assessment of recoverability of the carrying value of our long-lived assets."   While the Company determined that carrying value assessment indicated no impairment as of June 30, 2019, Defendants, however, explained that the assessment assumed that resumption of previously-anticipated production levels at Nevada will take place in 2021 upon "the resolution of operational issues." However, Defendants warned that there can be no assurance that any of the operational issues at the Nevada Mines will be resolved by 2021 "or ever".

168.    On December 3, 2019, Defendant Baker participated in Bank of America Merrill Lynch's Leveraged Finance Conference, during which the following statements were made:

[Defendant Baker]: And then finally, at Nevada, . . . we bought this. We attempted to take this plane that was flying and **redesign it and rebuild it in the air, and it was just costing us way too much money**. So we've landed the plane, and we're going to do the studies necessary to restart it, where we're assured of the profitability of the mine . . .

(Emphasis added).

56

169.    On February 6, 2020, Defendants Baker and Hall conducted a conference call with investors and analysts to discuss the Company's financial results for the quarter and year-ended December 31, 2019.  Defendant Hall stated the following concerning the Nevada properties:

> **We also need a means of processing refractory ore**, which would require third-party processing agreements, and we would expect a restart to require a permitting cycle. **These actions will take time, but it is important for us to get them right.**

(Emphasis added).

170.    Analyst reports issued after the Company's February 6, 2020 conference call noted that production of gold at the Nevada properties was years away in light of the uneconomic ore, lack of certain permits and water issues.  For example, on February 6, 2020, CIBC Equity Research stated, "a toll milling agreement would be required to process refractory ore from the operation going forward, and that would require new permits and therefore returning the assets to production is likely years away."  Similarly, on March 17, 2020, Scotiabank published a report stating "**Nevada Operations** could come back on-line with improved mining methods and greater water discharge allowances. Given the likely permitting lead times, this remains a few years away." (Emphasis in original).

## X.    LOSS CAUSATION/ECONOMIC LOSS

171.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Hecla's common stock and operated as a fraud or deceit on Class Period purchasers of Hecla common stock by misrepresenting the Company's operating condition and future business prospects.  Defendants achieved this by making positive statements about Hecla's business and the Nevada Mines while they knew, or recklessly disregarded, that the Nevada Mines were plagued by a multitude of material, negative problems.

172.    Later, however, when the falsity of Defendants' misrepresentations materialized and became apparent to the market, the price of Hecla's common stock fell precipitously as the prior artificial inflation came out of the price of Hecla's common stock.  As a result of their purchases of Hecla common stock during the Class Period, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages under the federal securities laws.

173.    As a direct result of the public revelations regarding the truth about the condition of Hecla's business and the negative adverse factors that had been impacting Hecla's business during the Class Period, the price of Hecla's common stock materially declined.  These stock drops removed the inflation from the price of Hecla's common stock, causing real economic loss to investors who purchased Hecla common stock during the Class Period.

174.    As alleged in paragraphs 16-24, 131-58, the decline in the price of Hecla's common stock as the truth about the conditions at the Nevada Mines began to materialize through a series of partial disclosures was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market.

175.    The timing and magnitude of Hecla's share price declines negate any inference that the loss suffered by Plaintiffs and other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to the Defendants' fraudulent conduct.

## XI.    **FRAUD-ON-THE-MARKET DOCTRINE**

176.    At all relevant times, the market for Hecla's common stock was an efficient market for the following reasons, among others:

(a)    The Company's common stock met the requirements for public listing and was listed and actively traded on the NYSE, a highly efficient market;

58

(b)      As a regulated issuer, the Company filed periodic public reports with the SEC;

(c)      The Company regularly issued press releases which were carried by national news wires.  Each of these releases was publicly available and entered the public marketplace; and

(d)      A number of securities analysts, including JP Morgan, CIBC, Roth Capital Partners, RBC Capital and BMO Capital, regularly followed and analyzed the Company, and issued reports concerning the Company.

177.      As a result, the market for the Company's publicly traded common stock promptly digested current information with respect to Hecla from all publicly available sources and reflected such information in the price of the Company's common stock.   Under these circumstances, all purchasers of the Company's common stock during the Class Period suffered similar injury through their purchase of the publicly traded common stock of Hecla at artificially inflated prices and a presumption of reliance applies.

## XII.      ADDITIONAL SCIENTER ALLEGATIONS

178.      Defendants acted with scienter in that Defendants knew, or recklessly disregarded, that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew, or recklessly disregarded, that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.   By virtue of their receipt of information reflecting the true facts regarding Hecla, including Defendants' admitted extensive due diligence prior to the acquisition of the Nevada Mines during which a multitude of material, negative problems were identified, Defendants participated in the fraudulent scheme alleged

herein.

179.     Defendants knew, or recklessly disregarded, the false and misleading nature of the information which they caused to be disseminated to the investing public.  The ongoing fraudulent scheme described in this complaint could not have been perpetrated over a substantial period, as has occurred, without the knowledge or recklessness, and complicity of the personnel at the highest level of the Company, including the Individual Defendants.

### A.     Defendants Regularly Visited the Nevada Mines during Due Diligence and during the Class Period and Actively Managed the Nevada Mines

180.     During the Class Period, Defendant Baker regularly visited the Nevada Mines to review the results of operations and the conditions at the Nevada Mines, including on or around August 1, 2018, when he visited each operation in the Reno and Winnemucca, Nevada offices, during which, he spoke with almost all of the supervisory and management personnel.  Further, in or around late October 2018 and February 2019, Defendant Baker again visited the Nevada Mines and observed how the material negative conditions were then affecting production and cash flows.

