**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

ROBERT GLUCK, et al.,

            *Plaintiffs,*

v.

HECLA MINING CO., et al.,

            *Defendants.*

Case No. 1:19-cv-4883 (ALC)

ECF Case

## <u>MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS</u>

Stefan Atkinson, P.C.
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-4800

Joshua Z. Rabinovitz
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 389-5000

*Counsel for Defendants*

# **Table Of Contents**

Preliminary Statement ................................................................................................ 1

Background .................................................................................................................. 2

    A.     Defendants' Disclosures Regarding The Nevada Operations ................................ 3

    B.     Plaintiffs' Allegations Of The Disclosure Of Problems That Had Been
Concealed ............................................................................................................. 6

    C.     The Alleged Misstatements ................................................................................... 8

Argument ................................................................................................................... 10

I.     The Alleged Misstatements About Future Performance Are Not Actionable. ................ 10

    A.     The Statements About Future Performance Are Protected By The
Statutory Safe Harbor For Forward-Looking Statements. .................................... 11

         1.     The Estimates Were Accompanied By Meaningful Cautions. ................. 11

         2.     Plaintiffs Do Not Plead That The Maker Of Any Allegedly
Fraudulent Forward-Looking Statement Knew The Statement Was
False. .................................................................................................... 12

               a.     Baker's Supposed Post-Class Period Admissions ........................ 13

               b.     "Confidential Witness" Information ............................................. 14

    B.     The Estimates Are Opinions That Plaintiffs Do Not Plead Were False Or
Misleading ......................................................................................................... 17

II.    Plaintiffs Do Not Plead With Particularity Any False Or Misleading Statements
Of Fact. .................................................................................................................. 18

III.   Plaintiffs Do Not Plead With Particularity Facts Giving Rise To The Requisite
"Strong Inference" That Any Defendant Acted With Scienter. ............................... 22

Conclusion ................................................................................................................. 25

# Table Of Authorities

## Cases

*In re AmEx Sec. Litig.*,
  2008 WL 4501928 (S.D.N.Y. Sept. 26, 2008),
  *aff'd* 604 F.3d 758 (2d Cir. 2010) ............................................................................14

*ATSI Commc'ns v. Shaar Fund*,
  493 F.3d 87 (2d Cir. 2007).......................................................................................10

*In re Bank of Am. Sec. Litig.*,
  980 F. Supp. 2d 564 (S.D.N.Y. 2013)......................................................................16

*Chapman v. Mueller Water*,
  466 F. Supp. 3d 382 (S.D.N.Y. 2020)........................................................13, 15, 22

*Das v. Rio Tinto*,
  332 F. Supp. 3d 786 (S.D.N.Y. 2018).................................................................10, 24

*ECA v. JP Morgan*,
  553 F.3d 187 (2d Cir. 2009).....................................................................................18

*Gissin v. Endres*,
  739 F. Supp. 2d 488 (S.D.N.Y. 2010).......................................................................12

*Glaser v. The9*,
  772 F. Supp. 2d 573 (S.D.N.Y. 2011)......................................................................25

*Gray v. Wesco Aircraft*,
  454 F. Supp. 3d 366 (S.D.N.Y. 2020).................................................................11, 18

*Halebian v. Berv*,
  644 F.3d 122 (2d Cir. 2011).......................................................................................2

*Kalnit v. Eichler*,
  264 F.3d 131 (2d Cir. 2001).....................................................................................23

*Kuriakose v. Federal Home Loan Mortg. Corp.*,
  897 F. Supp. 2d 168 (S.D.N.Y. 2012).......................................................................25

*Nguyen v. Endologix*,
  962 F.3d 405 (9th Cir. 2020) .................................................................................2, 24

*Nurlybayev v. ZTO Express*,
  2019 WL 3219451 (S.D.N.Y. July 17, 2019) ..........................................................17

*Omnicare v. Laborers District Council*,
  575 U.S. 175 (2015)..................................................................................................18

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004)............................................................................................18

*S. Cherry St. LLC v. Hennessee Grp.*,
    573 F.3d 98 (2d Cir. 2009)...............................................................................................22

*In re Sanofi Sec. Litig.*,
    87 F. Supp. 3d 510 (S.D.N.Y. 2015)................................................................................17

*Slayton v. AmEx*,
    604 F.3d 758 (2d Cir. 2010).............................................................................................23

*Stadnick v. Vivint Solar*,
    861 F.3d 31 (2d Cir. 2017)...............................................................................................17

*Staehr v. Hartford Fin. Servs.*,
    547 F.3d 406 (2d Cir. 2008)...............................................................................................2

*Stoneridge Inv. v. Scientific-Atlanta*,
    552 U.S. 148 (2008)..........................................................................................................10

*Tellabs v. Makor Issues & Rights*,
    551 U.S. 308 (2007)..............................................................................................22, 23, 25

*In re Textron Sec. Litig.*,
    2020 WL 4059179 (S.D.N.Y. July 20, 2020) ..................................................................12

## **Statutes**

15 U.S.C. § 78u-4(b)(2)(A)...................................................................................................23

15 U.S.C. § 78u-5 .................................................................................................................11

15 U.S.C. § 78u-5(c)(1)(A)(i) ...............................................................................................12

15 U.S.C. § 78u-5(c)(1)(B)(i) ...............................................................................................12

**Preliminary Statement**

This securities fraud case arises out of Defendant Hecla Mining Company's acquisition, on July 23, 2018, of Klondex Mines, Ltd., which owned three gold mines and related infrastructure in Nevada.  When Hecla announced the acquisition in March 2018, Hecla and its officers disclosed their plans for what would be called the "Nevada operations" and their expectation that the Nevada operations would benefit Hecla.  However, in May 2019, Hecla announced that the Nevada operations were consuming too much cash and that it would suspend estimates of future production and costs while it conducted a comprehensive review.  As frequently happens when an acquisition underperforms, three Hecla shareholders now claim they were defrauded, rather than that the acquisition was not as successful as Defendants sincerely expected.

Plaintiffs' effort to turn disappointing performance into a case for securities fraud fails, and the case should be dismissed with prejudice.  Defendants' statements about the future performance of the Nevada operations are classic examples of forward-looking statements protected by the statutory safe harbor.  And Defendants' statements of existing fact about the Nevada operations are not adequately pled to have been false or misleading.  From the time Hecla announced the acquisition, Defendants disclosed publicly the very "problems" Plaintiffs assert were concealed.  The claim that investors were unaware that the Nevada operations were not performing to expectation prior to the May 2019 announcement is inconsistent with the public record.

