**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ROBERT GLUCK, EMMA GLUCK and SARA GLUCK, on behalf of themselves and all others similarly situated, | Case No.: 19-cv-4883 (ALC) |
| Plaintiffs, | CLASS ACTION |
| vs. | JURY TRIAL DEMANDED |
| HECLA MINING COMPANY, PHILLIPS S. BAKER, JR., LINDSAY A. HALL, and LAWRENCE P. RADFORD, | (Consolidated with Case No.: 19-cv-5719 (ALC)) |
| Defendants. | |

**LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

**KAPLAN FOX & KILSHEIMER LLP**
Robert N. Kaplan
Jeffrey P. Campisi
Jason A. Uris
850 Third Avenue, 14th Floor
New York, NY 10022

*Lead Counsel for Lead Plaintiffs and the Proposed Class*

Dated: January 22, 2021

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ................................................................................................ ii

I.    PRELIMINARY STATEMENT ................................................................................. 1

II.   FACTUAL BACKGROUND ..................................................................................... 5

    A.  Defendants' Due Diligence Reveals Numerous Material Problems Plaguing the
        Nevada Mines That Were Draining Capital and Cash Flows ............................................ 5

    B.  While Conditions at the Nevada Mines Further Deteriorate, Defendants Close
        the Acquisition of the Nevada Mines and, Based on Their False Representations
        of the Nevada Mines' Purported Positive Cash Flows, Hecla Is Able to Have Its
        Credit Metrics and Ratings Improve ............................................................................ 7

    C.  Negative Conditions Continue to Drain Capital and Cash Flows from the
        Nevada Mines ................................................................................................................ 8

    D.  Defendants Begin to Reveal the Truth about the Nevada Mines Tthrough a
        Series of Partial Disclosures ......................................................................................... 9

III.  ARGUMENT ............................................................................................................. 10

    A.  The Complaint Adequately Alleges Falsity ............................................................... 11

     1.  Defendants Falsely Misrepresented Throughout The Class Period That the
        Nevada Mines Were Cash Flow Positive, or at Least Self-Funding ............................... 11

     2.  Defendants' Did Not Disclose the Ongoing Serious Problems Plaguing the
        Nevada Mines or Their Impact on Production and Cash Flow ....................................... 13

     3.  Defendants' Arguments Improperly Dispute Facts ....................................................... 17

     4.  Defendants' Misrepresentations Were Not Accompanied by Meaningful
        Cautionary Risk Language .......................................................................................... 20

     5.  The Complaint Adequately Alleges Information Based on CIs ...................................... 21

    B.  The Complaint Alleges a Cogent and Compelling Inference of Scienter ...................... 22

     1.  Defendants' Motive and Opportunity to Commit Fraud ................................................ 23

     2.  Defendants' Conscious Misbehavior and Reckless Conduct ......................................... 24

IV.   CONCLUSION .......................................................................................................... 25

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Abramson v. Newlink Genetics Corp.*,
965 F.3d 165 (2d Cir. 2020)..................................................................................... 13

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)............................................................................................... 11

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)............................................................................................... 11

*Chapman v. Mueller Water Products, Inc.*,
466 F. Supp. 3d 382 (S.D.N.Y. 2020)...................................................................... 20

*City of Pontiac Gen. Emp. Ret. Sys. v. Lockheed Martin Corp.*,
875 F. Supp. 2d 359 (S.D.N.Y. 2012)...................................................................... 24

*Emp.' Ret. Sys. of Gov't of the V.I. v. Blanford*,
794 F.3d 297 (2d Cir. 2015)................................................................................ 22, 24

*Ganino v. Citizens Util. Co.*,
228 F.3d 154 (2d Cir. 2000)................................................................................... 13

*Gissen v. Endres*,
739 F. Supp. 2d 488 (S.D.N.Y. 2010)...................................................................... 20

*Gray v. Wesco Aircraft Holdings, Inc.*,
454 F. Supp. 3d 366 (S.D.N.Y. 2020)...................................................................... 20

*In re AmEx. Sec. Litig.*,
2008 WL 4501928 (S.D.N.Y. Sept. 26, 2008).......................................................... 21

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
324 F. Supp. 2d 474 (S.D.N.Y. 2004)...................................................................... 24

*In re Bank of Am. AIG Disclosure Sec. Litig.*,
980 F. Supp. 2d 564 (S.D.N.Y. 2013)...................................................................... 17

*In re BioScrip, Inc. Sec. Litig.*,
95 F. Supp. 3d 711 (S.D.N.Y. 2015)........................................................................ 13

*In re Complete Mgmt., Inc. Sec. Litig.*
153 F. Supp. 2d 314 (S.D.N.Y. 2001)...................................................................... 23

*In re EVCI Colls. Holding Corp. Sec. Litig.*,
469 F. Supp. 2d 88 (S.D.N.Y. 2006)................................................................ 24

*In re IPO Sec. Litig.*,
220 F.R.D. 30 (S.D.N.Y. 2003) ....................................................................... 21

*In re Sadia, S.A. Sec. Litig.*,
643 F. Supp. 2d 521 (S.D.N.Y. 2009)............................................................. 25

*In re Scholastic Corp. Sec. Litig.*,
252 F.3d 63 (2d Cir. 2001)............................................................. 10, 22, 25

*In re Scottish Re Group Sec. Litig.*,
524 F.Supp.2d 370 (S.D.N.Y. 2007)............................................................. 25

*In re Signet Jewelers Ltd. Sec. Litig.*,
2018 WL 6167889 (S.D.N.Y. Nov. 26, 2018) ............................................... 14

*In re STEC Inc. Sec. Litig.*,
2011 WL 2669217 (C.D. Cal. June 17, 2011) ............................................... 14

*In re Textron Sec. Litig.*,
2020 WL 4059179 (S.D.N.Y. July 20, 2020) ............................................... 20

*In re Vivendi, S.A. Sec. Litig.*,
838 F.3d 223 (2d Cir. 2016)................................................................. 12, 13

*In re: EZCorp, Inc. Sec. Litig.*,
181 F. Supp. 3d 197 (S.D.N.Y. 2016)............................................................. 12

*Ind. Pub. Ret. Sys. v. SAIC, Inc.*,
818 F.3d 85 (2d Cir. 2016)........................................................... 3, 12, 23

*Jackson v. Abernathy*,
960 F.3d 94 (2d Cir. 2020)............................................................................. 25

*Kuriakose v. Fed. Home Loan Mort. Corp.*,
897 F. Supp. 2d 168 (S.D.N.Y. 2012)............................................................. 25

*Local 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*,
595 F.3d 86 (2d Cir. 2010)............................................................................. 13

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
515 F.3d 702 (7th Cir. 2008) ........................................................................ 23

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011)................................................................................. 10

*Meyer v. Jinkosolar Holdings Co.*,
    761 F.3d 245 (2d Cir. 2014)........................................................... 2, 11, 20

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000).............................................. 10, 12, 13, 21

*Nguyen v. Endologix*,
    962 F.3d 405 (9th Cir. 2020) ............................................................. 23

*Richman v. Goldman Sachs Group, Inc.*,
    868 F. Supp. 2d 261 (S.D.N.Y. 2012).................................................. 24

*Rombach v. Chang*,
    355 F.3d 164. (2d Cir. 2004)......................................................... 3, 20

*Roofer's Pension Fund v. Papa*,
    2018 WL 3601229 (D.N.J. July 27, 2018) ........................................ 13

*SEC v. Penn*,
    225 F. Supp. 3d 225 (S.D.N.Y. 2016).................................................. 24

*Setzer v. Omega Healthcare Inv'rs, Inc.*,
    968 F.3d 204 (2d Cir. 2020)...................................................... 13, 24

*Skiadas v. Acer Therapeutics, Inc.*,
    2020 WL 4208442 (S.D.N.Y. July 21, 2020) ............................ 3, 18, 23

