**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

ROBERT GLUCK, et al.,

                *Plaintiffs*,

v.

HECLA MINING CO., et al.,

                *Defendants*.

Case No. 1:19-cv-4883 (ALC)

ECF Case

## <u>REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS</u>

Stefan Atkinson, P.C.
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-4800

Joshua Z. Rabinovitz
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 389-5000

*Counsel for Defendants*

**<u>Table Of Contents</u>**

Preliminary Statement.......................................................................................................... 1

Argument .............................................................................................................................. 2

I.      The Alleged Misstatements About Future Performance Are Not Actionable. ................. 2

        A.     The Statements About Future Performance Are Protected By The Statutory Safe Harbor For Forward-Looking Statements. ...................................... 4

              1.     The Estimates Were Accompanied By Meaningful Cautions. .................. 6

              2.     Plaintiffs Do Not Plead That The Maker Of Any Allegedly Fraudulent Forward-Looking Statement Knew The Statement Was False. ...................................................................................................... 7

                        a.     Baker's Supposed Post-Class Period Admissions .......................... 8

                        b.     "Confidential Informant" Information ............................................ 9

        B.     Estimates About Performance Of The Nevada Operations Are Opinions That Plaintiffs Do Not Plead Were False Or Misleading. .................................... 13

II.     Plaintiffs Do Not Plead With Particularity Any False Or Misleading Statements Of Existing Fact. ...................................................................................................... 13

III.    Plaintiffs Do Not Plead With Particularity Facts Giving Rise To The Requisite "Strong Inference" That Any Defendant Acted With Scienter......................................... 16

Conclusion .......................................................................................................................... 20

**Table Of Authorities**

**Cases**

*In re Bemis Sec. Litig.*,
   2021 WL 101559 (S.D.N.Y. Jan. 12, 2021) ............................................................6, 7

*In re Ceridian Sec. Litig.*,
   542 F.3d 240 (8th Cir. 2008) ...........................................................................19

*Chapman v. Mueller Water*,
   466 F. Supp. 3d 382 (S.D.N.Y. 2020).................................................................6

*In re FedEx Sec. Litig.*,
   2021 WL 396423 (S.D.N.Y. Feb. 4, 2021)......................................................10, 11

*Glaser v. The9*,
   772 F. Supp. 2d 573 (S.D.N.Y. 2011).................................................................19

*Gray v. Wesco Aircraft*,
   454 F. Supp. 3d 366 (S.D.N.Y. 2020)............................................................6, 7, 12

*Inst. Inv. Grp. v. Avaya*,
   564 F.3d 242 (3d Cir. 2009)..............................................................................6

*Julianello v. K-V Pharm.*,
   791 F.3d 915 (8th Cir. 2015) ............................................................................5

*Kuriakose v. Federal Home Loan Mortg. Corp.*,
   897 F. Supp. 2d 168 (S.D.N.Y. 2012) ...............................................................20

*Marsh Grp. v. Prime Retail*,
   46 F. App'x 140 (4th Cir. 2002) .........................................................................6

*Matrixx Initiatives v. Siracusano*,
   563 U.S. 27 (2011)...........................................................................................13

*Nguyen v. Endologix*,
   962 F.3d 405 (9th Cir. 2020) .............................................................................17

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000)..............................................................................19

*Sjunde AP-Fonden v. GE*,
   2021 WL 311003 (S.D.N.Y. Jan. 29, 2021) ..............................................11, 12, 13

*Skiadas v. Acer Therapeutics*,
   2020 WL 4208442 (S.D.N.Y. July 21, 2020) ....................................................17

*Tellabs v. Makor Issues & Rights*,
    551 U.S. 308 (2007)..............................................................................................18, 19

*Wochos v. Tesla*,
    985 F.3d 1180 (9th Cir. Jan. 26, 2021) ......................................................7, 12, 16

*In re Zagg Sec. Litig.*,
    797 F.3d 1194 (10th Cir. 2015) .......................................................................19

*Zucco Partners v. Digimarc*,
    552 F.3d 981 (9th Cir. 2009) ............................................................................19

## Statutes & Regulations

15 U.S.C. § 78u-4(b)(1) ............................................................................................16

15 U.S.C. § 78u-4(b)(2)(A) ......................................................................................18

15 U.S.C. § 78u-5(i)(1)(B)...........................................................................................6

17 C.F.R. § 240.10b-5(b) ..........................................................................................13

30 C.F.R. § 57.2 ..........................................................................................................3

**Preliminary Statement**

When Defendants announced the agreement to acquire what became Hecla's Nevada operations, they expressed their belief that the Nevada operations would be a positive contributor to the overall Company.  They did not say there were not problems Hecla would need to overcome. To the contrary, they disclosed a list of risks to the acquisition, cautioned that pre-acquisition due diligence is "not capable of identifying all potential adverse conditions," and disclosed actual existing problems in Nevada that Hecla would need to address, including replacing old equipment, reducing employee turnover, and constructing a new tailings pond.

After Hecla completed the acquisition and gained experience with the Nevada operations, Defendants publicly disclosed additional negative information.  Just seventeen days after closing the acquisition, they disclosed that one of the three new mines was being shut down and also disclosed other problems they had learned about the rest of the Nevada operations.  They disclosed, contrary to what they had stated before the acquisition, that Nevada might not generate positive returns immediately.  Three months later, Hecla issued its first financial reports that included Nevada, disclosing a *loss* from the Nevada operations of more than $13 million, that Nevada's production costs were 75% higher than the prior owner had reported just before the acquisition and 60% higher than the price at which Hecla was selling gold, and that Hecla did not expect positive cash flow for the next *two years*.  Less than a month later, Defendants disclosed that Hecla was shifting focus away from another of the three Nevada mines.  Defendants made these and other disclosures *during* the Class Period, at the same time Plaintiffs assert they were intentionally attempting to conceal the Nevada operations' poor actual and expected performance.

