**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **ROBERT GLUCK, et al.,** | |
| **Plaintiffs,** | |
| **-against-** | **19-CV-4883 (ALC)** |
| **HECLA MINING CO. et al.,** | **OPINION AND ORDER** |
| **Defendants.** | |

**ANDREW L. CARTER, JR., United States District Judge:**

Lead Plaintiffs Robert Gluck, Emma Gluck and Sarah Gluck ("Plaintiffs") bring this securities class action against the Hecla Mining Company ("Hecla"), Phillips S. Baker, Jr. ("Baker"), Lindsay A. Hall ("Hall") and Lawrence P. Radford ("Radford") (collectively "Defendants") alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder on behalf of themselves and a class of all persons who purchased the publicly traded common stock of Hecla between March 19, 2018 and May 8, 2019 (the "Class Period"). Currently pending before the Court is Defendants' motion to dismiss the Amended Complaint. For the reasons stated below, the motion is **GRANTED**.

## BACKGROUND

### A. Factual Background[1]

This dispute arises from Hecla's July 2018 acquisition of Klondex Mines, Ltd. ("Klondex"). On March 19, 2018, Hecla, a mining company, announced that it was acquiring

---

[1] The following facts are drawn from the Amended Complaint and documents relied upon therein.

Klondex—a company that operated three high-grade gold mines in Nevada (the "Nevada Mines"). (Am. Compl., ECF No. 86 ¶ 6.)  In sum, Plaintiffs allege that Defendants made materially false and misleading statements and failed to disclose material adverse facts regarding Hecla's business, operations and prospects related to Klondex and the Nevada Mines.  (*See generally id.*)

### i.   The Parties

Lead Plaintiffs purchased Hecla common stock during the Class Period and have brought suit on behalf of all other individuals similarly situated against Hecla and several of its officers: (1) Defendant Baker, Hecla's CEO, (2) Defendant Hall, Hecla's CFO and Treasurer, (3) Defendant Radford, Hecla's Vice President of Operations, and (4) Defendant McDonald, Hecla's Vice President of Exploration (the "Individual Defendants").  (*Id.* ¶¶ 31–37.)  Plaintiffs allege that the Individual Defendants were provided with copies of Hecla's press releases and "possessed the power and authority to control the contents of Hecla's press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market."  (*Id.* ¶ 37.)

### ii.   The Nevada Mines and Defendants' Due Diligence

Plaintiffs allege that Hecla began "technical due diligence of the Nevada Mines" in or around November 2017.  (*Id.* ¶ 41.)  This included access to the mines and Klondex's personnel, onsite physical inspections of the condition of the properties, and access to documents and records maintained by the mines.  (*Id.* ¶ 41.)  Plaintiffs allege that through this due diligence, Defendants learned of several material problems with the Nevada Mines which would affect the ability of the Mines to be profitable once the acquisition of Klondex was completed; however, Plaintiffs allege that Defendants did not disclose these problems to the public.  (*Id.* ¶¶ 149–51.)

In support of Plaintiff's assertion that Defendants were aware of or recklessly disregarded the truth of the problems plaguing the Nevada Mines, Plaintiffs primarily rely on the statements

of twelve Confidential Informants ("CIs") who assert that there were significant operational problems affecting the Nevada Mines since before Hecla announced the potential acquisition. (*Id.* ¶ 56.) These CIs consist of former employees, including miners, surveyors, operators, IT support professionals, environmental coordinators, engineers. (*See id.* ns.6–17.) The problems included a serious water management issue at the Fire Creek mine whereby water continually collected at the bottom of the mine. (*See id.* ¶¶ 50, 51, 52, 59, 60, 61, 63, 69, 72, 84.) Plaintiffs also allege that the Nevada Mines "lacked equipment needed to excavate and process material." (*Id.* ¶¶ 58, 60.) Additionally, one informant stated that he knew that the cost of excavation of gold ore at Fire Creek would increase because the pH balance in the "wash plant" where the ore is extracted was higher than previously thought. (*Id.* ¶ 60.) Another informant stated that two veins at the Fire Creek mine did not contain high grade ore and were thus unable to "produce profitable material." (*Id.* ¶ 82.) Several informants also allege that throughout the Class Period, problems of poor ore quality plagued the Nevada Mines. (*see, e.g., id.* ¶ 86.)

### iii. *Defendants' Alleged Misstatements and Omissions During the Class Period*

Plaintiffs allege that Defendants did not disclose the extent or severity of the above-mentioned problems with the Nevada Mines beginning on March 19, 2018, when it publicly announced its acquisition of Klondex. These misstatements and omissions were made in Hecla's routine filings with the Securities and Exchange Commission ("SEC") and associated press releases and public statements.

On March 19, 2018, in announcing the potential Klondex acquisition, Defendant Baker, Hecla's CEO, stated that he expected the deal to be "accretive on many important financial and credit metrics" and that the Nevada operations would require "a small amount of capital" and would be "cash flow positive." (*Id.* ¶¶ 44, 88–89, 91.) The press release indicated that "[a]fter

extensive due diligence . . . We expect this transaction to be accretive on many important financial and credit metrics" and that "Fire Creek is a cornerstone producing asset with robust cash flows." (*Id.* ¶¶ 44, 88.)  Additionally, during a conference call with investors and analysists, Baker stated that the Nevada Mines "will be cash flow positive for us."  (*Id.* ¶ 91)

On May 10, 2018, in Hecla's first quarterly report filed with the SEC on Form 10-Q, Plaintiffs allege that Hecla failed to disclose "[t]he ongoing material, negative problems that were negatively affecting operations and that were growing worse at the Nevada Mines."  (*Id.* ¶¶ 96–99.)  In a conference call with investors, Baker said: "When we looked at Klondex … we saw extraordinary grades."  (*Id.* ¶ 93.)  Plaintiffs also allege that the cautionary language that warned of future potential risks that "may" or "could" adversely affect Hecla's business were insufficient and materially false and misleading because those "future" risks had in fact already materialized. (*Id.* ¶¶ 97–99.)

