## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROBERT GLUCK, EMMA GLUCK and SARA GLUCK, on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>  vs.<br><br>HECLA MINING COMPANY, PHILLIPS S. BAKER, JR., LINDSAY A. HALL, LAWRENCE P. RADFORD, and DEAN W.A. MCDONALD,<br><br>        Defendants. | Case No.: 19-cv-4883 (ALC)<br><br>(consolidated with Case No.: 19-cv-5719 (ALC))<br><br>CLASS ACTION<br><br>JURY TRIAL DEMANDED |

**SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**

**KAPLAN FOX & KILSHEIMER LLP**
Robert N. Kaplan
Jeffrey P. Campisi
Jason A. Uris
800 Third Avenue, 38th Floor
New York, NY 10022

*Lead Counsel for Lead Plaintiffs and the Proposed Class*

Dated: March 29, 2023

**TABLE OF CONTENTS**

**Page(s)**

I.      SUMMARY OF THE CASE.................................................................. 1

II.     INTRODUCTION ......................................................................... 3

III.    JURISDICTION AND VENUE ........................................................... 21

IV.     PARTIES ................................................................................. 22

V.      CLASS ACTION ALLEGATIONS ....................................................... 24

VI.     BEFORE AND DURING THE CLASS PERIOD DEFENDANTS KNEW OR
        RECKLESSY DISREGARDED THAT THE NEVEADA MINES WERE
        PLAGUED BY MATERIAL NEGATIVE OPERATIONAL PROBLEMS AND
        WERE NOT, AND WOULD NOT BE, CASH FLOW POSITIVE ............................... 24

VII.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING
        STATEMENTS............................................................................. 39

VIII.   THE TRUTH BEGINS TO EMERGE THROUGH A SERIES OF PARTIAL
        DISCLOSURES............................................................................ 60

IX.     POST CLASS PERIOD EVENTS......................................................... 72

X.      LOSS CAUSATION/ECONOMIC LOSS ................................................. 81

XI.     FRAUD-ON-THE-MARKET DOCTRINE ............................................... 82

XII.    ADDITIONAL SCIENTER ALLEGATIONS.............................................. 83

        A.      Defendants Regularly Visited the Nevada Mines during Due Diligence
                and during the Class Period and Actively Managed the Nevada Mines.............. 83

        B.      The Scienter of Hecla's senior Executives and Officers Is Imputed to
                Defendant Hecla........................................................................ 84

        C.      Defendants Had Motive and Opportunity to Hide the Material, Negative
                Problems at the Nevada Mines and That the Mines Were Cash Flow
                Negative Throughout the Class Period ............................................... 85

XIII.   NO SAFE HARBOR ...................................................................... 86

FIRST CLAIM FOR RELIEF
For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All
Defendants ................................................................................................................ 87

SECOND CLAIM FOR RELIEF
For Violation of Section 20(a) of the Exchange Act Against the Individual Defendants ........... 88

PRAYER FOR RELIEF ........................................................................................... 89

JURY DEMAND ...................................................................................................... 89

Lead Plaintiffs Robert Gluck, Emma Gluck and Sara Gluck ("Plaintiffs"), by their attorneys, on behalf of themselves and all others similarly situated, allege the following based upon the investigation of Plaintiffs' counsel, except as to allegations specifically pertaining to Plaintiffs, which are based on personal knowledge. The investigation of counsel included, among other things: 1) a review of Hecla Mining Company's ("Hecla" or the "Company") public filings with the United States Securities and Exchange Commission ("SEC"); 2) press releases issued by the Company, and media, news and analyst reports about the Company; 3) quarterly earnings conference calls with Company executives, analysts and investors, and conferences with investors; 4) information obtained from confidential informants ("CIs"); 5) information based on consultation with experts in loss causation, economic loss and the mining industry; 6) publicly available data, including, but not limited to, publicly available trading data relating to the price and trading volume of Hecla's common stock; and 7) information obtained through public records requests. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    SUMMARY OF THE CASE

1.    In March 2018, Hecla announced that it would acquire certain gold mines in Nevada from Klondex Mines Ltd. ("Klondex") for $462 million in cash and shares of Hecla stock, and closed the acquisition in July 2018. Defendants (defined below) knowingly or at least recklessly made misleadingly positive representations about the Nevada Mines (defined below) and represented that, based on their extensive due diligence, the Nevada Mines were a turnkey operation which were immediately cash flow positive and would be accretive to the Company's financial metrics. Defendants made materially misleading positive statements throughout the Class Period such as the Nevada Mines were "high-grade" gold mines, were producing "robust cash flows", that

the Nevada Mines required a "small amount of capital", and worst-case scenario was the Company would "get all of our money back."

2.      Indeed, after Defendants announced the acquisition and made their false and misleading representations, credit agencies increased Hecla's credit rating, which was important to Defendants because Hecla had $500 million of bonds to refinance in or after May 2019.  Defendant Baker on November 8, 2018 explicitly linked the acquisition of the Nevada Mines to Defendants' desire to convince rating agencies to raise Hecla's credit rating in advance of the refinancing of Hecla's debt: "one of the complaints they [rating agencies] had was, we didn't have enough operations. And like okay well now we've got some more and we now have some more EBITDA [(earnings before interest, taxes, depreciation and amortization)]. So that's what we're hanging our hat on . . . ."  And also, based on Defendants' materially false and misleading representations about the purportedly accretive nature of the acquisition, banks increased Hecla's credit facility from $100 million to $250 million in July 2018 around the time Defendants closed the acquisition of the Nevada Mines operations and earnings.

3.      After the Class Period (March 19, 2018 through May 8, 2019) ended, Defendant Phillips S. Baker, Jr. ("Baker"), Hecla's President and Chief Executive Officer ("CEO"), admitted that Defendants' positive Class Period representations were materially false and misleading when he admitted that the acquisition of the Nevada Mines was an attempt "to take this plane that was flying and *redesign it and rebuild it* in the air, and it was just *costing us way too much money*". (Emphasis added).

4.      Indeed, as set forth hereafter the Nevada Mines had a myriad of serious problems from the outset, including water issues for which the Nevada Mines did not have permits needed to discharge, uneconomic refractory ore, insufficient workforce and equipment, defections of key

2

employees, and others which were known to Defendants, not disclosed, and that caused their positive representations that the Nevada Mines were cash flow positive or cash flow neutral and other positive representations to be materially misleading at the time they were made. Even assuming, *arguendo*, that Defendants thought that they could turn around the Nevada Mines in mid-air, and make them reliably cash flow positive, investors had the right to be apprised of the true facts which Defendants hid. After the facts were disclosed through a series of partial disclosures, the price of Hecla stock declined materially and investors were damaged. Moreover, the credit agencies, which based on Defendants' false statements had increased Hecla's credit rating, reduced the ratings, and the banks, which following Defendants' false representations had increased Hecla's credit line to $250 million, reduced the line to $150 million. Defendants should be accountable for these clear violations of the federal securities laws.

## II.    **INTRODUCTION**

5.    This action is a securities fraud action brought under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder by the SEC brought by Plaintiffs on behalf of themselves and a class of all persons and entities who purchased the publicly traded common stock of Hecla between March 19, 2018 and May 8, 2019, inclusive (the "Class Period").

6.    Founded in 1891, Hecla purports to discover, acquire, develop, and produce silver, gold, lead and zinc. The Company produces lead, zinc and bulk concentrates, which Hecla sells to custom smelters and brokers, and unrefined precipitate and bullion bars (doré) containing gold and silver, which are further refined before sale to precious metals traders. Before the Class Period, the Company was organized and managed in four segments that encompassed its operating units: Greens Creek (Alaska), Lucky Friday (Idaho), Casa Berardi (Quebec, Canada), and San Sebastian units (Mexico).

7.    On March 19, 2018, Hecla announced it was acquiring three purportedly high-grade Nevada gold mines through the acquisition of Klondex for a mix of cash and Hecla stock worth $462 million.  Defendant Baker, represented that "Klondex's three operating mines – Fire Creek, Midas and Hollister – are some of the highest-grade gold mines in the world" and that "[a]fter extensive due diligence, we see significant opportunity to improve costs, throughput and recoveries over time with our expertise."[1]  Fire Creek, which started production in 2014, was the primary driver of the acquisition due to its reportedly robust positive cash flows.  Hollister was important for the prospective development and mining of the Hatter Graben, a large system of veins that Hecla said it could reach from Hollister.  Midas was an older mine that had been in production for decades, but was still purportedly providing production and cash flow. Materials mined at Fire Creek and Hollister were processed at the Midas mine. After the acquisition closed in July 2018, the Nevada Mines became a fifth operating segment of the Company.

8.    Hecla's due diligence and senior management team during the Class Period was led by Defendant Baker; Defendant Lindsay A. Hall ("Hall"), Hecla's former Vice President, Chief Financial Officer ("CFO") and Treasurer; Defendant Lawrence P. Radford ("Radford"), the Company's former Senior Vice President – Operations; and Defendant Dean W.A. McDonald ("McDonald"), the Company's former Senior Vice President – Exploration.[2]  As part of Defendants' due diligence during the period in or around November 2017 through March 2018, they conducted onsite physical inspections of the Nevada Mines, and had access to key personnel

---

[1] The Fire Creek, Hollister and Midas mines and operations that Hecla acquired from Klondex are collectively referred to throughout the complaint as the "Nevada Mines."

[2] Defendants Baker, Hall, Radford and McDonald are referred to throughout this complaint as the "Individual Defendants."  The Individual Defendants and Hecla are collectively referred to throughout this complaint as "Defendants."

of Klondex and reports that provided them significant insight into the Nevada Mines, particularly Fire Creek.

9.      Both before and after Hecla announced the acquisition at the start of the Class Period, Defendants monitored the operations at the Nevada Mines, including regular visits to the Nevada Mines and meetings where conditions at the Nevada Mines were discussed.  According to CIs 13 and 14, Defendants Radford and McDonald were directly informed of material negative problems and conditions at the Nevada Mines, and that costs were dramatically increasing and gold production was materially declining, including that at Fire Creek there was uneconomic refractory ore and permit limits on water removal that hampered production at Fire Creek, facts that cut against Defendants' positive representations to investors.

10.      Once gold-bearing ore is mined, it is crushed to a powder and pumped through a series of tanks in a process called tank leaching. Cyanide or chloride is then used to separate the gold from the ore into the leached solution.  In the mining industry, refractory gold ore is an ore that has ultra-fine gold particles disseminated throughout its gold occluded minerals and is undesirable because it is not amenable to gold extraction using cyanide or chloride and the methods needed to enable gold extraction from refractory ore are more expensive than extracting gold from non-refractory ore.

11.      While refractory ore may be high grade, the costs to extract that gold can be astronomical.  Processing refractory gold ore requires nonstandard methods such as ultrafine grinding, bio oxidation, roasting or pressure oxidation, which adds costs compared to extraction from non-refractory ore. The capital and operational costs to extract gold from refractory ore are substantially higher than extraction of gold from non-refractory ore: capital costs are higher, with

facilities costing over $1 billion, and operational costs are higher driven by labor, consumables, freight, mine overhead and energy costs.

12.     Milling or tolling agreements are sometimes used by companies to outsource the processing of refractory gold ore to contractors or companies who have the proper work force, equipment and facilities to process refractory ore.  However, such agreements significantly add to the cost of extraction, and severely diminish profit margins.  Due to the scarcity of facilities that can extract refractory gold ore in some jurisdictions, like Nevada, the cost of a tolling or milling agreement may be cost prohibitive and cause the extraction of "high grade" ore to be unprofitable due to the very high costs incurred.

13.     During the Class Period, while Defendants represented that the Nevada Mines were cash flow positive, contained high grade ore, and made other positive representations about the Nevada Mines, it was materially misleading for Defendants not to disclose that they knew, or at least recklessly disregarded, that the gold ore at Fire Creek was refractory and could not be profitably mined, that the mines were plagued with material, negative conditions that increased costs and drained cash flow, and that gold ore production and cash flows were materially declining.

a.     According to CI 13[3], during Hecla's due diligence of the Nevada Mines, which took place in or around November 2017 through March 2018, CI 13 met with Defendant Radford and Mark Board ("Board"), Hecla's VP, Technology and Innovation (technical services) several times. CI 13 escorted Radford and Board through the Fire Creek mines and showed them the poor ground conditions and the issues with the ore characteristics.  According to CI 13, at the time of due diligence, Hollister and Midas mines were both cash flow negative, Hollister needed much capital and Midas had not been profitable since 2015 and while Fire Creek produced $70 million in cash

---

[3] CI 13 was a general manager at the Nevada Mines before and during the Class Period.

flow in 2017, the production of gold at Fire Creek was in decline and cash flows were rapidly declining due to poor ore characteristics and increased costs of production.  Throughout 2018 positive cash flows continued to decline at Fire Creek, and by the end of 2018 had declined to $35 million.  Further cash flow decline was expected in 2019.  According to CI 13, the following information was provided to Defendants, in particular Radford and McDonald, during due diligence (in or around November 2017 through March 2018):

i.  At Fire Creek, CI 13 told Radford that increased costs due to poor mine conditions coupled with poor ore quality, such as refractory ore, were and would continue to be a drain on cash flows.  Cash flow at Fire Creek was dependent on the ore type.  Both on-site observations and the mine models provided to Radford and Board during due diligence showed that due to the ore characteristics and increasing production costs, cash flows at Fire Creek were in decline and would continue to decline in 2018.  On several occasions during 2018, CI 13 escorted Radford through the Fire Creek mines and informed him that costs to operate were dramatically going up.

ii.  Defendant Radford was informed of the material negative conditions that were a drag on production and a drain on cash flows.

iii.  Due to the poor ground conditions, like clay, there was significant waste and expense. $10-12 million in capital per year was needed to address the clay issue alone.

iv.  With respect to the refractory ore, Radford's plan to turn around the Nevada Mines was contingent on obtaining a contract through Barrick Gold Corporation/Nevada Gold Mines, which had a facility for processing refractory ore.  Upon sending a small test sample to Barrick, the cost per ton to mill was way too high which negatively affected the ability to profitably mill refractory ore from Fire Creek (over of $400/ton).

v. Defendants were informed of the contract with American Mining & Tunneling, LLC ("AMT") that was a key driver of the costs of production at Fire Creek, which were unavoidable because the Nevada Mines did not have the workforce or equipment to do the work performed by the outside contractors.

vi. Defendants were informed that the rapid infiltration basins used to discharge water ("RIBs") did not work properly. The RIBs were designed defectively and did not discharge water as they were designed to do. RIBs costs approximately $2 million each to build. The design defects in the RIB contributed to the excess water at Fire Creek.

vii. Fire Creek always had issue with water. There were no storage facilities and small ponds. The Nevada Mines relied on a reverse osmosis water treatment plant to handle the water discharge, which was expensive, at $120,000 per month to rent and run water treatment. Later in 2018, the Nevada Mines could not get rid of wastewater and evaporation was not working. According to CI 13, Hecla management was aware of costs to repair water treatment plants and throughout 2018, the Nevada Mines had to truck water to a waste treatment facility in Wendover, Nevada. Hecla executives were informed that the Nevada Mines permits limited the amount of water that could be treated. Hecla management was aware that the permit limit was insufficient and additional permitting was needed to handle the water. Permits from the State of Nevada were difficult to obtain and it was a lengthy process.

viii. Radford and Board were made aware of the increasing costs of production due to the difficult ground conditions and poor ore quality through mine tours and access to mining records, including mine models, and were further aware that production of gold ounces at Fire Creek was in decline. While Klondex produced over 100,000 ounces of

8

gold in 2017, Hecla executives including Radford were informed that due to the ore characteristics at Fire Creek, gold production would drop to mid-80,000 ounces in 2018. According to CI 13, it was obvious in the model that the Nevada Mines were running out of platforms to drill.[4]

ix.   In short, according to CI 13, senior Hecla management, including Defendant Radford, had plenty of time to investigate how bad the situation was during due diligence. Defendant Radford and Board were provided access to electronic data rooms that showed the conditions at each of the Nevada Mines.   The electronic data rooms contained all drill results and models.  Hecla management had access to all sites and people.  Defendant Radford and Board were two main Hecla executives at Fire Creek during due diligence.   In addition to Defendant Radford and Board, Defendant McDonald and Kurt Allen ("Allen"), Vice President, Exploration were informed during the due diligence period of the rapidly-declining conditions at the Nevada Mines.

x.   The following types of documents were provided to Hecla management during the due diligence period:

1.  Resource Models
2.  Reserve Models
3.  Budgets
4.  3 and 5 Year Mining Plans for each mine
5.  Expiration Plans
6.  Moving Forward Documents
7.  43-101 technical reports which are a summary of the mineral resource estimate for the Nevada Mines.

xii.   According to CI 13, mine tours with Radford and Board continued after Hecla closed the acquisition.   In July 2018, there was a meeting, which included at least,

---

[4] Platform drilling is used to determine whether gold is present and to estimate the amount of gold and grade of the gold.