181.     At or around the time Hecla announced the acquisition of the Nevada Mines, Defendant Radford established a development plan for Fire Creek and Hatter Graben in Nevada. Defendant Radford was involved in organizing managers and employees at the Nevada Mines after Hecla's acquisition and was involved in the Company's due diligence, including regular site visits to inspect the Nevada Mines and meetings, as alleged in paragraphs 68, 71, 73, 76, 78-79, and 81.

### B.     The Scienter of Hecla's senior Executives and Officers Is Imputed to Defendant Hecla

182.      The scienter of numerous senior executives and officers of Hecla, who acted within the scope of their authority and as agents of Hecla during the Class Period, is imputed to Defendant Hecla.

183.    Specifically, the following senior Hecla executives knew, or at least recklessly disregarded, the true facts about the material, negative problems plaguing the Nevada Mines:

a.    Defendant Baker, who was Hecla's President and Chief Executive Officer during the Class Period;

b.    Defendant Radford, who was the Company's Senior Vice President – Operations during the Class Period;

c.    Defendant Hall, who was the Company's Senior Vice President, Chief Financial Officer and Treasurer during the Class Period; and

d.    Defendant McDonald, who was the Company's Senior Vice President – Exploration during the Class Period.

184.    Defendants Baker, Radford, McDonald and Hall, as well as the following executives, officers and employees knew, or at least recklessly disregarded, the undisclosed facts concerning the material, negative problems plaguing the Nevada Mines and acted as agents of Hecla or its subsidiaries during the Class Period:

1. Shiell, Vice President and General Manager of the Nevada Mines;

2. Tolbert, the General Manager at the Fire Creek mine;

3. Leader, Process Manager at the Midas and Hollister mines;

4. Hendricks, Chief Engineer at Fire Creek;

6. Sara Bowl, Senior Geologist;

7. Allen, Director, Exploration; and

8. Blair, Chief Resource Geologist.

185.    Accordingly, the state of mind of each of these officers or employees who worked at the Nevada Mines is imputed to Defendant Hecla.

**C.      Defendants Had Motive and Opportunity to Hide the Material, Negative Problems at the Nevada Mines and That the Mines Were Cash Flow Negative Throughout the Class Period**

186.     Defendants had the opportunity to perpetrate the fraudulent scheme and course of business described herein because the Individual Defendants were the most senior officers of Hecla, issued statements and press releases on behalf of Hecla and had the opportunity to commit the fraud alleged herein.

187.     The Individual Defendants had the motive to conceal the material negative problems plaguing the Nevada Mines throughout the Class Period and the negative cash flows in order to bolster, or at least maintain, the Company's ratings with the credit agencies (S&P and Moody's), including the credit rating on the Company's approximately $500 million in senior note debt, and line of credit, as alleged above.  Indeed, as a result of their scheme and false statements, credit agencies increased Hecla's credit rating, and then decreased it after the true facts were disclosed.  Similarly, Hecla's lenders increased Hecla's line of credit as a result of the acquisition of the Nevada Mines, from $100 million to $250 million, and decreased it after the true facts were disclosed.  Defendant Hall, as CFO, was instrumental in achieving this increase in the credit rating and the line of credit, while making materially false and misleading statements to investors in order to increase the credit rating and line of credit.

**XIII.   NO SAFE HARBOR**

188.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false and misleading statements pleaded in this complaint.  Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Hecla who knew that those statements were false when made.

## FIRST CLAIM FOR RELIEF
### For Violation of Section 10(b) of the Exchange Act
### and Rule 10b-5 Against All Defendants

189.   Plaintiffs repeat and reallege each and every allegation as if fully set forth above.

190.   During the Class Period, Defendants disseminated or approved the false and misleading statements specified above, which they knew or recklessly disregarded were materially false and misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

191.   Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)   Employed devices, schemes and artifices to defraud;

(b)   Made untrue statements of material facts or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made not misleading; or

(c)   Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Hecla's publicly traded common stock during the Class Period.

192.   Plaintiffs and the Class have suffered damages in that, in reliance on the integrity

of the market, they paid artificially inflated prices for Hecla's publicly traded common stock. Plaintiffs and the Class would not have purchased Hecla's common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

193.     As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Hecla common stock during the Class Period.

## SECOND CLAIM FOR RELIEF
### For Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

194.     Plaintiffs repeat and reallege each and every allegation as if fully set forth above.

195.     The Individual Defendants acted as controlling persons of Hecla within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations at the Nevada Mines and/or intimate knowledge of the statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

196.     In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to

control or influence the particular transactions giving rise to the securities violations as alleged herein and exercised the same.

197.    As set forth above, Hecla and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions each as a controlling person, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Hecla's and the Individual Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows: declaring this action to be a proper class action; awarding damages, including interest; awarding reasonable costs, including attorneys' fees; and such equitable/injunctive relief as the Court may deem proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

Dated: September 9, 2020

**KAPLAN FOX & KILSHEIMER LLP**

By: _/s/   *Jeffrey P. Campisi*___

Robert N. Kaplan
Jeffrey P. Campisi
Jason A. Uris
850 Third Avenue, 14th Floor
New York, NY 10022
Tel: (212) 687-1980
Fax: (212) 687-7714
rkaplan@kaplanfox.com
jcampisi@kaplanfox.com
juris@kaplanfox.com

*Lead Counsel for Lead Plaintiffs and the Proposed Class*