Plaintiffs' allegations are also deficient for the independent reason that they do not give rise to a strong inference of scienter.  Plaintiffs' theory is that Defendants knew about the problems in Nevada but intentionally concealed them from investors.  Plaintiffs do not allege that any individual Defendant sold stock or otherwise gained some personal benefit from the alleged fraud.  Rather, Plaintiffs suggest Defendants concealed Nevada's problems to obtain a higher credit rating and increased line of credit for Hecla.  But such a fraud would have been illogical,

for the supposedly false expectations would be quickly revealed as inaccurate when the actual performance of the Nevada operations was disclosed.  Indeed, although Plaintiffs allege Hecla obtained a higher credit rating and increased credit line after acquiring Klondex, they also readily admit that the credit rating was downgraded, and the line of credit decreased, when Hecla disclosed Nevada's poor performance.  Plaintiffs fail to allege any motive Defendants had to fraudulently cause a short-term credit rating and credit line increase that Defendants knew would be quickly reversed.  Plaintiffs do not allege Hecla refinanced any debt while the credit rating was higher or that Hecla borrowed more with the extended credit line.  The Ninth Circuit recently rejected a similar theory of short-term deception, holding that "[i]t depends on the supposition that defendants would rather keep the stock price high for a time and then face the inevitable fallout" once the problem is revealed, which "does not resonate in common experience." *Nguyen v. Endologix*, 962 F.3d 405, 415 (9th Cir. 2020).

### Background

Hecla Mining Company mines precious metals.  After acquiring Klondex, Hecla had five operating segments, of which the Nevada operations was one, contributing 5.5% of Hecla's sales for 2018.  (Ex. 1 at 5)[1]  Plaintiffs are three investors who allege they purchased Hecla stock after Hecla's agreement to acquire Klondex was announced.  (Docket #86, "Compl." ¶ 31)  They purport to bring a claim on behalf of all investors who purchased Hecla stock between March 19, 2018, and May 8, 2019 (the "Class Period").  (*Id*. ¶ 4)  In addition to Hecla, Plaintiffs also name as defendants Hecla's CEO and CFO, as well as its former head of Operations.  (*Id*. ¶¶ 33-35)

---

[1] The exhibits cited herein are attached to the Declaration of Stefan Atkinson, filed with this brief.  On a Rule 12(b)(6) motion to dismiss, the Court may consider these documents because it may "properly consider matters of which judicial notice may be taken." *Halebian v. Berv*, 644 F.3d 122, 131 n.7 (2d Cir. 2011).  "[I]t is proper to take judicial notice of the fact that press coverage, prior lawsuits, or regulatory filings contained certain information, without regard to the truth of their contents." *Staehr v. Hartford Fin. Servs.*, 547 F.3d 406, 425 (2d Cir. 2008).

The central premise of Plaintiffs' complaint is that Defendants' public statements during the Class Period were fraudulent because "the Nevada Mines had a myriad of serious problems … including water issues, insufficient equipment, defections of key employees and others which were known to Defendants and not disclosed."  (*Id*. ¶ 3)  The assertion that these issues were not disclosed is directly contradicted by the statements Defendants made during that time.

### A.     Defendants' Disclosures Regarding The Nevada Operations

Hecla announced its agreement to acquire Klondex on March 19, 2018.  (*Id*. ¶ 6)  The announcement explained that the acquisition would entail three operating gold mines, all in Nevada: Fire Creek, Hollister, and Midas.  (*Id*.)  Hecla's CEO, Phillips Baker, predicted that the Nevada operations "will be cash flow positive for us."  (*Id*. ¶ 91)  Hecla also filed with the SEC a presentation that included a chart showing that the Fire Creek and Midas mines were among the ten highest grade mines in North America.  (Ex. 2 at 13)  It measured "grade" as ounces of gold per ton of ore.  (*Id*.)  Both the announcement and the presentation included a warning to investors about the risks of forward-looking statements contained therein and directed investors to risk factors in both Hecla's and Klondex's SEC Form 10-Ks.  (*Id*. at 2; Ex. 3 at 5-6)

Contrary to Plaintiffs' assertion that Defendants concealed material adverse information about the Nevada operations, Defendants disclosed negative conditions and risks to the Nevada operations' performance throughout the Class Period.  On May 10, 2018, still before the acquisition had closed, Hecla disclosed in an SEC Form 10-Q risks specific to the Klondex acquisition, including that the acquisition itself "may cause a loss of management personnel and other key employees of Klondex"; that Hecla may not achieve the anticipated benefits of the acquisition for reasons including "higher than expected acquisition and operating costs or other difficulties"; and that Klondex's mines "may be in an unexpected condition."  (Ex. 4 at 62-63)  It cautioned on this last point that due diligence of mines has significant limitations:

Although we review properties prior to acquisition in a manner consistent with industry practices, such reviews are not capable of identifying all potential adverse conditions..... Even a detailed review of records and properties may not necessarily reveal existing or potential problems or permit a buyer to become sufficiently familiar with the properties to fully assess their condition, and deficiencies, and development potential. (*Id*. at 63)

Also before closing the acquisition, Defendants disclosed operational problems at the Nevada operations. On May 10, 2018, Hecla's head of Operations, Lawrence Radford, disclosed that Hecla would "push the construction of a new tailings facility this season as there is little overlap between the filling of the old facility and the commissioning of the new facility."[2] (Ex. 5 at 6) In other words, Radford disclosed that the then-current tailings facility for the Nevada operations was almost full and a new place to put wastewater was needed. The same day, Hecla filed with the SEC on Form 8-K a presentation with information about the Nevada operations. It listed the strengths of the operations as well as "opportunities" to improve by addressing weaknesses. (Ex. 6 at 4) Such opportunities included "[r]eplacement of old equipment," "[r]educe turnover," and "[a]dvance tailings construction." (*Id*.) The only reason a company would disclose the "opportunity" to take these actions is if the issues being addressed existed—that is, if Nevada had "old equipment," employee "turnover," and the need for a new tailings facility.

Hecla closed the acquisition of Klondex on July 23, 2018, after which the mines became Hecla's "Nevada operations" segment. (Compl. ¶ 102) Defendants continued to make candid disclosures about problems at the Nevada operations. On August 9, 2018, only seventeen days after the acquisition closed, Hecla filed its quarterly SEC report and held a public conference call. Defendants disclosed a host of problems with the Nevada operations. First, Baker disclosed that one of the three newly acquired mines, Midas, was being shut down entirely. (Ex. 7

---

[2] A tailings facility is a pond where wastewater from the mining and milling process is pumped. (Compl. ¶ 61) Plaintiffs refer to the tailings facility as the "tailings pond." (*E.g.*, *id.*)

at 5)  Second, Radford disclosed that water was creating problems at Fire Creek: "In some areas of the mine, the road conditions are muddy" and "conditions would get bad enough that machines will get stuck and would have to get towed out."  (*Id*. at 7)  As a result, Radford stated, "the first order of business is to clean up some of the messes."  (*Id*. at 11)  Third, Radford disclosed: "There has been a lot of turnover at Fire Creek," which "we need to remediate."  (*Id*.)  Fourth, Radford disclosed "the Hollister ore is carbonaceous."  (*Id*. at 12)  Finally, Hecla explained that "[t]he reserves for the Nevada assets have declined from last reporting," reflecting that Klondex had done "little, if any, drilling to improve reserves and resources during the latter part of 2017 and early in 2018."  (*Id*. at 8)  Ultimately, Baker acknowledged the Nevada operations might "not generate returns immediately."  (*Id*. at 10)