*Speakes v. Taro Pharm. Indus., Ltd.*,
    No. 16-CV-08318 (ALC), 2018 WL 4572987 (S.D.N.Y. Sept. 24, 2018).................. 2, 18, 21

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Cap., Inc.*,
    531 F.3d 190 (2d Cir. 2008)............................................................. 25

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)........................................................................ 22

*Va. Bankshares, Inc. v. Sandberg*,
    501 U.S. 1083 (1991)...................................................................... 13

## Rules

Fed. R. Civ. P. 9(b) ................................................................................ 4, 10

Fed. R. Civ. P. 15(a)(2)............................................................................ 25

# I.    **PRELIMINARY STATEMENT**

The nub of Defendants'[1] argument is that they did not mislead investors because "all of the problems" plaguing the Nevada Mines alleged in the Complaint were disclosed by the start of and throughout the Class Period.[2]  Mot. at 3-8; 16.  As set forth in the charts below (at 14-19), Defendants' arguments are strained, inaccurate, ignore and contradict key facts, improperly seek factual inferences in their favor, and Defendants' references to their disclosures present a cropped picture, selecting portions of quotes.  Defendants ignore that the Complaint alleges that, by the start of the Class Period, water continually filled the underground mines, the amount of water grew throughout the Class Period, that key infrastructure to manage the water was damaged or inoperable, that Defendants lacked permits needed to effectively discharge excess water, and that there were problems with development, production and ore—all of which increased costs and drained the Company's capital.  None of these facts were disclosed until after the Class Period.  ¶¶148-51, 153-55, 159-70.

Indeed, after the Class Period, several research analysts that followed Hecla expressed surprise and astonishment at the severity of the problems that had not previously been disclosed. *See* ¶150 (analyst confounded by Defendants' May 9, 2019 disclosure and asking Baker for disclosure of "what the problems actually are in Nevada"), ¶153 (analyst noting in May 2019 that Defendants disclosed a "plethora" of problems); ¶155 (analyst downgrading Hecla stock and noting Defendants' May 9, 2019 disclosures represent a "complete reversal" since the Company

---

[1] "Defendants" means Defendant Hecla Mining Company ("Hecla" or the "Company"); Defendant Phillips S. Baker, Jr. ("Baker"), Hecla's President and CEO; Defendant Lindsay A. Hall ("Hall"), Hecla's Senior Vice President and CFO; and Defendant Lawrence P. Radford ("Radford"), who during the Class Period served in various senior management roles until he resigned after the Class Period. *See* Consol. Class Action Compl., ECF No. 86 (the "Complaint"), ¶¶2, 7, 33-35.  Defendants Baker, Hall and Radford are referred to as the "Individual Defendants".  Citations to "Mot. at __" refer to Defendants' Memo. in Support of Defendants' Motion to Dismiss (ECF No. 95).

[2] The Class Period is March 19, 2018 through May 8, 2019. ¶2.

acquired the Nevada Mines).  Defendants offer no explanation why Hecla's stock price crashed 37% through partial disclosures or the surprise of research analysts in response to Defendants' disclosures, if, as they assert, all the problems were disclosed by the start of and throughout the Class Period.  And, even assuming *arguendo*, Defendants purportedly disclosed certain very limited, negative conditions at the Nevada Mines, Defendants' representations were materially false and misleading because they violated the black-letter rule of securities law that "once a company speaks on an issue or topic, there is a duty to tell the whole truth".  *Meyer v. Jinkosolar Holdings Co*., 761 F.3d 245, 250 (2d Cir. 2014).  Defendants certainly did not do that.

Further, Defendants repeatedly make in their brief self-serving, *ipse dixit* assertions about the meaning of their representations and admissions—in effect testifying and asking the Court to make improper factual inferences in their favor. *Speakes v. Taro Pharm. Indus., Ltd.*, No. 16-CV-08318 (ALC), 2018 WL 4572987, at *6 (S.D.N.Y. Sept. 24, 2018) (Carter Jr., J.) (disagreement about proper reading of misrepresentation presents question of fact).  For example, Defendants assert that Baker's admission, after the Class Period and after Defendants effectively shut down the Nevada Mines, that "for the first time since the acquisition of Klondex a year ago, our plans show us generating more cash than we spend" did not refer to the Nevada Mines specifically, but was a more general statement about "cash flow at the corporate-level". Mot. at 14.  But Baker discussed reducing expenses at the Nevada Mines, and what he said, in effect, was that because Defendants "have nearly stopped all development" at the Nevada Mines, they stopped hemorrhaging cash. ¶166. Indeed, Defendants' quarterly report for the quarter ended June 30, 2019, filed with the SEC the day after Baker's admission, confirmed that "total production and capital costs have exceeded sales at our Nevada operations *since the acquisition*" (¶167)—an allegation Defendants ignore.  Defendants' self-serving interpretations cannot be

credited on a motion to dismiss.

Defendants argue that many of their representations were forward-looking and accompanied by meaningful cautionary language. Defendants' arguments ignore that many of their misrepresentations concerned current or historical facts, and therefore are not forward-looking. Even assuming, *arguendo*, a statement is considered forward-looking, where such statements include mixed representations of current or historical facts, they are not protected by the safe harbor provisions of the Private Securities Litigation Reform Act of 1995 ("PSLRA"). Likewise, Defendants' arguments that they provided cautionary warnings about future risks, and are therefore protected from liability, ignore that the Complaint alleges Defendants' future risk warnings were themselves materially false and misleading because they failed to warn of risks that had already materialized. The Second Circuit and numerous courts in this District have held that a future risk disclosure itself can constitute a material misrepresentation when it presents a risk that has already transpired. *Rombach v. Chang*, 355 F.3d 164, 173. (2d Cir. 2004).

In addition, the Complaint alleges facts that give rise to a strong inference of Defendants' scienter based on both motive and opportunity to commit fraud, and facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. Defendants argue that the Complaint's motive allegations are "illogical" because the Complaint fails to allege "any motive Defendants had to fraudulently cause a short-term credit rating and credit line increase that Defendants knew would be quickly reversed," and that Defendants did not take advantage of Hecla's enhanced credit rating or draw on its line of credit. Mot. at 1-2. Defendants' argument has been rejected by the Second Circuit and courts within this District because it confuses expected with realized benefits. *See Skiadas v. Acer Therapeutics, Inc.* 2020 WL 4208442, at *7-8 (S.D.N.Y. July 21, 2020) (citing *Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 97 (2d Cir.

2016)).  The Complaint alleges that Defendants made a reckless gamble—concealing the bad news about the Nevada Mines in order to increase Hecla's credit rating in the hope that they would refinance $500 million of debt at a lower rate and increase Hecla's line of credit.  The fact that Defendants' reckless gamble ultimately failed—their deceit was revealed before they could take advantage—is not inconsistent with its having been considered and an undisclosed, reckless gamble.  As cogent and at least as compelling as Defendants' opposing inferences is that Defendants believed that they would refinance Hecla's debt or draw on its expanded line of credit before the truth about the Nevada Mines was revealed, and that the benefits of their deceit exceeded the costs.

Likewise, Defendants' argument that the Complaint fails to allege Defendants' recklessness ignores that the Complaint alleges with particularity the ongoing negative conditions that existed at the Nevada Mines, including meetings and specific negative information discussed with or available to Defendants—allegations that are corroborated by information obtained from Confidential Informants ("CIs"), which among other facts, support an inference of scienter.  When these allegations are viewed holistically with Defendants' admissions after the Class Period—including Defendant Baker's admission (¶168), not mentioned by Defendants in their brief, that, in effect, with respect to the Nevada Mines, Defendants were attempting "to take this plane that was flying and redesign and rebuild it in the air"—the Complaint alleges an inference of scienter that is cogent and at least as compelling as Defendants' suggested inferences that they did nothing wrong.