Defendants also stated during this time their belief that Hecla would eventually turn the Nevada operations into a positive contributor for the Company.  Plaintiffs' principal argument in opposing dismissal is that they have sufficiently alleged these forward-looking statements of be-

lief were false or misleading because they allege Defendants knew Hecla would not successfully address the problems in Nevada. Yet Plaintiffs fail to allege a single fact showing that anyone—much less *Defendants*—had concluded at the time Defendants made any supposed misstatement that the problems in Nevada were insurmountable. Alleging that problems existed does not plead that those problems dictated any particular financial or cash flow result or that Hecla would not be able to overcome those problems at a reasonable cost and within the years-long period that Defendants disclosed the turnaround would take. It also does not plead that Defendants knew in advance that Hecla would be unable to do so. As a result, Plaintiffs' allegations do not adequately plead that Defendants' statements of the Nevada operations' future performance were false or misleading. With respect to the remaining alleged misstatements—which are statements of existing fact—Plaintiffs fail to allege facts showing they were false or misleading.

Plaintiffs also fail to allege facts creating a strong inference that Defendants acted with scienter. Plaintiffs argue that Defendants committed intentional fraud, even though they knew it would be short-lived, to obtain a higher credit rating that they would use to refinance Hecla's debt while the fraud lasted. But Plaintiffs fail to allege that Defendants even tried to refinance that debt during the *eleven months* they allege the credit rating was fraudulently inflated, even though the point of the fraud, according to Plaintiffs, was to complete the refinancing before the "truth" was revealed. Plaintiffs cannot satisfy their heightened pleading burden for scienter with conjecture about Defendants' motives that lacks any support in Defendants' alleged actions.

## Argument

### I. The Alleged Misstatements About Future Performance Are Not Actionable.

Plaintiffs purport to summarize their allegations on the first page of their brief:

[T]he Complaint alleges that, by the start of the Class Period, water continually filled the underground mines, the amount of water grew throughout the Class Period, that key infrastructure to manage the water was damaged or inoperable, that

Defendants lacked permits needed to effectively discharge excess water, and that there were problems with development, production and ore.

(Docket #97 ("Pl. Opp.") at 1)  Each of these assertions either is *not* pled in the complaint, or was disclosed by Defendants during the Class Period.  First, there is no support in the complaint for the assertion that water continually filled the mines.  Later in Plaintiffs' brief, they reduce their assertion to water "continually collect[ing] *at the bottom* of the mine."  (*Id*. at 6, emphasis added)  Even then, the allegations Plaintiffs cite do not support the assertion; those paragraphs allege only that water was an issue—which Defendants disclosed from the start.  (Docket #95 ("Def. Br.") at 4-5)  Second, the assertion that the amount of water grew throughout the Class Period *undermines* Plaintiffs' claims.  If the water problem worsened over time, that would support Hecla's reduced expectations and eventual decision to reconsider its strategy.  Third, Plaintiffs do not explain their reference to "key infrastructure" being damaged or inoperable, but it appears they are referring to the tailings facility at the Midas mine nearing capacity and the need for an additional facility.  But Defendants disclosed the need for a new tailings facility in May 2018, even before closing the acquisition.  (*Id*. at 4)  The complaint contains no allegations about Hecla's progress constructing that new tailings facility, how the progress compared to Defendants' expectations, or how it affected production or costs relative to expectation.[1]  Fourth, the complaint does not allege with particularity that Hecla lacked permits to discharge water effec-

---

[1] Plaintiffs also assert that Defendants "admitted" that "the rapid infiltration basis, or RIBs" were "failing before the Class Period [and] needed to be redesigned and rebuilt at great expense."  (Pl. Opp. 6 n.3)  The sole support for this "admission" is a post-Class Period statement by Defendant Baker that "we still had a problem with dealing with the RIBs and the back…."  (Compl. ¶ 150)  However, the capitalization, which makes "RIBs" look like an acronym, is Plaintiffs', not Baker's.  The transcript of Baker's remarks shows he said "we still had [a] problem with the ribs and the back…."  (Docket #96-15 at 17)  "Ribs" refers to the sides of a mine, not to some rapid infiltration basin.  This is confirmed by the fact that the next words Baker used are "and the back."  "Back" refers to the ceiling of a mine.  *See* 30 C.F.R. § 57.2 (definition of "mine atmosphere," which refers to the "rib," "back," and "floor").  No other allegation in the complaint, including no "confidential witness" allegation, asserts any issue with rapid infiltration basins.

tively.  Baker's post-Class Period statement that Hecla would seek to "expand[] our permitted water discharge limit" does not indicate Hecla previously lacked permits necessary to discharge water effectively.  (Compl. ¶ 150)  Further, it is consistent with Plaintiffs' own assertion that the water problem worsened over the Class Period.  Finally, Plaintiffs assert "there were problems with development, production and ore."  (Pl. Opp. 1)  But Defendants disclosed these problems throughout the Class Period.  (Def. Br. 4-7)[2]

Plaintiffs also contend that "several research analysts that followed Hecla expressed surprise and astonishment at the severity of the problems that had not previously been disclosed."  (Pl. Opp. 1)  But this relies on Plaintiffs' mischaracterization of analysts' remarks, which themselves do not support the characterization.  Plaintiffs cite only three such remarks.  (*Id.*, citing Compl. ¶¶ 150, 153, 155)  None expresses surprise or astonishment.  None indicates any belief that analysts had previously been deceived.

### A.    The Statements About Future Performance Are Protected By The Statutory Safe Harbor For Forward-Looking Statements.