On July 23, 2018, the day the acquisition of Klondex was completed, Defendant Baker stated publicly that "Hecla now has three high-grade mines in Nevada" that would "immediately add production and cash flow."  (*Id.* ¶ 102.)  A few days after the acquisition was finalized, on August 9, 2018, Hecla issued a press release that reported its financial results for the second quarter of 2018 which stated "[w]e have now closed the acquisition of the high-grade Nevada mines . . . Our plan is to operate the mines and mill as one unit, allocating the workforce and capital to generate margins and focus on profitability, not just on production for production's sake."  (*Id.* ¶ 105.)  On the associated conference call, Baker said that he "expect[ed]" that the Nevada assets would be "basically self-funding" for 2018.  (*Id.* ¶¶ 107, 109.)  Additionally, in response to an analyst's question about permits for the Nevada Mines, Baker stated "Yeah. We've got everything we need."  (*Id.* ¶ 111.)  Hecla also incorporated into its Form 10-Q its prior disclosures about the

potential future risks that could affect the Nevada operations, which Plaintiffs maintain were fraudulent.  (*Id.* ¶ 116).

On November 8, 2018, during a conference call regarding Hecla's financial results, Baker stated that "[w]e think we can run it pretty close to cash flow neutral" and that the Nevada Mines would allow them to generate "margin" that "should not only improve our equity value, but also our credit metrics and the rating agencies are beginning to take notice of this as exemplified by our bond rating upgrade by S&P."  (*Id.* ¶¶ 113, 121, 123.)  Regarding the Fire Creek mine, Defendant Radford, Hecla's Vice President of Operations, explained: "[a]s we began to ramp development back up, we encountered existing foreground conditions, many development phases were in unconsolidated tuff[2], which is basically clay rich, add a little bit of water and the conditions turn to mush" but also stated that "our goal for Nevada operations is that the operations are cash-neutral[.]"  (*Id.* ¶ 121.)  In the associated press release, Hecla also disclosed that "[t]he mining of select high-grade zones [at Fire Creek] has been moved from Q3 2018 into 2019 as the ore extended vertically farther than expected, and development is needed for full extraction of the ore panels."  (*Id.* ¶ 119)  Hecla also incorporated into its Form 10-Q its prior disclosures about the potential future risks that could affect the Nevada operations, which Plaintiffs maintain were fraudulent.  (*Id.* ¶ 127)

Plaintiffs allege that Defendants' disclosures during this time continued to mask the true extent and severity of problems plaguing the Nevada Mines.  On December 4, 2018, during a conference call, Hall stated that "[t]here's no major capital expenditures that we can't fund out of the Nevada operations.  So we're really quite pleased with the transaction."  (*Id.* ¶ 129.)  On

---

[2] Tuff is a type of rock formation that contains clay which purportedly creates challenges to mining operations.  (Am. Compl., ECF No. 86 ¶¶ 49, 132.)

February 14, 2019, Hecla issued a press release with information about its exploration programs, including at Fire Creek. (*Id.* ¶ 136)

Beginning in early 2019, Plaintiffs allege that Defendants began to make "partial disclosures" of the truth regarding the condition and profitability at the Nevada Mines. On February 21, 2019, Hecla issued a press release filed with the SEC on Form 8-K which explained that Defendants had experienced "'challenges' with the conditions at the Nevada Mines." (*Id.* ¶ 131.) In the associated conference call, Baker and Hall both stated that they expected the Nevada operations to be "cash flow positive" for 2019, despite some of the challenges with the mines that had been disclosed in the Form 8-K. (*Id.* ¶ 138.) Regarding the Fire Creek mine, Defendant Radford disclosed that "we're looking at a bit more of a mobile dewatering plant so that we're not managing the water underground." (*Id.* ¶ 140.) Additionally, Hecla identified problems with the "tuff" material that it encountered at the Nevada Mines which would require additional equipment and costs to properly mine. (*Id.* ¶ 132.)

On February 22, 2019, Hecla's Form 10-K disclosed risks that may or could affect the Nevada Mines, which Plaintiffs maintain was insufficient because the language did not fully disclose that these risks had in fact already occurred. (*Id.* ¶¶ 142–144.) After this "partial" disclosure, Hecla's stock price declined from of $2.39 per share to $2.74 per share. (*Id.* ¶ 134.) However, Plaintiffs maintain that this price was still "artificially inflated" because Defendants had not disclosed the full extent of the problems at the Nevada Mines. (*Id.* ¶ 135.)

On April 18, 2019, Hecla issued a press release disclosing: "[a] minor amendment to the water discharge permit for Fire Creek is expected in the second quarter which should enable a higher discharge rate", which Plaintiffs maintain was false and misleading because it implied that the water discharge problems at the Nevada Mines were minor, when they were not. (*Id.* ¶ 145.)

This announcement caused a further share price decline from $2.28 per share to $2.15 per share. (*Id.* ¶ 146.)  However, Plaintiffs allege that this disclosure failed to fully explain the extent of the problem, whereby excess water had been leaking at the Fire Creek since 2017 and throughout the Class Period.  (*Id.* ¶ 147.)  Plaintiffs note that "Hecla had been shipping water at great expense from the dewatering storage pond at Fire Creek to the Midas mine" because of the extent of water problems at the Fire Creek mine.  (*Id.* ¶ 147.)