Defendant Radford, Allen, Keith Blair ("Blair"), Chief Resource Geologist, and Defendant McDonald, in which they walked through the ore and clay issues at Fire Creek and discussed the increased costs and declining production. Further, during this time period (mid-2018), excavating through Fire Creek was getting into soft, muddy conditions that were harder to support. Ore grade was going down, while costs were going up. Radford and Board were frequently informed of these issues by CI 13.

xiii.    According to CI 13, water conditions were always 30-40 gallons per minute and PDQ Trucking was used to move water out of Fire Creek at a cost of 60-70 cents per gallon per truckload. Hauling wastewater was a drain on cash flow. After the acquisition closed in July 2018, Defendant Radford and CI 13 spoke weekly about the water/cost issue, and the need for permit changes. Some of the additional difficulties and costs with water treatment at Fire Creek included filters which routinely needed attention due to poor conditions within the mines. New filters cost approximately $80,000 each and $25,000-30,000 to clean existing filters. Cleaning took place once per quarter and after every three to four cleanings, new filters had to be purchased.

xiv.    In approximately September-December 2018, a big cave void was found within one of the Fire Creek Joyce veins that caused gold production to be about 20% of expected production, a loss of approximately 20,000 gold ounces. With the price of gold around $1,200/ounce at that time, the lost gold production had a value of approximately $24 million in lost cash flows.

xv.     CI 13 presented budgets to Hecla management in late 2018.  CI 13 presented the
Company's budget to approximately 40-50 Hecla senior managers, including
Defendants Baker, Radford, Hall and McDonald, that showed cash flow at Fire
Creek extremely reduced year over year.  The budget meetings occurred over the
course of three days at the Company's corporate office in Coeur d'Alene, Idaho.
According to CI 13, in 2017, Fire Creek was at $70 million cash flow while Midas
and Hollister were cash flow negative.  In 2018, cash flow at Fire Creek was between
$35-50 million. The Nevada Mines were running out of ounces at Fire Creek.  The
cash flows declined due to the poor recoveries. Hecla was spending more money
and getting fewer ounces of gold. For 2019, cash flow at Fire Creek was continuing
to trend negatively.

xvi.    CI 13's presentations in late 2018 showed fewer ounces produced year-over-year at
the Nevada Mines.  By the end of 2018, CI 13 knew the veins at Fire Creek were
dying.  Defendants were running out of platforms to drill, and the models reflected
lower ore grades, and that these areas contained perched water.

xvii.   According to CI 13, while Defendant Baker stated in May and June 2019 that in the
first five months of 2019 the rate of increase in the water doubled and that this was
something that was not anticipated, CI 13 did not recall such an increase and
observed that water was always a problem at the Nevada Mines.

b.      According to CI 14,[5] in the time period before the acquisition by Hecla in March
2018 in connection with due diligence, Klondex technical staff prepared a data repository, which
included models and other data including drilling results of ore body.  Data included the life of

_____

[5] CI 14 was a geologist at the Nevada Mines before and during the Class Period.

mine plans ("LOM") and PowerPoint presentations concerning how the mines were doing.  A LOM provides an estimate of the amount of inferred and proven reserves left to mine.  To extend the life of a mine, more time and expense needs to be invested to gain confidence in the reserve estimates.

i.   According to CI 14, the Hecla senior leadership team consisted of Defendants Baker, Hall, Radford and McDonald, and Board.  Blair and Allen reported to McDonald.

ii.  Before the closing of the acquisition, Defendants McDonald and Radford were told of the refractory ore at Fire Creek and water conditions and permit limits on water discharge.  According to CI 14, Defendant McDonald was made aware by Klondex geologists that the ore in the LOM plan were of a moderate refractory basis.  McDonald was made aware through informal direct communications of the struggles at Fire Creek with Klondex geologists.

iii. During due diligence, Hecla did not conduct any metallurgical tests on the ore.  Dale Dean, Chief Metallurgist had no interaction with the Klondex team and CI 14 was surprised not to see Dean on site because a metallurgist played a crucial role working with geologists on ore characterization.

iv.  After the closing in July 2018, Hecla's senior leadership team gained access to the Nevada Mines.  At that point they recognized the shift in the LOM and the presence of refractory ore.  The refractory ore was a big deal to Hecla because there were only a few roasters in Nevada owned by other companies like Barrick or Nevada Gold Mines (and Jerritt Canyon) that could process refractory ore, and the Nevada Mines did not have one.

v.   To remove or discharge water from Fire Creek was difficult and became a bottleneck due to permit limits.  The issue with permitting is that it is time intensive (long process

and length, takes many years) and there was reluctance to ask regulators for additional permitting because it could trigger an Environmental Impact Assessment or Audit. Hecla wanted to avoid making a big change due to concerns about a natural spring adjacent to the mine that could draw regulatory scrutiny.

vi.  Hecla's senior leadership team learned it paid a steep price for the Nevada Mines and once they closed the wanted to show investors it was a good investment. Once Hecla came in, they immediately acknowledged the struggles with Fire Creek and were apprehensive to spend any more money, which CI 14 learned in budget meetings at which the Individual Defendants were present.

vii.  After the close, budget and drilling programs for 2019 and the needs for Fire Creek were discussed. In or around September 2018, CI 14 attended a budget meeting (at Hecla's office in Coeur d'Alene, Idaho) where the Fire Creek managers proposed new spending for drill programs, approximately $12-14 million for the drilling program alone, not including additional capital and equipment needs. Defendant Baker was at the meeting and was concerned about the proposed spending on projects, and was shocked by the proposed amount and that it was required to be invested so soon to extend the life of mine. The LOM on the books was 5 years, but in reality, it was closer to 3 years. More spending was needed to extend life of mine.

viii. With the Nevada Mines now on care and maintenance, Hecla is spending a base amount to keep ventilation, dewatering operating at the site.

14.    Despite knowing of or at least recklessly disregarding the material negative conditions at the Nevada Mines, which were bleeding cash and necessitated additional, uneconomical capital and operational expenditures in order to expand production that would further

reduce cash flows, according to CIs 13 and 14 as well as CIs 1-12 alleged below, during the Class Period, Defendants falsely represented and made materially misleading positive statements that the Nevada Mines were and would continue to be cash flow positive, or at the very least "self-funding" and were "high grade". Defendants' positive representations created the misleading impression that the acquisition would be accretive to Hecla's financial and credit metrics and, at a minimum, the positive cash flow from the ongoing production at the Nevada Mines would cover any required investment or capital expense by the Company. In essence, Defendants falsely and misleadingly represented that the transaction was a turn-key, transformative acquisition that was and would continue to produce positive cash flows and enhance Hecla's credit in the time leading up the refinancing of Hecla's debt in or after May 2019.

15.     Indeed, Defendants' false representations and materially misleading positive statements of positive cash flow from the Nevada Mines resulted in a concrete benefit to Defendant Hecla by causing two rating agencies to increase the Company's credit rating which was important to the Company because Defendants were planning to refinance Hecla's debt in or after May 2019. According to Defendant Baker during the November 8, 2018 conference call with investors, through his and Defendant Hall's meetings with rating agencies, they had been informed that in order to increase Hecla's credit rating, they would need more operations and earnings, and the acquisition of the Nevada Mines was Defendants' answer to the rating agencies' concerns.

16.     Furthermore, it was materially misleading for Defendants to make positive representations about the purported benefits of the acquisition of the "high grade gold" Nevada Mines, while failing to disclose to investors material, negative conditions then existing at the Nevada Mines and failing to disclose material risks to their plan for the Nevada Mines that had already materialized, all of which severely cut against Defendants' positive and misleading

14

representations.  In fact, since before the Class Period, the operations at the Nevada Mines were producing declining cash flows and were known at the time to require capital and operational expenditures that would ultimately (and did) wipe out all positive cash flow from the Nevada Mines. Defendants knew of, or at least recklessly disregarded, material negative conditions that were then negatively affecting operations and preventing the generation of positive cash flows from the Nevada Mines at the time they made their positive representations to investors.

17.     As Defendant Baker admitted after the Class Period, (which contradicted representations he made during the Class Period), "when doing the due diligence [in November 2017 through March 2018], we recognized certain problems with Fire Creek dealing with the tuff material,[6] managing the water, equipment availability, getting enough development to have consistent production, lack of characterization of ore types" and revealed issues with water permit limits and refractory ore that increased costs and slowed production.

18.     Unsurprisingly, just three months after the end of the Class Period, Defendant Radford, who along with Defendant McDonald led Hecla's due diligence team and according to CIs 13 and 14 both were directly informed of the refractory ore and water permitting conditions at Fire Creek, suspiciously "resigned" from his position as Senior Vice President and Chief Operating Officer, and left the Company by the end of 2019.  Defendant McDonald "retired" in September 2019.

19.     Additional information provided by CIs corroborate Defendants' knowledge, or at least reckless disregard, of the material, negative conditions at the Nevada Mines by the beginning of the Class Period that Defendants had an obligation under the federal securities laws to disclose when they made positive representations about the Nevada Mines.  For example, in addition to CIs

---

[6] "Tuff" material is a type of rock that contains clay.

13 and 14, 12 CIs (*see infra* ¶¶ 65-94) observed excess water at the Nevada Mines at the time Hecla announced the acquisition in March 2018, and several CIs noted the lack of proper equipment and workforce, uneconomic refractory ore and poor ore characteristics, and lack of permits needed to manage excess water.

20.      These problems and, in particular, Defendants' material difficulties managing excess water due to permit limits and refractory ore, persisted during the Class Period, but were not disclosed by Defendants who continued to make misleading positive representations that the Nevada Mines were cash flow positive, that the acquisition enhanced the Company's financial results and credit rating, and that the Nevada Mines were not a drain on its capital when, in fact, the Company's production and costs were being negatively affected by the conditions at the Nevada Mines and Hecla's capital was being drained.

21.      Only after the Class Period, when Defendants effectively shut down operations at the Nevada Mines, did Defendants stanch the bleeding of cash at the Nevada Mines.

22.      Defendants repeatedly made positive and misleading representations throughout the Class Period that were materially false and misleading at the time Defendants made them, as confirmed by 14 CIs.  And many of the representations made by Defendants during the Class Period were contradicted by statements made by Defendants after the end of the Class Period:

| **Defendants' Representations During the Class Period** | **The Undisclosed Truth** |
|---|---|
| Defendant Baker on March 19, 2018: "from the get-go, the Nevada assets are going to be cash flow positive" (*see infra* ¶ 99);<br><br>Defendant Baker on March 19, 2018: "Nevada itself will be cash flow positive for us. There is no capital outlay that we're looking to, in Nevada, that's going to consume all of the cash flow that will be generated from the three mines" (*see infra* ¶ 99); | Defendant Baker on May 9, 2019: "we have not seen the relative productivity that we were anticipating . . . what it comes down to is we're not getting enough tons moved for the dollars . . . ." (*see infra* ¶ 176).<br><br>Defendant Baker on June 6, 2019: "development drilling did not lead to the ounces and cash flow we expected.  This has led us to reevaluate our plan in Nevada because |

| **Defendants' Representations During the Class Period** | **The Undisclosed Truth** |
|---|---|
| Defendant Baker on March 19, 2018: "our mine plans is that we will, basically the downside is we get all of our money back" (*see infra* ¶ 99);<br><br>Defendant Baker on July 23, 2018: "These assets immediately add production and cash flow" (*see infra* ¶ 115);<br><br>Defendant Baker on August 9, 2018: "One is the expectation is this year that for the five months, it will be self-funding. We're not anticipating needing to contribute additional capital into it. . . ." (*see infra* ¶ 121);<br><br>Defendant Hall on August 9, 2018: "The Nevada assets are basically self-funding" (*see infra* ¶ 120);<br><br>Defendant Baker on November 8, 2018: "we're not anticipating the need to make significant contributions into Nevada . . . . . . We think we can run it pretty close to cash flow neutral." (*see infra* ¶ 135);<br><br>Defendant Radford on November 8, 2018: "[O]ur goal for Nevada operations is that the operations are cash-neutral" (*see infra* ¶ 137);<br><br>Defendant Hall on December 4, 2018: "There's no major capital expenditures that we can't fund out of the Nevada operations" (*see infra* ¶ 145);<br><br>Defendant Baker on February 21, 2019: "we're right at positive cash flow from Nevada" (*see infra* ¶ 160); | we expect our assets to operate on a cash-positive basis, and **clearly, this one has not**. . . . we announced that we are focusing on mining at Fire Creek and pausing most of our development activities in Nevada **given the cash outflow the mines had since acquisition**." (*see infra* ¶ 187).<br><br>Defendant Baker on August 7, 2019: "so in this third quarter [after the Class Period], for the first time since the acquisition of Klondex a year ago, our plans show us generating more cash than we spend . . . ."; (*see infra* ¶ 196).<br><br>Defendant Baker on December 3, 2019 described the acquisition of the Nevada Mines as an attempt "to take this plane that was flying and redesign it and rebuild it in the air, and it was just costing us way too much money"; (*see infra* ¶ 198).<br><br>Undisclosed material facts according to multiple CI 1-14: throughout the Class Period, the Nevada Mines suffered from a multi-faceted material problem with excess water, lack of both equipment and proper permits, and low grade or uneconomic refractory ore. *See* ¶¶ 13, 58-87. As a result of these material negative problems, Defendants had no reasonable basis for their representations that the Nevada Mines were or would be cash flow positive or self-funding, or accretive to important Hecla financial metrics. |
| Defendants Baker and Hall on May 10, 2018: "Uncertainties associated with the acquisition may cause a loss of management personnel and other key employees of Klondex which could adversely affect the future business and operations of the combined company following the acquisition" (*see infra* ¶ 109). | Undisclosed material facts according to multiple CIs: starting in March 2018, undisclosed to investors, key personnel resigned from their positions at the Nevada Mines, harming production and productivity, and Defendants did not have the equipment and workforce to operate the Nevada Mines and |

| Defendants' Representations During the Class Period | The Undisclosed Truth |
|---|---|
| | were reliant on expensive outside contractors. (*see infra* ¶¶ 13(a)(v); 83). |
| Defendant Baker on August 9, 2018, regarding permits for the Nevada Mines, "We've got everything we need." (*see infra* ¶ 123). | Defendant Baker on May 9, 2019: "the amount of water has increased, making the conditions worse. This has limited our access . . . they will require quarters to construct some infrastructure **and get some permit limits changed**." (*see infra* ¶ 173).<br><br>Defendant Baker on August 7, 2019: "With water discharge from Fire Creek higher than it was a year ago, **work is underway to increase discharge permits**, expected to be obtained in the near future and increase non-consumptive water rights, **expected within approximately one year**." (*see infra* ¶ 195); and<br><br>According to CIs 5, 10 and 11, 13-14, the Nevada Mines lacked permits to handle water discharge. (¶¶ 13, 68, 77). |

23.     On February 21, 2019, before the market opened, Defendants partially disclosed the truth concerning the conditions at the Nevada Mines when they disclosed Hecla's financial results for the quarter and year-ended December 31, 2018.  Defendants reported lower than anticipated production, higher costs at the Nevada Mines, and loss of reserves—the very same issues Defendants Radford and McDonald were warned about before and during the Class Period—and that Defendants were focusing on ways of maintaining development "in all ground conditions." During the February 21, 2019 conference call with investors and analysts, Defendants Baker and Hall further disclosed that Hecla had experienced certain "challenges" with the Nevada Mines, including "reserve losses" and "higher costs while we worked through what we believe are transitional issues."  Furthermore, Defendant Hall disclosed that "[w]e have a goal of financial discipline in which each of our mines should produce free cash flow and clearly that didn't happen with our Nevada operations that we acquired effective July of this last year."

24.     On February 21, 2019, Hecla stock declined from a closing price on February 20, 2019 of $2.93 per share, to close at $2.74 per share, a decline of $0.19 per share or approximately 7% on heavier than usual volume.

25.     However, Hecla stock continued to trade at artificially inflated prices because Defendants continued to falsely represent and make materially misleading positive statements that the Nevada Mines were cash flow positive and high grade, and failed to disclose that the ongoing material, negative conditions then affecting the Nevada Mines had and were continuing to have, a material, adverse effect on the Company's operations and cash flow.

26.     On April 18, 2019, at the opening of the market, Defendants partially disclosed, contrary to prior representations, that the Fire Creek mine lacked necessary permits when Defendants disclosed "[a] minor amendment to the water discharge permit for Fire Creek is expected in the second quarter which should enable a higher discharge rate."  However, Defendants learned during due diligence that new permits were required to handle the existing water discharge at Fire Creek and that the Nevada Mines limit of 100 gallons per minute was insufficient to treat the water discharged from the mines, which posed a roadblock to Defendants' then-planned and forecasted expansion of exploration and production.  On April 18, 2019, Hecla shares declined from a price at the opening of the market of $2.28 per share, to close at $2.15 per share, a decline of $0.13 per share of approximately 6% on heavier than usual volume.

27.     Defendants' partial disclosure was materially false and misleading because Defendants created the misimpression that Defendants' water discharge problems were minor, and further, failed to disclose that the Nevada Mines had been experiencing material problems with excess water that could not be discharged under permit limits throughout the Class Period and that negatively affected cash flow.

19

28.     Then, on May 9, 2019, before the market opened, Hecla shocked investors when the Company issued a press release entitled "Hecla Reports First Quarter Results[;] Nevada operations under review", in which the Company disclosed a "comprehensive review" of its Nevada operations that Baker characterized during the ensuing conference call as "really just asking the question, are we going to get the return for the investment we're making."  Furthermore, Defendants disclosed that the material, negative operational issues at the Nevada Mines were so severe that Defendants were not sure if Hecla would ever get a positive return on its investment in the Nevada Mines, and that the Company might write off the Nevada Mines.  Additionally, the Company reported a loss of $13.8 million from its Nevada Mines.

29.     On May 9, 2019, the price of Hecla's common stock declined from a closing price on May 8, 2019 of $2.04 per share to close at $1.77 per share, a decline of $0.27 per share, or 13.24% on heavier than usual volume.

30.     On May 10, 2019, before the market opened, Hecla filed its quarterly report with the SEC on Form 10-Q for the period ending March 31, 2019 that disclosed, among other things, that the Company's review of the Nevada Mines may result in "a temporary cessation of all mine operations at Fire Creek" and a potential material impairment to the "assets at Fire Creek with the potential to impact near-term estimated cash flows."  Also on May 10, 2019, *Bloomberg News* reported that "Hecla Mining slumped almost 14% intraday Friday, touching the lowest since January 2016, as at least three analysts downgraded their investment opinion after the precious metal miner posted a lQ loss and failed to provide forward guidance for its Nevada operations."

31.     On May 10, 2019, Hecla's common stock declined from a closing price on May 9, 2019 of $1.77 per share, to close at $1.56 per share, a decline of $0.21 per share, or 11.86% on heavier than usual volume.

32.     On June 6, 2019, Defendants caused Hecla to issue a press release titled "Hecla Reduces Spending For Nevada Operations" that stated, in part, changes were being made at the Nevada Mines with the goal of turning it into a positive cash flow unit, including a shutdown of the Midas and Hollister mines, curtailed development of the Hatter Graben, and plans for managing excess water and low-grade refractory ore at Fire Creek, changes described by one analyst as "desperate".