On November 8 and 9, 2018, Hecla disclosed its results for the third quarter of 2018—the first quarter in which it owned the Nevada operations.  It disclosed a *loss* from the Nevada operations of $13.7 million.  (Ex. 8 at 18)  It also disclosed all-in sustaining costs ("AISC") for Nevada of $1,932 per gold ounce.  (*Id*. at 57)[3]  This was significant because Klondex's final AISC disclosure before the sale was $1,107 per gold ounce.  (Ex. 9 at 52)  It was also significant because Hecla reported gold sales at an average price of $1,205 per ounce.  (Ex. 8 at 45)  Thus, Hecla's disclosure meant that, after owning the Nevada operations for only two months, its costs of production were 75% higher than Klondex had disclosed immediately before the transaction, *and* that the difference in cost now meant it cost Hecla significantly more to produce gold from the Nevada operations than the price at which it was selling it.  Further, on a public conference call on November 8, Radford disclosed specific operational problems in Nevada.  For instance,

---

[3] AISC is a measure adopted by the World Gold Council in 2013 to more accurately capture all the costs of precious metals production.  It has been widely adopted by gold mining companies. *See* https://www.gold.org/about-gold/gold-supply/responsible-gold/all-in-costs.

he explained regarding Fire Creek that "[a]s we began to ramp development back up, we encountered existing foreground conditions, many development phases were in unconsolidated tuff, which is basically clay rich, add a little bit of water and the conditions turn to mush." (Ex. 10 at 6)  He disclosed "the poor conditions of the mine" generally.  (*Id*. at 7)  Revising the pre-acquisition expectation that the Nevada operations would generate positive cash flow, Radford stated: "Hecla is in the process of creating budgets for 2019 and our goal for Nevada operations is that the operations are cash neutral." (*Id*.)  An analyst asked whether Hecla's expectation was that "the first little bit is really a challenge, and that's kind of what you're working through now, then kind of breakeven for a couple of years and then really start to hopefully see some gravy in 2021-type thing." (*Id*. at 12)  Baker responded: "I think that's right." (*Id*.)

On December 4, 2018, Hecla's CFO, Lindsay Hall, presented at a public conference, and indicated that the Hollister mine "was a high-cost operation" with a "different kind of ore." (Ex. 11 at 7)  "So, we're taking the focus off Hollister." (*Id*.)  He explained Hecla's focus on the remaining Nevada mine, Fire Creek, explaining that "we've been working at refocusing the team, rehabilitating the mine, fixing a lot of the mining operations that is mining 101." (*Id*. at 7-8)

### B.    Plaintiffs' Allegations Of The Disclosure Of Problems That Had Been Concealed

Ignoring the year-long and continual disclosures summarized above, Plaintiffs allege Defendants only began to disclose problems with the Nevada operations on February 21, 2019, when Hecla reported its full-year 2018 performance.  Plaintiffs allege Hecla revealed for the first time on that day that it "had experienced 'challenges' with the conditions at the Nevada Mines, including 'reserve losses' and 'higher costs while we worked through what we believe are transitional issues.'" (Compl. ¶ 131)  They also allege Hecla revealed for the first time that it had "encountered 'tuff' material, or soft clay, that when combined with water, required additional sup-

port and higher costs from equipment." (*Id*. ¶ 132)  Finally, they allege Hecla newly revealed that "our mines should produce free cash flow and clearly that didn't happen with our Nevada operations." (*Id*. ¶ 133)  As demonstrated above, none of these things was disclosed "for the first time"; they had all been previously disclosed. *Supra* at 4-6.

Plaintiffs also ignore additional negative information about the Nevada operations that Defendants disclosed in describing Hecla's full-year 2018 performance.  Specifically, Hecla's February 22, 2019 SEC Form 10-K disclosed a *loss* from the Nevada operations of $26.7 million for the five months of 2018 that it owned the operations.  (Ex. 1 at 74)  It disclosed that cash flow from operations for the entire company had declined, attributing the decline in part to "a gross loss at the newly-acquired Nevada Operations." (*Id*. at 85)  It disclosed all-in sustaining costs for Nevada of $1,950 (*id*. at 74), consistent with the third quarter's disclosure, which, again, was much higher than production costs Klondex had disclosed, and much higher than the $1,265 per ounce average price at which Hecla had been able to sell gold. (*Id*. at 62)  It disclosed Hecla's net income for each quarter of 2018, showing positive $8.2 million and $12.1 million, respectively, for the first two quarters of 2018—before Hecla acquired the Nevada operations—and a net *loss* of $23.2 million and $23.7 million for the third and fourth quarters of 2018, after acquiring the Nevada operations. (*Id*. at 94)  On the public conference call discussing the 2018 results, Baker stated regarding Nevada that Hecla was "still trying different ways of dealing with different conditions in the mine[s]," but that the Company had "more questions than answers" and was "still in this learning phase." (Ex. 12 at 5, 17)  He said Hecla was "happy with our cost at our operating units *other than Nevada* [at] which we reported higher cost while we work through what we believe are transitional issue[s]." (*Id*. at 5, emphasis added)  Radford referred to Hecla's plan for Fire Creek as a "turn around" plan. (*Id*. at 7)

On April 18, 2019, Hecla announced its first quarter 2019 results. It explained regarding the Nevada operations that "[d]uring the quarter, the focus continued on establishing a robust development program in a variety of ground conditions at Fire Creek and Hollister, rather than on production which is expected to be second-half weighted this year." (Ex. 13 at 2)

Plaintiffs allege the full "truth" was finally revealed on May 9, 2019, when Hecla "disclosed that the Nevada Mines were cash flow negative" and that it was suspending estimates of annual production and costs for Nevada while it conducted a comprehensive review. (Compl. ¶ 148) Hecla's Form 10-Q for the first quarter of 2019, filed the same day, disclosed that Nevada had a loss from operations of $14 million. (Ex. 14 at 13) Ultimately, Baker explained, "our original plan is not making enough progress fast enough." (Ex. 15 at 5)

### C. The Alleged Misstatements

Plaintiffs allege Defendants misled investors on nine occasions during the Class Period:

1. On March 19, 2018, in announcing Hecla's agreement to acquire Klondex, Baker stated that he expected the transaction to be "accretive on many important financial and credit metrics" and that the Nevada operations would require "a small amount of capital" and would be "cash flow positive." (Compl. ¶¶ 88-89, 91) Hecla's press release also stated that "Fire Creek is a cornerstone producing asset with robust cash flows." (*Id*. ¶ 88)

2. On May 10, 2018, Baker said: "When we looked at Klondex … we saw extraordinary grades." (*Id*. ¶ 93; Ex. 5 at 3) According to Plaintiffs, Hecla's SEC Form 10-Q also fraudulently disclosed risks that could cause Klondex's performance to differ from expectations. (Compl. ¶¶ 97-98)

3. On July 23, 2018, the day Hecla closed the acquisition, Baker stated "Hecla now has three high-grade mines in Nevada" and "[t]hese assets immediately add production and cash flow." (*Id*. ¶ 102)