For these reasons and as further explained below, the Complaint adequately alleges Defendants' materially false and misleading statements and scienter with the particularity required by Rule 9(b) of the Federal Rules of Civil Procedure and the PSLRA, and Defendants'

motion to dismiss should be denied in its entirety.

## II.    FACTUAL BACKGROUND

Before the Class Period, in advance of Hecla's acquisition of the Nevada Mines (comprised of the Fire Creek, Midas and Hollister mines) from Klondex, the Individual Defendants conducted due diligence and onsite physical inspections of the Nevada Mines that, according to Baker, provided them "significant insights" into the Nevada Mines, particularly Fire Creek, which was the crown jewel or "cornerstone" of the three mines. ¶¶1, 6, 7, 11, 41, 68, 73, 88, 149, 180-81. Based on Defendants' due diligence over four months, on March 19, 2018 Baker represented to investors that "from the get-go", the Nevada assets are going to be "cash flow positive", the worst case scenario "is we get all of our money back" and that the Nevada Mines required investment of "relatively small capital", assuring investors that any capital outlay would be paid from the cash flow generated by the Nevada Mines and that the Nevada Mines were self-funding. ¶91.  In particular, Defendants represented that the Fire Creek mine was then producing "robust cash flows".  ¶88.  Baker represented that the acquisition of the Nevada Mines would be "accretive" and "dramatically" improve the Company's credit metrics and advance the goal of becoming investment grade, given the small amount of capital that the Nevada Mines would require—the key fact motivating Defendants' acquisition. ¶¶88-89, 186-87.  Unknown to investors, by the start of the Class Period, the Nevada Mines were cash flow negative, and the acquisition was dilutive. ¶¶92, 148-51, 153-55, 159-70.

### A.    Defendants' Due Diligence Reveals Numerous Material Problems Plaguing the Nevada Mines That Were Draining Capital and Cash Flows

While Defendants represented that the Nevada Mines would benefit the Company's credit profile and were cash flow positive, or at least self-funding, in truth, as Baker admitted after the Class Period, Defendants' learned of the undisclosed problems during due diligence

(¶¶149-51), the acquisition of the Nevada Mines was an undisclosed attempt "to take a plane that was flying and redesign it and rebuild it in the air" that was and would increasingly drain capital (¶168), and Defendants' internal mine plans at the start of the Class Period showed the Nevada Mines were consuming more cash than the Nevada Mines produced. ¶¶166-67.

According to multiple CIs, before the start of the Class Period, the "cornerstone asset", Fire Creek, had been experiencing a perfect storm of negative events. ¶¶88, 69, 72. Yet, Defendants represented that Fire Creek had "robust cash flows". Contrary to Defendants' representations, at the Fire Creek mine, water continually collected at the bottom of the mine, and water flow was increasing, a negative trend that continued throughout the Class Period. ¶¶50, 63, 67, 69, 72, 150. CI 12, a senior mine engineer whose duties included management of the water treatment plant at Fire Creek, observed excessive water became a problem in early 2018. ¶¶ 50-52, 74. As Baker admitted after the Class Period, excess water "limited places that we're able to go in the mine because we cannot deal with the water fast enough to be able to effectively move forward. So our advance rate really slowed down and our ability to mine in those areas slows down". ¶150. Moreover, the excess water problem was aggravated by both the lack of permits to discharge water and decrepit water treatment infrastructure that required major capital investment to maintain and repair. ¶¶50, 150.[3] To the contrary, during the Class Period, Defendants falsely represented that they had adequate permits and they failed to disclose that they needed to make substantial capital investments to improve the aging, antiquated infrastructure. ¶¶ 111, 50, 60, 87, 98-99, 123-24, 135, 138-39, 149.

Defendants' makeshift efforts to remediate the excess underground water consumed

---

[3] At the end of the Class Period, Defendants admitted that key water treatment infrastructure at Fire Creek (the rapid infiltration basins, or RIBs), which was failing before the Class Period, needed to be redesigned and rebuilt at great expense, an allegation Defendants ignore. ¶¶50, 150.

significant cash flow.  Indeed, excessive water discharge within the Fire Creek facility forced the Company to use tanker trucks to transport water to the Midas mill at great cost. ¶66. Furthermore, excessive sediments of clay in the material caused the Company to use chemicals to clean the water prior to evaporation from the pond, which caused water pumps to malfunction. ¶¶66-67.  Similarly, by the start of the Class Period, both the Hollister and Midas mines also faced significant water and infrastructure issues.  ¶¶59, 68.  In addition, as Baker admitted after the Class Period, that while conducting due diligence, Defendants learned of problems with the characteristics of the gold ore—low quality refractory ore (ultra-fine gold which require special equipment and chemicals to extract that the Nevada Mines did not have) and low grade ore—characteristics that reduced both the amount of gold the Nevada Mines could actually produce and cash flows.  ¶¶58[4], 70.  Finally, by the start of the Class Period, key, essential personnel that worked at the Nevada Mines resigned due to the poor conditions at the Nevada mines, which reduced productivity and cash flows.  ¶75.  None of this was disclosed.

> **B.**    **While Conditions at the Nevada Mines Further Deteriorate, Defendants Close the Acquisition of the Nevada Mines and, Based on their False Representations of the Nevada Mines' Purported Positive Cash Flows, Hecla Is Able to Have Its Credit Metrics and Ratings Improve**

On May 10, 2018, Baker stated "we're talking to rating agencies to make sure they understand what Hecla looks like with" the Nevada Mines.  ¶95.  Then on July 18, 2018, Hecla's line of credit was increased from $100 million to $200 million (and later, in November 2018, to $250 million).  ¶¶101, 125.  By July 24, 2018, S&P raised Hecla's credit rating based, in material part, on the purported cash flows then being produced at the Nevada Mines. ¶104.  However, the undisclosed negative conditions known by the start of the Class Period were further deteriorating.  In or around June 2018, additional underground water was encountered at the Fire

---

[4] Not until after the Class Period did Defendants pursue efforts to process refractory ore, an allegation Defendants ignore.  ¶159.

Creek mine and excess water flow continued unabated. ¶51.  Fire Creek's excess water became so serious that by approximately July 2018, the Company retained outside contractors, including Sandvik Mining, to assist with the escaping ground water, at great cost.  ¶62.  In July 2018, according to CI 10, John Spring, Fire Creek's chief geologist, held a meeting with the Hecla management team, which would include the Individual Defendants, during which Spring raised the drilling, refractory ore and water issues.  ¶77.  Furthermore, CI 9 attended meetings with Defendant Radford and employees of the Nevada Mines at which Radford acknowledged problems with the ore body and water buildup at the mill, including at Fire Creek. ¶¶78-79.

In sharp contrast to the true condition of the Nevada Mines, on July 23, 2018, Baker represented that Hecla now has "three high-grade mines" that "immediately add production and cash flow" and just days later, on August 9, 2018, Defendants repeated these false representations, and further represented that the Nevada Mines are "self-funding".  ¶¶102, 107, 109.  Baker also falsely represented that, with respect to permits, "we've got everything we need."  ¶111.  However, after the end of the Class period, Baker admitted that the Nevada Mines did not have proper permits to discharge water.  ¶150.

## C.    Negative Conditions Continue to Drain Capital and Cash Flows from the Nevada Mines

Defendants Radford and Hall participated in weekly production meetings and discussed water and ore characteristic problems, and the strain these issues were having on production. ¶¶78-79.  According to CI 8, in the fall of 2018, Radford participated in a planning meeting where build-up of excessive water within the Fire Creek mine was discussed.  More ominously, according to CI 10, during the fall of 2018, Defendants confirmed that the Joyce and Vonnie veins at Fire Creek were not high grade ore, further confirming that the Nevada Mines did not contain high grade gold ore, contrary to the representation Defendants had made that Fire Creek

had "robust cash flows" and "high-grade" ore. ¶¶82, 119, 136.  On November 8, 2018, in direct contradiction of the negative facts known to Defendants, Baker represented "we see Nevada being able to largely pay for the Hatter Graben, to pay for the development within Fire Creek" and "we can run it pretty close to cash flow neutral and that is what we have suggested we would be able to do."  ¶123.  Just days later, on December 4, 2018, Defendant Hall represented that "[t]here's no major capital expenditures that we can't fund out of the Nevada operations." ¶129.