Plaintiffs argue that not one of the alleged misstatements was forward-looking.  (*Compare* Docket #97-1 (asserting that every alleged misstatement is a statement "of current or historical fact"), *with* Def. Br. 10 (specifying alleged forward-looking misstatements), and Docket #95-1 (same))  Plaintiffs' position is indefensible.

Plaintiffs first argue that "Defendants represented the Nevada Mines were *currently* cash flow positive, or at least self-funding."  (Pl. Opp. 12, emphasis added)  They do not specify

---

[2] Plaintiffs characterize Defendants' focus on the Class Period disclosures as a "truth on the market" argument.  (Pl. Opp. 13)  It is not.  It is a response to Plaintiffs' argument that Defendants' forward-looking statements were misleading because they did not disclose such problems.  It is also crucial to any analysis of whether Plaintiffs have adequately pled scienter.  *Infra* at 20.  The fundamental point is that Defendants disclosed their expectation for the Nevada operations' performance, but they also disclosed the problems that might hinder that performance—and, critically, *actual* negative performance as it occurred.

which statement supposedly did so.[3]  Only three alleged misstatements use the term "cash flow positive."  All three are explicitly about what the Nevada operations "will be" and therefore are forward-looking.  (Compl. ¶ 91 ("Nevada itself *will be* cash flow positive for us," and, "from the get-go, the Nevada assets are *going to be* cash flow positive"); *id*. ¶ 138 ("the operations *will be* cash flow positive"); *id*. ("[w]e *expect* in 2019, the Nevada mining operations *will be* cash flow positive."))  Other alleged misstatements similarly used explicit language indicating Defendants were discussing the future.  (*Id*. ¶ 88 ("[w]e *expect* this transaction *to be* accretive on many important financial and credit metrics"); *id*. ¶ 89 (discussing the amount of capital that projects "are *going* to require"); *id*. ¶ 105 ("Our *plan* is to …"); *id*. ¶ 109 ("the *expectation* is this year that for the five months, it *will be* self-funding"); *id*. ¶ 113 (margin from the Nevada operations "should" improve equity value); *id*. ¶ 121 ("Our *goal* for Nevada operations is that the operations are cash-neutral."); *id*. ¶ 123 ("We *think* we *can* run it pretty close to cash flow neutral"); ¶ 145 (an amendment to the water discharge permit "is *expected* in the second quarter"))

Three other alleged misstatements, although not explicitly referencing the future, are also forward-looking.  On the day it closed the acquisition, Hecla stated that the Nevada operations "immediately add production and cash flow."  (Compl. ¶ 102)  The only way to understand that statement in context is as a statement that the Nevada operations *will* add production and cash, for at the time Hecla made the statement, it would have been impossible for them to actually have added either.  *See Julianello v. K-V Pharm.*, 791 F.3d 915, 921 (8th Cir. 2015) ("In determining whether a statement is truly forward-looking, the determinative factor is not the tense of the statement; instead, the key is whether its truth or falsity is discernible only after it is

---

[3] Defendants reiterate that they do not argue that the alleged misstatement, made before the acquisition closed, that Fire Creek has "robust cash flows" was forward-looking.  (Docket #95-1 at 1)  That statement is a statement of fact and is addressed below in Part II.

made.").[4]    Similarly, the statement that "[t]here's no major capital expenditures that we can't

fund out of the Nevada operations" is a statement about the ability to fund *future* capital expendi-

tures with *future* cash flow.  (Compl. ¶ 129)  That it is stated as a present belief about the future

does not change that it is forward-looking.[5]    Finally, the statement that the Nevada operations

"are basically self-funding" was expressly made in the context of a discussion of "mine plans,"

not of existing fact.  (Docket #96-7 at 6; Compl. ¶ 107)  The Exchange Act defines "forward-

looking statement" to include plans for future operations.  15 U.S.C. § 78u-5(i)(1)(B).

As a result, the statements identified in Defendants' opening brief as forward-looking are

indeed forward-looking, and therefore eligible for protection by the safe harbor.

### 1.    The Estimates Were Accompanied By Meaningful Cautions.

Plaintiffs do not dispute that the cautions identified in Defendants' opening brief are spe-

cific and meaningful.  (Def. Br. Part I.A.1)  Rather, they argue only that "[c]autionary words

about future risk cannot insulate from liability the failure to disclose that the risk has transpired."

(Pl. Opp. 20)  However, Plaintiffs do not allege that the risks Hecla disclosed were of the type

that could not worsen or recur and adversely affect future results.  *See Chapman v. Mueller Wa-*

*ter*, 466 F. Supp. 3d 382, 406 (S.D.N.Y. 2020) ("the risk disclosure language can be understood

---

[4] Further, if understood as an assertion of the Nevada operations' then-current state, the state-
ment would have to be understood as referring to the Nevada operations' performance under
Klondex's ownership, because the statement was made the day the acquisition closed.  And, only
five days before the acquisition closed, Klondex had reported positive cash flow from Nevada.
(Def. Br. 19)  Plaintiffs do not allege Klondex's statement was false.