> iv.  *Defendants' Announcement of a Review of Spending and Operations at the Nevada Mines*

Plaintiffs allege that Defendants finally fully disclosed the extent and severity with the issues plaguing the Nevada Mines in May 2019.  On May 9, 2019, during a conference call with investors, Defendant Baker discussed the review for the Nevada Mines and the suspension of operations at those mines.  (*Id.* ¶ 149.)  During this conference call, Defendant Baker also discussed when these problems first began to emerge, stating:

> "A year ago when doing the due diligence, we recognized certain problems with Fire Creek dealing with the tuff material, managing the water, equipment availability, getting enough development to have consistent production, lack of characterization of ore types.
>
> And while we've made progress in dealing with the issues we saw the short answer is it's not been enough. The advance rate has increased, but the mill tonnage decreased by a similar percentage in the last quarter.
>
> And while we've done things to manage the water, the amount of water has increased, making the conditions worse. This has limited our access, and while they're not insurmountable and not a large amount of dollars, they will require quarters to construct some infrastructure and get some permit limits changed."

(*Id.* ¶ 149.)  Plaintiffs maintain that this disclosure "shocked investors" and caused Hecla's share price to decline from $2.04 per share to $1.77 per share.  (*Id.* ¶¶ 148–152.)

The next day, on May 10, 2019, Hecla filed its quarterly Form 10-Q, which stated:

> "We are currently undertaking a review of spending at the Nevada operations which may result in the following changes at the Fire Creek mine: a reduction in capital spending; ceasing current production and only developing to spirals 9, 10 and 11; or a temporary cessation of all mine operations at Fire Creek. As a result, the values of certain components of properties, plants, equipment and mineral interests could be adjusted in the second quarter of 2019 when we expect to finalize the allocation of the Klondex purchase price. The outcome of the review may constitute a triggering event requiring assessment of the carrying value of our long-lived assets at Fire Creek with the potential to impact near term estimated cash flows. . . . We may recognize an impairment, which could be material, if the carrying value of the assets exceeds the estimated future undiscounted cash flows expected to result from their use and eventual disposition. . . ."

(*Id.* ¶ 155.)

Scotiabank characterized the announcement as a "a complete reversal" in Hecla's outlook on the Nevada mine since Hecla acquired Klondex. (*Id.* ¶ 156.) This announcement caused Hecla's stick price to decline from $1.77 per share to $1.56 per share. (*Id.* ¶ 157.)

On June 6, 2019, following its review of the Nevada Mine operations, Hecla issued a press release indicating that "changes are being made with the goal of turning [the Nevada Mines] into a positive cash flowing unit." (*Id.* ¶ 159.) Hecla determined that it would continue to mine "developed ore" at Fire Creek, that Midas would continue production through the end of 2019, but that the Hollister mine would be shut down. (*Id.*) After this announcement, Standard & Poor's and Moody's downgraded Hecla's credit rating. (*Id.* ¶¶ 161, 162.)

## B. Procedural Background

Plaintiffs filed the Complaint on May 24, 2019. (ECF No. 1.) Plaintiffs filed a consolidated Amended Complaint on September 9, 2020. (Am. Compl., ECF No. 86.) On May 25, 2020, the Court appointed the Gluck Family as Lead Plaintiffs and consolidated this action with *Bhattacharya v. Hecla Mining Co. et al.*, 1:19-cv-05719 (ALC). (ECF No. 80.)

Subsequently, Defendants filed a motion to dismiss the Amended Complaint, arguing that (1) the alleged misstatements are actionable because they are protected by the statutory safe harbor for forward-looking statements and were not false or misleading; (2) Plaintiffs have not plead with particularity any false or misleading statements of fact and (3) Plaintiffs do not plead with particularity facts giving rise to a "strong inference" of scienter.  (*See generally* ECF No. 95.) Plaintiffs filed their memorandum of law in opposition to the motion on January 22, 2021.  (ECF No. 97.)  Defendants filed a reply in further support of their motion on February 22, 2021.  (ECF No. 101.)

 Plaintiffs also filed a letter advising the Court of supplemental authority on September 21, 2021 (ECF No. 107), to which Defendants responded (ECF No. 108).  Plaintiffs filed an additional notice of supplemental authority on December 22, 2022.  (ECF No. 114.)  Defendants filed a letter response on December 27, 2022.  (ECF No. 115.)

## LEGAL STANDARDS

### A.  Motions to Dismiss under Rule 12(b)(6)

When deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must "accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party."  *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007).  However, the Court need not credit "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  Claims should be dismissed when a plaintiff has not pleaded enough facts that "plausibly give rise to an entitlement for relief."  *Id.* at 679.  A claim is plausible "when the plaintiff pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* at 678 (citing *Twombly*, 550 U.S. at 556).  While not akin to a "probability requirement," the

9

plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556).  Accordingly, where a plaintiff alleges facts that are "'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).  The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient."  *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985).

In deciding a motion to dismiss a securities action, the Court may consider "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit" of which a court may take judicial notice.  *Sgalambo v. McKenzie*, 739 F.Supp.2d 453, 470 (S.D.N.Y. 2010) (quoting *ATSI Commc'ns,* 493 F.3d at 98); *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000)).

## B.  Section 10(b) and Rule 10b-5

To plead a claim under Section 10(b) and Rule 10b-5, a plaintiff must adequately allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation; (5) economic loss; and (6) loss causation." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267, (2014); *Waggoner v. Barclays PLC*, 875 F.3d 79, 93 n.23 (2d Cir. 2017).