33.     On June 14 and 20, 2019, S&P and Moody's, respectively, disclosed downgrades on the Company's credit rating, and in July 2018, Hecla's line of credit was reduced by 40%, from $250 million to $150 million.

34.     On August 7, 2019, Hecla disclosed that Defendant McDonald would resign from the Company effective September 30, 2019, and that Defendant Radford had resigned his position to become the Company's Senior Vice President and Chief Technical Officer.  In December 2019, Defendant Radford resigned from the Company.

35.     To this day, operations at the Nevada Mines have effectively been shut down, are on "care and maintenance", and do not have meaningful gold production—a far cry from the robust cash flow positive properties Defendants misled investors into believing the Company had purchased with hundreds of millions of dollars of investors' capital.

36.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock, Plaintiffs and other Class members have suffered significant losses and damages.

## III.    JURISDICTION AND VENUE

37.     The claims asserted arise under Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.  Jurisdiction is conferred by Section 27 of the Exchange Act. Venue is proper because Hecla's common stock has traded on the New York Stock Exchange

("NYSE") in this District throughout the Class Period, Defendants made materially false and misleading representations to investors that were disseminated to investors in this District, and Company executives attended meetings in this District. For example, on April 12, 2018, Defendant Baker met with certain investors in New York City in this District, where a presentation was given that discussed the Company's acquisition of the Nevada Mines from Klondex.

38.    In connection with the material misrepresentations of facts and omissions alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## IV.    PARTIES

39.    Lead Plaintiffs purchased Hecla common stock on the NYSE as detailed in the certification previously filed with the Court and were damaged thereby. ECF Nos. 33-1; 78-2; 78-3.

40.    Defendant Hecla is headquartered in Coeur D'Alene, Idaho. Hecla's common stock trades on the NYSE under the symbol "HL".

41.    Defendant Baker was the Company's President and Chief Executive Officer throughout the Class Period. He has been Hecla's Chief Executive Officer since May 2003 and has served as its President and a director since 2001. Defendant Baker made materially false and misleading statements and omitted material facts in Hecla's SEC filings, press releases and on public conference calls during the Class Period.

42.    Defendant Hall was the Company's Senior Vice President, CFO and Treasurer throughout the Class Period. He has served as Senior Vice President and CFO since July 2016. Defendant Hall made materially false and misleading statements and omitted material facts in Hecla's SEC filings and on public conference calls during the Class Period. In January 2021, Hecla

disclosed that Hall would resign effective February 28, 2021, and would retire from the Company at the end of March 2021.

43.    Defendant Radford served as Vice President – Operations of the Company from October 2011 to June 2013; Senior Vice President – Operations from July 2013 to May 2018; and he was appointed Senior Vice President and Chief Operating Officer in May 2018.  On or around August 5, 2019, he resigned as Senior Vice President and Chief Operating Officer, and continued as the Company's Senior Vice President and Chief Technical Officer.  On December 11, 2019, he retired from the Company.  Defendant Radford made materially false and misleading statements and omitted material facts on public conference calls during Class Period.

44.    Defendant McDonald was the Company's Senior Vice President – Exploration during the Class Period.  On September 30, 2019, he retired from the Company.  Defendant McDonald made materially false and misleading statements and omitted material facts on public conference calls during the Class Period.

45.    The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Hecla's press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market.  Each of the Individual Defendants was provided with copies of the Company's press releases alleged herein to be misleading before or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, including the information learned during the Defendants' due diligence before the Class Period and through visits to the Nevada Mines during the Class Period, but not to investors, each of the Individual Defendants knew, or at least recklessly disregarded, that the adverse facts specified herein had not been disclosed to and were being

concealed from the public and that the positive representations which were being made were then materially false and misleading.

## V.  CLASS ACTION ALLEGATIONS

46.  Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of a class of all persons and entities who purchased the publicly traded common stock of Hecla during the Class Period.

47.  The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at the present time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds of members of the Class located throughout the United States.  As of February 19, 2019, Hecla had over 482 million common shares outstanding and the average daily trading volume for Hecla's common stock on the NYSE during the Class Period was over 5.5 million shares.

48.  Plaintiffs' claims are typical of the claims of the members of the Class.  Plaintiffs and all members of the Class have sustained damages because of Defendants' unlawful activities alleged herein.  Plaintiffs have retained counsel competent and experienced in class and securities litigation and intend to pursue this action vigorously.  The interests of the Class will be fairly and adequately protected by Plaintiffs.  Plaintiffs have no interests which are contrary to or in conflict with those of the Class that Plaintiffs seek to represent.

## VI.  BEFORE AND DURING THE CLASS PERIOD DEFENDANTS KNEW OR RECKLESSY DISREGARDED THAT THE NEVEADA MINES WERE PLAGUED BY MATERIAL NEGATIVE OPERATIONAL PROBLEMS AND WERE NOT, AND WOULD NOT BE, CASH FLOW POSITIVE

49.  In or around November 2017, Defendants began technical due diligence of the Nevada Mines regarding the Company's potential acquisition of them.  As part of this work, Defendants were granted access to the Nevada Mines and key people, which provided what

Defendant Baker described as "significant insights into the properties, particularly Fire Creek." Defendants' due diligence involved an onsite physical inspection of the condition of the property, interviews with key personnel, as well as access to various documents, including all mining permits, equipment lists and maintenance records, production records, test results and analysis of samples of material produced at the time, operating budgets, existing business plan projections and financial statements.

50.     The Class Period begins on March 19, 2018, the date that Defendants caused Hecla to issue a press release announcing the acquisition of the Klondex, including three purportedly high-grade Nevada gold mines.[7]

51.     A gold mine characterized as high-grade indicates that, compared to a lower-grade mine, it costs relatively less to extract an ounce of gold from the ground because less ore has to be extracted, thus reducing operational costs and increasing margin.

52.     Defendants represented that in light of their "extensive" due diligence, the acquisition of the Nevada Mines would be accretive to many of the Company's financial metrics and that the Fire Creek mine was producing "robust" and "strong" cash flows.

53.     Also, on March 19, 2018, during a conference call with analysts that followed the press release, Defendant Baker represented, among other things:

> about four months ago, we began our due diligence. As part of this work, we were granted access to the properties and key people, which gave us significant insights into the properties, particularly Fire Creek.

54.     Furthermore, based on Defendants' due diligence, Defendant Baker indicated that

---

[7] Through the acquisition, various Klondex subsidiaries, through which the Nevada Mines operated, became wholly-owned subsidiaries of Hecla that continued operating the Nevada Mines after Defendants closed the acquisition.

Klondex had done "a good job of running" the Nevada Mines, that Klondex management did a "really good job of understanding the geology", that it "was clear" that there was "excess value", and that Defendants' mine plans found that "the downside is we get all of our money back. So we don't have a view that we're relying upon a big increase in the grade to have this thing be economic for us." Defendant Baker further represented that the acquisition of the Nevada Mines would not present financial stress on Hecla's balance sheet because the Nevada Mines were "self-funding", meaning all of the capital expenses and production costs incurred in maintaining and operating the Nevada Mines would be paid for from existing cash flow produced by the sale of minerals from the Nevada Mines.

55.     While Defendant Baker represented the purported positive benefits of the acquisition of the Nevada Mines, he failed to disclose to investors material risks and material, negative conditions at the Nevada Mines that Defendants knew of, or at least recklessly disregarded, that were negatively affecting operations before the Class Period and that continued to plague the Company throughout the Class Period.

56.     As Defendant Baker admitted on May 9, 2019, after the Class Period, at the time Defendants announced the acquisition of the Nevada Mines, "when doing the due diligence, we recognized certain problems with Fire Creek dealing with the tuff material, managing the water, equipment availability, getting enough development to have consistent production, lack of characterization of ore types."

57.     Tuff material is a type of rock formation that contains clay. Characterization of ore types refers to an understanding of the mineral contents of geological formations.

58.     Furthermore, Defendants knew since at least the beginning of the Class Period, or at least recklessly disregarded: (i) that the RIBs at the Fire Creek mine, which is key infrastructure

used to treat wastewater, were experiencing water management issues and were slow and ineffective in treating waste water and had design defects that impeded treatment of water discharged from the Nevada Mines; (ii) that the geological structure at Fire Creek contained compartmentalized or perched water; (iii) that dewatering rates were anticipated to increase with future development; (iv) that after clearing sediment from Fire Creek's Dewatering Storage Pond 1 in 2017, a key element of Fire Creek's water treatment infrastructure, it developed a leak and that water flow from the leak was beyond the amount allowed by permit; and (v) that excess amounts of water had been discharged into the tailings pond at the Midas mine and were reaching capacity.

59.     By June 2018, additional underground water was encountered at the Fire Creek mine. The source of the water was identified and excess water flow was expected to continue for the foreseeable future.

60.     In or around January 21, 2019, the leak at Fire Creek's Dewatering Storage Pond, which was leaking since 2017, began leaking even more water. Kevin Shiell ("Shiell"),[8] Hecla's VP and General Manager of the Nevada Mines, was aware of these material, negative conditions. In order to make repairs to the pond, Hecla planned to drain the pond to identify and repair any leaks. However, draining the pond would exceed all available surface storage capacity available at Fire Creek. As a result, Hecla began to ship water from the dewatering storage pond at Fire Creek to the Midas mine as a short-term solution, while Hecla attempted to develop new water management strategies at the Fire Creek mine. Hecla contracted PDQ Trucking to ship the water in tanker trucks to the Midas mine.

---

[8] Shiell was appointed Vice President and General Manager – Nevada Operations effective July 20, 2018. He was General Manager – Midas and Hollister mines with Klondex Gold & Silver (January 2017 to June 2018), and General Manager – Fire Creek Project (November 2015 to December 2016).

61.    By no later than February 14, 2019, Fire Creek's reverse osmosis water treatment plant began to experience difficulties treating the flow of the mine-dewatering.

62.    In or around April 2019, Hecla contracted with Watertectonics to install a temporary water treatment plant at the Fire Creek mine to treat water that exceeded the legal limits for toxic arsenic and antimony.

63.    After the Class Period, Defendants finally admitted that the RIBs needed to be redesigned and rebuilt and that there was a "permit in process" to increase water treatment, but that it could take up to a year to obtain approval.

64.    Defendants' knowledge or reckless disregard of these and other material, negative conditions at the Nevada Mines, that they were negatively affecting the cash flows at the Nevada Mines, and that they were expected to continue to do so, is confirmed by numerous confidential informants, including CIs 13 and 14 alleged above.

65.    According to CI 1,[9] the Nevada Mines were experiencing major problems by early 2018.  Water built up at each of the Nevada Mines.  For example, material excavated at the Fire Creek mine had a high degree of clay content, while material excavated at the Midas and Hollister mines had a high degree of carbon, conditions that were a known problem throughout 2018.  The amount of water used to process material containing such unusable sediments, coupled with lack of sizeable pools to capture the wastewater, left the Nevada Mines with excess water.

66.    Yet another problem was that miners lacked equipment needed to excavate and process material.  For example, according to CI 1, at the time of the acquisition of the Nevada Mines by Hecla, General Manager, Rosco Hamilton, was aware that the Nevada Mines had few semi-

_____

[9] CI 1 was a miner at the Nevada Mines during the period from 2017 through June 2019 who worked at each of the Nevada Mines.

trailers, not enough pumps for the ponds, old haulers and loaders, and did not own a single autoclave or roaster. Roasting is a stage in processing used to process low-quality refractory gold, or ultra fine gold particles, amenable to cyanidation, a process used to extract gold. By the end of the Class Period, Hecla had yet to purchase this equipment.

67.    At the Midas mine, water was used in the mining and milling operations. However, excess amounts of water had been discharged into the tailings facilities at the Midas mine. According to CI 2,[10] CI 2 observed high water levels of the tailing pond at the Midas Mill. According to CI 3,[11] CI 3 worked with geologists, engineers and surveyors at the Hollister and Midas mines. Throughout CI 3's employment, CI 3 observed that the Midas mine experienced a severe water issue that grew worse during the Class Period. Further, in early 2018 at the time Hecla was conducting due diligence, CI 3 learned that Klondex reopened abandoned mines that did not yield high grade or self-funding product. Several senior geologists, including Matthew Burgess, repeatedly stated there was no high-grade gold ore at the Hollister and Midas mines.

68.    According to CI 4,[12] since approximately 2017, there was a substantial water buildup problem at the Fire Creek mine that continued throughout CI 4's employment at the Nevada Mines. CI 4 attributed the water build up to excessive amount of clay content in the excavated material. Water needed to process material containing worthless waste rock, coupled with a lack of sizeable pools to capture and process the material, left the Company with significantly more material for which the Company did not have the equipment, infrastructure or permits to remediate. In addition,

---

[10] CI 2 was a miner at the Midas mine from 2017 through March 2018.

[11] CI 3 was a surveyor and miner from 2017 through November 2018 at the Hollister and Midas mines.

[12] CI 4 was a miner from approximately 2014 through June 2018 who worked at the Fire Creek mine.

CI 4 learned that excavated material at Fire Creek was also found to have a higher pH balance in the wash plant where ore is extracted from worthless rock. This was a problem because acidic solutions are required to extract gold ore. To lower the pH in the wash plant, additional chemicals were needed, which increased the cost of extraction.

69.     According to CI 5,[13] by early 2018, the Midas mine tailings pond was about to overflow due to too much processing of material from Midas and neighboring mines, Hollister and Fire Creek. The water buildup was easy to see by January 2018. A tailing pond or dam is where waterborne refuse material was pumped into a pond to allow separation of solids from the water. Several Klondex/Hecla managers, including Ken Leader ("Leader"), Process Manager at the Midas and Hollister mines who was responsible for production operation and maintenance, were aware of the excess water problem. CI 5 attended weekly meetings run by Leader and held within the Midas mill lunchroom (typically on Monday afternoons). Several mine workers, along with two crush operators, also attended these weekly meetings. Leader informed employees that the Company needed additional equipment to handle the water overflow issuer. Further, production at the Midas mill would be severely hampered until the water problem was corrected.

70.     According to CI 6,[14] who worked closely with Shiell, by early 2018, there were numerous problems with the ore characteristics at Midas, Hollister, and Fire Creek. Specifically, Fire Creek ore had a high degree of clay content, while the ore at Midas and Hollister mines had a high degree of carbon. The amount of water needed to process material at these facilities containing unusable sediments, coupled with lack of sizeable pools to capture and process the material, left the

---

[13] CI 5 was a crusher operator at the Midas mine during the period 2014 through April 2019.

[14] CI 6 worked in the information technology department at the Nevada Mines 2017 through October 2019 and was responsible for providing IT support for employees at the Nevada Mines properties and worked with management at the Nevada Mines.

Nevada Mines with a sizeable amount of excess water. CI 6 first learned of these issues through conversations with Shiell. Fire Creek's water issue became so serious that by approximately July 2018, the Company retained outside contractors, including Sandvik Mining, to assist with the escaping ground water.

71.    According to CI 7,[15] Jimmy Schmidt was the general foreman at the Midas mine and Leader was the process manager for the Midas and Hollister mines. CI 7 observed that the ore from Fire Creek trucked to the Midas mine for processing was wet due to water exposure coming from within the mine and contained a high level of clay. Due to these problems with the ore, mill operators had to process the material through the mill several times, costing the Company more time and money than budgeted. According to CI 7, Hecla employees frequently complained to Schmidt and Leader about the poor quality of the ore being shipped to Midas from the Hollister and Fire Creek mines.

72.    According to CI 7, material excavated from the Hollister mine was known to have a high content of carbon and oil. Rock mined at Hollister needed to be processed separately from Fire Creek and Midas rock because it required the addition of hypochlorite to remove the carbon. CI 7 knew when Hollister material was being processed because the addition of hypochlorite to the Hollister material burned employees' eyes. According to CI 8,[16] material excavated from Hollister and Midas was known to have high levels of free carbon which needed to be removed before processing. In early 2019, Claire Leuschen, a metallurgist at Hecla, developed a procedure involving the addition of hypochlorite to remove the free carbon from the material to properly

---

[15] CI 7 worked as a crusher, mill operator and refinery operator at the Midas mine during the period from 2016 through the end of 2019.

[16] CI 8 worked as a process operator at the Nevada Mines during the period from 2017 through June 2019 at the Midas mine and was responsible for operating machinery within the Midas processing plant.

excavate, but which added costs to the production process.

73.    Furthermore, CI 7 observed that essential excavating and processing equipment was either unavailable or needed to be upgraded in order to efficiently process gold ore.  In response to complaints from CI 7 and other employees of the Nevada Mines about the poor condition of the equipment, Leader and Schmidt informed CI 7 that this essential equipment was not in Hecla's budget.

74.    According to CI 8, at the time of Hecla's announcement of its acquisition of the Nevada Mines, management and employees at the Nevada Mines were experiencing material production problems with excess water that continued throughout CIs 8's tenure.  Excessive water discharge within the Fire Creek facility forced the Company to use tanker trucks to transport water to the Midas mill.  Furthermore, excessive sediments in the material caused the Company to use chemicals to clean the water prior to evaporation from the pond.  This process placed strain on the water pumps that caused many of them to malfunction and need replacement. These measures constrained production and increased costs for the Company.

75.    According to CI 8, throughout 2018-19, Fire Creek material was known to have a high degree of clay content which was costly to process and required more water to properly run and operate hydrocyclones, which separate gold from waste rock.

76.    According to CI 9,[17] starting in March 2018, CI 9 witnessed Defendants Baker and Radford walking around the Nevada Mines' facilities and milling areas on a regular basis.  The Hollister mine had a long-standing water problem within the mine.  Due to its elevation, water frequently flooded at the bottom of the mine.  This problem was clear at the time Hecla announced

---

[17] CI 9 worked as a mine superintendent at the Hollister and Midas mines from 2014 through August 2019 and, among other responsibilities, prepared operational budgets.

the acquisition in March 2018.  The Company needed pumps to remove the excess water.  Since the ore was heavy in carbon and silt, the pumps were frequently clogging and needing repair.  At the bottom of the mine, someone at the Company needed to monitor the pumps, which negatively affected production and Company revenues.