4. On August 9, 2018, after Hecla had owned the Nevada mines for seventeen days, Baker stated: "We have now closed the acquisition of the high-grade Nevada mines." (*Id*. ¶ 105) He stated further: "Our plan is to operate the mines and mill as one unit, allocating the workforce and capital to generate margins and focus on profitability, not just on production for production's sake." (*Id*.) He stated his "expectation" that the Nevada assets would be "self-funding" for 2018, and Hall stated that "[t]he Nevada assets are basically self-funding." (*Id*. ¶¶ 107, 109) In reference to Hecla's intention to explore the development of the Hatter Graben, which is an area adjacent to the Hollister mine, an analyst asked whether Hecla had "all

the permits in place" and Baker responded: "Yeah. We've got everything we need." (*Id.* ¶ 111; Docket #92; Ex. 7 at 12)  Finally, Hecla incorporated into its Form 10-Q its supposedly fraudulent prior disclosures of risks that could cause the Nevada operations' performance to differ from expectations.  (Compl. ¶ 116)

5.  On November 8, 2018, Hecla held a public conference call, during which Radford stated "our goal for Nevada operations is that the operations are cash-neutral" and Baker stated "[w]e think we can run it pretty close to cash flow neutral." (*Id.* ¶¶ 121, 123)  Baker also stated that the Nevada operations are "going to be able to generate margin, and they're going to have an extended mine life. This should not only improve our equity value, but also our credit metrics." (*Id.* ¶ 113; Ex. 7 at 5)  Regarding Fire Creek, Radford explained: "As we began to ramp development back up, we encountered existing foreground conditions, many development phases were in unconsolidated tuff, which is basically clay rich, add a little bit of water and the conditions turn to mush." (Compl. ¶ 121; Ex. 10 at 6)[4]  Hecla also disclosed that "[t]he mining of select high-grade zones [at Fire Creek] has been moved from Q3 2018 into 2019 as the ore extended vertically farther than expected, and development is needed for full extraction of the ore panels." (Compl. ¶ 119)  Finally, Hecla again incorporated into its 10-Q filing its supposedly fraudulent prior disclosures of risks that could cause the Nevada operations' performance to differ from expectations. (*Id.* ¶ 127)

6.  On December 4, 2018, Hall stated regarding the Nevada operations: "There's no major capital expenditures that we can't fund out of the Nevada operations." (*Id.* ¶ 129)

7.  On February 14, 2019, Hecla issued a press release with information about its exploration programs, including at Fire Creek. (*Id.* ¶ 136)

8.  On February 21, 2019, Baker and Hall each stated that they expected the Nevada operations to be "cash flow positive" for 2019. (*Id.* ¶ 138)  Regarding Fire Creek, Radford disclosed "we're looking at a bit more of a mobile dewatering plant so that we're not managing the water underground." (*Id.* ¶ 140)  Finally, Hecla's Form 10-K disclosed risks that could negatively impact Hecla's future performance. (*Id.* ¶ 143)

9.  On April 18, 2019, Hecla disclosed: "A minor amendment to the water discharge permit for Fire Creek is expected in the second quarter which should enable a higher discharge rate." (*Id.* ¶ 145)

Plaintiffs allege each of the above statements was fraudulent.  First, Plaintiffs allege "Defendants had no reasonable basis for their representations that the Nevada Mines were or would be cash flow positive or self-funding." (Compl. ¶ 87)  Second, they allege that the Nevada operations suffered from problems that Defendants supposedly did not disclose.  (*Id.* ¶¶ 57-86)

---

[4] Plaintiffs allege incorrectly that Radford said "*had* a little water…." (Compl. ¶ 121)  As the transcript shows, he said "*add* a little water." (Ex. 10 at 6)

Third, they allege Hecla's disclosures about risks that *could* occur were false because those risks had *already* occurred.  (*Id.* ¶ 99)  Plaintiffs assert claims under § 10(b) and § 20(a) of the Securities Exchange Act.  (*Id.* ¶¶ 189-97)  The Appendix to this brief identifies each alleged misstatement and the pleading burdens Plaintiffs fail to meet for each one.

## Argument

The elements of a § 10(b) claim include that each defendant (1) made a material misrepresentation or omission, (2) with scienter.  *Stoneridge Inv. v. Scientific-Atlanta*, 552 U.S. 148, 157 (2008).  Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act create a heightened pleading standard for such claims, requiring the plaintiff to plead these elements with particularity.  *See ATSI Commc'ns v. Shaar Fund*, 493 F.3d 87, 99 (2d Cir. 2007).

Here, Plaintiffs' allegations do not satisfy their pleading burdens for three independent reasons.  First, the principal alleged misstatements are expectations about future performance that are protected by the safe harbor for forward-looking statements, and also are opinions that are not pled to have been false or misleading.  Second, Plaintiffs do not plead with particularity facts establishing that any of the alleged misstatements of existing fact were false or misleading.  Third, Plaintiffs do not plead facts that create the requisite strong inference that Defendants acted with scienter in issuing any alleged misstatement.[5]

## I.    The Alleged Misstatements About Future Performance Are Not Actionable.

The principal alleged misstatements concern the future performance of the Nevada operations.  Statements that the Nevada operations *would be* cash flow positive, cash flow neutral, or self-funding were all forward-looking.  (Compl. ¶¶ 89, 91, 102, 107, 109, 121, 123, 129, 138)  So was Baker's statement that "[w]e expect this transaction to be accretive on many important fi-

---

[5] Because Plaintiffs fail to plead their § 10(b) claim, their § 20(a) claim also fails.  *See Das v. Rio Tinto*, 332 F. Supp. 3d 786, 817-18 (S.D.N.Y. 2018).

nancial and credit metrics" and his statement about the effect that the operations should have on

Hecla's credit metrics. (*Id*. ¶¶ 88, 113)[6]  These statements are not actionable for two reasons.

### A.    The Statements About Future Performance Are Protected By The Statutory Safe Harbor For Forward-Looking Statements.

First, the statements about future performance are forward-looking statements protected

by the statutory safe harbor, 15 U.S.C. § 78u-5.  "A defendant is not liable for a forward-looking

statement if (1) 'the forward-looking statement is identified and accompanied by meaningful

cautionary language,' or (2) the forward-looking statement 'is immaterial,' or (3) 'the plaintiff

fails to prove that [the forward-looking statement] was made with actual knowledge that it was

false or misleading." *Gray v. Wesco Aircraft*, 454 F. Supp. 3d 366, 385 (S.D.N.Y. 2020).  The

statute is written in the disjunctive, meaning "[a]s long as the plaintiff fails to satisfy one of those

elements (e.g., the statement is accompanied by meaningful cautionary language or is immateri-

al), the presence of one of the other elements (e.g., the statement was known to be false or mis-

leading) will not subject the defendant to liability." *Id*. at 385-86.