In or around January 2019, the decrepit water treatment infrastructure at the Nevada Mines deteriorated further.  ¶52. The leak at Fire Creek's Dewatering Storage Pond, which was leaking since 2017, began leaking even more water and due to lack of capacity and permits, Defendants contracted with yet another company, PDQ Trucking, to ship the water in tanker trucks to the Midas mine at great cost. ¶¶52, 83-84.  By no later than February 14, 2019, Fire Creek's reverse osmosis water treatment plant, which was needed to treat water from the mine before discharging it, began to experience difficulties treating the flow of the mine-dewatering, thus impeding production. ¶53.  Around that time, Baker again visited the Nevada Mines and observed how the material, negative conditions were then affecting production and draining cash flows. ¶85.

### D.    Defendants Begin to Reveal the Truth about the Nevada Mines through a Series of Partial Disclosures

Defendants began to reveal the truth about the Nevada Mines through a series of partial disclosures on February 21 and April 18, 2019. ¶¶16-17, 132, 134 (February 21, 2019 partial disclosures); ¶¶18-19, 145-46 (April 18, 2019 partial disclosures).   However, Hecla's stock price continued to be artificially inflated as a result of Defendants' misrepresentations.  ¶¶135-40, 142-44, 146-47.  Then, on May 9, 2019, before the market opened, Hecla shocked investors and analysts when the Company disclosed a "comprehensive review" of its Nevada operations.  ¶¶21,

148-53, 160.  Baker admitted that during due diligence, which occurred before the start of the Class Period, Defendants learned of "problems" "managing the water", that the water problem grew over the Class Period, the need to construct "some infrastructure", that the Nevada Mines lacked adequate permits for discharging the water, and problems with "ore characteristics". ¶¶149-51.  As a result of Defendants' disclosures, on May 9-10, 2019, the price of Hecla's common stock declined by $0.48 per share, or approximately 24%, from a closing price of $2.04 per share on May 8, 2019, to close at $1.56 per share on May 10, 2019 on heavier than usual volume. ¶148.  In total, the three disclosures caused Hecla stock to decline by 37%.

On June 6, 2019, Defendants effectively shut down the Nevada Mines thereby, in effect, losing all of Hecla's investment. ¶¶159-60.  In June 2019, S&P and Moody's, respectively, downgraded the Company's credit rating, and in July 2018, Hecla's line of credit was reduced by 40%. ¶¶161-62.  On August 7, 2019, Hecla disclosed both that Radford had resigned his position (and later left the Company in December 2019), and that Dean McDonald, SVP of Exploration, would resign from the Company.  ¶¶27, 35, 164.  The next day, Hecla disclosed that it was uncertain whether the operational issues at the Nevada Mines could ever be resolved.  ¶167.

## III.  <u>ARGUMENT</u>

To state a claim under Rule 10b-5 of the Securities Exchange Act of 1934 ("'34 Act"), Plaintiffs must allege that Defendants: (1) made a material misstatement or omission; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; (5) economic loss; and (6) loss causation.  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011).  Defendants' motion only challenges the adequacy of the falsity and scienter allegations.  Under the PSLRA and Rule 9(b), a plaintiff is not required to plead a "detailed evidentiary matter," *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001), but simply sufficient facts "to support a reasonable belief" that defendants' statements were

materially false or misleading.  *Novak v. Kasaks*, 216 F.3d 300, 314 n.1 (2d Cir. 2000).  In ruling on a motion to dismiss, the Court must accept as true all well-pleaded factual allegations and draw all reasonable inferences in the plaintiffs' favor.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Dismissal is appropriate only where "[Plaintiffs] can prove no set of facts consistent with the complaint that would entitle them to relief."  *Meyer*, 761 F.3d at 249.  Thus, the Complaint need only contain sufficient facts "to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

   A.   **The Complaint Adequately Alleges Falsity**

   1.   **Defendants Falsely Misrepresented Throughout the Class Period That the Nevada Mines Were Cash Flow Positive, or at Least Self-Funding**

   The Complaint alleges that Defendants misrepresented current or historical facts concerning the Nevada Mines' cash flows and operations.  ¶91 (on 3/19/18: "from the get-go, the Nevada assets are going to be cash flow positive" and "basically the downside is we get all of our money back"); ¶89 (on 3/19/18: falsely representing that the Nevada Mines did not require significant capital investment); ¶102 (on 7/23/18: "these assets immediately add production and cash flow"); ¶107 (on 8/9/18: "[t]he Nevada assets are basically self-funding,"; ¶123 (on 11/8/18: "We see Nevada being able to pay for the Hatter Graben, to pay for the development within Fire Creek"); ¶129 (on 12/4/18: "[t]here's no major capital expenditures that we can't fund out of the Nevada operations"); ¶138 (on 2/21/19: "we're right at positive cash flow from Nevada"). These representations were materially false and misleading because at that time the Nevada Mines were not cash flow positive and required to be "redesigned and rebuilt" through significant capital investment, contradicting Defendants' representations to Hecla investors. ¶¶15, 50-87, 92, 108, 130, 139, 148-58, 166, 168.

   Defendants' argument that their representations are "not actionable" because they were

"all forward-looking" and protected by the PSLRA's safe harbor (Mot. at 10-11), is wrong. Defendants represented the Nevada Mines were currently cash flow positive, or at least self-funding, while they knew or recklessly ignored that the opposite was true, *Novak*, 216 F.3d at 315. Because these are statements of present fact, they are not protected by the PSLRA's safe harbor. *In re: EZCorp, Inc. Sec. Litig.*, 181 F. Supp. 3d 197, 207–08 (S.D.N.Y. 2016) (Carter, Jr., J.).[5] Other misrepresentations that Defendants assert are forward-looking (*e.g.* ¶¶109, 121, 123, 129), contain some elements that look forward and others that do not, and forward-looking elements are severable from non-forward-looking elements. For example, Baker's representations that Defendants were "not anticipating the need to make significant contributions into Nevada", "we see Nevada being able to largely pay for" development, and "there's no major capital expenditures that we can't fund out of the Nevada operations" (¶¶123, 129), represented to investors that the Nevada Mines were, at that time, producing sufficient cash flows and did not require major capital investment, while the Complaint alleges the opposite was true. ¶¶15, 124, 130. Mixed present and future statements are not entitled to the safe harbor with respect to the part of the statement that refers to the present. *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 246 (2d Cir. 2016).

Defendants argue that Baker's statement that he expected the acquisition of the Nevada Mines to be "accretive on many important financial and credit metrics" is "immaterial", opinion and too vague to be actionable. Mot. at 18, n. 10. However, this statement was verifiably untrue—Defendants' mine plans and the ongoing negative conditions impeding production and

---

[5] The Complaint further alleges that Defendants violated Item 303 of Regulation S-K by failing to disclose ongoing material negative trends ***and*** uncertainties in Hecla's SEC filings. ¶¶115, 126, 142; *See SAIC*, 818 F.3d at 88. Defendants make conclusory assertions that the Complaint has not alleged a "trend" that was not already disclosed, but ignore uncertainties. Mot. at 17, n.9. As set forth in the chart below, Defendants' disclosure arguments are meritless.

requiring significant capital investment showed the acquisition was dilutive—therefore, Baker asserted facts based on due diligence about the Nevada Mines that were false and misleading. *Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1093 (1991); *Novak*, 216 F.3d at 315.[6]

## 2.    Defendants' Did Not Disclose the Ongoing Serious Problems Plaguing the Nevada Mines or Their Impact on Production and Cash Flow