[5] *See In re Bemis Sec. Litig.*, 2021 WL 101559, *7 (S.D.N.Y. Jan. 12, 2021) (statements "con-
cerning the Board's belief in such projections" were "forward-looking"); *Gray v. Wesco Aircraft*,
454 F. Supp. 3d 366, 387 (S.D.N.Y. 2020) (same); *Inst. Inv. Grp. v. Avaya*, 564 F.3d 242, 256
(3d Cir. 2009) (expressing "continuing comfort" in estimates "does not transform the statements,
or any part of them, into non-forward-looking assertions"); *Marsh Grp. v. Prime Retail*, 46 F.
App'x 140, 146 (4th Cir. 2002) ("All projections can be characterized as presently held beliefs.
The statements are forward-looking because they relate to 'future economic performance.'").

to convey that, in addition to the costs for which Mueller had accrued and that it had determined should be disclosed pursuant to GAAP, there was a risk that Mueller would incur additional 'significant' expenses").  Thus, Hecla's risk disclosures did not imply the risks had not transpired to any extent.  *See Wochos v. Tesla*, 985 F.3d 1180, 1196 (9th Cir. Jan. 26, 2021) ("these challenged statements contain no explicit or implicit representation that Tesla had *not* already experienced such issues") (emphasis in original).  That is particularly true here, where Hecla disclosed that several of the risks *had* in fact already transpired, even while still disclosing them as risks because they could worsen or recur in the future.  (Def. Br. 3-7)  Finally, Plaintiffs' argument also fails because it "conflates the actual knowledge and meaningful cautionary language prongs of the PSLRA, and would mean that an allegation of actual knowledge of falsity would suffice to deprive a forward-looking statement of the protections of the safe harbor even if there were meaningful cautionary language otherwise."  *Bemis*, 2021 WL 101559 at *9 (adopting *Gray*, 454 F. Supp. 3d at 394).  Moreover, as discussed next, Plaintiffs do not plead any such facts.[6]

### 2.    Plaintiffs Do Not Plead That The Maker Of Any Allegedly Fraudulent Forward-Looking Statement Knew The Statement Was False.

Plaintiffs make two arguments why the complaint pleads that Defendants had "actual knowledge" their forward-looking statements were false at the time they made each statement.  Neither argument has merit.

---

[6] Plaintiffs also argue that, even if "the Court finds any of Defendants' representations were forward-looking and accompanied by meaningful cautionary language," the safe harbor does not apply because "the Complaint alleges facts demonstrating Defendants' actual knowledge." (Pl. Opp. 20 n.10)  However, the safe harbor applies if *either* the statements were accompanied by meaningful cautionary language *or* the plaintiff fails to plead the defendants actually knew the statements were false.  If the first prong applies, as it does here, whether the plaintiff pleads actual knowledge does not matter.  *Gray*, 454 F. Supp. 3d at 385-86 (the safe harbor applies "[a]s long as the plaintiff fails to satisfy one of those elements").  Regardless, here Defendants satisfy both prongs, making two *independent* reasons the safe harbor applies.

### a.    Baker's Supposed Post-Class Period Admissions

Plaintiffs repeatedly assert that Baker admitted after the Class Period that Defendants' statements were false.  But what Baker actually said does not support their assertion.

First, Plaintiffs assert Baker "admitted" after the Class Period "that during due diligence, which occurred before the start of the Class Period, Defendants learned of 'problems' 'managing the water,' that the water problem grew over the Class Period, the need to construct 'some infra-structure', that the Nevada Mines lacked adequate permits for discharging the water, and prob-lems with 'ore characteristics.'"  (Pl. Opp. 10)  This assertion mischaracterizes Baker's state-ment.  It is chronologically impossible that Baker learned before the Class Period that the water problem grew during the Class Period.  What Baker actually stated is that, during due diligence, he learned about "certain problems with Fire Creek dealing with tuff material, managing the wa-ter, equipment availability, getting enough development to have consistent production, lack of characterization of ore types."  (Compl. ¶ 149)  Plaintiffs offer no response to Defendants' argu-ment that none of this "admits" Baker knew that those problems meant the expectations he stated for the Nevada operations' performance were not achievable; the fact that problems exist at a mine does not mean the mine will have a particular cash flow outcome.  (Def. Br. 13-14)

Second, Plaintiffs assert Baker admitted that "Defendants' internal mine plans at the start of the Class Period showed the Nevada Mines were consuming more cash than the Nevada Mines produced."  (Pl. Opp. 6)  Plaintiffs' purported support for this assertion is ¶ 166 of the complaint, which quotes Baker's August 7, 2019 statement that "in this third quarter, for the first time since the acquisition of Klondex a year ago, our plans show us generating more cash than we spend."  (*Id.*)  However, this statement concerned Hecla as a whole, not the Nevada opera-tions.  (Def. Br. 14)  Plaintiffs argue that Baker must have been referring to Nevada, and not Hecla as a whole, because "what he said, in effect, was that because Defendants 'have nearly

stopped development' at the Nevada Mines, they stopped hemorrhaging cash." (Pl. Opp. 2, quoting Docket #96-17 at 5)  But the language Plaintiffs' brief quotes is three transcript pages away from Baker's supposed admission, and was not even Baker speaking.  (Docket #96-17 at 5) Baker's statement came at the beginning of the conference call, during a discussion of the entire Company's earnings (hence the use of "us" and "we" in the sentence at issue and "we" in the one following it).  Indeed, the sentences before the supposed "admission" discuss Hecla's other business units, making clear that Baker was referring to Hecla's overall cash flow, not cash flow from Nevada.  (*Id*. at 3)  (There is a paragraph break, but that was inserted by the stenographer, not Baker, whose remarks were oral, so had no paragraph breaks.)  Given the focus in Plaintiffs' brief on analyst reactions to Hecla's disclosures, it is telling that not a single analyst wrote that Baker had admitted that he had been disclosing false projections to the market for three quarters. That can only be because no analyst understood his statement to say so.