"'The test for whether a statement or omission is materially misleading'. . . is not whether the statement is misleading in and of itself, but 'whether the defendants' representations, taken together and in context, would have misled a reasonable investor.'" *In re Vivendi S.A. Sec. Litig.*,

838 F.3d 223, 250 (2d Cir. 2016) (quoting *Rombach v. Chang*, 355 F.3d 164, 172 n.7 (2d Cir. 2004). This is an objective test that looks to the understanding of an "ordinary investor." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 187 (2015). Importantly, "literal accuracy is not enough. An issuer must as well desist from misleading investors by saying one thing and holding back another." *Id.* at 192. "However, Section 10(b) and Rule 10b-5(b) "do not create an affirmative duty to disclose any and all material information." *Chapman v. Mueller Water Prod., Inc.*, 466 F. Supp. 3d 382, 397 (S.D.N.Y. 2020) (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011)). Thus, issuers have a duty of disclosure "only when necessary 'to make . . . statements made, in light of the circumstances under which they were made, not misleading.'" *Matrixx*, 563 U.S. at 44 (quoting 17 C.F.R. 240.10b-5(b)).

### C. Fed. R. Civ. P. 9(b) and the PSLRA

When a plaintiff has alleged securities fraud claims, the complaint is subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 (the "PSLRA"). Rule 9(b) requires that the complaint "state with particularity the circumstances constituting fraud or mistake." To satisfy the particularity requirement, a complaint must "(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." *Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 403 (2d Cir. 2015).

The PSLRA holds private securities plaintiffs to an even more stringent pleading standard. Under the PSLRA, a plaintiff must "(1) specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading; and (2) state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Tellabs,*

*Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321 (2007) (internal citation and quotation marks omitted) (quoting 15 U.S.C. § 78u-4(b)).  Under this heightened pleading standard for scienter, a plaintiff will sufficiently allege scienter and a complaint will survive, "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324.

## ANALYSIS

Drawing all reasonable inferences in Plaintiffs' favor, the Court finds that Plaintiffs have not articulated sufficient factual allegations to carry their assertions beyond the speculative level: many of Defendants' alleged misstatements are protected by the PSLRA safe harbor; Plaintiffs have not asserted sufficient facts to indicate a strong inference of scienter and have failed to plead sufficient facts demonstrating Defendants' statements were false when made.

### A. Safe Harbor for Forward-Looking Statements

Defendants argue that statements about future performance are not actionable because they are covered by the PSLRA's statutory safe harbor.  (ECF No. 95 at 10.)  A "forward-looking statement" is (1) "a statement containing a projection of revenues, income. . . or other financial items," (2) "a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer," or (3) "a statement of future economic performance."  15 U.S.C. § 78u-5(i)(1)(A)-(C); *see also In re Vivendi*, 838 F.3d at 246. These statements are subject to the PSLRA's "Safe Harbor", which provides, in relevant part, that:

> [A] defendant is not liable if (1) the forward-looking statement is identified and accompanied by meaningful cautionary language, (2) the forward-looking statement is immaterial, or (3) the plaintiff fails to prove that the forward-looking statement was made with actual knowledge that it was false or misleading. Because the safe harbor is written in the disjunctive, a forward-looking statement is protected under the safe harbor if any of the three prongs applies.

*Id.* at 245–46 (citation omitted).  To qualify as "meaningful," cautionary language must "convey[] substantive information" and cannot be "boilerplate" or "vague."  *Id.* at 247 (citation omitted). However, "[t]he cautionary language need not directly precede or follow the forward-looking statement for it to be meaningful."  *Gray v. Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366, 392 (S.D.N.Y. 2020), aff'd, 847 F. App'x 35 (2d Cir. 2021) (citing *Slayton v. American Exp. Co.*, 604 F.3d 758, 768–69 (2d Cir. 2010)).

Defendants maintain that the following statements are forward looking and thus protected by the safe harbor:

- "After extensive due diligence, we see significant opportunity to improve costs, throughput and recoveries over time with our expertise. . . .We expect this transaction to be accretive on many important financial and credit metrics."  (Am. Compl. ¶ 88.)

- "And we think that this is a huge step in that direction given the small amount of capital that these projects are going to require."  (*Id.* ¶ 89.)

- "But all of this stuff is relatively small capital. That was one of the things that struck us is we can acquire this. Nevada itself will be cash flow positive for us. There is no capital outlay that we're looking to, in Nevada, that's going to consume all of the cash flow that will be generated from the three mines.
  ***
  We would anticipate seeing that higher grade. But even if it's not, what we find with our mine plan is that we will, basically the downside is we get all of our money back.
  ***
  And then from the get-go, the Nevada assets are going to be cash flow positive." (*Id.* ¶ 91.)

- "With this acquisition, Hecla now has three high-grade mines in Nevada…. These assets immediately add production and cash flow." (*Id.* ¶ 102.)

- "We have now closed the acquisition of the high-grade Nevada mines, and are beginning their integration into Hecla…. Our plan is to operate the mines and mill as one unit, allocating the workforce and capital to generate margins and focus on profitability, not just on production for production's sake, Fire Creek has the best margin of the 3 mines by a considerable amount, so ramping it up is our priority." (*Id.* ¶ 105.)

- "As is our mantra at Hecla, all operations need to generate positive cash flows in their mine plans and we expect Nevada will be no different. The Nevada assets are basically self-funding." (*Id.* ¶ 107.)

- "One is the expectation is this year that for the five months, it will be self-funding. We're not anticipating needing to contribute additional capital into it." (*Id.* ¶ 109.)

- "Our goal for Nevada operations is that the operations are cash-neutral, including Hatter Graben development and the Fire Creek development ramp-up. . .." (*Id.* ¶ 121.)

- The Nevada Mines are "going to generate the cash flow necessary for it to do the ramp up of development in 2019." (*Id.* ¶ 123.)

- "We see Nevada being able to largely pay for the Hatter Graben, to pay for the development within Fire Creek. We think we can run it pretty close to cash flow neutral." (*Id.*)

- "There's no major capital expenditures that we can't fund out of the Nevada operations. So we're really quite pleased with the transaction." (*Id.* ¶ 129.)