77.     According to CI 10,[18] at the time Hecla disclosed the acquisition of the Nevada Mines, Fire Creek had been experiencing a perfect storm of negative events, including a significant problem with water collecting at the bottom of the mine.  Several of the Company's most productive veins at Fire Creek were affected and the water was exceeding the 100 gallon per minute permit limit.  Limitations in permitting and an under equipped water treatment plant slowed the discharge of water from the mine.  Removing the water would take considerable time to pump out, clean and rehabilitate, which slowed removal of ore and waste from the mine.  Furthermore, in approximately late 2017, the Company ceased to conduct exploratory drilling which is a fundamental process to identify gold prospects to be excavated in the following one to two years.  According to CI 10, this sent Fire Creek into a tail spin.

78.     In addition, CI 10 was aware of a refractory ore problem which existed at the time Hecla announced the acquisition of the Nevada Mines.  CI 10 conducted both the testing and modeling of these veins which CI 10 determined held refractory ore.  During due diligence, CI 10 believes that Hecla was given all the core photos for over 1,000 holes, including the holes with refractory ore.  The failure of having a working roaster at the Nevada Mines impeded the ability to process the material.

79.     In early 2018, CI 10 learned from John Spring ("Spring"), chief geologist at Fire Creek, and others that Hecla was going to acquire the Nevada Mines and Hecla's due diligence

---

[18] CI 10 was a geologist at the Fire Creek mine between 2013 and December 2019.

team would be on site for several months reviewing the Company's procedures and production. CI 10 participated in a mine tour with Defendant Radford and McDonald, Allen, and Blair. From March through July 2018, water issues at Fire Creek were constant.

80.    According to CI 11,[19] CI 11 was responsible for public water system permitting (both federal and state), maintenance, and monitoring as well as developing sampling plans and other required documentation for public water system compliance and reporting and worked at Fire Creek. In the months before Hecla announced the acquisition of the Nevada Mines, the Fire Creek mine experienced multiple problems, including water seepage, underground mine workings that filled with water, reduced water storage capacity, and failure to meet the State of Nevada water treatment regulations. The on-site water treatment plant went out of compliance at least two times since 2017 for not meeting water treatment regulations. The tailings pond at the Midas mine had too much water and Hollister produced acidic waste rock. CI 11 assisted in preparing files that included information on all air, water, waste permits for the Nevada properties on file with state and federal regulatory agencies. CI 11 prepared weekly environmental reports that discussed the water discharge needs as well as other environmental concerns of the Nevada Mines, including the need for water discharge permits.

81.    In approximately January 2018, CI 11 learned that Hecla was seeking to acquire the Nevada Mines. Shortly thereafter, CI 11 witnessed Defendant Radford, Shiell, and Luke Russell, VP External Affairs ("Russell"), touring the Fire Creek facility approximately three to four times per month through July 2018. During due diligence, CI 11 assisted in preparing files that included information on water and waste permits for the Nevada Mines on file with state and federal

---

[19] CI 11 was an environmental coordinator and environmental engineer at the Nevada Mines from 2014 through April 2019.

regulatory agencies.  Shortly before the closing of the acquisition by Hecla, CI 11 worked to request additional water discharge rights with state agencies to combat the infiltration issues at Fire Creek, but water discharge permit applications typically take one to two years for approval.

82.    According to CI 12,[20] in early 2018, excessive water discharge became problematic for the Company.

83.    According to CIs 1, 3, 6 and 10, during the period from the start of the Class Period, through the fall of 2018, key personnel that worked at the Nevada Mines resigned due to the poor conditions at the Nevada mines:

- According to CI 10, from March through July 2018, there was a growing number of defections of employees at the Nevada Mines who were growing discouraged by management's failure to address equipment problems as well as failure to conduct exploratory excavating.

- CI 1 observed mass defections of talented and experienced employees, as management failed to provide basic essentials, such as tools and hard hats.

- CI 3 observed numerous resignations of key employees due to concerns that management of the Nevada Mines was not doing enough to address development problems at the Midas and Hollister mines, and failing to provide basic essentials, such as tools and hard hats for employees.  Several senior geologists, including Matt Burgess, repeatedly stated there was no high-grade gold ore at the Hollister and Midas mines.

- CI 6 observed that, by the fall of 2018, there were several resignations of senior geologists who were upset with management of the Nevada Mines for not properly addressing ongoing

---

[20] CI 12 was a senior mine engineer from 2017 through June 2018 and worked at the Fire Creek mine and whose duties included planning and management of the water treatment plant.

production problems, as well as not conducting enough core sample drilling for future development at these mines.

84.    According to CI 12, in or around April 2018, CI 12 participated in a working session meeting with Defendant Radford, Graeme Hendricks ("Hendricks"), Chief Engineer at Fire Creek through August 2018, Sid Tolbert ("Tolbert"), the General Manager at Fire Creek, and other senior management at Hecla's office in Winnemucca, Nevada.  At the April 2018 meeting, several metrics of the Fire Creek mine and various reports and plans were discussed, including budgets, life of mine reports, production schedules, operating costs, and anticipated versus actual production reports.

85.    According to CI 10, following the closing of Hecla's acquisition of the Nevada Mines on July 20, 2018, Spring told CI 10 that he had a meeting with the Hecla management team during which Spring raised the drilling, refractory ore and water issues.  According to CI 10, during the meeting with the Hecla management team, Spring laid all the drilling and refractory ore issues on the table.

86.    According to CI 9, shortly after the acquisition closed in July 2018, CI 9 attended a meeting with Defendant Radford and employees of the Nevada Mines.  At this meeting, Defendant Radford acknowledged problems with the ore body and water buildup at the mill. Moreover, after the acquisition closed in July 2018, CI 9 attended weekly production meetings held in a conference room at the Midas facility for managers among the Company's operations, maintenance, geology and engineering departments.  Defendant Radford was a regular attendee at these production meetings, Defendant Hall occasionally participated, and the following managers of the Nevada Mines attended: Bryan Farbridge ("Farbridge"), Technical Services Manager/Chief Engineer of Midas and Hollister, Paul Schmiesing, Mine Manager at Hollister, Mike Turnbull, Superintendent, Todd Kelton, Operational Manager from American Mining and Tunneling, John Francis, General

Foreman, Brad Bodvin, General Foreman, Mike Blankenship, Front-Line Foreman, and Jason Deputy, Electrical Foreman. During these weekly meetings, internal production reports were discussed which showed actual versus projected production at the Hollister and Midas mines, typically by Farbridge. Occasional PowerPoint presentations and spreadsheets were also prepared and distributed. Water problems, including issues with the mills and tailings pond, and ore characteristic problems, including the buildup of carbon at Hollister and Midas, were regularly discussed at production meetings. On several occasions, Defendant Radford acknowledged to participants the strain these issues were having on production.

87. According to CI 9, after the weekly production meetings, there was a management meeting, which Defendant Radford, Leader, and Shiell attended. Through conversations with Leader, CI 9 learned that ore taken from the Fire Creek facility was found to be heavy in clay which was plugging up the mill. Leader informed CI 9 that ore characteristic problems at all the Company's Nevada properties were regularly discussed during these management meetings.

88. On or around August 1, 2018, Defendant Baker visited the Nevada Mines and he spoke with almost all of the supervisory and management personnel. In late October 2018, Defendant Baker again visited the Nevada Mines and observed how the material, negative conditions were then affecting production and cash flows.

89. According to CI 8, in the fall of 2018, CI 8 attended a planning meeting at Hecla's Reno, Nevada office. The meeting was held in a large conference room and attended by approximately 25-40 Hecla employees from the Nevada Mines. According to CI 8, Defendant Radford participated via video. During this meeting, CI 8 learned of production problems at the Fire Creek mine, specifically the build-up of excessive water within the mine. Additionally, based on a survey of veins within Fire Creek, there was significantly more ore body to drill to reach

profitable, high-grade material.  Maps were shown to meeting participants highlighting these findings.  Given the lack of high-grade ore and excess water, Hecla management further explained to attendees that positive cash flow and profitability from the Fire Creek mine was now at least a year or more away.  According to CI 9, on several occasions throughout late 2018 and early 2019, Gabriel Adogla, Geologist for the Midas and Hollister Mines, expressed concern to CI 9 and others regarding the future production at each mine.  The Hollister mine required additional holes to be drilled to identify profitable material, which cost the Company more money.

90.    According to CI 10, during the fall of 2018, Hecla began to further explore the Joyce and Vonnie veins at Fire Creek.  Though these veins were represented by Defendants as high grade (i.e. visible gold), upon commencement of mining the top two layers, staffers concluded the high-grade ore was not there, which meant these veins were not then able to produce profitable material. When Hecla started to mine the ground conditions quickly turned poor and Hecla had a great deal of difficulty mining these areas.  At Vonnie, mining was cut short because the ground conditions were very poor and the vein started to lean over and was too shallow to be mined safely.

91.    According to CI 6, in early 2019, while at Fire Creek, CI 6 learned of production delays at Fire Creek.  The processing equipment at the Midas mine, which was being used at the time to process ore excavated at Midas, Hollister and Fire Creek, was in disrepair from excessive use and lack of maintenance.  According to CI 6, CI 6 witnessed a conversation among Sara Bowl ("Bowl"), senior Geologist, Allen, and other senior executives of the Nevada Mines concerning these problems.

92.    According to CI 9, by January 2019, due to an influx of additional water, water was being trucked from the Company's Fire Creek facility to Midas on a rolling basis.

93.    In February 2019, Defendant Baker again visited the Nevada Mines and observed

how the material, negative conditions were then affecting production and cash flows.

94.    According to CI 6, poor ore characteristics of the ore excavated at the Nevada Mines was damaging the processing plant at the Midas mine.  By May 2019, processing delays at the Midas mine became so problematic, instead of processing material at the Midas mine mill, the Company began shipping materials to a processing mill at Aurora located several hundred miles away from the Midas, Hollister and Fire Creek mines, which was inefficient and increased costs.

## VII.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

95.    During the Class Period, Defendants made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and Defendants knew, or disregarded with at least recklessness, that their representations were false or misleading at the time they made their representations.  During the Class Period, it was at least reckless for Defendants to make positive representations about the Nevada Mines while they were aware of or recklessly disregarded the following material negative conditions at the Nevada Mines that were and would continue to increase production costs and impede the production of gold at the Nevada Mines: 1) that, far from being self-funding or cash flow positive during the Class Period, the Nevada Mines needed to be redesigned and rebuilt before they could produce positive cash flows; 2) that the Nevada Mines contained refractory gold ore and Defendants did not possess the means or methods to profitably extract refractory gold ore; 3) throughout the Class Period, the Nevada Mines suffered from a multi-faceted material problem with excess water.  However, the Company did not have the permits, equipment or infrastructure required to manage water discharge and, as a result, the Nevada Mines experienced the buildup of excess water that impeded ore production and increased costs; 4) that throughout the Class Period, the Nevada Mines lacked sufficient equipment, had inadequate infrastructure and development, and lacked permits needed to manage excess water; 5) that

throughout 2018, key personnel resigned from their positions at the Nevada Mines, which negatively affected production and productivity at the Nevada Mines, and the Nevada Mines did not have an adequate workforce or equipment causing operations to be reliant on expensive outside contractors to perform essential work; and 6) as a result of these material negative problems, Defendants had no reasonable basis for their representations that the Nevada Mines were or would be cash flow positive or self-funding, or accretive to Hecla's financial and credit metrics.[21]

96.     The Class Period begins on March 19, 2018, the date that Defendants caused Hecla to issue a press release announcing the acquisition of the Nevada Mines for a mix of cash and stock worth $462 million.[22]  The March 19, 2018 press release stated, in part, the following:

> Hecla to Acquire **Three High-Grade Gold Mines** with the Acquisition of Klondex Mines Ltd.
>
> These land packages . . . **have the highest grade mines in the U.S. . . .**
>
> **We can improve costs, grow reserves and expand production** . . . . shareholders can benefit from the **162,000 gold equivalent ounces a year of production**
>
> After extensive due diligence, **we see significant opportunity to improve costs, throughput and recoveries** over time with our expertise. . . .We expect this transaction to be accretive on many important financial and credit metrics, with potentially significant synergies. . . .
>
> A Further Transformation of Hecla . . . Well capitalized pro - forma company with strong cash flow and solid balance sheet – Hecla expects to improve financial metrics with the Nevada mines' cash flow. . .

---

[21] The statements quoted in Section VII and VIII in ***bold and italicized*** typeface are materially false and misleading for the reasons set forth herein. Additionally, as specifically indicated below, many of the identified statements are alleged to have been false and misleading by omission. Thus, additional text is provided for context and in support of these statements' misleading nature.

[22] Klondex shareholders could elect to receive either $2.47 in cash or 0.6272 of a Hecla share, each full Hecla share being valued at $3.94, subject in each case to pro-ration based on a maximum cash consideration of $157.4 million and a maximum number of Hecla shares issued of 77.4 million.

Benefits to Hecla Shareholders . . . ***Fire Creek is a cornerstone producing asset with robust cash flows and significant opportunities for exploration, mine life expansion, and increased throughput***.

97.    Defendants represented that they were motivated to acquire the Nevada Mines to improve the Company's credit metrics and bond ratings through the increased earnings of the purportedly accretive acquisition and low capital requirements of the Nevada Mines:

one of Hecla's long-term goals is to become investment grade and we think this transaction [acquisition of the Nevada Mines] helps us move in that direction. . . our credit metrics are going to improve dramatically as a result of the acquisition. We're going to have more EBITDA, we're going to see those metrics continue to – that improvement that we've seen over the last five years. And I can't emphasize to you enough that the objective we have is to go from B to BB, BB to BBB. And we think that this is a huge step in that direction ***given the small amount of capital that these projects are going to require***.

98.    Increasing Hecla's credit rating was materially important to Defendant Hecla because Defendants were planning to refinance the Company's outstanding $500 million 6.78% senior notes in or after May 2019 and an increase in its credit rating would reduce the Company's borrowing costs, and further, the purportedly accretive acquisition allowed the Company to increase its line of credit from $100 million to $250 million and relaxed restrictive covenants concerning the Company's leverage ratio.

99.    On March 19, 2018, during a conference call with investors and analysts in which Defendant Baker participated, in response to an analyst who asked what the ongoing maintenance capital expenditures for the Nevada Mines would be, Defendant Baker represented that factoring in exploration and development costs at the Nevada Mines, and based on Defendants' extensive due diligence, the operations were and would continue to be cash flow positive at that time:

[B]ut ***all of this stuff is relatively small capital***. That was one of the things that struck us is we can acquire this. Nevada itself will be cash

41

flow positive for us. ***There is no capital outlay that we're looking to, in Nevada, that's going to consume all of the cash flow that will be generated from the three mines*** . . .

***

"We would anticipate seeing that higher grade. But even if it's not, ***what we find with our mine plans is that we will, basically the downside is we get all of our money back***. So we don't have a view that we're relying upon a big increase in the grade to have this thing be economic for us."

***

***And then from the get-go, the Nevada assets are going to be cash flow positive.*** So we don't see any sort of financial stress as a result of the transaction. . . we put to good use the cash that we have on our balance sheet. It's sitting there and hasn't – it doesn't generate any returns for us and instead ***we're now acquiring 160,000 plus of production, and immediate cash flow***.

100.    Defendants' representations in paragraphs 96-97 and 99 were materially false and misleading and failed to disclose material adverse facts because in contrast to the positive representation that the Nevada Mines required "small capital", in truth, the Nevada Mines needed to be redesigned and rebuilt through significant investment of capital that exceeded the current cash flows.

101.    Defendants' positive representations that the Nevada Mines contained high grade gold was materially misleading because the Individual Defendants knew, or at least recklessly disregarded, and failed to disclose the material, negative fact that the cornerstone property of the Nevada Mines, Fire Creek, contained refractory ore that could not be profitably extracted without substantial and uneconomical capital and operational costs, as confirmed by CIs 13 and 14. Furthermore, Defendant Baker's representation that Defendants would get over 160,000 ounces of gold production was materially false and misleading because, as confirmed by CIs 13 and 14, production of gold ore at the Nevada Mines had already substantial declined and production was

42

expected to further decline throughout 2018.

102.    Moreover, as alleged in paragraphs 13, 56, 58 and 64-82 and as confirmed by CIs 1-14, at the time Baker made these false and misleading representations, the Nevada Mines were plagued with ongoing material, negative problems that were negatively affecting operations, and were expected to persist unless uneconomical capital and operational expenditures were made to cure the negative conditions (which would accelerate the decline of the Nevada Mines' already negatively-trending cash flows).  Defendants had no reasonable basis to represent that the Nevada Mines were cash flow positive from "the get-go" or producing "robust cash flows", that the Nevada Mines required a "small amount of capital", that the Nevada Mines would be cash flow positive during the Class Period, or that the acquisition of the Nevada Mines would be accretive to Hecla "on many important financial and credit metrics". In fact, Defendants knew, or recklessly disregarded, that the acquisition was and would be dilutive to the Company's financial results and important financial metrics due to the material, negative conditions that were then plaguing the Nevada Mines.

103.    On May 10, 2018, during a conference call with investors and analysts in which the Individual Defendants participated, Defendant Baker represented that concerning the Nevada Mines "[w]e saw three large, in this case, Nevada properties as big as those that we already have, and *we saw extraordinary grades*."