### 1.    The Estimates Were Accompanied By Meaningful Cautions.

The statements are first protected by the safe harbor because they were accompanied by

---

[6] Plaintiffs also allege two other forward-looking statements.  First, they allege Baker stated on August 9, 2018: "Our plan is to operate the mines and mill as one unit, allocating the workforce and capital to generate margins and focus on profitability, not just on production for production's sake, Fire Creek has the best margin of the 3 mines by a considerable amount, so ramping it up is our priority." (Compl. ¶ 105)  Plaintiffs allege the statement was fraudulent because "the Neva-da Mines, including Fire Creek, were not profitable and were not margin producing assets." (*Id*.)  However, the statement was not an assertion of profitability, but an assertion of Hecla's "plan" to "focus on profitability" and a comparison of margin across the three mines.  Plaintiffs do not al-lege Hecla did not plan to focus on profitability over production.  Nor do they allege that Fire Creek did not have the best margin of the three Nevada mines.  Second, Plaintiffs allege that, on April 18, 2019, Hecla disclosed that "[a] minor amendment to the water discharge permit for Fire Creek is expected in the second quarter which should enable a higher discharge rate." (*Id*. ¶ 145)  Plaintiffs allege the statement "created the misimpression that Defendants' water discharge prob-lems were minor." (*Id*. ¶ 147)  This mischaracterizes the statement, which said the expected amendment to the permit was minor.  It did not characterize the severity of the water issue.

meaningful cautionary language.  15 U.S.C. § 78u-5(c)(1)(A)(i).  On the day the agreement to acquire Klondex was announced, Hecla published a presentation that contained a caution regarding forward-looking statements.  (Ex. 2 at 2)  That caution referred investors to Hecla's previous Form 10-K (and Klondex's) "for a more detailed discussion of factors that may impact expected future results."  (*Id*.)  Hecla's 10-K contained warnings regarding acquisitions, including that Hecla "may not realize all (or any) of the anticipated benefits from any acquisition … for various reasons, including … higher than expected acquisition and operating costs."  (Ex. 16 at 17)  It also explained limitations on pre-acquisition due diligence.  (*Id*.)  By referring to these warnings in the context of forward-looking statements about the Klondex acquisition, Hecla made clear the risks applied to that acquisition.  In addition to the cautions presented when the acquisition was announced, Hecla disclosed on May 10, 2018, additional warnings specific to the Nevada operations, including that Hecla might not be able to "retain key management personnel and other key employees of Klondex"; that it might have "higher than expected" operating costs; and that the mines might "be in an unexpected condition" despite Hecla's due diligence.  (Ex. 4 at 62-63)

These warnings "spoke to the very type of forecasts at issue here—projected profits of acquired businesses."  *In re Textron Sec. Litig*., 2020 WL 4059179, *11 (S.D.N.Y. July 20, 2020).  Consequently, the safe harbor protects these statements.  *Id*.; *see also Gissin v. Endres*, 739 F. Supp. 2d 488, 508 (S.D.N.Y. 2010) (cautionary language was sufficient because it "directly acknowledged the very risks plaintiffs fault for their losses").

### 2.     Plaintiffs Do Not Plead That The Maker Of Any Allegedly Fraudulent Forward-Looking Statement Knew The Statement Was False.

Independent of the cautionary language, the safe harbor also applies because Plaintiffs do not allege with particularity that the maker of any forward-looking statement had "actual knowledge" at the time he made the statement that it was inaccurate.  15 U.S.C. § 78u-

5(c)(1)(B)(i).  Plaintiffs attempt to plead actual knowledge in two ways.  First, they allege Baker made two statements after the Class Period that admitted he had such knowledge.  Second, they allege that information from supposed "confidential witnesses" establishes such knowledge.

### a.    Baker's Supposed Post-Class Period Admissions

Plaintiffs allege that Baker stated on May 9, 2019, that "when doing the due diligence, we recognized certain problems with Fire Creek dealing with the tuff material, managing the water, equipment availability, getting enough development to have consistent production, lack of characterization of ore types."  (Compl. ¶ 48)  However, Plaintiffs fail to allege any facts establishing that knowing about those issues means Baker knew his stated expectations about the Nevada operations, including that they would be cash flow positive or neutral, were false.  Plaintiffs do not allege any facts demonstrating that mines facing such issues cannot be cash flow positive or neutral, nor any facts demonstrating that Baker knew the issues would thwart such cash flow expectations for the Nevada mines.  All businesses have challenges, particularly underground mines.  How those challenges translate into predicted performance—whether Hecla estimated it could address those issues and at what (a) impact on cash flow, or (b) cost compared to what revenue— is entirely missing from Plaintiffs' complaint.  Baker's statement says only that Hecla identified challenges at Fire Creek, but not that Hecla knew such challenges would thwart its disclosed expectations, including about cash flow.  *See*, *e.g.*, *Chapman v. Mueller Water*, 466 F. Supp. 3d 382, 400 (S.D.N.Y. 2020) (alleging problems with water meters did not establish the company's existing estimate for defective meters was inaccurate).  Indeed, the challenges Baker identified existed when Klondex owned Fire Creek (because they were identified during pre-closing due diligence), and yet, only five days before Hecla announced the acquisition, Klondex disclosed *positive* cash flow from operations.  (Ex. 9 at 46-48)  Thus, Baker's "admission" that Hecla had identified issues at Nevada does not establish he knew his expectations about of Nevada's future

performance were inaccurate.  In any event, all of the issues Baker supposedly "admitted" were disclosed during the Class Period, as was the fact that the Nevada operations were not achieving the cash flow expectations.  *Supra* at 5-7.

Second, Plaintiffs allege that Baker stated on August 7, 2019, that "in this third quarter, for the first time since the acquisition of Klondex a year ago, our plans show us generating more cash than we spend."  (Compl. ¶ 166)  Plaintiffs contend this statement "admitted that Defendants' representations that the Nevada Mines were self-funding were false and misleading at the time they were made."  (*Id*.)  However, Baker's statement was not about the Nevada operations; it was about Hecla in its entirety.  (Ex. 17 at 3)  Cash flow at the corporate level includes Hecla's other operating segments (which significantly predominate over the Nevada operations segment), as well as corporate level expenses like overhead, debt service, and the costs of the Klondex acquisition itself—none of which are included in the cash flow from the Nevada operations.  Thus, Baker's statement that Hecla expected to be cash-flow positive on a company-wide basis for the first time since the Klondex acquisition does not "admit" that Hecla had not expected the Nevada operations to be cash flow positive or neutral before then.

**b.    "Confidential Witness" Information**

Plaintiffs also rely on information allegedly provided by twelve so-called confidential witnesses.  (Compl. ¶¶ 57-86)  As an initial matter, information from confidential witnesses is irrelevant unless the plaintiff alleges "the confidential sources would have known what information was communicated to senior executives."  *In re AmEx Sec. Litig*., 2008 WL 4501928, *8 (S.D.N.Y. Sept. 26, 2008), *aff'd* 604 F.3d 758 (2d Cir. 2010).  Here, Plaintiffs' allegations regarding CIs 1, 2, 3, 4, 5, 6, and 7 fail to assert any information supposedly communicated to any Defendant.  And for the witnesses who supposedly did assert a connection to a Defendant, Plaintiffs fail to allege even a single specific piece of information that any Defendant supposedly

knew that contradicted any public statement that Defendant made.[7]

Plaintiffs allege CI 8 told them he and Radford attended a meeting in Fall 2018.  (Compl. ¶ 81)  At that meeting, "Hecla management" allegedly explained that "positive cash flow and profitability from the Fire Creek mine was now at least a year or more away."  (*Id*.)  But that is also what Hecla said *publicly* at the time.  As explained above, on November 8, 2018, Baker disclosed that Hecla had lost millions of dollars in its first quarter owning Fire Creek, and explained that the Company was then in a period that was a "challenge," after which it expected to "break-even for a couple of years," and then "hopefully" start to see profits around 2021.  *Supra* at 6.