Defendants assert that the undisclosed negative problems were all disclosed (Mot. at 3-8, 16-17), in effect, asserting "truth on the market." This is not accurate. However, in any event, the Second Circuit has held that any asserted "corrective information must be conveyed to the public with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by the alleged misstatements" and the "defense is intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint . . . ." *Ganino v. Citizens Util. Co.*, 228 F.3d 154, 167 (2d Cir. 2000); *Roofer's Pension Fund v. Papa*, 2018 WL 3601229, at *9 (D.N.J. July 27, 2018). As set forth in the chart below, Defendants' so-called disclosures failed to do so. Indeed, several of Defendants' so-called disclosures misleadingly express optimism or misrepresent the extent of the ongoing problems. *Setzer v. Omega Healthcare Inv'rs, Inc.*, 968 F.3d 204, 216 (2d Cir. 2020); *Op. Local 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92 (2d Cir. 2010) (stating veracity of a statement or omission is measured by ability to mislead, not by literal truth). "It is well-established . . . that once a company speaks on an issue or topic, there is a duty to tell the whole truth, [e]ven when there is no existing independent duty to disclose information on the issue or topic", *Vivendi*, 838

---

[6] Moreover, while Defendants assert that investors "pay no mind" to such representations, Defendants repeated discussion of the impact of the acquisition on Hecla's credit shows that they were, in fact, material to investors. ¶¶89-90, 95, 101, 104, 125. Assuming, *arguendo*, Baker's statement is considered an opinion, Baker omitted contrary facts that substantially undermine the conclusion a reasonable investor would reach from a statement of opinion, therefore his statement is misleading and actionable. *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 178 (2d Cir. 2020). Defendants' assertion, without explanation or supporting argument, that 14 other representations are opinion (s*ee* Appendix A (ECF No. 95-1)), is meritless for the same reason.

F.3d at 258, and be "both accurate and complete." *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d

711, 727 (S.D.N.Y. 2015). Moreover, analyst surprise and shock at Defendants' disclosures in

May 2019 underscore the plausibility and reasonableness of the false impression that

Defendants' misrepresentations had. *See In re Signet Jewelers Ltd. Sec. Litig.*, 2018 WL

6167889, at *13 (S.D.N.Y. Nov. 26, 2018) (finding analyst reaction among facts that give rise to

a plausible inference that Defendants' statements were misleading); *see also In re STEC Inc. Sec.*

*Litig.*, 2011 WL 2669217, at *8 (C.D. Cal. June 17, 2011) (same).

| Defendants' Purported Disclosure | Material Facts Defendants Failed to Disclose and Defendants' Mischaracterize Facts |
|---|---|
| Defendants assert that when Defendant Radford disclosed on May 10, 2018 that they were constructing a new tailing facility investors should have understood that the Midas tailings pond was "almost full". Mot. at 4, 15. | Defendants' argument misses the point. Defendants did not disclose that, by early 2018, the Midas mine tailings pond was experiencing water build up at an alarming rate due to excessive processing of materials from Midas, Fire Creek and Hollister, they did not have permits needed to handle the water, and as a result, production was severely hampered and would continue to be until the water problem was resolved. ¶¶50, 61. Moreover, Defendants ignore that Radford represented that the transition to the new facility would be seamless: "we will push the construction of a new tailings facility this season as there is little overlap between the filling of the old facility and the commissioning of the new facility." ECF No. 96-5 at 6. This created the false impression there would be no material impact on production, when in fact, Midas had already been operating well below capacity since early 2018. Defendants' argument, which is, in effect testimony, that Radford disclosed that the Midas mine tailings pond was "almost full", is a red herring and does not disclose the severe production issues then negatively affecting the Nevada Mines. |
| Defendants argue that Hecla disclosed the need for new equipment on May 10, 2018 in a presentation filed with the SEC that listed 20 strengths and "opportunities" of the Klondex | Defendants failed to disclose the equipment issues alleged in the Complaint, which include for example, that "the Nevada Mines had few semi-trailers, not enough pumps for the ponds, old haulers and loaders, and did not own a single |

| Defendants' Purported Disclosure | Material Facts Defendants Failed to Disclose and Defendants' Mischaracterize Facts |
|---|---|
| acquisition, and among the listed "opportunities" was "replacement of old equipment." Mot. at 4, 16. | autoclave or roaster," which was necessary to process refractory ore. ¶58. Indeed, not only were the Nevada operations *completely lacking* essential equipment needed for production, but such equipment was "*not in Hecla's budget.*" ¶¶63, 65. Disclosure of a generic opportunity did not disclose the severity of the ongoing equipment issues, which included the need for additional and different equipment that they did not have and could not pay for, or that these issues were materially increasing Defendants' expenses associated with the Nevada Mines and impeded production of gold ore. |
| Defendants assert that because on August 9, 2018 Radford mentioned that "[i]n some areas of the mine, the road conditions are muddy", and on November 8, 2018, Defendants encountered "mush" (Mot. at 5-6, 16-17), they disclosed all of the undisclosed ongoing problems with water that had been negatively affecting production at the Nevada Mines. Mot. at 19-20. | Defendants present a cropped picture. They fail to mention that on August 9, Radford further stated the road conditions was "an issue in isolated areas", and that the road conditions "dramatic[ally] improve[d]", which is the opposite of what Defendants' argue was disclosed. ECF No. 96-7 at 7-8.<br><br>Defendants ignore that the Complaint alleges that the ongoing excess water problem affected all of the Nevada Mines—it was not isolated—and, that water continually filled the underground mines and the amount of water grew throughout the Class Period. And, Radford's statement certainly did not disclose that, as Baker admitted after the Class Period, that water limited access to the mines, that the water could not be dealt with fast enough, or that it impeded production, or the major water issues and infrastructure defects plaguing the cornerstone Fire Creek mine. ¶¶50-80, 149. |
| Defendants argue that "Hecla disclosed on August 9, 2018, it had experienced "a lot" of turnover, and disclosed the need to reduce turnover even before that." Mot. at 16. | The Complaint alleges that from the start of the Class Period, in the midst of "mass defections of talented and experienced employees", *key personnel*, including several *senior geologists* resigned due to concerns that management of the Nevada Mines was not properly addressing ongoing production problems and failed to provide even basic essentials such as tools and hard hats for employees. ¶75. Defendants' unremarkable disclosure that the Company had |

| Defendants' Purported Disclosure | Material Facts Defendants Failed to Disclose and Defendants' Mischaracterize Facts |
|---|---|
| | experienced "a lot" of turnover failed to inform investors of the magnitude of underlying production problems and lack of essential equipment causing the turnover, and that the turnover actually included key, senior personnel who were not easily replaceable, or that these problems were materially increasing Defendants' expenses associated with the Nevada Mines. |
| On August 9, 2018, Defendants disclosed a "host of problems" including that Baker disclosed "that one of the three newly acquired mines, Midas, was being shut down entirely" (Mot. at 4). | Defendants' argument conflates the Midas mine, and the Midas ore milling facility, which was not shut down and which included the Midas tailing pond—key infrastructure for processing gold ore from Fire Creek and Hollister during the Class Period. ¶¶ 6, 59. Defendants ignore that they did not disclose the myriad ongoing problems at the functioning Midas processing facility which slowed production and increased costs, including excess water. ¶¶ 50, 52, 57, 59, 61, 63, 72, 86. |
| On August 9, 2018, Defendants disclosed the "Hollister ore is carbonaceous." Mot. at 5, 16. On November 8, 2018, Defendants disclosed Fire Creek's "clay issues". Mot. at 6, 16. | Defendants did not disclose that the high clay and carbon was a drain on capital and increased costs. Additional water was needed to process and extract the ore from excess clay and carbon. However, the Company did not have the permits, equipment or infrastructure required to manage excess water needed to process ore high in clay and carbon. Further, Defendants did not disclose that the clay and carbon was damaging equipment, were a drain on productivity, and increased costs. ¶¶ 57, 60, 62-64, 66, 68, 78, 87, 110. At the same time, Defendants continued to represent that the Nevada Mines were self-funding. ¶¶ 107, 123. |
| Defendants argue that Hecla's disclosure of "poor financial performance of the Nevada operations" is "inconsistent" with the Complaint's allegations. Mot. at 17. Specifically, Defendants assert that on August 9, 2018, Baker stated that Hecla was prepared for the Nevada Mines to "not generate returns immediately". *Id*. | Again, Defendants present a cropped picture, ignoring what Baker actually stated on August 9, 2018: "We are prepared to allow it -- this mine to *be self-funding* and not generate returns immediately". ECF No. 96-7 at 11. This was false and misleading because the Nevada Mines were not self-funding at that time. *See also* ¶107 (8/9/18: Hall: "The Nevada assets are basically self-funding"). |
| "On November 8 and 9, 2018, Hecla | Again, Defendants present a cropped picture. |