Finally, Plaintiffs refer to Baker's post-Class Period statement that Hecla had "attempted to take this plane that was flying and redesign it and rebuild it in the air, and it was just costing us way too much money." (Compl. ¶ 168; Pl. Opp. 6)  However, the airplane metaphor is commonly used to describe the process of making changes to something without first shutting it down.  Baker did not state that he knew his estimates for the Nevada operations' performance would be inaccurate at the time he disclosed them.  Moreover, that there were problems at the mines, that Hecla was attempting to fix them while continuing to mine, and that it was costing more to do so than Hecla had anticipated, were all disclosed during the time Plaintiffs allege the fraud was occurring.  (Def. Br. 4-7)

### b.    "Confidential Informant" Information

Plaintiffs' so-called "CI" allegations do not plead that Defendants knew any forward-looking statement they made was false because Plaintiffs do not allege any supposed "CI" stated

that any such statement was not possible at the time it was disclosed.  Even on Plaintiffs' telling, the witnesses merely described problems at the Nevada operations and indicated that addressing those problems increased Hecla's costs.  Plaintiffs do not respond to the concrete discussion of these allegations in Defendants' opening brief.  (Pl. Opp. 21-22; Def. Br. 14-17)  At base, neither the existence of problems, nor the fact that Hecla spent money to address them, pleads what is required for Plaintiffs' claim to be viable: that Defendants knew at the time they made any alleged misstatement that the problems would lead to a particular cash flow result or could not be addressed at a cost Hecla was willing to bear.  *See In re FedEx Sec. Litig.*, 2021 WL 396423, *10 (S.D.N.Y. Feb. 4, 2021) (rejecting CI allegations even though the CIs expressed "significant doubt" about the company's ability to meet earnings targets).  For instance, Plaintiffs highlight that CI 12 told them that "in early 2018, excessive water discharge became problematic for the Company."  (Compl. ¶ 74, cited at Pl. Opp. 6)  Yet Plaintiffs do not allege what "problematic" meant.  They likewise do not allege that any forward-looking statements about the Nevada operations' performance failed to take into account the supposed excessive water discharge problem, that the discharge problem caused actual results to differ from any forward-looking statement, or that any Defendant knew in advance it would cause such a difference.  The same is true for all Plaintiffs' CI allegations.  The timeline of the alleged misstatements makes this clear:

- Before completing the acquisition, Defendants stated their expectation that the Nevada operations would be "accretive on many important financial and credit metrics," would require a "small amount of capital," and "will be cash flow positive" from the "get-go." (Compl ¶¶ 88, 89, 91)  Concurrent with the acquisition's closing, Hecla stated its expectation that the Nevada operations would "immediately add production and cash flow."  (*Id*. ¶ 102)  Plaintiffs do not identify any CI statement alleging that problems at the Nevada operations known when these

statements were made meant the Nevada operations would not satisfy these expectations.

- In August 2018, shortly after completing the acquisition, Defendants disclosed that they now expected the Nevada operations would only be self-funding or cash flow neutral—a more pessimistic view than what they had expressed initially.  (*Id.* ¶¶ 107, 109)  They continued to make such statements through December.  (*Id.* ¶¶ 121, 123, 129)  Again, Plaintiffs identify no allegation indicating any CI had concluded during this period that the Nevada operations would not be cash flow neutral.  Moreover, Defendants' more pessimistic expectations are consistent with Plaintiffs' allegations that conditions worsened over time.  (Pl. Opp. 15)

- Finally, in early 2019, Defendants stated they expected the Nevada operations to be cash flow positive "with exception of the exploration and the development for the Hatter Graben." (Compl. ¶ 138)  Thus, Defendants now projected that the Nevada operations would *not* have positive cash flow unless certain costs were excluded.  Again, Plaintiffs identify no allegation indicating any CI had concluded this expectation was not possible at the time it was disclosed.

In addition to failing to allege that any CI said any forward-looking statement was impossible to achieve at the time it was made, Plaintiffs also fail to allege that any *Defendant* knew specific facts establishing any forward-looking statement was impossible to achieve when the statement was made.  *See FedEx*, 2021 WL 396423 at *10 ("the allegations do not permit the Court to reasonably attribute the doubt to any of the individual defendants").  Plaintiffs implicitly concede the point in their brief, arguing only that their allegations permit "a reasonable inference" that Defendants knew what the CIs supposedly knew.  (Pl. Opp. 22)  But Plaintiffs do not explain why such an inference is warranted, nor do they cite any authority supporting such an inference.  That an employee knows a particular fact does not mean he has shared that fact with his company's most senior officers.  The recent decision in *Sjunde AP-Fonden v. GE*, 2021 WL

311003, *6-8 (S.D.N.Y. Jan. 29, 2021), is instructive. It rejected confidential witness allegations far more specific than those alleged here because, despite their specificity, they did not plead that the defendants had knowledge contradicting their public statements. *Id*.

Finally, even if a CI had concluded some problem or problems meant a particular forward-looking statement was impossible at the time it was made and the CI had relayed that conclusion to any Defendant, that still would not plead any Defendant's "actual knowledge" because Plaintiffs do not allege any Defendant agreed with any such conclusion. The Ninth Circuit made just this point in *Wochos v. Tesla*. There, an auto manufacturer's CEO had issued forward-looking statements estimating production levels, which ultimately had not come true. *Wochos*, 985 F.3d at 1193. The plaintiffs alleged the CEO knew the estimate was inaccurate because his employees told him at the time that the production estimate was impossible. *Id*. The court rejected the plaintiffs' argument, reasoning that "Plaintiffs failed to plead any facts showing that [the CEO] ever accepted those employees' views that the goal was impossible." *Id*. at 1194.

In sum, it is Plaintiffs' burden to plead with particularity that Defendants had "actual knowledge" their forward-looking statements were false at the time they made them. *Gray*, 454 F. Supp. 3d at 385. Plaintiffs do not do so.[7] As a result, Defendants' forward-looking statements are protected by the safe harbor for a second, independent reason.