- "[W]hat we've said is, is that the operations will be cash flow positive with exception of the exploration and the development for the Hatter Graben. So when you look at -- and so basically we're saying that we're right at positive cash flow from Nevada." (*Id.* ¶ 138.)

- "We expect in 2019, the Nevada mining operations will be cash flow positive." (*Id.*)

- "A minor amendment to the water discharge permit for Fire Creek is expected in the second quarter which should enable a higher discharge rate." (*Id.* ¶ 145.)

Defendants argue that these forward-looking statements were accompanied by meaningful cautionary language which advised investors that these statements were forecasts of future performance. (ECF No. 95 at 12.) Plaintiffs do not contest whether Defendants' cautionary language was sufficient *per se*. Rather, Plaintiffs argue that Defendants' cautionary warnings were "misleading" principally "because the risks had *already* materialized." (ECF No. 97 at 20–21) (emphasis in original). In other words, they contend that Defendants' cautionary statements cannot be issued to "insulate from liability" risks that had already transpired. (*Id.* at 20.)

First, the Court finds that the majority of the above-listed statements constitute forward looking statements. These statements "fall squarely within the definition of 'a statement containing a projection of ... income (including income loss), earnings (including earnings loss) per share, ... or other financial items" and "a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management." *Gray*, 454 F. Supp. 3d at 386 (quoting 15 U.S.C. § 78u-5(i)(1)(A) & (C)). However, the Court finds that two of the statements are not forward looking and thus not covered by the statutory safe harbor: (1) "With this acquisition, Hecla now has three high-grade mines in Nevada…. These assets immediately add production and cash flow." (Am. Compl. ¶ 102) and (2) "There's no major capital expenditures that we can't fund out of the Nevada operations. So we're really quite pleased with the transaction" (*Id.* ¶ 129).

Second, the Court finds that Defendants' forward-looking statements were accompanied by meaningful cautionary language. Meaningful cautionary language must include the "important factors that could realistically cause results to differ materially." *Slayton*, 604 F.3d at 773. This language must be both "extensive and specific. . . .and must contain substantive company-specific warnings." *Gray*, 454 F. Supp. 3d at 392 (internal quotations and citations omitted). Hecla's Form 8-K, issued the same day the Klondex acquisition was finalized, contained statements cautioning that the report contained "forward looking statements" which involved "a number of risks and uncertainties that could cause actual results to differ materially from those projected, anticipated, expected or implied." (ECF No. 96-2.) The presentation also incorporated the risk disclosures made in Hecla's Form 10-K and 10-Q Reports. (*Id.*) Hecla's Form 10-K from year-end 2017 contained discussion of specific risk factors that could prevent Hecla from realizing all the anticipated benefits of the Klondex acquisition. (ECF No. 96-16 at 17.) Those risks included

"difficulties integrating operations and personal, higher than expected acquisition and operating costs. . . " (*Id.*)  The disclosure also notes that various factors could impact its overall growth strategy, including "lower than expected ore grades" and "labor problems". (*Id.* at 10, 16.)  The disclosure also noted that the acquired properties "may be in an unexpected condition". (*Id.* at 17.) In fact, the disclosure explained the risks of acquiring new properties, even with extensive due diligence, noting that Hecla may not be able to "identify liabilities associated with the acquired properties" and that "[e]ven a detailed review of records and properties may not necessarily reveal existing or potential problems or permit a buyer to become sufficiently familiar with the properties to fully assess their condition, any deficiencies, and development potential." (*Id.* at 17.)

These warnings were substantively repeated throughout the Class Period in Hecla's public disclosures. (*See, e.g.,* ECF No. 96-1 at 16–17 ("The properties we acquire in any acquisition, including our recently-acquired Nevada Operations unit, may not produce as expected, may be in an unexpected condition and we may be subject to increased costs and liabilities."); *see also* ECF No. 96-4 at 62–63 ("The Klondex properties and any others we may acquire may not produce as expected and may not generate additional reserves, and may come with liabilities beyond those known at the time of acquisition.")) These warnings, when read together, caution investors of the very risks that Plaintiffs allege ultimately occurred—namely that the Nevada Mines were not in the condition they were initially thought to be and that the cost of operating those mines would ultimately be higher than expected.  This language is sufficiently specific to insulate Defendants from liability for its forward-looking statements. *See In re Bemis Co. Sec. Litig.*, 512 F. Supp. 3d 518, 534 (S.D.N.Y. 2021).

Accordingly, for the reasons stated above, Defendants' forward-looking statements are protected by the PSLRA's safe harbor for forward-looking statements and are thus not actionable.

**B. Scienter**

In addition, the Court finds that the Amended Complaint does not set forth sufficient facts alleging scienter, and thus Plaintiffs fail to state a claim as a matter of law as to all of Defendants' alleged misstatements.  As stated previously, a plaintiff must set forth facts giving rise to a "strong inference of scienter" which is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *In re Advanced Battery Techs., Inc.*, 781 F.3d 638, 644 (2d Cir. 2015) (quoting *Tellabs*, 551 U.S. at 314, 324).  The Second Circuit has identified two ways a plaintiff can plead the required "strong inference" of fraudulent intent, by alleging either (1) that the defendants "had both motive and opportunity to commit fraud," or (2) "facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001).