104.    Defendant Baker's representation that, based on what the Individual Defendants saw, the gold at the Nevada Mines contained extraordinary grades was a materially misleading positive representation because the Individual Defendants knew, or at least recklessly disregarded, and failed to disclose the material, the material negative fact that the cornerstone property of the Nevada Mines, Fire Creek, contained refractory ore that could not be profitably extracted with

substantial and uneconomical capital and operational costs, as confirmed by CIs 13 and 14. Furthermore, Defendant Baker's representations were materially false and misleading at this time because he failed to disclose that, according to Cis 1, 4, 6-8, 10, 13, and 14, the Nevada Mines comprised uneconomic ore bodies, and were plagued by ongoing material problems, and were expected to persist unless uneconomical capital and operational expenditures were made to cure the negative conditions (which would accelerate the decline of the Nevada Mines' already negatively-trending cash flows), including excess water for which the Nevada Mines did not have permits to discharge, and therefore were not economical because the cost of extraction was exceeding the value of the mined gold, as alleged in paragraphs 13, 56, 58, 64-84.

105.    During the May 10, 2018 conference call, Defendant McDonald stated "I'm very excited about the exploration opportunities in northern Nevada once the acquisition of Klondex is concluded . . . [I]t is rare that you can acquire 110 square miles of exploration ground in northern Nevada that lies within or at the intersection of *prolific trends or rifts.* They have a great team of geologists, with a significant understanding of the properties, and we look forward to working together to realize *the potential of this ground*."

106.    Defendants McDonald's representations to investors presented the acquisition in a positive light, however, it was materially misleading for Defendant McDonald to identify purportedly positive "prolific trends or rifts" and positively representing the potential of the Nevada Mines, and failing to disclose the material, negative facts that the Klondex geologists and other executives at the Nevada Mines told him during due diligence.  As confirmed by CIs 13 and 14, McDonald was told by Klondex geologist and executives of the material, negative fact that the cornerstone property of the Nevada Mines, Fire Creek, contained refractory ore that could not be

profitably extracted with substantial capital and operational costs and was uneconomic, and about the poor ore characteristics and that water permits limited water removal and hampered production.

107.    Also on the conference call on May 10, 2018, Defendant Baker, following up on his statements that indicated Defendants were motivated to acquire the Nevada Mines in order to bolster the Company's credit rating, stated "we're talking to rating agencies to make sure they understand what Hecla looks like with these assets [the Nevada Mines]."

108.    On May 10, 2018, Defendants caused Hecla to file its quarterly report for the quarter ended March 31, 2018 with the SEC on Form 10-Q (the "Q1 2018 10-Q"), which was signed by Defendants Baker and Hall.  Item 303 of SEC Regulation S-K, 17 C.F.R. 929.303 ("Item 303") required the Q1 2018 10-Q's Management Discussion and Analysis ("MD&A") section to disclose: (i) unusual events, transactions or significant economic changes that materially affected the amount of Hecla's reported income from continuing operations and the extent of such changes; and (ii) known trends or uncertainties reasonably expected to have a material impact on the Company's net sales or revenues or income from continuing operations.  The ongoing material, negative problems that at this time were negatively affecting operations and that were trending negative at the Nevada Mines, as alleged in paragraphs 13, 56, 58, 64-84, were unusual events and transactions, significant economic changes, and known trends and uncertainties that were required to be disclosed under Item 303 because they were known to Defendants by at least the beginning of the Class Period, as confirmed by CIs 13 and 14, and likely to (and did) have a material unfavorable impact on the Company's net sales, revenues and income from continuing operations.

109.    The Q1 2018 10-Q represented that certain risks "may" or "could" adversely impact Hecla's business in the future:

- Uncertainties associated with the acquisition ***may cause*** a loss of management personnel and other key employees of Klondex which ***could***

45

*adversely affect* the future business and operations of the combined company following the acquisition;

- We *may* not realize all of the anticipated benefits from our acquisitions, including the potential acquisition of Klondex.

  We *may* not realize all (or any) of the anticipated benefits from the acquisition of Klondex, if consummated, or any future acquisitions, such as increased earnings, cost savings and revenue enhancements, for various reasons, including difficulties integrating operations and personnel, higher than expected acquisition and operating costs or other difficulties, unknown liabilities, inaccurate reserve estimates and fluctuations in market prices.

- The Klondex properties and any others we may acquire *may* not produce as expected and *may* not generate additional reserves, and *may* come with liabilities beyond those known at the time of acquisition.

  The properties we acquire in the acquisition of Klondex, if consummated, or in other acquisitions *may* not produce as expected, *may* not generate reserves beyond those known at the time of acquisition, *may* be in an unexpected condition and we *may* be subject to increased costs and liabilities, including environmental liabilities. Although we review properties prior to acquisition in a manner consistent with industry practices, such reviews are not capable of identifying all potential adverse conditions. Generally, it is not feasible to review in depth every individual property involved in each acquisition. Even a detailed review of records and properties *may* not necessarily reveal existing or potential problems or permit a buyer to become sufficiently familiar with the properties to fully assess their condition, any deficiencies, and development potential.

110.    The Q1 2018 10-Q also incorporated by reference the risk warnings set forth in the

Company's annual report for the year ended December 31, 2017, filed with the SEC on Form 10-

K, which represented that certain risks "may" or "could" adversely impact Hecla's business in the

future:

- We *may* be subject to a number of unanticipated risks related to inadequate infrastructure.

  Mining, processing, development, exploration and other activities depend on adequate infrastructure. Reliable roads, bridges, ports, power sources, internet access and water supply are important to our operations, and their availability and condition affect capital and operating costs. . . amount or complexity of required investment, or other interference in the maintenance

46

or provision of such infrastructure . . . ***could*** adversely affect our mining operations.

- Our business depends on availability of skilled miners and good relations with employees.

    We are dependent upon the ability and experience of our executive officers, managers, employees, contractors and their employees, and other personnel, and there can be no assurance that we will be able to retain such employees or contractors. We compete with other companies both in and outside the mining industry in recruiting and retaining qualified employees and contractors knowledgeable about the mining business. From time to time, we have encountered, and may in the future encounter, difficulty recruiting skilled mining personnel at acceptable wage and benefit levels in a competitive labor market, and may be required to utilize contractors, which can be more costly. Temporary or extended lay-offs due to mine closures may exacerbate such issues and result in vacancies or the need to hire less skilled or efficient employees or contractors. The loss of these persons or our inability to attract and retain additional highly skilled employees and contractors ***could*** have an adverse effect on our business and future operations.

111.    Defendants Baker and Hall's representations that warned of future, potential risks that "may" or "could" adversely affect Hecla's business and operations were materially false and misleading because these risks had already materialized, as alleged in paragraphs 13, 56, 58, 64-84. Indeed, as Defendants admitted after the Class Period, and as corroborated by CIs 1-14 observations before and during the Class Period, by the beginning of the Class Period and throughout the Class Period, the Nevada Mines were plagued by ongoing, known material, negative conditions, including inadequate infrastructure, that were negatively affecting operations and were expected to persist unless uneconomical capital and operational expenditures were made to cure the negative conditions (which would accelerate the decline of the Nevada Mines' already negatively-trending cash flows), and according to CIs 1, 3, 6, 10, 13 and 14, at that time, Defendants had experienced and continued to experience loss of key personnel that negatively affected production and productivity, and the Nevada Mines did not have an adequate workforce or equipment were reliant

on expensive outside contractors (AMT) to operate the Nevada Mines, which was a significant drain on cash flows, as Baker admitted after the Class Period.

112.    Moreover, Defendants purported warning that the "[e]ven a detailed review of records and properties *may* not necessarily reveal existing or potential problems or permit a buyer to become sufficiently familiar with the properties to fully assess their condition, any deficiencies, and development potential" was materially false and misleading because, as confirmed by CIs 13-14, Defendants Radford and McDonald had already been informed of existing problems and deficiencies and development problems that were increasing costs and draining cash flow at the Nevada Mines, including that they were directly informed that Fire Creek contained uneconomic refractory ore and that water permit limits hindered removal of water from the mines, and hampered production and increased costs, and that production of gold ore and cash flows had been and would continue to materially decline.

113.    On May 24, 2018, Defendants caused Hecla to issue a press release that stated, in part, that Defendant Radford:

> has been appointed Chief Operating Officer of the Company effective immediately, a promotion from his previous role of Senior Vice President – Operations, overseeing Hecla's operations, development projects, pre-development initiatives.
>
> "Throughout his career Larry has demonstrated a strong ability to optimize operations, and you can see this in the improved performance of Greens Creek and Casa Berardi since he joined Hecla," said Phillips S. Baker, Jr., Hecla's President and Chief Executive Officer. "With the expected addition of the Klondex assets, Hecla is growing again and his talents will continue to be an important part of our strong team as it integrates and optimizes these new mines."

114.    On July 16, 2018, based upon the supposedly accretive nature of the acquisition of the Nevada Mines, Hecla entered into a $200 million senior secured revolving credit facility that replaced the Company's previous $100 million credit facility, which would increase to $250 million

in November 2018. Furthermore, the new credit facility relaxed certain financial covenants, including increasing the Company's leverage ratio (total debt less unencumbered cash/EBITDA). Under the new credit facility, the leverage ratio would improve to 4.50:1 on September 30, 2018 from 4.00:1.

115.    On July 23, 2018, Defendants caused Hecla to issue a press release announcing that the Company had closed the acquisition of the Nevada Mines from Klondex for approximately $153 million and 75 million shares of Hecla common stock valued at $3.94 per share. The July 23, 2018 press release stated, among other things:

> "With this acquisition, **Hecla now has three high-grade mines** in Nevada, one of the best mining districts in the world," said Phillips S. Baker, Jr., President and CEO. **"These assets immediately add production** and **cash flow,** and because they are a good fit with Hecla's expertise, we believe there is significant opportunity for improvement in the mines' productivity and consistency.

116.    Defendant Baker's positive representations that the Nevada Mines immediately added production, positive cash flow and were high-grade mines were materially false and misleading because as Defendant Baker admitted after the Class Period, at that time the Nevada Mines were experiencing ongoing material, negative problems that were negatively affecting operations as described by CIs 1-14. ¶¶ 13, 56, 58-59, 64-87. It was materially misleading for Baker to make the positive representation to investors that the Nevada Mines were high grade and immediately added production and cash flow, and fail to disclose known, material negative facts and conditions that cut against his positive representations. According to CIs 1, 4, 6, 7, 8, 10, 13 and 14, the Nevada Mines comprised uneconomic ore bodies with uneconomic refractory ore, and were plagued by material problems that hampered production, such as excess water and permit limits, and therefore the cost of extraction was exceeding the value of the mined gold, and cash flows and gold ore production had and would continue to materially decline. These material

negative challenges were expected to persist unless uneconomical capital and operational expenditures were made to cure the negative conditions (which would accelerate the decline of the Nevada Mines' already negatively-trending cash flows).

117.    On July 24, 2018, S&P raised Hecla's issuer-credit rating and credit rating on its $500 million 6.875% senior notes due 2021 from B to B+, based, in material part, on the cash flows that Defendants falsely represented the Nevada Mines were producing and would continue to produce.  On July 24, 2018, S&P Global Market Intelligence issued a press release, that stated, in part, the following:

> The upgrade reflects the rating agency's view that the U.S. silver producer's acquisition of junior gold-silver miner Klondex Mines Ltd. will significantly enhance its scale, adding three high-grade Nevada mines to increase its total to seven. . .
>
> In addition, S&P Global Ratings estimates that its full-year production will increase between 15% and 16% to 579,000 gold equivalent ounces, which will help in achieving a revenue uptick ranging from 40% to 45% to US$824 million. Further, it also forecasts the combined entity to generate EBITDA of between US$275 million and US$290 million over the next two years.
>
> The addition of the Klondex mine assets in Nevada also lessens the impact of potential disruptions at any one mine, the rating agency added.

118.    On August 9, 2018, Defendants caused Hecla to issue a press release that reported the Company's financial results for the second quarter ended June 30, 2018.  The August 9, 2018 press release stated, among other things:

> "We have now closed the acquisition of **the high-grade Nevada mines**, and are beginning their integration into Hecla," Mr. Baker added. "Our plan is to operate the mines and mill as one unit, allocating the workforce and capital **to generate margins** and **focus on profitability, not just on production for production's sake, Fire Creek has the best margin of the 3 mines by a considerable amount, so ramping it up is our priority**…"

119.    Defendant Baker's representations were materially false and misleading and failed to disclose material adverse facts because the Nevada Mines' cash flows had been materially declining throughout 2018, a negative trend that expected to continue, and the Nevada Mines were plagued by material, negative problems, as alleged in paragraphs 13, 56, 58-59, 64-88, that negatively affected operations, production and costs, and caused the Nevada Mines to hemorrhage cash.  The material, negative problems were expected to persist unless uneconomical capital and operational expenditures were made to cure the negative conditions (which would accelerate the decline of the Nevada Mines' already negatively-trending cash flows). In contrast to Defendant Baker's representation that Fire Creek was profitable and had the best margin, Defendant Baker failed to disclose that excess water that could not be discharged under existing permit limitations, and refectory ore was encountered at Fire Creek, which diminished returns and increased production costs, which made it unprofitable.  Defendant Baker's representation that the Nevada Mines were "high grade" was materially false and misleading for the reasons delineated in paragraph 116.

120.    Also on August 9, 2018, during the conference call with analysts to discuss second quarter financial results in which the Individual Defendants participated, Defendant Hall stated, among other things:

> As is our mantra at Hecla, all operations need to generate positive cash flows in their mine plans and we expect Nevada will be no different. ***The Nevada assets are basically self-funding.***  The cash flow from production pays for the $11 million in development and definition drilling expenditures in the last half of the year, and as well, $5 million related to the completion of the new tailings, facility, plus the CIL planned improvements,

121.    Furthermore, on August 9, 2018, during the question and answer portion of the conference call, Defendant Baker represented that the Nevada Mines were currently self-funding:

> [J.P. Morgan Analyst John Bridges]: Good morning, Phil, everybody. I just want to dig into cash flows. Your intention is to have the Nevada assets being cash flow neutral to you as soon as possible. When is that likely to be? And then, when will they be contributing to the portion of debt that they've – that you are sort of – you have taken on in the form of the revolver to run those just to start with?
>
> [Defendant Baker]: Well, I guess two things. ***One is the expectation is this year that for the five months, it will be self-funding. We're not anticipating needing to contribute additional capital into it***.

122.    Defendant Hall's and Baker's representations were materially false and misleading and failed to disclose material adverse facts because the Nevada Mines were not self-funding at that time and the declining cash flows would not be sufficient to pay for Defendants' capital and operational expenditures that were then required. The Nevada Mines were plagued by material, negative problems that were negatively affecting operations, production and costs, as alleged in paragraphs 13, 56, 58-59, 64-88. The material, negative problems were expected to persist unless uneconomical capital and operational expenditures were made to cure the negative conditions (which would accelerate the decline of the Nevada Mines' already negatively-trending cash flows).

123.    During the August 9, 2018 conference call, in response to an analyst's question concerning permits for the Nevada Mines, Defendant Baker made the following representation:

> [CIBC analyst]: Then have you – do you have all the permits in place, do you for even like say the ventilation shafts and everything else that you need?
>
> [Defendant Baker]: ***Yeah. We've got everything we need***.

124.    Defendant Baker's representation was materially false and misleading and failed to disclose material adverse facts because, as confirmed by CIs 5, 10-11, 13 and 14, and as admitted by Defendants Baker and Radford after the Class Period, Defendants did not have the permits required to manage the excess water conditions that were growing worse throughout the Class

Period.  Defendants' inability to manage the excess water due to permit limitations materially hampered exploration and production at the Nevada Mines, and caused costs to materially increase.

125.    On August 9, 2018, during the conference call with investors and analysts, Defendant Baker again represented the purportedly positive effect the acquisition of the Nevada Mines had on Hecla's credit rating, stating that the "***margin***" from the Nevada Mines "should not only improve our equity value, but also our credit metrics and the rating agencies are beginning to take notice of this as exemplified by our bond rating upgrade by S&P. . . ."

126.    Defendant Baker's representations were materially false and misleading and failed to disclose material adverse facts because he failed to disclose that the cash flows at the Nevada Mines had materially declined and were expect to continue to decline during 2018 due to the material negative conditions affecting operations at the Nevada Mines, as confirmed by CIs 1-14, and in contrast to improving shareholder equity value, the acquisition of the Nevada Mines and its attendant material negative conditions was, in fact, an equity-destroying transaction.

127.    On August 9, 2018, Defendants caused Hecla to file its quarterly report for the quarter ended June 30, 2018 with the SEC on Form 10-Q (the "Q2 2018 10-Q"), which was signed by Defendants Baker and Hall.  Item 303 required the Q2 2018 10-Q's MD&A section to disclose: (i) unusual events, transactions or significant economic changes that materially affected the amount of Hecla's reported income from continuing operations and the extent of such changes; and (ii) known trends or uncertainties reasonably expected to have a material impact on the Company's net sales or revenues or income from continuing operations.  The ongoing material negative problems that at this time were negatively affecting operations, production, costs and cash flows, and that were trending negative, as alleged in paragraphs 13, 56, 58-59, 64-88, were unusual events and transactions, significant economic changes, and known trends and uncertainties (as confirmed by

CIs 13 and 14) that were required to be disclosed under Item 303 because they were known to Defendants at that time and likely to (and did) have a material unfavorable impact on the Company's net sales, revenues and income from continuing operations.

128.    The Q2 2018 10-Q incorporated by reference the risk warnings set forth above in the Q1 2018 10-Q.

129.    Defendants Baker and Hall's purported warnings about future potential risks were materially false and misleading because at this time these risks had already materialized as alleged in paragraph 111-12.

130.    On October 3, 2018, Defendants caused Hecla to disseminate to investors a Corporate Update" titled "Near-Term Value Drivers" at the Deutsche Bank Annual Leveraged Finance Conference that represented "Fire Creek Vein Networks Offer Extensive Opportunities . . . *Current reserves and resources provide mining inventory out to 2023*" and that Hecla "[r]ecently acquired *high grade gold mines in Nevada*"

131.    Defendants' representations were materially false and misleading because in September 2018, Defendant Baker and senior Hecla management were told at a budget meeting by Nevada Mines executives that the Nevada Mines LOM—which provides an estimate of the amount of inferred and proven reserves left to mine—was not five years, but, in fact, was three years, and that substantial and uneconomic capital and operational costs would have to be incurred to extend the life of mine, as confirmed by CI 14. Defendants' representation that the Nevada Mines were "high grade" was materially false and misleading for the reasons delineated in paragraph 116.