CI 9 allegedly told Plaintiffs that Baker and Radford "walk[ed] around the Nevada Mines' facilities and milling areas on a regular basis."  (Compl. ¶ 68)  But Plaintiffs do not allege CI 9 told them any fact Baker or Radford learned while "walking around."  Similarly, CI 9 allegedly attended a meeting in July 2018 at which Radford "acknowledged" "problems with the ore body and water build up at the mill."  (*Id*. ¶ 78)  But Plaintiffs do not allege what ore body was being discussed, what the problems were, or how any Defendant predicted those "problems" would affect future performance.  *See Chapman*, 466 F. Supp. 3d at 399 (identifying problems is insufficient to plead that those problems contradicted any estimate of future performance).  Further, regarding the water at the mill, the need for a new tailings pond (where wastewater from the mill is sent) because the old one was nearly full had been disclosed two months earlier.  *Supra* at 4.  Finally, CI 9 allegedly attended "weekly meetings" with Radford at which "reports were discussed which showed actual versus projected production at the Hollister and Midas mines," and

---

[7] Additionally, many of the witnesses were not, even by Plaintiffs' allegations, in a position to know the events at the Nevada operations during the Class Period.  CIs 2, 4, and 12 left their jobs before Hecla even acquired Klondex.  (Compl. p. 18 nn. 7 & 9, p. 23 n.17)  CI 6 worked in the information technology department, but supposedly told Plaintiffs about the "ore characteristics" at the mines.  (*Id*. ¶ 62 & n.11)

issues with those mines. (Compl. ¶ 78) But Plaintiffs do not allege any specific fact disclosed to Radford at any weekly meeting, much less that any fact disclosed to him conflicted with any statement he made thereafter.[8]

More broadly, these allegations are deficient because *all* of the problems the witnesses supposedly identified were disclosed during the Class Period, directly contradicting Plaintiffs' allegation that they were concealed during that time. "Even at the pleading stage, dismissal is appropriate where the complaint is premised on the nondisclosure of information that was actually disclosed." *In re Bank of Am. Sec. Litig.*, 980 F. Supp. 2d 564, 577 (S.D.N.Y. 2013).

For instance, Plaintiffs allege the ore at Midas and Hollister had high carbon content. (Compl. ¶ 57) But Hecla announced seventeen days after closing the acquisition that it was shutting down Midas, and on the same day disclosed that the Hollister ore was "carbonaceous"—that is, high in carbon. *Supra* at 5. Plaintiffs allege Fire Creek's ore had high clay content. (Compl. ¶ 62) But Hecla disclosed Fire Creek's clay issues on November 8, 2018, and discussed poor ground conditions on August 9, 2018. *Supra* at 5-6. Plaintiffs allege employees left the Nevada operations from March through Fall 2018. (Compl. ¶ 75) But Hecla disclosed on August 9, 2018, it had experienced "a lot" of turnover, and disclosed the need to reduce turnover even before that. *Supra* at 5. Plaintiffs allege the Nevada operations needed new equipment. (Compl. ¶ 58) Hecla disclosed that need on May 10, 2018, before even acquiring Klondex. *Supra* at 4.

---

[8] Likewise with other witnesses. CI 10 allegedly participated in a "mine tour" with Radford. (Compl. ¶ 71) Plaintiffs do not allege when the tour occurred, what mine was toured, where in the mine the tour went, whether any problems with the mine were viewed on that tour, or any specific facts Radford learned that contradicted his public statements. CI 11 allegedly told Plaintiffs that Radford "tour[ed]" Fire Creek three or four times a month through July 2018. (*Id*. ¶ 73) Plaintiffs do not allege any fact he learned on any tour. CI 12 allegedly participated in an April 2018 meeting with Radford at which unspecified "metrics" and "reports and plans" regarding Fire Creek were discussed. (*Id*. ¶ 76) Plaintiffs do not allege any information discussed at the meeting that contradicted any statement Radford made.

Plaintiffs allege water was a problem at Fire Creek.  (Compl. ¶ 69)  That was disclosed on Au-

gust 9, 2018.  *Supra* at 5.  Plaintiffs allege Klondex had stopped exploratory drilling in 2017.

(Compl. ¶ 69)  But Hecla disclosed on August 9, 2018, that Klondex had done "little, if any,

drilling" during the latter part of 2017 and 2018.  *Supra* at 5.

In addition to disclosing these problems at the Nevada operations, Defendants also dis-

closed poor financial performance of the Nevada operations—that is, the bottom line losses that

investors care most about.  Seventeen days after acquiring Klondex, Baker disclosed that Hecla

was prepared for the Nevada operations to "not generate returns immediately." *Supra* at 5.  After

the first two months owning the Nevada operations, Hecla disclosed that Nevada had a *loss* from

operations for the quarter of almost $14 million, that it was seeing production costs that were

significantly higher than what Klondex had disclosed, and that those production costs far ex-

ceeded the available sale price.  *Id*.  Baker disclosed the same day that Hecla did not hope for

profitability from Nevada for at least two years.  *Id*. at 6.  At the end of 2018, Hecla disclosed

additional losses from Nevada.  *Id.* at 7.  These disclosures are inconsistent with Plaintiffs' asser-

tion that Defendants concealed poor performance at the Nevada operations.[9]

## B.    The Estimates Are Opinions That Plaintiffs Do Not Plead Were False Or Misleading.

In addition to being protected forward-looking statements, the alleged misstatements

about future performance were also opinions.  *See In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510,

531 (S.D.N.Y. 2015) (statements were opinions because they expressed "expectations for the fu-

---

[9] These disclosures also defeat Plaintiffs' allegation that Hecla's second and third quarter 2018
10-Q filings violated Item 303 of Regulation S-K.  (Compl. ¶¶ 115, 126)  Plaintiffs do not allege
any "trend" that was "both (1) known to management and (2) 'reasonably likely to have material
effects on the registrant's financial condition or results of operations" that Hecla did not disclose.
*Stadnick v. Vivint Solar*, 861 F.3d 31, 39 (2d Cir. 2017); *see also Nurlybayev v. ZTO Express*,
2019 WL 3219451, *8 (S.D.N.Y. July 17, 2019).

ture"). Under the Supreme Court's decision in *Omnicare v. Laborers District Council*, 575 U.S. 175 (2015), "liability for making a false statement of opinion may lie only under limited circumstances—if plaintiff pleads facts demonstrating either 'the speaker did not hold the belief she professed,' … 'the supporting facts she supplied were untrue' … [or if] the speaker omits information whose omission makes the statement misleading to a reasonable investor.'" *Gray*, 454 F. Supp. 3d at 400. "For an omissions case, '[t]he investor must identify particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context.'" *Id.*

Plaintiffs do not satisfy this standard. First, Plaintiffs do not allege facts establishing that any Defendant who expressed an opinion about how the Nevada operations would perform did not sincerely believe that opinion. Second, Plaintiffs do not allege that any statements of "supporting fact" about Defendants' opinions were untrue. And, third, Plaintiffs do not allege "facts going to the basis" of any opinion whose omission rendered the opinion misleading.[10]

## II.  Plaintiffs Do Not Plead With Particularity Any False Or Misleading Statements Of Fact.

In addition to the forward-looking statements, Plaintiffs also allege that certain statements of existing fact were fraudulent. However, Plaintiffs do not plead with particularity facts establishing that any such statements were false or misleading:

- On March 19, 2018, when announcing the agreement to acquire Klondex, Hecla stated

---

[10] In addition, Baker's statement (Compl. ¶ 88) that he expected the Klondex acquisition to be "accretive on many important financial and credit metrics" is immaterial, for it is the type of vague optimistic statement to which investors pay no mind. *See, e.g.*, *ECA v. JP Morgan*, 553 F.3d 187, 206 (2d Cir. 2009) (statements are immaterial if they are "too general to cause a reasonable investor to rely upon them"); *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004) ("[E]xpressions of puffery and corporate optimism do not give rise to securities violations.").