| Defendants' Purported Disclosure | Material Facts Defendants Failed to Disclose and Defendants' Mischaracterize Facts |
|---|---|
| disclosed its results for the third quarter of 2018—the first quarter in which it owned the Nevada operations. It disclosed a *loss* from the Nevada operations of $13.7 million. (Ex. 8 at 18) It also disclosed all-in sustaining costs ("AISC") for Nevada of $1,932 per gold ounce. (*Id.* at 57) This was significant because Klondex's final AISC disclosure before the sale was $1,107 per gold ounce. (Ex. 9 at 52) It was also significant because Hecla reported gold sales at an average price of $1,205 per ounce. (Ex. 8 at 45) Thus, Hecla's disclosure meant that, after owning the Nevada operations for only two months, its costs of production were 75% higher than Klondex had disclosed immediately before the transaction, *and* that the difference in cost now meant it cost Hecla significantly more to produce gold from the Nevada operations than the price at which it was selling it." Mot. at 5, *see also* 15, 17. | With respect to the losses Hecla reported on November 8, 2018, Defendants fail to mention that the higher costs were represented to be temporary or "going away". Baker attributed the higher per ounce cost at Nevada to a 7% decline in the price of gold and that Defendants "gave up about 1/4 of our third quarter" production to preserve purportedly "high-grade" mineralization. Radford further explained that the "high cost per ounce reflects low production more than anything" and added that the higher cost per ounce also reflects the sale of legacy "Hollister stockpile" which "distort the financial results." Given the lower production figure, costs increased. ECF 96-10 at 4-5, 7.<br><br>However, on November 8, Baker assured investors that temporary costs were "going away", "Fire Creek and Hatter Graben at Hollister are the keys to unlocking value" and the Nevada Mines were increasing production. ECF 96-10 at 6, 8, 10. Baker falsely assured investors that "we can run it pretty close to cash flow neutral" and at the time they were not "anticipating the need to make significant contributions into Nevada" (¶123), both of which were untrue at the time. ¶124. And, just days later, on December 4, 2018, Defendant Hall falsely represented "there's no major capital expenditures that we can't fund out of the Nevada operations." ¶¶129-30. |
| Defendants argue that Radford's February 21, 2019 representation that "we're looking at a bit more of a mobile dewatering plant, so that we're not managing the water underground" was not false and misleading. Mot. at 21-22; ¶140. | Defendants essentially argue that investors should have inferred from Radford's general statement that we are "looking at a bit more of a mobile dewatering plant" disclosed that Hecla was experiencing difficulties treating the flow of water at Fire Creek. But Radford failed to disclose the ongoing problems with excess water, that the then-current water treatment system was deficient, the lack of permits, or that just days before his statement, the decrepit water treatment infrastructure had further deteriorated. ¶¶52-53, 84-85.[7] |

---

[7] *In re Bank of Am. AIG Disclosure Sec. Litig.,* 980 F. Supp. 2d 564, 577-78 (S.D.N.Y. 2013),

### 3. Defendants' Arguments Improperly Dispute Facts

Defendants argue that, with respect to certain misrepresentations, which Defendants concede are not forward-looking,, "Plaintiffs do not plead with particularity facts establishing that any such statements were false or misleading." Mot. at 18-22. Defendants' arguments are meritless because they contradict and dispute the Complaint's allegations, and argue self-serving interpretations. When "there are multiple plausible readings of [a] statement", a fact issue is presented that cannot be resolved on a motion to dismiss. *Speakes*, 2018 WL 4572987, at *6; *Skiadas*, 2020 WL 4208442, at *2. Here are a few examples of Defendants' improper arguments:

| Defendants' Argument That Their Representations Were Not Misleading | Defendants' Dispute Facts, Ignore the Complaint's Allegations and Seek Inferences in Their Favor |
|---|---|
| Defendants assert that Hecla's March 19, 2018 statement that "Fire Creek is a cornerstone producing asset with robust cash flows" was not false and misleading when made because Fire Creek was, in fact, producing "robust cash flow". Mot. at 18-19. | Defendants rely on Klondex's financial statements as of December 31, 2017, nearly three months before the statement was made, and ignore and contradict the Complaint's allegation that Defendants' undisclosed mine plans at that time found that Hecla needed to invest significant capital before the Nevada Mines could be cash flow positive, and the CIs and other allegations that serious ongoing problems were negatively affecting Fire Creek before the start of the Class Period. ¶¶50-52, 57, 60, 62, 66-67, 69-74,166-68. |
| Defendants assert that Baker's representation on May 10, 2018 that "[w]hen we looked at Klondex … we saw extraordinary grades" was not false or misleading because the Complaint does not "allege facts establishing the Nevada Mines are not high grade." Mot. at 19. | Defendants ignore the Complaint's allegations that Baker *admitted* after the Class Period, that while conducting due diligence, Defendants learned of problems with the characteristics of the gold ore—e.g., low quality refractory ore and low grade ore—characteristics that reduced both the amount of gold the Nevada Mines could actually produce and cash flows, and further ignores CI allegations that they did not contain high grade gold ore. ¶¶58, 70, 75. |
| Defendants argue that Baker's false | However, it is undisputed that the Hatter |

where BofA's exposure to AIG had been widely reported in the national press, is inapposite.

| **Defendants' Argument That Their Representations Were Not Misleading** | **Defendants' Dispute Facts, Ignore the Complaint's Allegations and Seek Inferences in Their Favor** |
|---|---|
| representation on August 8, 2018, that Defendants had all the permits needed solely related to the Hatter Graben veins, suggesting that this area was unrelated to the Nevada Mines. Mot. at 19. | Graben is part of the Nevada Mines that were acquired by Defendants, and Defendants represented that they depended on cash flows from the Nevada Mines "to largely pay for" development of the Hatter Graben.  ¶¶6, 121, 123, 138; Hecla's 2018 10-K, ECF 96-1 at 80 of 152 ("The Hollister property also includes the Hatter Graben vein system . . .").[8] |
| Defendants assert that the Court should accept as true the reasons for the developmental delays they announced on November 8, 2018 (¶119), and their representations on February 14, 2019 that Defendants were drilling "high-grade" gold (¶137). Mot. at 19-20. | Defendants' *ipse dixit* assertions ignore and contradict the Complaint's allegations that these representations were false and misleading when made, based on CIs allegations.  *See* ¶¶81, 120 (alleging 11/8/18 representation concerning delay was false and misleading); ¶¶82, 137 (alleging that 2/14/19 representation that Fire Creek's Vonnie and Joyce structures contained high-grade ore veins/structures was materially false and misleading). |
| Defendants argue that Radford's statement on November 8, 2018 regarding Fire Creek that, "[a]s we began to ramp development back up, we encountered existing foreground conditions, many development phases in unconsolidated tuff, which is basically clay rich, add a little bit of water and the conditions turn to mush", was not false and misleading because "Radford's statement did not "falsely downplay" the issue". Mot. at 19-20.  Arguing facts outside the Complaint, and in effect, testifying, Defendants further argue that "Radford did not use 'little' to describe the severity of the water problem, but to explain that even a little water would turn the clay to 'mush.' 'Mush' is a real problem for mining, regardless of whether it is | Defendants ignore that once Radford spoke about water, he had a duty to tell the whole truth and not mislead. Radford did not disclose the ongoing excess water problems that Defendants encountered at Fire Creek and that were negatively affecting production.  ¶¶ 50-51, 57-81. Defendants neglect to include that Radford misleadingly assured that "We are addressing this.  We provided tools and techniques to manage the conditions" (ECF No. 96-10 at 4), which created the false impression that the "little bit of water" issue at Fire Creek described by Radford was manageable, which was not true. ¶¶50-79.  Defendants' argument that when Radford stated "little" he was not describing the severity of the water problem improperly |