---

[7] As explained in Defendants' opening brief, these arguments also defeat Plaintiffs' allegation that Hecla's 10-Q filings violated Item 303 of Regulation S-K. (Def. Br. 17 n.9) Plaintiffs' only response is that Defendants' argument does not address known "uncertainties." (Pl. Opp. 12 n.5) This misses the point, which is that Plaintiffs fail to allege anything that was known to management and reasonably likely to have material effects on Hecla's financial condition or results. This argument applies to "trends" *and* "uncertainties." *See Sjunde*, 2021 WL 311003 at *7. Additionally, none of Plaintiffs' CI allegations even asserts, let alone alleges with particularity, that any problem in Nevada was reasonably likely to have a material effect on Hecla's financial condition or results relative to what Hecla had estimated and the actual poor results Hecla had disclosed. Finally, Plaintiffs ignore Hecla's risk disclosures (Def. Br. 3-4), which disclosed risks to the Nevada operations' performance, thereby satisfying Item 303.

B.      **Estimates About Performance Of The Nevada Operations Are Opinions That Plaintiffs Do Not Plead Were False Or Misleading.**

Plaintiffs offer a single sentence responding to Defendants' argument that the alleged misstatements about the Nevada operations' future performance were opinions, arguing that Defendants "omitted contrary facts that substantially undermine[d] the conclusion a reasonable investor would reach from [their] statement of opinion." (Pl. Opp. 13 n.6)  However, Plaintiffs do not identify any such facts.  Thus, for the reasons stated in Defendants' opening brief, Plaintiffs' allegations regarding the statements of opinion do not state a claim, which provides an independent basis to dismiss Plaintiffs' claims regarding the alleged forward-looking misstatements.

II.     **Plaintiffs Do Not Plead With Particularity Any False Or Misleading Statements Of Existing Fact.**

The remaining alleged misstatements are statements of fact, and Defendants addressed each one individually in their opening brief.  (Def. Br. Part II)  Plaintiffs' responses are inadequate.  As an initial matter, Plaintiffs repeat throughout their brief the principle that "once a company speaks on an issue or topic, there is a duty to tell the whole truth."  (*E.g.*, Pl. Opp. 2, 13, 19)  They then use this principle to argue that failing to disclose any particular detail of the Nevada operations alone is actionable, without showing how any statement Defendants made was misleading because of the alleged omission.  However, the principle Plaintiffs quote means only that once a corporation speaks on an issue, it has a duty to disclose all facts necessary to ensure what it has said on that issue is not misleading.  It does not alter the rule that liability can exist *only* for statements actually made, not for failing to disclose additional facts investors might want to know.  *See Matrixx Initiatives v. Siracusano*, 563 U.S. 27, 44 (2011) ("Disclosure is required under these provisions only when necessary 'to make ... statements made, in the light of the circumstances under which they were made, not misleading.'"); *Sjunde*, 2021 WL 311003 at *9 (same).  This is explicit in the SEC rule that implements § 10(b).  *See* 17 C.F.R. § 240.10b-

13

5(b).  For this reason, and the other reasons explained below, Plaintiffs' brief does not demon-

strate they have alleged with particularity any false or misleading statement of fact.

- When Hecla announced it would acquire the Nevada mines, it stated that Fire Creek "is a

cornerstone producing asset with robust cash flows."  (Def. Br. 18-19)  This statement of present

fact was made months before the acquisition closed, and so concerned a mine owned by another

company, Klondex.  Plaintiffs do not identify any allegations indicating that Fire Creek was not a

producing asset with robust cash flows at that time.  Indeed, only five days before Hecla made

the alleged misstatement, Klondex had issued its 2017 financial report, which indicated Fire

Creek did have robust cash flows.  (*Id*. at 19)  Plaintiffs argue that they have alleged "that De-

fendants' undisclosed mine plans at that time found that Hecla needed to invest significant capi-

tal before the Nevada Mines could be cash flow positive."  (Pl. Opp. 18)  But none of the allega-

tions Plaintiffs cite indicates Hecla even had a mine plan at that point.  Regardless, as Plaintiffs

themselves argue, this was a statement of present fact—not a statement about future plans.

- On May 10, 2018, Baker stated that Hecla "saw extraordinary grades" when it looked at

the Nevada mines.  (Def. Br. 19)  He made similar statements on July 23 and August 9.  (*Id*.)

Plaintiffs argue that "Baker admitted after the Class Period, that while conducting due diligence,

Defendants learned of problems with the characteristics of the gold ore—e.g., low quality refrac-

tory ore and low grade ore."  (Pl. Opp. 18)  That misrepresents Baker's statement, which is quot-

ed in the complaint: Baker actually stated that Hecla learned during due diligence of "lack of

characterization of ore types."  (Compl. ¶ 149)  Plaintiffs misconstrue Baker's statement in two

respects: First, Baker said Hecla learned of lack of characterization of ore *types*, not ore grade.

"Ore type" refers to the type of rock that surrounds the gold: refractory or free-milling.  *See*

https://www.sgs.com/-/media/global/documents/technical-documents/sgs-technical-papers/sgs-

min-tp2004-03-process-mineralogy-of-gold-ores.pdf.  Refractory ore is more difficult to process. *Id*.  "Ore grade" refers to the ounces of gold per ton of rock.  (Def. Br. 3)  Baker's supposed admission did not concern grade, only type, so did not say anything about "low grade" ore.  Second, Baker said Hecla had learned of *lack of characterization* of ore types; he did not say the ore had been characterized and determined to be problematic.  Thus, Baker did not "admit" he had learned during due diligence of refractory or low grade ore.

- Baker responded affirmatively to a question whether Hecla had "all the permits in place" to access Hatter Graben, which is a separate system of mineral veins that Hecla intended to access through the Hollister mine.  (Def. Br. 19; Compl. ¶ 6)  Plaintiffs address this statement by discussing cash flows, which have nothing to do with permits.  (Pl. Opp. 18-19)  The complaint does not allege Hecla lacked the permits required to access Hatter Graben.