*i.     Motive and Opportunity*

The Court finds that Plaintiffs have not adequately pleaded that any Defendant had the motive or opportunity to commit fraud.  "Sufficient motive allegations 'entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged.'" *Id.* at 139 (quoting *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000)).  In determining whether a strong inference exists, the allegations are not to be reviewed independently or in isolation, but the facts alleged must be "taken collectively" and "the court must take into account plausible opposing inferences." *Id.* at 323.  This heightened pleading standard, when viewed together with the more general standards applicable to Rule 12(b)(6) motions to dismiss under *Twombly* and *Iqbal,* make clear that "plaintiffs must provide sufficient particularity in their allegations to support a plausible inference that it is more likely than not that a securities law violation has been committed." *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 570 (S.D.N.Y.

2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015) (citing *ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009)).

Plaintiffs posit that because the acquisition of the Nevada Mines would increase Hecla's credit rating, Defendants had both a motive and an opportunity to commit fraud so that "the ongoing problems [at the Nevada Mines] could be hidden indefinitely or at least until [Defendants] refined Hecla's debt". (ECF No. 97 at 23–24.) However, as noted by Defendants, "[m]otives that are generally possessed by most corporate directors and officers," such as "the desire for the corporation to appear profitable" or "the desire to keep stock prices high to increase officer compensation," are insufficient to allege a strong inference of scienter. *Kalnit*, 264 F.3d at 139; *see also In re Bemis Co. Sec. Litig.*, 512 F. Supp. 3d at 535. Plaintiffs have put forth no cogent basis for Defendants to commit fraud other than the normal profit-making incentives of any corporate officer, and they have provided no supporting facts underpinning their theory of motive. For example, while Plaintiffs assert that Defendants were motivated to commit fraud in order to increase Hecla's credit rating, they do not allege that Defendants did in fact refinance Hecla's bonds while its credit rating was allegedly artificially inflated. Nor do they allege that any of the Individual Defendants sold stock during the Class Period at the allegedly inflated prices or that they realized any personal benefit from the alleged misstatements. In short, Plaintiffs' allegations lack the factual specificity moving their claims of scienter beyond the speculative level.

Moreover, Plaintiffs' overall theory of motive and opportunity is neither "cogent" nor "at least as compelling as any opposing inference". *See Tellabs*, 551 U.S. at 324. Plaintiffs ask the Court to infer from their proffered facts that Defendants had a motive to increase Hecla's credit rating—but only for a short period of time—before they ultimately decided to reveal the full truth to the public and thereby *decreasing* Hecla's credit rating.

Another, more logical, inference that could be made from the alleged facts is that the water build-up and other issues that were percolating at the Nevada Mines, while perhaps emerging at the time Defendants completed their acquisition, worsened over time. Thus, when Defendants realized that their initial projections about the profitability of the Nevada Mines were no longer feasible, they disclosed these facts to the market. This competing inference is bolstered by Defendant Baker's own statements made at the close of the Class Period on May 9, 2019. Baker acknowledged that Hecla had first learned of certain water management and ore quality issues affecting the Nevada Mines during due diligence, but noted that since that time, "the amount of water has increased, making the conditions worse." (Am. Compl., ECF No. 86 ¶ 149.) Likewise, on August 7, 2019, Hecla publicly stated that "[w]ith water discharge from Fire Creek higher than it was a year ago, work is underway to increase discharge permits. . ." (*id.* ¶ 165), also suggesting that the issues plaguing the Nevada Mines had increased in severity since Hecla's acquisition. Thus, a cogent and compelling inference that can be drawn from the Amended Complaint is that Defendants did in fact disclose the negative conditions affecting Nevada Mines when those problems became so severe that they affected their forecast for the overall profitability of the Nevada Mines.

Accordingly, Plaintiffs' allegations fail the first prong of the scienter test. *See Maloney v. Ollie's Bargain Outlet Holdings, Inc.*, 518 F. Supp. 3d 772, 779 (S.D.N.Y. 2021) (internal citations and quotations omitted).

*ii.    Recklessness*

The Court also finds that Plaintiffs have not adequately pleaded strong circumstantial evidence supporting scienter. While scienter "may also be pleaded by alleging 'strong circumstantial evidence of conscious misbehavior or recklessness", in the absence of evidence of

a cogent motive and opportunity, "the strength of the circumstantial allegations must be correspondingly greater." *Maloney*, 518 F. Supp. 3d at 780 (quoting *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago*, 553 F.3d at 198–99). "Conscious misbehavior refers to 'deliberate illegal behavior, such as securities trading by insiders privy to undisclosed and material information, or knowing sale of a company's stock at an unwarranted discount.'" *Maloney*, 518 F. Supp. 3d at 780 (quoting *Novak,* 216 F.3d at 300). By contrast, "recklessness is harder to identify but involves 'an extreme departure from the standards of ordinary care." *Maloney*, 518 F. Supp. 3d at 780 (S.D.N.Y. 2021) (quoting *Kalnit*, 264 F.3d at 142). "In other words, an allegation that a defendant merely ought to have known is not sufficient to allege recklessness.'" *In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 535 (S.D.N.Y.), *aff'd sub nom. Condra v. PXRE Grp. Ltd.*, 357 F. App'x 393 (2d Cir. 2009) (quoting *Hart v. Internet Wire, Inc.*, 145 F.Supp.2d 360, 368 (S.D.N.Y.2001)) (internal quotations omitted).

Plaintiffs allege that recklessness may be inferred because Defendants had access to information about the condition of the Nevada Mines through their due diligence efforts as early as 2017, and thus knew or recklessly disregarded the false and misleading nature of their public statements about the profitability of the acquisition and the mines. (ECF No. 86 ¶ 179.) They contend that the nondisclosure of the negative conditions at the Nevada Mines was "highly unreasonable" and an "extreme departure from the standards of ordinary care" because the negative conditions at the Nevada Mines was already known to Defendants. (ECF No. 97 at 24.) Plaintiffs bolster these allegations by pointing to Defendant Baker's "admission" in May 2019 that "[a] year ago when doing the due diligence, we recognized certain problems with Fire Creek dealing with the tuff material, managing the water, equipment availability, getting enough development to have consistent production, lack of characterization of certain ore types." (ECF

No. 86 ¶ 149.)  They also use the statements of their CIs, who allege that the myriad of problems at the Nevada Mines were readily apparent and known to Defendants throughout the Class Period.