132.    On November 8, 2018, Defendants caused Hecla to issue a press release in which it disclosed the Company's reported financial results for the third quarter of 2018 ended September 30, 2018.

133.    The November 8, 2018 press release represented that at Fire Creek "[t]he mining of select high-grade zones has been moved from Q3 2018 into 2019 as the ore extended vertically farther than expected, and development is needed for full extraction of the ore panels."

134.    Defendants' representations were materially false and misleading and failed to disclose material adverse facts because, while Defendants announced mining of certain zones was being moved to 2019, Defendants failed to disclose the true reasons for the delay. In truth, Defendants had encountered uneconomic, low grade ore and were experiencing material production problems as a result of excess water that could not be discharged under permit limits, as alleged in paragraphs 13, 56, 58-59, 64-90. Indeed, as observed by CI 8, during a meeting in which Defendant Radford participated, CI 8 learned that mining of certain areas at Fire Creek was delayed, that the cause of such delay was the build-up of excessive water within the mine and uneconomic ore, and that given the lack of high-grade ore and excess water, positive cash flow and profitability from the Fire Creek mine was at least a year or more away. Furthermore, Defendants drilling encountered a large cave void where gold ore had been expected, resulting in a loss of $20 million in cash flows, as confirmed by CI 13. Defendants' representation that the Nevada Mines contained high grade gold ore was materially false and misleading for the reasons delineated in paragraph 116.

135.    The November 8, 2018 press release quoted Defendant Baker as representing "we don't believe we will need to make significant new financial investment to put the mine on the same improvement path that we have seen at Greens Creek and Casa Berardi . . . ." Also on November 8, 2018, during the Individual Defendants' conference call with investors and analysis, Defendant Baker falsely and misleadingly represented that the Nevada Mines "***are going to generate the cash flow necessary for it to do the ramp up of development in 2019***. . . ." and that "we're not anticipating the need to make significant contributions into Nevada, right? I mean, ***we see Nevada***

*being able to largely pay for the Hatter Graben, to pay for the development within Fire Creek.  I mean, we think we can run it pretty close to cash flow neutral.* And that is what we have suggested we would be able to do."

136.    Defendant Baker's representations were materially false and misleading because they gave investors the false impression that the Nevada Mines would not require new financial investment to generate positive cash flows as had reportedly occurred at the Company's Greens Creek and Casa Berardi mines.  In sharp contrast, Baker was told the opposite at the September 2018 budget meeting, specifically that substantial and uneconomic capital and operational costs would have to be incurred to extend the life of mine, as confirmed by CI 14, and that the LOM had in fact declined 40%.  Furthermore, Defendants Baker's representations were materially false and misleading because he failed to disclose that material, negative problems were negatively affecting operations at that time (¶¶ 13, 56, 58-59, 64-90), including uneconomic refractory ore, that the excess water problem was growing worse that had caused production delays and could not be avoided due to permit limits, and that the Nevada Mines did not have the required permitting and infrastructure to handle the excess water. As a result, Defendant Baker had no reasonable basis to represent that the Nevada Mines would operate cash-flow neutral or that the cash flow from the Nevada Mines could pay for the exploration and production of Hatter Graben.

137.    During the conference call with analysts and investors, Defendant Radford represented "we encountered existing poor ground conditions, many development phases were in unconsolidated tuff, which is basically clay-rich, had *a little bit of water* and the conditions turn to [mush]", and that "Hecla is in a process of creating budgets for 2019, and *our goal for Nevada operations is that the operations are cash-neutral*, *including* Hatter Graben development and *the Fire Creek development ramp-up. . .*".

138.    Defendant Radford's representations were materially false and misleading because he misleadingly downplayed the severity of the material excess water problems that Defendants encountered, which could not be discharged due to permit limitations, and that were negatively affecting production by representing that the Company was "managing" the conditions, and further, he failed to disclose that, far from "a little bit of water", Defendants were experiencing material production problems as a result of excess water, which could not be discharged under permit limitations, as alleged in paragraphs 13, 56, 58-59, 64-90 and confirmed by CIs 1-14.  Moreover, contrary to Defendant Radford's representation that the Nevada Mines were expected to be cash-neutral as the Company ramped up production, given the refractory ore and excess water that could not be discharged due to permit limitations, positive cash flow and profitability from the Fire Creek mine was at least a year or more away as confirmed by CI 8, and further, Defendants drilling encountered a large cave void where gold ore had been expected, resulting in a loss of $20 million in cash flows, and that cash flows were declining and costs were increasing, as confirmed by CI 13.

139.    During the November 8, 2018 conference call with investors and analysts, Defendant Hall explained that in early November 2018, the Company's revolving line of credit "increased to $250 million from $200 million, as per our agreement with the banks when we acquired the Nevada operations."  Also during the November 8, 2018 conference call, Defendants Baker and Hall discussed the refinancing of Hecla's debt, which was targeted for in or after May 2019, and the importance of the Nevada Mines to Defendants efforts to refinance Hecla's debt at a lower rate:

> [Defendant Baker:] if we were to take that debt out today, we would have to pay a premium . . . so the first thing when we think about it is, we think it's a May [2019] event, no earlier than May of next year . . . .
>
> It's going to be an EBITDA to debt measure. And we're going to be roughly speaking around two times.  And if we show consistently, they [rating

agencies] should be getting more comfortable. We now have more operations.  One of the complaints they had was, we didn't have enough operations. And like okay well now we've got some more and we now have some more EBITDA. So that's what we're hanging our hat on . . . .

140.    On November 8, 2018, Defendants caused Hecla to file its quarterly report for the quarter ended September 30, 2018 with the SEC on Form 10-Q (the "Q3 2018 10-Q"), which was signed by Defendants Baker and Hall.  Item 303 required the Q3 2018 10-Q's MD&A section to disclose: (i) unusual events, transactions or significant economic changes that materially affected the amount of Hecla's reported income from continuing operations and the extent of such changes; and (ii) known trends or uncertainties reasonably expected to have a material impact on the Company's net sales or revenues or income from continuing operations.  The ongoing material negative problems, as alleged in paragraphs 13, 56, 58-59, 64-90, that at this time were negatively affecting operations and cash flows and trending negative were unusual events and transactions, significant economic changes, and known trends and uncertainties (as confirmed by CIs 13 and 14) that were required to be disclosed under Item 303 because they were known to Defendants at that time and likely to (and did) have a material unfavorable impact on the Company's net sales, revenues and income from continuing operations.

141.    The Q3 2018 10-Q incorporated by reference the risk warnings set forth above in the Q1 2018 10-Q.

142.    Defendants Baker and Hall's purported warnings about future potential risks were materially false and misleading because at this time these risks had already materialized as alleged in paragraphs 111-12.

143.    On November 9, 2018, Defendants caused Hecla to disseminate to investors a Corporate Update titled "Creating Value Through Innovative Mining" that represented "Fire Creek

Vein Networks Offer Extensive Opportunities . . . ***Current reserves and resources provide mining inventory out to 2023"*** and that Hecla "[r]ecently acquired ***high grade gold mines in Nevada***".

144.    Defendants' representation was materially false and misleading for the reasons delineated in paragraph 131.

145.    On December 4, 2018, the Company held a conference call at the Bank of America Merrill Lynch Leveraged Finance Conference during which Defendant Hall stated, in part:

> ***There's no major capital expenditures that we can't fund out of the Nevada operations***. So we're really quite pleased with the transaction.

(Emphasis added).

146.    By this point in time, Defendants had been operating the Nevada Mines for several months and had been informed by Nevada Mines executives of material negative problems that were negatively affecting operations, production, costs and cash flows, and were growing worse, as alleged in paragraphs 13, 56, 58-59, 64-90.  Accordingly, Defendant Hall's representation were materially false and misleading for the reasons delineated above in paragraph 136.

147.    On December 10, 2018, Defendants caused Hecla to disseminate to investors a Corporate Update titled "Creating Value Through Innovative Mining" that represented "Fire Creek Vein Networks Offer Extensive Opportunities . . . ***Current reserves and resources provide mining inventory out to 2023"*** and that Hecla "[r]ecently acquired ***high grade gold mines in Nevada***".

148.    Defendants' representation was materially false and misleading for the reasons delineated in paragraph 131.

149.    On January 22, 2019, Defendants caused Hecla to disseminate to investors a Corporate Update" titled "Creating Value Through Innovative Mining" that represented "Fire Creek Vein Networks Offer Extensive Opportunities . . . ***Current reserves and resources provide***

*mining inventory out to 2023"* and that Hecla "[r]ecently acquired *high grade gold mines in Nevada*".

150.    Defendants' representation was materially false and misleading for the reasons delineated in paragraph 131.

151.    On January 23, 2019, Defendants caused Hecla to disseminate to investors a presentation titled "Hecla Mining Company at CIBC Annual Whistler Institutional Investor Conference" that represented  "Mine Life . . . Mine Life at our most important mines are long *and getting longer*."

152.    Defendants' representation was materially false and misleading for the reasons delineated in paragraph 131.  In truth, the LOM at the Nevada Mines, of which Fire Creek was the purported cornerstone property that Defendant Baker likened to Hecla's other cash flow producing mines, was not getting longer, but, in fact, had contracted by 40%, a fact that was disclosed to Defendant Baker no later than the September 2018 budget meeting.

## VIII.    THE TRUTH BEGINS TO EMERGE THROUGH A SERIES OF PARTIAL DISCLOSURES

153.    On February 21, 2019, before the market opened, Defendants caused Hecla to issue a press release that was filed with the SEC on Form 8-K reporting the Company's financial results for the quarter and year ended December 31, 2018.  Also on February 21, 2019, Defendants conducted a conference call with investors and analysts.  In the February 21, 2019 press release and during the conference call with investors in which Defendants Baker, Hall, Radford, and McDonald participated, Defendants partially disclosed the undisclosed material adverse facts concerning the Nevada Mines that existed since the beginning of the Class Period.  Defendants Baker and Hall reported that Defendants had experienced "challenges" with the conditions at the Nevada Mines, including "reserve losses"—in direct contrast to Defendants' representations that the reserves at the

Nevada Mines (LOM) were five year and getting longer—and "higher costs while we worked through what we believe are transitional issues."  Defendants further disclosed that the Nevada Mines production during the period after the acquisition through the end of 2018 was just 32,887 gold ounces.

154.    In particular, Defendants identified challenges where Defendants encountered "tuff" material, or soft clay, that when combined with water, required additional support and higher costs from additional equipment.

155.    Furthermore, Defendant Hall disclosed that "[w]e have a goal of financial discipline in which each of our mines should produce free cash flow and clearly that didn't happen with our Nevada operations that we acquired effective July of this last year."

156.    On February 21, 2019, Hecla stock declined from a closing price on February 20, 2019 of $2.93 per share, to close at $2.74 per share, a decline of $0.19 per share or approximately 7% on heavier than usual volume.

157.    However, as alleged below, Hecla's stock continued to trade at artificially inflated prices because Defendants mislead investors by presenting the problems at the Nevada Mines as "transitional" and by downplaying the severity and persistence and endemic nature of the material negative problems then plaguing the Nevada Mines that were negatively affecting operations, production and costs, including lack of permits to handle the water discharge and inadequate infrastructure and workforce, and uneconomic refractory ore, as alleged in paragraphs 13, 56, 58-59, 64-92 and because Defendants continued to misleadingly represent that Hecla had acquired "high grade" gold ore mines.

158.    The February 21, 2019 press release represented that "[u]nderground drilling at Fire Creek *is identifying extensions to the Vonnie, Joyce*, Karen and Honey Runner *high-grade*

*veins/structures* in the Spiral 2, 3 and 4 areas" and "[t]he drill targeting the southern up-dip extents of the ***Vonnie, Vein 6, Joyce, and Vein 8 has defined multiple narrow, gold-bearing structures that persist into the upper extents of the Spiral 4 area***."

159.    Defendants' representations were materially false and misleading and failed to disclose material adverse facts because the Vonnie and Joyce veins/structures did not contain high grade gold ore and were uneconomic.  According to CI 10, during the fall of 2018, Hecla began to further explore the Joyce and Vonnie veins at Fire Creek, and upon commencement of mining the top two layers, staffers concluded the high-grade ore was not there, which meant these veins were not able to produce profitable material at that time.  Moreover, according to CI 13, Defendants encountered a large cave void where gold ore had been expected resulting in the loss of expected gold ore of 20,000, or a loss of approximately $24 million in cash flows.

160.    Furthermore, on the February 21, 2019 conference call, Defendant Baker falsely represented "what we've said is, is that the operations will be cash flow positive with exception of the exploration and the development for the Hatter Graben. So when you look at – and so basically we're saying that ***we're right at positive cash flow from Nevada***. And if you look at the all-in sustaining costs, you'll see that."  Furthermore, Defendant Hall represented "[w]e expect in 2019, the Nevada mining operations ***will be cash flow positive***, but we'll invest those cash flows and more in exploration around the various Nevada mine sites and the development of the Hatter Graben decline."

161.    Defendants Baker and Hall's representations were materially false and misleading because Defendants failed to disclose that they did not possess the permitting and infrastructure needed to remediate the excess water, that the Nevada Mines did not possess the equipment, workforce and infrastructure needed to generate positive cash flows, and Fire Creek contained

uneconomic refractory ore for which Defendants did not have the means or methods to profitable mine.  Moreover, at this point, Defendants knew or recklessly disregarded that the negative trends in production and cash flows at Nevada Mines were budgeted to continue in 2019.

162.    Also on the February 21, 2019 conference call, Defendant Radford's representation that "we're looking at a bit more of a mobile dewatering plant, so that we're not managing the water underground" was materially false and misleading because he failed to disclose that by that time, Fire Creek's reverse osmosis water treatment plant was experiencing difficulties treating the flow of the mine-dewatering.  Additionally, Defendant Radford failed to disclose that in or around January 21, 2019, the leak at Fire Creek's Dewatering Storage Pond, which was leaking since 2017, began leaking more water than allowed by permit.  In order to make repairs to the pond, Hecla planned to drain the pond to identify and repair tears and holes.  However, draining the pond would exceed all available surface storage capacity available at Fire Creek.  As a result, Hecla began to ship water at great expense from the dewatering storage pond at Fire Creek to the Midas mine.  Thus, Radford misled investors about the permit limits that hampered water removal and that this material negative condition was increasing costs and draining cash flows.

163.    During the February 21, 2019 conference call, one analyst asked whether Defendants were going to have a "site visit" to make it "simpler to understand some of the stuff that's been discussed on the call."  Defendant Baker suspiciously responded:

> We haven't made any specific plans at the moment.  I want Larry [Radford] and his team to have the opportunity to get their SOPs for the development and the different conditions resolved before we start bringing people on to the site.  So while we're still in the learning phase, it's probably better to wait.

164.    On February 22, 2019, Hecla filed its Annual Report with the SEC on Form 10-K for the year ending December 31, 2018 ("2018 10-K"), which was signed by Defendants Baker and

Hall.  Item 303 required the 2018 10-K's MD&A section to disclose: (i) unusual events, transactions

or significant economic changes that materially affected the amount of Hecla's reported income

from continuing operations and the extent of such changes; and (ii) known trends or uncertainties

reasonably expected to have a material impact on the Company's net sales or revenues or income

from continuing operations.   The ongoing material, negative problems that at this time were

negatively affecting operations, productions, costs and cash flows, and that were trending negative,

as alleged in paragraphs 13, 56, 58-59, 64-92, were unusual events and transactions, significant

economic changes, and known trends and uncertainties (as confirmed by CIs 13 and 14) that were

required to be disclosed under Item 303 because they were known to Defendants by at least the

beginning of the Class Period and likely to (and did) have a material unfavorable impact on the

Company's net sales, revenues and income from continuing operations.

165.    In addition, the 2018 10-K represented that certain risks "may" or "could" adversely

impact Hecla's business in the future, including the following potential risks that had already

occurred:

- "Our costs of development of new orebodies and other capital costs *may* be higher and provide less return than we estimated"; and

- "We *may* not realize all of the anticipated benefits from our acquisitions, including our recent acquisition of Klondex".

166.    These representations were materially false and misleading at the time they were

made because while Defendants purported to warn that these risks "*may*" occur in the future, the

2018 10-K failed to disclose that these potential risks had *already* occurred.  The 2018 10-K's

failure to disclose the material negative problems plaguing the Nevada Mines, as confirmed by CIs

1-14, and that the Nevada Mines cash flows had been trending negative throughout 2018 and were

budgeted to continue to materially decline, which rendered Hecla's boilerplate disclosures of

potential adverse events that could occur in the future, and which applied to virtually any company, materially misleading. By this point in time, in light of the ongoing material negative conditions plaguing the Nevada Mines, Defendants knew, or recklessly disregarded, that the Nevada Mines were not cash flow positive and would continue to burn cash due to the ongoing material, negative conditions and that the acquisition of the Nevada Mines was an equity-destroying disaster for the Company. Rather than providing any benefit, the acquisition of the Nevada Mines saddled the Company with assets that were cash flow negative and that drained capital, and required major capital investment to rehabilitate and required substantial investment of operational costs, all of which would further reduce cash flows.

167. On March 22, 2019, Defendants caused Hecla to disseminate to investors a Corporate Update titled "Creating Value Through Innovative Mining" that represented that Hecla "[r]ecently acquired **high grade gold mines in Nevada**".

168. Defendants' representation was materially false and misleading for the reasons delineated in paragraph 131.

169. On April 18, 2019, at the opening of the market, Defendants caused Hecla to issue a press release that stated, in part, that "[a] **minor amendment to the water discharge permit for Fire Creek is expected in the second quarter which should enable a higher discharge rate**."

170. On April 18, 2019, Hecla shares declined from a price at the opening of the market of $2.28 per share, to close at $2.15 per share, a decline of $0.13 per share of approximately 6% on heavier than usual volume.