"Fire Creek is a cornerstone producing asset with robust cash flows." (Compl. ¶ 88) Plaintiffs do not allege facts demonstrating that this statement was inaccurate when made. Indeed, only five days before Hecla's statement, Klondex announced its 2017 results, disclosing that Fire Creek had income from operations of $64 million—that is, "robust cash flows." (Ex. 9 at 83)

- On May 10, 2018, Baker said: "When we looked at Klondex … we saw extraordinary grades." *Supra* at 8. He made similar statements on July 23 and August 9, 2018. (Compl. ¶¶ 102, 105) Plaintiffs allege these statements were false because "the Nevada Mines did not possess 'extraordinary grades'"—"the Nevada Mines comprised uneconomic ore bodies with excess clay, uneconomic refractory ore, and were plagued by material problems." (*Id*. ¶¶ 94, 103, 106) Plaintiffs confuse the "grade" of the ore with whether it is economic to extract it. "Grade" refers to the ounces of gold per ton. *Supra* at 3. Hecla's first presentation regarding the Nevada mines made this clear, measuring "Gold Reserve Grade" as "oz/ton." (Ex. 2 at 13) Plaintiffs do not allege facts establishing the Nevada mines are not high grade. Nor do Plaintiffs allege the dramatically *increased* costs of production Hecla disclosed, which showed production costs rising above sale prices, were false. *Supra* at 5-7.

- On August 9, 2018, in response to a question whether Hecla had "all the permits in place" to access Hatter Graben, which is an undeveloped area adjacent to the Hollister mine, Baker responded: "Yeah. We've got everything we need." (Ex. 7 at 12) Plaintiffs allege this statement was fraudulent because "Defendants did not have the permits required to manage the excess water conditions that were growing worse throughout the Class Period." (Compl. ¶ 112) But Plaintiffs do not allege Hecla lacked the required permits *for Hatter Graben*, including for water discharge. They do not even allege water was an issue with accessing Hatter Graben.

- On November 8, 2018, Radford explained regarding Fire Creek that, "[a]s we began to

ramp development back up, we encountered existing foreground conditions, many development phases were in unconsolidated tuff, which is basically clay rich, add a little bit of water and the conditions turn to mush." (Ex. 10 at 6)  Plaintiffs allege this statement "falsely downplayed the severity of the material excess water problems." (Compl. ¶ 122)  However, Radford did not use "little" to describe the severity of the water problem, but to explain that even a little water would turn the clay to "mush." "Mush" is a real problem for mining, regardless of whether it is caused by a little or a lot of water, as Radford himself had already disclosed months before this statement. *Supra* at 5.  Thus, Radford's statement did not "falsely downplay" the issue.  Indeed, on the same call Radford described the conditions of the mine as "poor." *Id.* at 6.

- Also on November 8, Hecla disclosed regarding Fire Creek that "[t]he mining of select high-grade zones has been moved from Q3 2018 into 2019 as the ore extended vertically farther than expected, and development is needed for full extraction of the ore panels." (Compl. ¶ 119)  Plaintiffs do not allege that Hecla's description of the ore was false, but rather that this statement was fraudulent because "Defendants failed to disclose the true reasons for the delay," which supposedly were that "Defendants had encountered uneconomic, low grade ore and were experiencing material production problems." (*Id*. ¶ 120)  However, Plaintiffs allege no facts indicating that the reason for the delay was not as stated: Plaintiffs allege that one "confidential" witness told them that "mining of certain areas at Fire Creek was delayed" because of "excess water" and "uneconomic ore" (*id*.), but they do not allege that those "certain areas" are the same areas addressed by the November 8 announcement.  They do not even allege when the delay described by the confidential witness is supposed to have occurred.

- On February 14, 2019, Hecla published a detailed report on the mineral reserves at all its mines company-wide. (Ex. 18)  The report disclosed that "[u]nderground drilling at Fire Creek

is identifying extensions to the Vonnie, Joyce, Karen and Honey Runner high-grade veins/structures in the Spiral 2, 3, and 4 areas." (*Id.* at 1)  It then provided specific details.  Regarding the "southern up-dip extents of the Vonnie, Vein 6, Joyce, and Vein 8," it disclosed drilling had "defined multiple narrow, gold-bearing structures that persist into the upper extents of the Spiral 4 area.  Recent intersections include 0.22 oz/ton gold over 10.0 feet and 0.20 oz/ton over 3.3 feet." (*Id.* at 3)  Plaintiffs allege these statements were false based on a confidential witness who supposedly told them that "during the fall of 2018, Hecla began to further explore the Joyce and Vonnie veins at Fire Creek, and upon commencement of mining the top two layers, staffers concluded the high grade ore was not there." (Compl. ¶ 137)  Plaintiffs do not allege the witness told them Hecla's statement was incorrect.  Nor does the allegation itself establish the statement was false.  The witness's statement that two specific layers at some unspecified part of the veins lacked "high grade ore" does not conflict with the ounce-per-ton characteristics in the specific locations within the veins that Hecla described as high grade.  In other words, describing the veins as high grade is not inconsistent with two layers at some unspecified part of the veins lacking high grade ore.

- On February 21, 2019, Radford said regarding Fire Creek: "we're looking at a bit more of a mobile dewatering plant, so that we're not managing the water underground." (Compl. ¶ 140) Plaintiffs allege his statement was fraudulent because he "failed to disclose that, by that time, Fire Creek's reverse osmosis water treatment plant was experiencing difficulties treating the flow of the mine-dewatering." (*Id.*)  But Plaintiffs fail to explain how their allegation demonstrates Radford's statement was false or misleading.  They do not allege Hecla was not looking into a mobile dewatering plant.  Nor do they allege any reasonable investor would have concluded from Radford's statement that Fire Creek was not experiencing difficulties treating the flow of

water.  Indeed, it is difficult to conceive why Hecla would invest in a different way of treating the water if the then-current method was adequate.