---

[8] Even assuming *arguendo*, Baker's representation is construed to relate only to Hatter Graben, it was misleading because the lack of permits and other problems were at that time negatively affecting production needed to generate cash flows to fund development in the Hatter Graben, thus Defendants did not have "everything" needed to develop the Hatter Graben.  ¶159.

| Defendants' Argument That Their Representations Were Not Misleading | Defendants' Dispute Facts, Ignore the Complaint's Allegations and Seek Inferences in Their Favor |
|---|---|
| caused by a little or a lot of water, as Radford himself had already disclosed months before this statement." | disputes facts, and in effect, testifies about the meaning of Radford's misrepresentation, which is improper on a motion to dismiss.[9] |

    **4.    Defendants' Misrepresentations Were Not Accompanied by Meaningful Cautionary Risk Language**

Defendants argue that their "risk" factors warned investors of the ongoing serious problems plaguing the Nevada Mines. Mot. at 11-12. Defendants' generic risk warnings that such adverse events with respect to production "could" or "may" occur in the future do not suffice when undisclosed facts on the ground would substantially affect a reasonable investor's calculations that the Nevada Mines were cash-flow positive or self-funding. *See Meyer*, 761 F.3d at 251.[10] "Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired." *Rombach*, 355 F.3d at 173; *Meyer*, 761 F.3d at 251.[11] Moreover, Defendants' arguments ignore that these warnings were misleading because the risks

---

[9] Defendants improperly dispute and mischaracterize the false and misleading statements alleged in paragraphs 105, 113, 145 and 147. Mot. at 11 n.6. None of the misrepresentations alleged are forward looking. Again, Defendants' argument improperly disputes these allegations and makes self-serving assertions about what Defendants intended to represent. Defendants' representation about the need for a "minor" amendment to a "water discharge permit" concealed from investors the ongoing significant water discharge problems and infrastructure failures at Fire Creek (¶¶50-52, 145-46), which were revealed to investors just days later at the end of the Class Period. Defendants' argument disputes facts and misses the point—Defendants violated their duty to disclose all material facts and be accurate when they spoke about water discharge permits.

[10] Assuming, *arguendo*, the Court finds any of Defendants' representations were forward-looking and accompanied by meaningful cautionary language, as set forth Section IV.B concerning Defendants' scienter, the Complaint alleges facts demonstrating Defendants' actual knowledge.

[11] Defendants, relying on *In re Textron Sec. Litig*., 2020 WL 4059179 (S.D.N.Y. July 20, 2020), and *Gissen v. Endres*, 739 F. Supp. 2d 488 (S.D.N.Y. 2010), argue that their warnings "spoke to the very type of forecast at issue here." However, in contrast, here Defendants misrepresented current or historical facts, and their representations were not forecasts, estimates or projections. Likewise, *Gray v. Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366, 390 (S.D.N.Y. 2020), involved "quintessentially forward-looking" projections.

had *already* materialized.[12] ¶¶97-99, 116-17, 127-28, 143-44.[13]

### 5.    The Complaint Adequately Alleges Information Based on CIs

Defendants argue that the Complaint's allegations based on CIs are irrelevant and lack particularity.  Mot. at 14-16.  Again, Defendants' arguments improperly dispute facts, cherry-pick and view the allegations in isolation, and ask the Court to make factual inferences in Defendants' favor, which are improper on a motion to dismiss.  *Speakes*, 2018 WL 4572987, at *6 (rejecting defendants' attempts to "poke holes" in confidential witness allegations).  The Complaint adequately alleges what each of the CIs observed and that they were in a position to make such observations, in accordance with Second Circuit law.  *Novak*, 216 F.3d at 314.

Defendants consider the allegations based on CI information in isolation, ignore the Complaint's allegations, and assert that CI's lack sufficient particularity.  Mot. at 15-16, n.8. Defendants, however, ignore that the Complaint's allegations must be read in the light most favorable to Plaintiffs and viewed holistically.  Moreover, because the CIs provide similar accounts that are corroborated by Baker's admissions after the Class Period, the sheer volume of the corroboration obviates the need for absolute particularity asserted by Defendants.  *In re IPO*

---

[12] Defendants' Appendix A (ECF No. 95-1) is incomplete, inaccurate and unreliable because it fails to include Hecla's materially false and misleading risk warnings and includes inaccurate cites to the Complaint.  Plaintiffs have submitted a counter-point Appendix along with this brief.

[13] Defendants' reliance on *Chapman v. Mueller Water Products, Inc.*, 466 F. Supp. 3d 382, 400 (S.D.N.Y. 2020), (Mot. at 13), is misplaced because unlike the warranty estimates for defective product returns in the future at issue in *Chapman*, Defendants represented that the Nevada Mines were currently cash flow positive, or at least self-funding, and did not require significant capital, none of which are forward-looking statements about future events.  Moreover, the court in *Chapman* discounted generalized CI allegations, such as "there were 'a lot of meter issues'" and "product returns were a 'big issue'", because there was no allegation that management knew (or should have known) the company's warranty reserve reported in its financial statements under GAAP was understated.  Here, in contrast, the CI allegations identify, with particularity, the ongoing problems negatively impacting cash flow at the Nevada Mines, which are corroborated by Baker's admissions made after the end of the Class Period. ¶¶148-58, 166-68.

*Sec. Litig.*, 220 F.R.D. 30, 32 n.4 (S.D.N.Y. 2003).[14]  For example, CIs 9-12—each of whom observed ongoing problems with excess water and decrepit infrastructure, particularly at Fire Creek—participated in meetings and inspections with Baker and Radford.  ¶¶68, 71, 76.  Given the ongoing problems at the Nevada Mines described by numerous CIs (¶¶50-52, 57-76), and Baker's admissions after the Class Period (¶¶148-58, 166-68), it is a reasonable inference that Baker and Radford learned of and discussed these ongoing conditions and their negative impact on production and cash flows during the meetings and visits described by CIs 9-12. ¶¶68, 71, 73, 76-78.  Furthermore, CI 9, a mine superintendent at Hollister and Midas, and CI 10, a geologist at Fire Creek, describe regular meetings attended by Radford, Hall and Hecla management where problems with the ore body, including refractory ore, water issues, and their impact on production were discussed (¶¶77-79)—issues that Baker admitted after the Class Period Defendants had learned in due diligence before the Class Period.   In fact, CI 9 described meetings with Radford where the ongoing problems, including the water and ore characteristics, were discussed and Radford acknowledged the strain they were having on production.   ¶78.  Read in the light most favorable to Plaintiffs, it is a reasonable inference that the Individual Defendants knew or had reason to know of the ongoing problems at the Nevada Mines and that the Nevada Mines were draining capital and cash flows.[15]

---

[14] Defendants' reliance on *In re AmEx. Sec. Litig.*, 2008 WL 4501928, *8 (S.D.N.Y. Sept. 26, 2008), is misplaced because the CIs there did not have any contact with the defendants or knowledge of what defendants knew or should have known.  *AmEx.*, 2008 WL 4501928, *8.