- As Defendants' opening brief explained, Plaintiffs mischaracterize Radford's statement regarding water at Fire Creek.  (Def. Br. 19-20)  Plaintiffs' brief doubles down, arguing that Radford stated there was only a "little bit of water," rather than what he actually said, which was that it only took a "little bit of water" to create problematic "mush" in Fire Creek's clay-rich ground. (Pl. Opp. 19-20; Docket #96-10 at 6)  Plaintiffs are not entitled to a mischaracterization of Radford's statement, which the Court can read for itself.  (Docket #96-10 at 6)  Plaintiffs also argue Radford's statement was misleading because he stated Hecla was addressing the water issue. But Plaintiffs do not allege that Hecla was not addressing the water issue, or that Radford had concluded at the time of his statement that Hecla's efforts to address the issue would fail.

- Plaintiffs argue that ¶ 81 of the complaint adequately pleads falsity for Hecla's statement that specific mining projects had been moved to 2019 because additional development was needed first.  (Def. Br. 20; Pl. Opp. 19)  But ¶ 81 says nothing about that decision; it discusses prob-

lems at Fire Creek generally.  Plaintiffs' brief *asserts* a connection between those problems and this decision, but the complaint fails to allege with particularity supporting facts.  *See* 15 U.S.C. § 78u-4(b)(1) ("[I]f an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.").

- Plaintiffs argue that ¶ 82 of the complaint adequately pleads falsity for Hecla's statement of specific details about its exploration of particular veins at Fire Creek.  (Def. Br. 20-21; Pl. Opp. 19)  But it does not; ¶ 82 alleges only that two layers at some unspecified part of two veins lacked high-grade ore.  That is not inconsistent with Hecla's statement.

- Plaintiffs do not challenge Defendants' argument why the statement that Hecla was looking into a mobile dewatering plant is not adequately pled as false or misleading.  (Def. Br. 21-22) Rather, they argue only that this statement "failed to disclose that Hecla was experiencing difficulties treating the flow of water at Fire Creek."  (Pl. Opp. 17)  But Plaintiffs provide no reason Hecla would have wanted a new dewatering plant if its current tools were adequately addressing the water.  Regardless, Plaintiffs do not argue the statement was false or misleading, which is the only way liability under § 10(b) can exist.  *Supra* at 13.

Finally, Plaintiffs do not respond to Defendants' arguments why Hecla's risk disclosures are not adequately pled to have been false or misleading.  (Def. Br. 22)  In addition to the precedent Defendants cited in their opening brief, *Wochos*—issued more recently—further supports the argument.  *See Wochos*, 985 F.3d at 1196 (rejecting the argument that risk disclosures were misleading, reasoning "these challenged statements contain no explicit or implicit representation that Tesla had not already experienced such issues") (emphasis in original).

### III.    Plaintiffs Do Not Plead With Particularity Facts Giving Rise To The Requisite "Strong Inference" That Any Defendant Acted With Scienter.

Plaintiffs do not dispute that, to plead facts giving rise to a strong inference of scienter,

they must plead with particularity either (1) that Defendants had a motive for the supposed fraud; or (2) a strong circumstantial case of conscious misbehavior or recklessness.  (Def. Br. 23)  Nor do Plaintiffs dispute that for forward-looking statements, the inference of scienter must be of actual knowledge of fraud, not recklessness.  (*Id*. at 22-23)

Plaintiffs first argue they plead facts that establish a motive: to "increase the the Company's credit rating."  (Pl. Opp. 23)  Plaintiffs characterize Defendants' brief as arguing "that 'Plaintiffs allege no reason why Defendants would have wanted' to obtain a better credit rating." (*Id*.)  But what Defendants actually argued is that Plaintiffs allege no reason why Defendants would have wanted to fraudulently obtain a higher credit rating *for a short period of time*, before they disclosed the "truth" and the credit rating declined again.  It is precisely Plaintiffs' type of false logic that the Ninth Circuit rejected in *Nguyen v. Endologix*, 962 F.3d 405 (9th Cir. 2020) (allegation that the defendants would want the stock price high for a time and face the inevitable fallout later "does not resonate in common experience").[8]  Plaintiffs *assert* that Defendants wanted a higher credit rating because of "the impending need for the Company to refinance $500 million in outstanding Hecla bonds."  (Pl. Opp. 23)  But Plaintiffs acknowledge that the bonds did not mature until 2021—*three years* after Plaintiffs assert Defendants began the fraud.  (*Id*.)  If this timeframe constitutes an "impending" need to refinance debt, then any company with bonds coming due any time in the future has a motive to commit fraud.  No precedent supports such a conclusion.  Moreover, Plaintiffs' argument lacks particularized supporting allegations in the

---

[8] Plaintiffs assert that *Nguyen* has been "rejected by Second Circuit courts because it confuses expected with realized benefits."  (Pl. Opp. 24)  This is not accurate.  The sole decision Plaintiffs cite merely holds that *Nguyen*'s analysis is inapposite when the plaintiff's theory is that the defendants did not know in advance the problems were unavoidable.  *Skiadas v. Acer Therapeutics*, 2020 WL 4208442, *8 (S.D.N.Y. July 21, 2020) (discussed at Pl. Opp. 24).  Here, however, Plaintiffs' theory *is* that Defendants knew all along that their stated expectations for the Nevada operations were false.  (*E.g.*, Pl. Opp. 5-6)  Thus, *Nguyen* applies directly.

complaint. Plaintiffs do not plead that Hecla refinanced its bonds while the credit rating was fraudulently high, or that it even *tried* to do so. Plaintiffs' theory, then, is that Defendants committed fraud to obtain a higher credit rating so they could refinance bonds, but then took no action to refinance those bonds over the eleven-month period from when they achieved the higher credit rating to when the "truth" was revealed. This theory is neither cogent nor compelling, and is therefore insufficient. *See Tellabs v. Makor Issues & Rights*, 551 U.S. 308, 324 (2007).