The defect in Plaintiffs' recklessness scienter theory lies in their failure to plead the falsity of Defendants' alleged misstatements.  As to the assertions made by Plaintiffs' CIs, Plaintiffs have not adequately alleged why and how the knowledge of the CIs can be imputed to the knowledge of the Defendants.  Most of these CIs were low level employees—miners, surveyors and machine operators—and Plaintiffs have provided no basis for the Court to infer that the balance of the information known by these CIs was also known or communicated to the Individual Defendants— all senior executives at Hecla.  *See In re Am. Express Co. Sec. Litig.*, No. 02 CIV. 5533 (WHP), 2008 WL 4501928, at *8 (S.D.N.Y. Sept. 26, 2008), *aff'd sub nom. Slayton v. Am. Exp. Co.*, 604 F.3d 758 (2d Cir. 2010) (quoting *In re Elan Corp. Secs. Litig.*, 543 F.Supp.2d 187, 219 (S.D.N.Y. 2008) ("allegations based on confidential sources were insufficient to establish scienter where there were no facts to establish that the confidential sources would have known what information was communicated to senior executives")).

Although Plaintiffs allege that two of the CIs attended meetings with Defendant Radford where problems at the Nevada Mines were discussed (*see, e.g.*, Am. Compl., ECF No. 86 ¶¶ 76, 78) and that some CIs saw the Individuals Defendants touring the Nevada Mines (*id.* ¶ 68), these allegations are insufficient for scienter through a theory of recklessness.  For instance, Plaintiffs allege that starting in July 2018, shortly after the Klondex acquisition, Defendant Radford attended weekly meetings with employees at the Nevada Mines where "Radford acknowledged problems with the ore body and water buildup at the mill" and that "Defendant Radford acknowledged to participants [in the meeting] the strain these issues were having on production."  (*Id.* ¶ 78.) However, the Amended Complaint does not sufficiently tie how Radford's knowledge of

"problems with the ore body and water buildup at the mill" rendered Defendants' public statements about the acquisition—for instance that the "margin" from the Nevada Mines "should not only improve our equity value, but also our credit metrics and the rating agencies" (*id.* ¶ 113)—false and misleading.

Likewise, CI 9's assertion that he saw Defendants Baker and Radford "Walking around the Nevada Mines' facilities and milling areas on a regular basis" is insufficient.  (ECF No. 86 ¶ 68.) The Amended Complaint does not explain how Defendants' presence at the Nevada Mines, where they allegedly could have observed water build-up and other issues, renders their *specific* public statements about the profitability of the Nevada Mines false and misleading.  The Amended Complaint merely asserts that the water buildup issues observed by Defendants meant that "Hecla needed pumps to remove the excess water" (*id.* ¶ 68), without explaining why or how this would hamper Hecla's overall financial forecast for the Nevada Mines.  *See Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786, 813 (S.D.N.Y. 2018) (emphasis in original) (a plaintiff must allege "specific contradictory information was available to [defendants] at the same time they made their [allegedly] misleading statements.")

Accordingly, Plaintiffs' allegations also do not give rise to a strong inference of scienter and thus Plaintiffs' claims fail as a matter of law.  *See, e.g.*, *Saraf v. Ebix, Inc.*, No. 21-CV-1589 (JMF), 2022 WL 4622676, at *7 (S.D.N.Y. Sept. 30, 2022).

## C.  Material Misrepresentations

In addition to Plaintiffs' failure to plead scienter, the Amended Complaint does not adequately allege that Defendants' alleged misstatements were material misrepresentations.

A violation of Section 10(b) and Rule 10b-5 premised on misstatements cannot occur unless an alleged material misstatement was false at the time it was made.  *See San Leandro*

*Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc.*, 75 F.3d 801, 812–13 (2d Cir. 1996).  A statement believed to be true when made, but later shown to be false, is insufficient. *Id.* (explaining that "plaintiffs have not alleged circumstances to show that the defendants lacked a reasonable basis for their optimistic, but qualified, predictions as to the company's future performance"); *see also Novak v. Kasaks*, 216 F.3d at 309 ("refus[ing] to allow plaintiffs to proceed with allegations of 'fraud by hindsight.' Corporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them." (internal citations omitted)), *cert. denied*, 531 U.S. 1012 (2000).  Indeed, the Second Circuit has repeatedly stated that plaintiffs must do more than simply assert that a statement is false—"they must demonstrate with specificity why and how that is so." *Rombach*, 355 F.3d at 174.  Where, as is true of many of the alleged misstatements at issue here, "a plaintiff asserts the falsity of a statement of belief or opinion, the plaintiff must plead that it 'was both objectively false and disbelieved by the defendant at the time it was expressed.'" *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d at 571 (quoting *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 110 (2d Cir.2011)).

As discussed above, the chief defect in the Amended Complaint is Plaintiffs' failure to plead that Defendants' statements were false at the time they were made.  The fact that Defendant Baker disclosed at the close of the Class Period that Hecla had "recognized certain problems with Fire Creek dealing with the tuff material, managing the water, equipment availability, getting enough development to have consistent production, lack of characterization of ore types" during the due diligence process (Am. Comp., ECF No. 86 ¶ 149), does not demonstrate that Defendants' public statements about their expectations that the Nevada Mines would be cash flow positive were false and misleading.  In the same vein, the anecdotal observations of Plaintiffs' CIs regarding water build-up and production problems at the Nevada Mines also do not establish that Defendants

public statements about their expectations of benefit from the Klondex acquisition were false or misleading.