171. However, Defendants' partial disclosure was materially false and misleading because Defendants' created the misimpression that the Nevada Mines' water discharge problems were minor. On the contrary, Defendants at this time knew, or recklessly disregarded, and failed

to disclose, that the Nevada Mines had been experiencing material problems with excess water that grew worse throughout the Class Period and would require major capital investment to repair and build, as alleged in paragraphs 13, 56, 58-59, 64-92 and further knew or at least recklessly disregarded for at least one year (since due diligence), that permitting limits concerning the removal of water at Fire Creek were hampering production and would continue to hamper production. Indeed, by this time Defendants knew or recklessly disregarded that efforts to work around the permit limits had failed and drove up costs and drained cash: 1) Fire Creek's reverse osmosis water treatment plant was experiencing difficulties treating the flow of the mine-dewatering; 2) Fire Creek's Dewatering Storage Pond, which was leaking since 2017, had been leaking more water than allowed by permit.  In order to make repairs to the pond, Hecla planned to drain the pond to identify and repair any tears and holes.  However, draining the pond would exceed all available surface storage capacity available at Fire Creek.  As a result, Hecla had been shipping water at great expense from the dewatering storage pond at Fire Creek to the Midas mine; and 3) the RIBs at Fire Creek were in poor condition, were ineffective in managing excess water, and needed to be redesigned and rebuilt, a major capital expense.

172.    Then, on May 9, 2019 Hecla shocked investors when, before the market opened, Defendants caused the Company to issue a press release entitled "Hecla Reports First Quarter 2019 Results" with the subheading, "Nevada operations under review," in which the Company disclosed a comprehensive review of its Nevada Mines and the suspension of annual production and cost estimates for its Nevada operations.  Specifically, the May 9, 2019 press release disclosed that the Nevada Mines were cash flow negative:

> Mr. Baker continued, "While Nevada operations had better development advance rates, **the operating metrics, including cost, grade and negative cash flow**, were unacceptable.  We are reviewing our Nevada operations to determine the best path forward

> and expect results of this review in the second quarter.  In the meantime, **we are suspending our annual Nevada estimates for production and cost.**
>
> * * *
>
> The annual production and cost outlook have been suspended for Nevada pending the results of the comprehensive review.

(Emphasis added).

173.    Also, on May 9, 2019, during a conference call with investors in which the Individual Defendants participated, Defendant Baker made the following disclosures concerning the rationale for the review of the Nevada Mines and suspension of outlook for those operations.  Far from being transitional issues as Defendants misleadingly stated in February 2019, Baker disclosed the full extent of the persistent material negative conditions and struggles facing the Nevada Mines:

> **A year ago when doing the due diligence, we recognized certain problems with Fire Creek dealing with the tuff material, managing the water, equipment availability, getting enough development to have consistent production, lack of characterization of ore types.**
>
> And while we've made progress in dealing with the issues we saw the short answer is it's not been enough. The advance rate has increased, but the mill tonnage decreased by a similar percentage in the last quarter.
>
> And while we've done things to manage the water, **the amount of water has increased, making the conditions worse. This has limited our access**, and while they're not insurmountable and not a large amount of dollars, **they will require quarters to construct some infrastructure and get some permit limits changed.**
>
> **Characterization of ore types has taken certain areas out of the plan**, so we will determine the best way to process them.
>
> We still believe in the potential of Fire Creek, but given the **ongoing challenges**, we're evaluating if there is a better way to go forward since our original plan is not making enough progress fast enough.

So over the next few weeks or months, **we are reviewing the Nevada operations to determine how we can improve the economics** in both the short and the long term.

This process is really maintaining our discipline and capital allocation, we're really just asking the question, **are we going to get the return for the investment we're making**. Since we don't know the outcome of the review, we are suspending guidance until we do. . . .

(Emphasis added).

174.    Defendant Radford disclosed the following on the May 9, 2018 conference call:

To begin with, I want to go into a bit more detail on the challenges in Nevada that we've mentioned. . . . To compensate for these issues, mining of previously developed remnants stopes at the Midas mine has resumed. Nevada costs were considerably higher than what we forecasted as noted earlier. **To this end we will have our development contractor demobilized by next week**. In addition, we have put together a revised mine plan, which incorporates a higher cutoff grade and **reduces development**. **Another challenge that we realized in the first quarter or in the Northeast section of the mine was determined to be refractory. This order was never in the 2019 production estimate. An investigation is underway to determine how much of this ore we will encounter in the future and what our options are for processing the ore. . . .**

(Emphasis added)

175.    Defendant Baker's and Radford's disclosures, while disclosing material negative conditions at the Nevada Mines, attempted to create the impression that the challenges had recently been discovered, which was not true.  During due diligence Defendant Radford was informed by Klondex executives that water permits limited water removal and hampered production, and that there was refractory gold ore to the north at Fire Creek, and that gold production was declining and costs were increasing.

176.    Several analysts posed questions indicating their surprise and astonishment at the severity of the problems that had not previously been disclosed and were incredulous of Defendants' purported surprise and excuses.  For example:

> [J.P. Morgan Analyst John Bridges]:  Just wondered if you could give us a bit of color on what the problems actually are in Nevada? We heard about the water.  You're waiting on some permits, is that part of it?
>
> And you say you've demobilized the contractor. Does that mean that you stopped advancing the exploration terminals which were **related to the upbeat comments that you've been giving as on exploration success**? I'm just a bit confused here.
>
> [Defendant Baker]:  Sure. With respect to the water, what it has done **is it's limited places that we're able to go in the mine because we cannot deal with the water fast enough to be able to effectively move forward**. **So our advance rate really slows down and our ability to mine in those areas slows down**. . . .
>
> [Defendant Radford]: Well **we are working on expanding our permitted water discharge limit** and . . . Right now we're using reverse osmosis, which is **slow and expensive** and very sensitive to fines.   **We're looking at an alternative process which could increase our discharge without a lot of expense.** There's a lot of work going on behind the scenes on the water. . . .
>
> [Defendant Baker]: I think certainly water is a big element of it, and it's not a huge amount of water, **but it's enough where there is inadequate infrastructure to deal with it.  And it has grown from where it was when we were doing the due diligence.** So that would be number one.
>
> And number two, **we have not seen the relative productivity that we were anticipating** . . . what it comes down to is **we're not getting enough tons moved for the dollars that we're spending**. . . .
>
> [Defendant Baker]: **we still had a problem with dealing with the RIBs** and the back and some of the problem of getting the advanced rate that we were looking for. And then you couple that with the fact that **these inferred areas did not upgrade as we were anticipating that they would upgrade**.  And so those two things caused -- **you had more cost and you had less revenue is really how it came out**. Larry?

[Defendant Radford]: Yes, I mean to be fair to the contractor, there have been periods where they've had to grout the water, which is basically not advancing when you're grouting. **But nonetheless, when we look at it on a per foot basis the contractors performance has not been -- we inherited this contract from Klondex. It's not where we want it to be and it's time to get control of it.**

[Trevor Turnbull, Scotiabank Global Banking and Markets, Research Division – Analyst]: Okay. It seems that in maybe hindsight that those were kind of too somewhat aggressive or wishful thinking that you could get contractors to kind of be more productive. I understand if it was your own crews maybe versus the other owner crews –

[Defendant Radford]: It was ours as well Trevor, wasn't just contractor. **We haven't seen the productivity from ours as much as we thought we would.**

[Trevor Turnbull, Scotiabank Global Banking and Markets, Research Division – Analyst]: . . . how much is kind of in your internal mine plan that is over and above the actual reserves?

[Defendant Baker]: *[We realize] that the reserve only provides for about a year and a half of mine life.* Remember, that's – it's quite small. . . . *it's just we're not seeing the results out of Fire Creek, hoping we would have early stages of this*. . . .

(Emphasis added).

177.    Regarding the refractory ore types Defendants encountered at Fire Creek, Defendants McDonald and Baker explained:

[Defendant McDonald]: Well, what we're seeing is that the type one ore, which **historically** is what's been mined. Those are very discrete veins. The host rock is dominantly basalt and so we continue to drill that type of ore. But what we're starting to see is, call it, a mixed stone. We're now getting into or at least in the areas where the basalt is mixed with other volcanics. **And so what happens is that the tenor of the mineralization changes. It's less discrete veins. It's more clay alteration,** a bit amorphous sulphides, and **so that's the area that we're coming to terms with in terms of recoveries continuity of grade. . . .**

> [Defendant Baker]: And so we're having to figure out where that is
> and then to the extent we have found where that is and **how do we
> process it.**

(Emphasis added).

178.    On May 9, 2019, the price of Hecla's common stock declined from a closing price

on May 8, 2019 of $2.04 per share to close at $1.77 per share, a decline of $0.27 per share, or

13.24% on heavier than usual volume.

179.    Following the May 9, 2019 disclosures, analyst reports indicated surprise over the

disclosed material problems at the Nevada Mines.  For example, a Cantor Fitzgerald report dated

May 9, 2019 stated as follows:

> Pencils Down in Nevada – **A plethora of challenges are facing
> Hecla at its Nevada operations.  These range from extra
> dewatering requirements, poor grade reconciliation relative to
> the mine plan, metallurgical challenges with refractory ore, and
> underperformance of the mining contractor, among several
> others.**  Hecla is in the process of completing a comprehensive
> review of its Nevada Operations that may result in a complete
> production shutdown across Fire Creek, Hollister, and Midas.

(Emphasis in original).

180.    On May 10, 2019, before the market opened, Hecla filed its quarterly report on Form

10-Q for the period ending March 31, 2019, which stated, in part, that because total production and

capital costs exceeded sales at the Nevada Mines:

> We are currently undertaking a review of spending at the Nevada
> operations which may result in the following changes at the Fire
> Creek mine: a reduction in capital spending; ceasing current
> production and only developing to spirals 9, 10 and 11; or a
> temporary cessation of all mine operations at Fire Creek. As a result,
> the values of certain components of properties, plants, equipment and
> mineral interests could be adjusted in the second quarter of 2019
> when we expect to finalize the allocation of the Klondex purchase
> price. The outcome of the review may constitute a triggering event
> requiring assessment of the carrying value of our long-lived assets at
> Fire Creek with the potential to impact near-term estimated cash

71

flows. . . . We may recognize an impairment, which could be material, if the carrying value of the assets exceeds the estimated future undiscounted cash flows expected to result from their use and eventual disposition. . . .

181.    On May 10, 2019, Scotiabank issued an analyst report titled "Fire Creek Flames Out: Downgrading" that stated, in part, the following:

> **Hecla reported its Q1 results, an adjusted loss of $18.5 million, and announced suspension of estimates for its Nevada operations pending a comprehensive review. This represents a complete reversal since the company paid $462 million for the high-grade assets from Klondex** . . . .
>
> **We are not confident the review over the next few months will change the prospects of Nevada as a self-funding entity.** In our opinion, the company needs to find alternative funding and **not depend on Fire Creek with its year's worth of reserves**. As to the issues at the mine, we think there was not enough focus on how things might go wrong. . . .

(Emphasis in original).

182.    On May 10, 2019, *Bloomberg News* reported that "Hecla Mining slumped almost 14% intraday Friday, touching the lowest since January 2016, as at least three analysts downgraded their investment opinion after the precious metal miner posted a lQ loss and failed to provide forward guidance for its Nevada operations."

183.    On May 10, 2019, Hecla's common stock declined from a closing price on May 9, 2019 of $1.77 per share, to close at $1.56 per share, a decline of $0.21 per share, or 11.86% on heavier than usual volume.

184.    Over two trading days, May 9-10, 2019, the price of Hecla's common stock declined by $0.48 per share, or approximately 24%, from a closing price of $2.04 per share on May 8, 2019, to close at $1.56 per share on May 10, 2019 on heavier than usual volume.

## IX.    POST CLASS PERIOD EVENTS

185.    On June 6, 2019, Defendants caused Hecla to issue a press release titled "Hecla

Reduces Spending For Nevada Operations" that stated, in part, the following:

> A review has been conducted of the Nevada operations and changes are being made with the goal of **turning it into a positive cash flowing unit**.
>
> The new approach is to mine the currently developed ore at Fire Creek. Mining at Midas is expected to continue through the end of the year, but Hollister will be shut down. . . .
>
> Third-party ore processing arrangements are also being pursued to try and reduce the transportation and milling costs. **This could include mills that can process ore that is considered refractory. With water discharge from Fire Creek more than double of a year ago, work is underway to increase discharge permits and change how the water is treated.**
>
> The Company is still committed to the exploration and definition of Hatter Graben, which is one of the key reasons the Nevada operations were acquired. However, **the level of development activity is being curtailed to reduce the cash consumption** . . . .

186.    Baker misleadingly presented the water conditions as unanticipated, when in fact they were a material hindrance to production at the Nevada Mines and a drain on cash flows from day one, and not an unforeseen development or condition, according to CI 13.

187.    Also on June 6, 2019, Defendants Baker, Hall and Radford participated in a conference call with investors and analysts, with Defendant McDonald conspicuously absent. Defendant Baker disclosed the following:

> You might recall we said our strategy was to develop and drill at Fire Creek. But that development drilling did not lead to the ounces and cash flow we expected. This has led us to reevaluate our plan in Nevada because we expect our assets to operate on a cash-positive basis, and **clearly, this one has not**. . . .
>
> we announced that we are focusing on mining at Fire Creek and pausing most of our development activities in Nevada **given the cash outflow the mines had since acquisition**.
>
> With the limited development we planned at Fire Creek, we expect to mine all of the development ore available for near-term

production primarily off of Spiral 2 by early 2020. Production is stopping from Hollister and is planned to continue at Midas only until year-end as we consolidate the workforce into Fire Creek.

**The steps we are taking have caused us to demobilize contractors**, which we've now completed and lay off about 25% of the Nevada workforce, which is being done today at a cost less than $1 million. **With this plan, we expect to produce about 60,000 ounces of gold for the year in Nevada**, about 10,000 in Q2, 38,000 in the second half of the year. . . .

We'll continue to work on how we should mine and process these ore bodies. **There's a lot of resource and mineralization that is relatively high grade, but the current cost per ton and development costs are too high**. . . .

We plan to continue to advance the work on permitting and hydrology. At Fire Creek, the water discharge in the first 5 months of this year is over 2x what it was over the same period last year. We currently have consumptive water rights for about 160 gallons per minute out of the mine and are working on strategies to allow higher flows up to about 400 gallons per minute based on our recent work in Spiral 4.

We are continuing to seek third-party processes for toll milling of our ore. We believe our material is a good fit for nearby mills in that we can utilize existing facilities, **potentially allowing us to reduce the transportation and milling costs**. . . .

So what went wrong? As we previously described, we expected the silling of the indicated resources to result in higher grades as was **historically** the case on the project and that an increase in development will allow an increase in throughput lowering the cutoff grades. **This hasn't proven to be the case in the new areas of the mine. And were seeing more refractory ore and poor ground conditions than initially encountered.**

While we recognized some of these issues as is typical with any acquisitions, we could -- we believed we could bring improvements and still do.  But these issues were more challenging and take more time and study than we thought. . . .

**What has changed is mining at Fire Creek, which had very little reserves.** We have not finished evaluating how we can approach Fire Creek with the improvements that we think can be done. . . .

74

We are now reducing our annual company-wide estimates for capital expenditures by $12 million, exploration by $9 million and G&A and other expenditures by $4 million. **So we estimate this will improve our cash flows by $25 million in 2019. . . . The capital expenditure reductions are primarily in Nevada**, but we expect there will also be a little less in each of the other operations. While we have cut back, we still have room to reduce costs more if necessary. The $25 million reduction in expenditures should help us in our goal to operate at close to a cash-neutral basis during this time of relatively weak prices. . . . .

In 2021, our bonds come due, and last month was our first opportunity to call the bonds at par. Over the past 4 months, we have met with a number of bond funds, some more than once, to determine the level of interest. And we hope over the second half of the year to demonstrate Hecla's cash flow generation potential, which we believe will help the potential refinance of the bonds. However, if the bond market doesn't have enough appetite to place all the bonds or if the coupon is too expensive and we decide to refi, then Hecla would have a number of potential options.

188.    During the question and answer portion of the conference call, Defendants Radford and Baker stated the following:

[Defendant Radford]: **we need to understand metallurgy better. We're working on that and looking at options for potential alternate processing**.

[Trevor Turnbull - Scotiabank Global Banking and Markets, Research Division – Analyst]: Okay. And I know you guys are looking, I think, to take it up to 400 gallons a minute. What's the timing on -- or what's your anticipation of kind of getting to that per minute level -- the permitting process itself?

[Defendant Baker]: Yes. **So it's still a work in progress**, and we were meeting yesterday on that. And I don't think the time lines have been sort of finalized by any means. **We have to make the decision if we'll spend the dollars associated with it**. Larry, what would you add?

[Defendant Radford]: **Well, there's a permit in process now that'll take us from 100 gpm up to about 160**. . . . And that's pretty simple, we think. To get up around 400, we're talking -- permits -- our environmental team's looking at a nonconsumptive water right, which is the first step. And that may take some time. **We're just**

>>> **starting that process now.**
>>>
>>> [Defendant Radford]: The water that we've encountered is perched water basically. So it will drain down. But what happens is as we expand north and south, we open up more perched water area. So we believe that -- or we have a model, I should say, that indicates that about 400 gpm will be the peak. . . .

189.    On June 6, 2019, Cantor Fitzgerald issued an analyst report that stated, in part, the following concerning Defendants' disclosure:

>>> Stopping all excess mine development in 2019 is a **desperate move**, and is effectively just deferring this cost until a later time. As such, we are reducing our 2020 production estimates and increasing our 2020 cost estimates for the Nevada operations.

190.    On June 14, 2019, Defendants caused Hecla to disseminate to investors a Company Overview titled "Creating Value Through Innovative Mining" that materially changed how Defendants represented the Nevada Mines to investors from "[r]ecently acquired high grade gold mines in Nevada" as had been done during the Class Period to "Recently acquired 110 square miles of prospective land **with a history** of high grade gold mines in Nevada", in effect admitting that the Nevada Mines do not have high grade gold ore due to the uneconomic refractory gold ore of which Defendants were directly informed during due diligence (November 2017 through March 2018) for which Defendants did not have the means or methods to process profitably.