Finally, Plaintiffs allege that Hecla's risk disclosures were fraudulent because "these risks had already materialized."  (Compl. ¶¶ 99, 117, 128, 144)  But, as detailed above, Defendants disclosed throughout the Class Period actual negative conditions and poor performance from the Nevada operations.  *Supra* at 4-7.  That Hecla adhered to SEC regulations by also disclosing the possibility that *additional* adverse conditions could arise, or that current conditions could worsen, is not misleading.  *Chapman*, 466 F. Supp. 3d at 406 ("the risk disclosure language can be understood to convey that, in addition to costs for which Mueller had accrued and that it had determined should be disclosed pursuant to GAAP, there was a risk that Mueller would incur additional 'significant' expenses").  For instance, Plaintiffs allege Hecla's disclosure that "the acquisition may cause a loss of management personnel" was false because the loss had already occurred.  (Compl. ¶ 97)  But Hecla disclosed before it even completed the acquisition that it needed to "reduce turnover"—actual turnover, not potential.  *Supra* at 4.  And even after actual turnover, *additional* turnover was still a risk—which is what Hecla's risk disclosure indicated.

## III.    Plaintiffs Do Not Plead With Particularity Facts Giving Rise To The Requisite "Strong Inference" That Any Defendant Acted With Scienter.

Independent of their failure to plead a false or misleading statement, Plaintiffs also fail to plead that any Defendant acted with scienter—with a "mental state embracing intent to deceive, manipulate, or defraud."  *Tellabs v. Makor Issues & Rights*, 551 U.S. 308, 319 (2007).  Reckless disregard for the truth can establish scienter, but it requires the plaintiff to plead with particularity "conscious recklessness—*i.e.*, a state of mind approximating actual intent, and not merely a heightened form of negligence."  *S. Cherry St. LLC v. Hennessee Grp.*, 573 F.3d 98, 109 (2d Cir. 2009).  Further, for forward-looking statements, "recklessness is not sufficient"—it must be

"knowing falsity." *Slayton v. AmEx*, 604 F.3d 758, 773 (2d Cir. 2010). In either event, a plain-tiff bringing a § 10(b) claim must plead scienter by "stat[ing] with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). This "strong inference" of state of mind must be both "cogent and at least as com-pelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314.

The Second Circuit has identified two ways a plaintiff can plead the required "strong in-ference" of fraudulent intent: by alleging either (1) that the defendants "had both motive and op-portunity to commit fraud," or (2) "facts that constitute strong circumstantial evidence of con-scious misbehavior or recklessness." *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001). For motive allegations, a plaintiff must plead with particularity a "concrete and *personal* benefit to the individual defendants resulting from the fraud." *Id*. at 139. However, "[m]otives that are generally possessed by most corporate directors and officers," such as "the desire for the corpo-ration to appear profitable" or "the desire to keep stock prices high to increase officer compensa-tion," are insufficient. *Id*. Further, if the plaintiff "has failed to demonstrate that defendants had a motive to defraud the shareholders, he must produce a stronger inference of recklessness." *Id*. at 143. Here, Plaintiffs' allegations do not satisfy either method of pleading scienter.

First, Plaintiffs fail to plead motive. They do not allege that any individual Defendant sold stock at allegedly inflated prices during the Class Period. Instead, they allege Defendants had motive to conceal problems "to bolster, or at least maintain, the Company's ratings with the credit agencies" and its line of credit. (Compl. ¶ 187) But credit ratings and the size of credit lines are not a personal benefit. They also are not permanent—they can be decreased just like they can be increased, as in fact occurred when the comprehensive review of the Nevada opera-tions was announced. (*Id*. ¶¶ 148, 161) Thus, Plaintiffs' motive allegation requires Defendants

to have had a reason to want Hecla to obtain a better credit rating and larger credit line for a limited period of time, until Nevada's poor performance was disclosed. However, Plaintiffs allege no reason why Defendants would have wanted this: Plaintiffs do not allege any benefit to Hecla's officers from such a scheme, nor do they allege Hecla took advantage of its allegedly inflated credit rating by borrowing money at allegedly favorable terms during the Class Period or using a larger credit line to make additional acquisitions.

The Ninth Circuit recently rejected similar scienter allegations in *Nguyen v. Endologix*, 962 F.3d 405 (9th Cir. 2020). There, a shareholder of a medical device company claimed securities fraud after the company announced it had not secured FDA approval for a new product. *Id.* at 407. The shareholder alleged the company knew, based on experience with European regulators, that the FDA would refuse to approve the product. *Id.* The Ninth Circuit held that the inference of scienter was not cogent. It asked, "why would defendants promise the market that the FDA would approve Nellix if defendants knew the FDA would eventually figure out that Nellix could not be approved?" *Id.* at 415. The court concluded that the plaintiff's scienter theory "depends on the supposition that defendants would rather keep the stock price high for a time and then face the inevitable fallout once Nellix's 'unsolvable' migration problem was revealed." *Id.* The court held: "The allegation does not resonate in common experience. And the PSLRA neither allows nor requires us to check our disbelief at the door." *Id.* So too here.

As a result, Plaintiffs are left to try to plead the even more difficult circumstantial case of scienter. To plead such a case, Plaintiffs must plead that "*specific* contradictory information was available to the defendants *at the same time* they made their misleading statements." *Das*, 332 F. Supp. 3d at 813 (emphasis in original). "Plaintiffs must *specifically identify* the reports or statements that are contradictory to the statements made, or must provide specific instances in which

Defendants received information that was contradictory to their public declarations." *Glaser v. The9*, 772 F. Supp. 2d 573, 588 (S.D.N.Y. 2011) (emphasis in original). Plaintiffs' allegations do not satisfy that standard. As explained above, their "confidential witness" allegations do not plead any specific facts that contradict any statement at the time it was made. *Supra* at 14-17.

Further, any inference of scienter is strong enough to satisfy this element only if it is at least as strong as the competing inference of nonfraudulent intent. *Tellabs*, 551 U.S. at 314. This analysis requires consideration of the totality of the allegations and record available to the Court on the motion to dismiss. *Id.* at 325. Here, that means the Court must weigh against any inference of scienter the fact that Defendants disclosed *throughout the time they supposedly intended to deceive investors* the problems with the Nevada operations and its poor actual performance. They disclosed problems with water, Fire Creek's clay ore, Hollister's carbonaceous ore, that Midas's performance was so weak it was shut down seventeen days Hecla acquired it, that Klondex had not done sufficient exploration, and that there had been personnel loss. *Supra* at 4-5. They also disclosed losses from the Nevada operations as that performance occurred, as well as significantly increased production costs that significantly exceeded sale prices. *Id.* at 5-7. These are not the actions of individuals attempting to conceal that the Nevada operations were not performing to expectation. *See, e.g.*, *Kuriakose v. Federal Home Loan Mortg. Corp.*, 897 F. Supp. 2d 168, 185 (S.D.N.Y. 2012) ("[T]he bevy of truthful disclosures that [defendant] made throughout the Class Period … negates an inference of scienter. It defies logic to conclude that executives who are seeking to perpetrate fraudulent information upon the market would make such fulsome disclosures."). Here, the Company's disclosures revealed a steady stream of challenges, problems, and poor performance. The disclosures contradict an inference of scienter.

## Conclusion

For the foregoing reasons, the Court should dismiss this action with prejudice.

Dated: December 9, 2020

Respectfully submitted,

 /s/ Stefan Atkinson
Stefan Atkinson, P.C.
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-4800
Stefan.Atkinson@kirkland.com

Joshua Z. Rabinovitz
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 389-5000
Joshua.Rabinovitz@kirkland.com

Counsel for Defendants