[15] Defendants denigrate CI 6's information that there were problems with "ore characteristics" because he provided IT support.  However, CI 6's allegations are reliable because they are corroborated by Baker's admission that Defendants learned of problems with ore characteristics during due diligence, as well as similar information from other CIs.  ¶¶62, 69-70, 75, 77, 81-82, 149.  Defendants assert that CIs 2, 4 and 12 were not in a position to know events at the Nevada Mines "during the Class Period" because they left the Company before Hecla acquired the mines. Mot. at 15 n.7.  Defendants ignore that CI 4 and 12 were employed at the Nevada Mines until June 2018, three months ***after*** the start of the Class Period (¶¶60, 74), and further ignore that the

**B.      The Complaint Alleges a Cogent and Compelling Inference of Scienter**

"[T]he scienter requirement is met where the complaint alleges facts showing either: 1) a 'motive and opportunity to commit the fraud'"; or 2) "strong circumstantial evidence of conscious misbehavior or recklessness." *Emp.' Ret. Sys. of Gov't of the V.I. v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015).   Scienter allegations must be viewed "holistically" and not in "isolation". *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-24 (2007).   The Complaint alleges both Defendants' motive and opportunity to commit fraud (¶¶186-87), and circumstantial evidence of scienter (¶¶50-86, 148-68).   Viewed holistically and in the light most favorable to Plaintiffs, the inference of scienter is strong—it is cogent and at least as compelling as any opposing inference one could draw from the facts alleged. *Id.*

**1.      Defendants' Motive and Opportunity to Commit Fraud**

Defendants represented that the acquisition of the Nevada Mines would increase the Company's credit rating, which was important to Defendants because the refinancing of $500 million in Hecla bonds was looming in 2021.   ¶¶ 9, 90, 95, 104, 113, 186-87.[16]  Defendants argue that "Plaintiffs allege no reason why Defendants would have wanted" to obtain a better credit rating (Mot. at 24), but this is not true, and ignore Baker's statement that the acquisition would increase the Company's credit rating.   The Complaint alleges that Defendants acquired the Nevada Mines using inflated Hecla shares in order to "improve" the Company's credit rating and that this was important because the impending need for the Company to refinance $500 million in outstanding Hecla bonds—an improved credit rating would lower Hecla's borrowing costs.

---

Complaint alleges that Defendants learned of the material, negative conditions affecting production and cash flow at the Nevada Mines during Defendants' due diligence, which occurred before the start of the Class Period.   ¶¶41, 45, 149.   Accordingly, pre-Class Period CI information is relevant.  *See Scholastic*, 252 F.3d at 72.

[16] Analysis of a defendant's motive is "extremely contextual." *In re Complete Mgmt., Inc. Sec. Litig.,* 153 F. Supp. 2d 314, 328 (S.D.N.Y. 2001).

¶¶89-90.  Defendants' argument that the Complaint's motive allegations are "illogical" (Mot. at 1-2, 24-25), which relies on a decision from outside the Second Circuit, has been rejected by Second Circuit courts because it confuses expected with realized benefits.  *See Skiadas*, 2020 WL 4208442, at *7-8; *SAIC*, 818 F.3d at 97; *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 515 F.3d 702, 710 (7th Cir. 2008).[17]  It is just as plausible that Defendants believed that the ongoing problems could be hidden indefinitely or at least until they refinanced Hecla's debt.[18]

### 2.    Defendants' Conscious Misbehavior and Reckless Conduct

Defendants' nondisclosure of the ongoing serious problems at the Nevada Mines was "highly unreasonable" and was "an extreme departure from the standards of ordinary care to the extent that the danger" was either known to Defendants or so obvious that Defendants must have been aware of it. *Setzer*, 968 F.3d at 215.   The following facts, when read holistically, demonstrate strong circumstantial evidence of conscious misbehavior or at least recklessness:

• Baker's admissions after the end of the Class Period (¶¶2, 41, 45, 48, 148-51; 166-68)—along with his regular visits to the Nevada Mines and meetings (¶¶80, 85), all support an inference that Defendants knew, or recklessly disregarded, the undisclosed, ongoing serious problems and their negative impact on production and cash flows at the Nevada Mines by the start of the Class Period.  *SEC v. Penn*, 225 F. Supp. 3d 225, 236 (S.D.N.Y. 2016); *Richman v. Goldman Sachs Group, Inc.*, 868 F. Supp. 2d 261, 281 (S.D.N.Y. 2012).

• The Individual Defendants, as the most senior Company officers (¶¶33-35, 37, 182), participated in the due diligence, regularly visited the Nevada Mines and attended production meetings (¶¶68, 71, 73, 76, 78-79, 81, 180-81)—all of which show that they had "access to" or

---

[17] Accordingly, Defendants' reliance on *Nguyen v. Endologix*, 962 F.3d 405, 415 (9th Cir. 2020), is misplaced.

[18] Stock sales are not required to plead a strong inference of scienter.  *City of Pontiac Gen. Emp. Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 370-71 (S.D.N.Y. 2012).

"should have known" about the ongoing negative conditions that existed at the Nevada Mines, or at least failed to check information they had a duty to monitor. *See In re EVCI Colls. Holding Corp. Sec. Litig.*, 469 F. Supp. 2d 88, 99 (S.D.N.Y. 2006); *Blanford*, 794 F.3d at 306; *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 489-91 (S.D.N.Y. 2004).

- Particularized allegations based on CIs show that the serious ongoing problems at the Nevada Mines were known by the mines' executives and employees (¶¶50-75, 183-84), that the ongoing problems continued and grew worse during the Class Period (¶¶77-88); and several CIs attended meetings where the ongoing problems and their negative impact on development and cash flows were discussed with Individual Defendants (¶¶77-79, 81). Defendants' representations during the Class Period contradicted the information known or recklessly disregarded by them. ¶15; *see Scholastic*, 252 F.3d at 74; and

- Radford, and another senior executive Dean McDonald, suspiciously resigned at the same time shortly after the end of the Class Period. ¶¶35-36, 164; *In re Scottish Re Group Sec. Litig.*, 524 F. Supp. 2d 370, 394 n. 176 (S.D.N.Y. 2007); *In re Sadia, S.A. Sec. Litig.*, 643 F. Supp. 2d 521, 523–24, 534 (S.D.N.Y. 2009).[19]  Viewed holistically, these facts supporting an inference of scienter that is cogent and at least as compelling Defendants' suggested inferences.[20]

## IV.  CONCLUSION

For the reasons set forth above, Defendants' motion should be denied in its entirety.[21]

---

[19] Defendants' reliance on *Kuriakose v. Fed. Home Loan Mort. Corp.*, 897 F. Supp. 2d 168, 182, 184 (S.D.N.Y. 2012), is misplaced because defendants "fully disclosed" risky loans.

[20] The scienter of the Individual Defendants and senior management of the Nevada Mines who reported to the Individual Defendants is imputed to Hecla, establishing Hecla's corporate scienter. ¶¶183-84; *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Cap., Inc.*, 531 F.3d 190, 195 (2d Cir. 2008); *see also Jackson v. Abernathy*, 960 F.3d 94, 98 (2d Cir. 2020).

[21] Defendants' motion to dismiss Count II, alleging control person claims under Section 20(a) of the '34 Act, should likewise be denied. If the Court dismisses some or all of the claims, Plaintiffs respectfully request leave to amend.  Fed. R. Civ. P. Rule 15(a)(2).

Dated: January 22, 2021                **KAPLAN FOX & KILSHEIMER LLP**

By: _/s/  _Jeffrey P. Campisi_____

Robert N. Kaplan
Jeffrey P. Campisi
Jason A. Uris
850 Third Avenue, 14th Floor
New York, NY 10022
Tel: (212) 687-1980
Fax: (212) 687-7714
rkaplan@kaplanfox.com
jcampisi@kaplanfox.com
juris@kaplanfox.com

*Lead Counsel for Lead Plaintiffs and the
Proposed Class*