Plaintiffs argue "[i]t is just as plausible that Defendants believed that the ongoing problems could be hidden indefinitely or at least until they refinanced Hecla's debt." (Pl. Opp. 24) But this runs counter to Plaintiffs' own allegations, which do not plead that the "truth" was ultimately revealed because some problem occurred that Defendants could no longer hide. Rather, Plaintiffs allege Defendants voluntarily disclosed the "truth" by affirmatively disclosing they were suspending future guidance for the Nevada operations and would conduct a comprehensive review. Plaintiffs offer no theory why, if Defendants' plan was to fraudulently inflate Hecla's credit rating to obtain better terms to refinance Hecla's debt, they would not have continued to hide the problems and until they refinanced Hecla's debt. The heightened pleading standard for scienter requires a plaintiff to plead *facts* that give rise to a strong inference of scienter. 15 U.S.C. § 78u-4(b)(2)(A). Asserting without supporting allegations that Defendants "believed" they could hide Nevada's problems indefinitely, but then disclosed those problems without some factor forcing their hand before they even tried to refinance Hecla's debt, does not satisfy the pleading requirements. It is rank conjecture.

Plaintiffs next argue that they allege actions by Defendants that "demonstrate strong circumstantial evidence of conscious misbehavior or at least recklessness." (Pl. Opp. 24) But the allegations Plaintiffs identify do not support their conclusion. Plaintiffs first argue they allege

that Baker made admissions after the Class Period.  (*Id.*)  However, as discussed above, Plaintiffs do not allege any statement by Baker that admitted he had any knowledge during the Class Period that any statement he made during the Class Period was false.  *Supra* at 8-9; *see also Tellabs*, 551 U.S. at 325 ("ambiguities count *against* inferring scienter") (emphasis added).

Plaintiffs also argue that Defendants "participated in due diligence, regularly visited the Nevada Mines and attended production meetings," which, Plaintiffs further argue, "show that they had 'access to' or 'should have known' about the ongoing negative conditions that existed at the Nevada Mines."  (Pl. Opp. 24-25)  However, "[w]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information."  *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000); *see also Glaser v. The9*, 772 F. Supp. 2d 573, 588 (S.D.N.Y. 2011) (similar).  Plaintiffs do not even argue their allegations meet that standard.  Moreover, none of the alleged misstatements asserted that there were no negative conditions in Nevada.  And Plaintiffs offer no explanation how knowing of negative conditions renders *any* alleged misstatement false or misleading, much less all of them.

Finally, Plaintiffs argue that Radford and another executive "suspiciously resigned at the same time shortly after the end of the Class Period."  (Pl. Opp. 25)  But Plaintiffs fail to explain why the retirements (Compl. ¶¶ 35-36) are suggestive of fraud, rather than of, at most, an acquisition whose integration did not go as expected.  Precedent holds that such resignations (or even terminations) do not support a strong inference of scienter.  *See In re Zagg Sec. Litig.*, 797 F.3d 1194, 1205 (10th Cir. 2015) (an executive's termination is "at most an acknowledgment that the company identified a better way of doing things moving forward, not an indicator that fraudulent intent existed at the time the alleged omissions occurred"); *Zucco Partners v. Digimarc*, 552 F.3d 981, 1002 (9th Cir. 2009) (similar); *In re Ceridian Sec. Litig.*, 542 F.3d 240, 249 (8th Cir.

2008) (similar).  That is particularly applicable here, where one of the two executives who retired (Dean McDonald) did not make any of the statements Plaintiffs allege were fraudulent but *did* participate in the integration of the Nevada operations.

Critically, although Plaintiffs acknowledge that analyzing proposed inferences of scienter requires considering the totality of Defendants' actions (Pl. Opp. 23), Plaintiffs ignore the other side of the ledger: Defendants' disclosure of a steady stream of negative information about the Nevada operations during the Class Period.  (Def. Br. 4-7; 25)  This includes not only operational issues, but also negative financial performance, including significantly increased production costs and millions of dollars of losses from operations per quarter.  Plaintiffs argue that the disclosures are not relevant because they did not "fully disclose" what Plaintiffs allege was the "truth."  (Pl. Opp. 25 n.19)  But the question in the scienter analysis is what these disclosures suggest about whether Defendants were intending to deceive.  Plaintiffs provide no explanation for why executives intending to conceal poor performance in Nevada would disclose, seventeen days into their ownership of the mines, that they were closing one of the three; no reason they would describe the mines' conditions as "poor" and the integration process as a "turnaround"; no reason they would disclose they had revised their position and did not expect Nevada to have positive cash flow for more than two years; no reason to disclose a huge jump in the cost of production versus the prior owner's disclosures; and no reason to disclose more than $10 million in operational losses per quarter.  Making these disclosures is *inconsistent* with an attempt to conceal from investors that the Nevada operations were performing poorly.  "It defies logic to conclude that executives who are seeking to perpetrate fraudulent information upon the market would make such fulsome disclosures." *Kuriakose*, 897 F. Supp. 2d at 185.

## Conclusion

For the foregoing reasons, the Court should dismiss this action with prejudice.

Dated: February 22, 2021

Respectfully submitted,

/s/ Stefan Atkinson

Stefan Atkinson, P.C.
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-4800
Stefan.Atkinson@kirkland.com

Joshua Z. Rabinovitz
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 389-5000
Joshua.Rabinovitz@kirkland.com

*Counsel for Defendants*