In short, Plaintiffs do not explain what "specific contradictory information was available to [Defendants] *at the same time* they made their [allegedly] misleading statements. *Das,* 332 F. at 813 (emphasis in the original). As Defendants note in their moving papers, "none of the alleged misstatements asserted that there were *no negative conditions* in [the] Nevada [Mines], (ECF No. 101 at 19) (emphasis added), and Plaintiffs have not adequately demonstrated how purported knowledge of negative conditions at the mines renders all of Defendants' public statements false or misleading. In other words, Plaintiffs have not alleged sufficient facts to suggest what effect these negative conditions would have had on the overall profitability Nevada Mines. Thus, their assertion that that Defendants knew or should have known that the reality of the Nevada Mines was inconsistent with their public statements regarding the overall profitability of the Klondex acquisition, is unavailing.

Additionally, reviewing the alleged misstatements in their full context reveals that Hecla did in fact disclose many of the challenged it was encountering wat the Nevada Mines. "The key question in considering the misleading nature of a statement is 'whether defendants' representations, taken together and in context, would have misle[d] a reasonable investor[.]'" *In re Skechers USA, Inc. Sec. Litig.*, 444 F. Supp. 3d 498, 516 (S.D.N.Y. 2020) (quoting *McMahan & Co. v. Wherehouse Ent., Inc.*, 900 F.2d 576, 579 (2d Cir. 1990)); *see also In re Nokia Corp. Sec. Litig.*, No. 19-CV-3509, 2021 WL 1199030, at *19 (S.D.N.Y. Mar. 29, 2021) (citing *S.C. Ret. Sys. Grp. Tr. v. Eaton Corp. PLC*, 791 F. App'x 230, 234 (2d Cir. 2019) (summary order)). For example, in an earnings call on August 9, 2018, a few weeks after the Klondex acquisition was completed, in response to a question about when Hecla expected to see positive returns from the

Fire Creek mine, Defendant Baker stated "[w]e are prepared to allow [Fire Creek] . . . to be self-funding and not generate returns immediately…"  (ECF No. 96-7 at 10.)  Likewise, Defendant Radford discussed "the poor conditions of the mine" at the time of acquisition and noted that as Hecla "began to ramp development back up, we encountered existing foreground conditions, many development phases were in unconsolidated tuff, which is basically clay rich, add a little bit of water and the conditions turn to mush."  (ECF No. 96-7 at 6.)  Defendants also discussed the water conditions at the Nevada Mines when Defendant Radford noted that at Fire Creek "[i]n some areas of the mine, the road conditions are muddy" and "conditions would get bad enough that machines will get stuck and have to get towed out." (*Id.* at 7.)  These statements are entirely consistent with the assertions of Plaintiffs' CIs who allege that there were negative conditions at the Nevada Mines throughout the Class Period.

Plaintiffs cite the Second Circuit's recent decision in *Moab Partners, L.P. v. Macquarie Infrastructure Corp.*, No. 21-2524, 2022 WL 17815767 (2d Cir. Dec. 20, 2022) as supplemental authority supporting their position, relying on the Second Circuit's finding that the omissions of the defendants in that case were not cured by disclosures defendants made about regulatory issues the company was facing because the disclosures did not give the investing public the necessary information needed to make an informed decision.  (ECF No. 114 at 1.)  However, the facts here are distinguishable.  Unlike in *Moab Partners*, Hecla's disclosures and cautionary language specifically addressed the very risks (*i.e.*, the water build-up, ore quality, and operational difficulties) that Plaintiffs allege Defendants did not disclose.  In other words, the entirety of Defendants' public statements allowed the investing public to have "ready access to the very information that the plaintiffs assert should have been disclosed. . . "  *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 577 (S.D.N.Y. 2013), aff'd, 566 F. App'x 93 (2d Cir.

2014).  Thus, the Court finds that Plaintiffs fail to allege sufficient facts to show any actionable misrepresentations or omissions by Defendants.  *See In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 377 (E.D.N.Y. 2003*)* ("Even at the pleading stage, dismissal is appropriate where the complaint is premised on the nondisclosure of information that was actually disclosed.")

### D.  Section 20(a)

As Plaintiffs have failed to adequately allege their § 10(b) claim, their claim under § 20(a) also fails as a matter of law.  *See S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996), *cert. denied*, 522 U.S. 812 (1997); *accord Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 139 (2d Cir. 2011).

### E.  Leave to Amend

In the event that the Court determines that any part of the Amended Complaint is legally deficient, Plaintiffs have requested leave to amend.  (ECF No. 97 at 25 n.21.)  The Second Circuit has recognized that "it is the usual practice upon granting a motion to dismiss to allow leave to replead," *Cruz v. TD Bank, N.A.*, 742 F.3d 520, 523 (2d Cir. 2013) (citation omitted), but it has also recognized that "[l]eave to amend may properly be denied if the amendment would be futile." *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012) (citation omitted). Given Defendants' disclosures regarding the negative conditions at the Nevada Mines and the paucity of allegations supporting Plaintiffs' allegations of scienter and falsity, the Court is doubtful that an amendment would certainly cure these defects.  However, the Court will grant leave to amend.  Any amended complaint should be filed by March 15.

## **CONCLUSION**

For the reasons stated above, Defendant's motion to dismiss is **GRANTED**. The Clerk of Court is respectfully requested to terminate the pending motion at ECF No. 94. Plaintiffs are granted leave to file a second amended complaint by **March 15, 2023.**

Dated:  February 22, 2023
      New York, New York

_____
        **ANDREW L. CARTER, JR.**
        **United States District Judge**