191.    Also on June 14, 2019, recognizing that Defendants' representations concerning the Nevada Mines cash flows had been presented falsely, S&P downgraded Hecla issuer-credit rating and its credit rating on its senior notes due to, in material part, the decrease in development at the Nevada Mines.  According to S&P Global Market Intelligence:

>>> S&P Global Ratings on June 14 downgraded Hecla Mining Co.'s issuer credit rating and its issue-level rating for its senior notes to B- from B+ after the company scaled back development at its Nevada operations on the back of lower-than-expected production.

The ratings agency's negative outlook reflects its expectation that the silver and gold producer's leverage at a now forecast 5x, previously 2.5x, would make it difficult for Hecla to refinance its US$500 million in senior notes due in May 2021.

S&P Global Ratings reduced Hecla's liquidity assessment to less than adequate from adequate based on these potential refinancing challenges.

Additionally, the rating agency expects the company to face diminishing profitability at the end of 2019 due to rising costs.

192.    Similarly, on June 20, 2019, Moody's downgraded Hecla's credit rating because, far from being accretive, Hecla's operating and credit metrics deteriorated substantially as a result of acquiring the Nevada Mines, issuing a press release that stated, in part, the following:

Moody's Investors Service ("Moody's") downgraded the Corporate Family Rating of Hecla Mining Company (Hecla) to Caa1 from B2, the probability of default rating to Caa1-PD from B2-PD and senior unsecured notes to Caa2 from B3. Moody's also downgraded the Speculative Grade Liquidity rating to SGL-3 from SGL-2. . .

The rating takes into account a substantial uncertainty over the economic viability of the company's Nevada assets . . . **Hecla's operating and credit metrics deteriorated substantially since the July 2018 $414 million acquisition of Klondex Mines with its properties in Nevada.** The acquisition consumed a substantial portion of Hecla's cash and raised the company's overall cost profile. Since the acquisition, Hecla invested a significant amount of capital into Nevada assets aiming to develop the underground infrastructure, upgrade resources into reserves, and improve productivity, mining rates and mill throughput. However, the company has encountered a number of unexpected operating issues, particularly at the Fire Creek mine, including **high water discharge levels, lower than expected grades and recoveries, slower than planned development rates and higher than anticipated amount of refractory ore, amongst other challenges**.

193.    In July 2019, Hecla entered into an amendment to its credit facility that, among other things, lowered the amount available that Hecla could borrow to $150 million.

194.    On August 7, 2019, the Company issued two reports filed with the SEC on Form 8-

K disclosing that Defendant Radford resigned as Senior Vice President and Chief Operating Officer, effective August 5, 2019, and would continue as the Company's Senior Vice President and Chief Technical Officer, and that McDonald notified the Company that he intends to retire as Senior Vice President – Exploration of the Company as of September 30, 2019.  By the end of 2019, Defendant Radford resigned from the Company.

195.    Also on August 7, 2019, Defendants caused Hecla to file a report with the SEC on Form 8-K and issue a press release reporting the Company's financial results for the quarter ended June 30, 2019.  The press release stated, in part, the following concerning the Nevada Mines:

> **With water discharge from Fire Creek higher than it was a year ago, work is underway to increase discharge permits**, expected to be obtained in the near future and increase non-consumptive water rights, **expected within approximately one year**. These changes, combined with changing how the water is treated, are important steps towards addressing the increase in water inflow expected when the mine expands north and southwards.

(Emphasis added).

196.    Also on August 7, 2019, the Individual Defendants conducted a conference call with investors and analysts to discuss the Company's financial results for the quarter ended June 30, 2019.  Defendant Baker admitted that the Nevada Mines were hemorrhaging cash since Hecla acquired the properties and essentially admitted that Defendants' representations that the Nevada Mines were self-funding were false and misleading at the time they were made:

> [Defendant Baker] . . . So in this third quarter, **for the first time since the acquisition of Klondex a year ago, our plans show us generating more cash than we spend** . . . .
>
> [Defendant Radford]:  . . . we have nearly stopped all development. Our plan is to mine out Fire Creek by the middle of next year . . . .
>
> Among the issues we face in Nevada is water. . . **We are more focused on ensuring that our permits are sufficient to match the expected water outflow**. . . **The process of obtaining this water**

**right is expected to take 12 months.**

(Emphasis added).

197.    On August 8, 2019, Defendants caused the Company to file its quarterly report for the quarter ended June 30, 2019 with the SEC on Form 10-Q ("Q2 2019 10-Q") that stated "total production and capital costs have exceeded sales at our Nevada operations **since the acquisition** . . .". (Emphasis added).  Further, the Q2 2019 10-Q stated that the Company's changes to the operational plans at the Nevada Mines "represented a triggering event requiring an assessment of recoverability of the carrying value of our long-lived assets."  While the Company determined that carrying value assessment indicated no impairment as of June 30, 2019, Defendants, however, explained that the assessment assumed that resumption of previously-anticipated production levels at Nevada will take place in 2021 upon "the resolution of operational issues."  However, Defendants warned that there can be no assurance that any of the operational issues at the Nevada Mines will be resolved by 2021 "or ever".

198.    On December 3, 2019, Defendant Baker participated in Bank of America Merrill Lynch's Leveraged Finance Conference, during which the following statements were made:

> [Defendant Baker]: And then finally, at Nevada, . . . we bought this. We attempted to take this plane that was flying and **redesign it and rebuild it in the air, and it was just costing us way too much money**. So we've landed the plane, and we're going to do the studies necessary to restart it, where we're **assured** of the profitability of the mine . . .

(Emphasis added).

199.    On February 6, 2020, Defendants Baker and Hall conducted a conference call with investors and analysts to discuss the Company's financial results for the quarter and year-ended December 31, 2019.  Defendant Hall stated the following concerning the Nevada properties:

> **We also need a means of processing refractory ore**, which would

require third-party processing agreements, and we would expect a restart to require a permitting cycle. **These actions will take time, but it is important for us to get them right.**

(Emphasis added).

200.     Analyst reports issued after the Company's February 6, 2020 conference call noted that production of gold at the Nevada properties was years away in light of the uneconomic ore, lack of certain permits and water issues.  For example, on February 6, 2020, CIBC Equity Research stated, "**a toll milling agreement would be required to process refractory ore from the operation going forward, and that would require new permits and therefore returning the assets to production is likely years away**."  Similarly, on March 17, 2020, Scotiabank published a report stating "Nevada Operations could come back on-line with improved mining methods and greater water discharge allowances. Given the likely permitting lead times, this remains a few years away." (Emphasis in original).

201.     In February 2020, Hecla disclosed that it refinanced the Company's debt at a **higher interest rate:**

> Hecla Mining Company (NYSE:HL) today announced that it has priced its previously announced public offering of senior notes (the "Offering"). The Company has agreed to sell $475.0 million aggregate principal amount of 7.250% Senior Notes due 2028 (the "Notes"). The Offering is expected to close on February 19, 2020, subject to customary closing conditions.
>
> The Notes will pay interest semi-annually in arrears at a rate of 7.250% per year and will mature on February 15, 2028, unless earlier redeemed or repurchased. The Notes will be fully and unconditionally guaranteed by certain of the Company's subsidiaries. The Company intends to use the net proceeds from the Offering, together with cash on hand, to redeem all of its outstanding 6.875% Senior Notes due 2021 (the "2021 Notes") and to pay fees and expenses in connection with the Offering and the redemption of the 2021 Notes.

## X.    LOSS CAUSATION/ECONOMIC LOSS

202.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Hecla's common stock and operated as a fraud or deceit on Class Period purchasers of Hecla common stock by misrepresenting the Company's operating condition and future business prospects.  Defendants achieved this by making positive statements about Hecla's business and the Nevada Mines while they knew, or recklessly disregarded, that the Nevada Mines were plagued by a multitude of material, negative problems which were expected to persist unless uneconomical capital and operational expenditures were made to cure the negative conditions (which would accelerate the decline of the Nevada Mines' already negatively-trending cash flows).

203.    Later, however, when the falsity of Defendants' misrepresentations materialized and became apparent to the market, the price of Hecla's common stock fell precipitously as the prior artificial inflation came out of the price of Hecla's common stock.  As a result of their purchases of Hecla common stock during the Class Period, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages under the federal securities laws.

204.    As a direct result of the public revelations regarding the truth about the condition of Hecla's business and the negative adverse factors that had been impacting Hecla's business during the Class Period, the price of Hecla's common stock materially declined.  These stock drops removed the inflation from the price of Hecla's common stock, causing real economic loss to investors who purchased Hecla common stock during the Class Period.

205.    As alleged above, the decline in the price of Hecla's common stock as the truth about the conditions at the Nevada Mines began to materialize through a series of partial disclosures was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market.

206.    The timing and magnitude of Hecla's share price declines negate any inference that the loss suffered by Plaintiffs and other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to the Defendants' fraudulent conduct.

## XI.    FRAUD-ON-THE-MARKET DOCTRINE

207.    At all relevant times, the market for Hecla's common stock was an efficient market for the following reasons, among others:

(a)    The Company's common stock met the requirements for public listing and was listed and actively traded on the NYSE, a highly efficient market;

(b)    As a regulated issuer, the Company filed periodic public reports with the SEC;

(c)    The Company regularly issued press releases which were carried by national news wires.   Each of these releases was publicly available and entered the public marketplace; and

(d)    A number of securities analysts, including JP Morgan, CIBC, Roth Capital Partners, RBC Capital and BMO Capital, regularly followed and analyzed the Company, and issued reports concerning the Company.

208.    As a result, the market for the Company's publicly traded common stock promptly digested current information with respect to Hecla from all publicly available sources and reflected such information in the price of the Company's common stock.   Under these circumstances, all purchasers of the Company's common stock during the Class Period suffered similar injury through their purchase of the publicly traded common stock of Hecla at artificially inflated prices and a presumption of reliance applies.

## XII.  ADDITIONAL SCIENTER ALLEGATIONS

209.  Defendants acted with scienter in that Defendants knew, or recklessly disregarded, that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew, or recklessly disregarded, that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  By virtue of their receipt of information reflecting the true facts regarding Hecla, including Defendants' admitted extensive due diligence prior to the acquisition of the Nevada Mines during which a multitude of material, negative problems were identified, Defendants participated in the fraudulent scheme alleged herein.

210.  Defendants knew, or recklessly disregarded, the false and misleading nature of the information which they caused to be disseminated to the investing public.  The ongoing fraudulent scheme described in this complaint could not have been perpetrated over a substantial period, as has occurred, without the knowledge or recklessness, and complicity of the personnel at the highest level of the Company, including the Individual Defendants.

### A.  Defendants Regularly Visited the Nevada Mines during Due Diligence and during the Class Period and Actively Managed the Nevada Mines

211.  During the Class Period, Defendant Baker regularly visited the Nevada Mines to review the results of operations and the conditions at the Nevada Mines, including on or around August 1, 2018, when he visited each operation in the Reno and Winnemucca, Nevada offices, during which, he spoke with almost all of the supervisory and management personnel.  Further, in or around late October 2018 and February 2019, Defendant Baker again visited the Nevada Mines and observed how the material negative conditions were then affecting production and cash flows.

212.  At or around the time Hecla announced the acquisition of the Nevada Mines,

Defendant Radford established a development plan for Fire Creek and Hatter Graben in Nevada. Defendants Radford and McDonald were involved in organizing managers and employees at the Nevada Mines after Hecla's acquisition and was involved in the Company's due diligence, including regular site visits to inspect the Nevada Mines and meetings, 13, 56, 58-59, 64-82

**B.    The Scienter of Hecla's senior Executives and Officers Is Imputed to Defendant Hecla**

213.    The scienter of numerous senior executives and officers of Hecla, who acted within the scope of their authority and as agents of Hecla during the Class Period, is imputed to Defendant Hecla.

214.    Specifically, the following senior Hecla executives knew, or at least recklessly disregarded, the true facts about the material, negative problems plaguing the Nevada Mines:

a.    Defendant Baker, who was Hecla's President and Chief Executive Officer during the Class Period;

b.    Defendant Radford, who was the Company's Senior Vice President – Operations during the Class Period;

c.    Defendant Hall, who was the Company's Senior Vice President, Chief Financial Officer and Treasurer during the Class Period; and

d.    Defendant McDonald, who was the Company's Senior Vice President – Exploration during the Class Period.

215.    Defendants Baker, Radford, Hall, and McDonald as well as the following executives, officers and employees knew, or at least recklessly disregarded, the undisclosed facts concerning the material, negative problems plaguing the Nevada Mines and acted as agents of Hecla or its subsidiaries during the Class Period:

1. Shiell, Vice President and General Manager of the Nevada Mines;

2. Tolbert, the General Manager at the Fire Creek mine;

3. Leader, Process Manager at the Midas and Hollister mines;

4. Hendricks, Chief Engineer at Fire Creek;

6. Sara Bowl, Senior Geologist;

7. Allen, Director, Exploration; and

8. Blair, Chief Resource Geologist.

216.    Accordingly, the state of mind of each of these officers or employees who worked at the Nevada Mines is imputed to Defendant Hecla.

### C.    Defendants Had Motive and Opportunity to Hide the Material, Negative Problems at the Nevada Mines and That the Mines Were Cash Flow Negative Throughout the Class Period

217.    Defendants had the opportunity to perpetrate the fraudulent scheme and course of business described herein because the Individual Defendants were the most senior officers of Hecla, issued statements and press releases on behalf of Hecla and had the opportunity to commit the fraud alleged herein.

218.    The Individual Defendants had the motive to conceal the material negative problems plaguing the Nevada Mines throughout the Class Period and the negative cash flows in order to bolster, or at least maintain, the Company's ratings with the credit agencies (S&P and Moody's), including the credit rating on the Company's approximately $500 million in senior note debt, and line of credit, as alleged above.  Indeed, as a result of their scheme and false and misleading statements, credit agencies increased Hecla's credit rating, and then decreased it after the true facts were disclosed.  Similarly, Hecla's lenders increased Hecla's line of credit as a result of the acquisition of the Nevada Mines, from $100 million to $250 million, and decreased it after the true facts were disclosed.  Defendant Hall, as CFO, was instrumental in achieving this increase in the

credit rating and the line of credit, while making materially false and misleading statements to investors in order to increase the credit rating and line of credit.

219.    Furthermore, the Individual Defendants were paid huge cash salaries in 2018 and cash bonuses for 2018 that were based, in material part, on the purported benefits to the Company as a result of the acquisition of the Nevada Mines, as follows:

| Individual Defendant | Salary | Cash Bonus |
|---|---|---|
| Baker | $635,000 | $317,500 |
| Hall | $380,000 | $190,000 |
| Radford | $416,000 | $208,000 |
| McDonald | $275,000 | $137,500 |
| Total | $1,706,000 | $853,000 |

## XIII.   NO SAFE HARBOR

220.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false and misleading statements pleaded in this complaint.  Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

221.    Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward looking statement was false, and/or the forward-looking statement was

authorized and/or approved by an executive officer of Hecla including the Individual Defendants who knew that those statements were false when made.

### FIRST CLAIM FOR RELIEF
#### For Violation of Section 10(b) of the Exchange Act
#### and Rule 10b-5 Against All Defendants

222.    Plaintiffs repeat and reallege each and every allegation as if fully set forth above.

223.    During the Class Period, Defendants disseminated or approved the false and misleading statements specified above, which they knew or recklessly disregarded were materially false and misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

224.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)    Employed devices, schemes and artifices to defraud;

(b)    Made untrue statements of material facts or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made not misleading; or

(c)    Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Hecla's publicly traded common stock during the Class Period.

225.    Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Hecla's publicly traded common stock. Plaintiffs and the Class would not have purchased Hecla's common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

226.    As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs

and the other members of the Class suffered damages in connection with their purchases of Hecla

common stock during the Class Period.

**SECOND CLAIM FOR RELIEF**
**For Violation of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

227.    Plaintiffs repeat and reallege each and every allegation as if fully set forth above.

228.    The Individual Defendants acted as controlling persons of Hecla within the meaning

of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and

their ownership and contractual rights, participation in and/or awareness of the Company's

operations at the Nevada Mines and/or intimate knowledge of the statements filed by the Company

with the SEC and disseminated to the investing public, the Individual Defendants had the power to

influence and control and did influence and control, directly or indirectly, the decision-making of

the Company, including the content and dissemination of the various statements which Plaintiffs

contend are false and misleading.  The Individual Defendants were provided with or had unlimited

access to copies of the Company's reports, press releases, public filings and other statements alleged

by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the

ability to prevent the issuance of the statements or cause the statements to be corrected.

229.    In particular, the Individual Defendants had direct and supervisory involvement in

the day-to-day operations of the Company and, therefore, are presumed to have had the power to

control or influence the particular transactions giving rise to the securities violations as alleged

herein and exercised the same.

230.    As set forth above, Hecla and the Individual Defendants each violated Section 10(b)

and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions

each as a controlling person, the Individual Defendants are liable pursuant to Section 20(a) of the

Exchange Act. As a direct and proximate result of Hecla's and the Individual Defendants' wrongful

conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows: declaring this action to be a proper class action; awarding damages, including interest; awarding reasonable costs, including attorneys' fees; and such equitable/injunctive relief as the Court may deem proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

Dated: March 29, 2023                    **KAPLAN FOX & KILSHEIMER LLP**

By: /s/   *Jeffrey P. Campisi*

Robert N. Kaplan
Jeffrey P. Campisi
Jason A. Uris
800 Third Avenue, 38th Floor
New York, NY 10022
Tel: (212) 687-1980
Fax: (212) 687-7714
rkaplan@kaplanfox.com
jcampisi@kaplanfox.com
juris@kaplanfox.com

*Lead Counsel for Lead Plaintiffs and the Proposed Class*