**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

ROBERT GLUCK, et al.,

        *Plaintiffs*,

v.

HECLA MINING CO., et al.,

        *Defendants*.

Case No. 1:19-cv-4883 (ALC)

ECF Case

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT

Stefan Atkinson, P.C.
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-4800

Joshua Z. Rabinovitz
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 389-5000

Kate Guilfoyle
KIRKLAND & ELLIS LLP
300 N. LaSalle
Chicago, IL 60654
(312) 862-2000

*Counsel for Defendants*

## **Table of Contents**

Preliminary Statement ........................................................................................... 1

Background ............................................................................................................. 2

    A.    Klondex's Disclosures About The Nevada Mines ................................... 2

    B.    Defendants' Disclosures About The Nevada Mines Before The Acquisition ................................................................................................. 3

    C.    Defendants' Disclosures About The Nevada Mines After The Acquisition .......... 4

    D.    Plaintiffs' New Allegations ..................................................................... 7

Argument .............................................................................................................. 10

I.    Plaintiffs' New Allegations Do Not Affect The Court's Dismissal Of The Claims Regarding Defendants' Forward-Looking Statements. .................................. 10

II.    Plaintiffs' New Allegations Do Not Give Rise To A Strong Inference Of Scienter. ....... 11

    A.    Plaintiffs' New Allegations Do Not Plead Motive And Opportunity. ................... 11

    B.    Plaintiffs' New Allegations Do Not Plead Circumstantial Facts Of Scienter. ....... 13

        1.    Plaintiffs Do Not Allege Actual Knowledge Of Falsity. ......................... 13

            a.    Plaintiffs' Allegations Are Not Pled With Particularity. .............. 13

            b.    Plaintiffs Do Not Allege Any Fact Known By A Defendant That Is Inconsistent With Any Statement Made By That Defendant. ................... 15

        2.    Plaintiffs Do Not Allege Facts Establishing Conscious Recklessness. ....... 17

    C.    Weighing All The Facts, Scienter Is Not The Most Plausible Inference. ............. 18

III.    Plaintiffs' New Allegations Do Not Plead With Particularity Any False Or Misleading Statement ........................................................................................... 20

    A.    Plaintiffs' New Allegations Do Not Plead Any Of The Previously Alleged Misstatements Were Inaccurate Or Misleading. ................... 20

    B.    Plaintiffs Do Not Allege With Particularity That Any Of The New Alleged Misstatements Are Actionable. ................... 22

Conclusion ........................................................................................................................ 25

## Table of Authorities

### Cases

*Anderson v. Spirit Aerosystems*,
    827 F.3d 1229 (10th Cir. 2016) ...........................................................................14

*Applestein v. Medivation*,
    861 F. Supp. 2d 1030 (N.D. Cal. 2012) ..............................................................14

*Bondali v. Yum Brands*,
    620 F. App'x 483 (6th Cir. 2015) .......................................................................22

*Bristol Cnty. Ret. Sys. v. Adient*,
    2022 WL 2824260 (2d Cir. July 20, 2022) ..........................................................15

*Chapman v. Mueller Water Prods.*,
    466 F. Supp. 3d 382 (S.D.N.Y. 2020) ...........................................................16, 22

*Das v. Rio Tinto*,
    332 F. Supp. 3d 786 (S.D.N.Y. 2018) .................................................................17

*Glaser v. The9*,
    772 F. Supp. 2d 573 (S.D.N.Y. 2011) ...........................................................13, 17

*Gray v. Wesco Aircraft*,
    454 F. Supp. 3d 366 (S.D.N.Y. 2020), *aff'd*, 847 F. App'x 35 (2d Cir. 2021).................11, 24

*Ind. Public Retirement Sys. v. SAIC*,
    818 F.3d 85 (2d Cir. 2016)..................................................................................22

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001)..........................................................................12, 17

*Kramer v. Time Warner*,
    937 F.2d 767 (2d Cir. 1991)................................................................................3

*Kuriakose v. Federal Home Loan*,
    897 F. Supp. 2d 168 (S.D.N.Y. 2012) .................................................................18

*Local No. 38 IBT v. AmEx*,
    724 F. Supp. 2d 447 (S.D.N.Y. 2010) .................................................................14

*Long Miao v. Fanhua*,
    442 F. Supp. 3d 774 (S.D.N.Y. 2020).................................................................13

*Maloney v. Ollie's Bargain Outlet*,
    518 F. Supp. 3d 772 (S.D.N.Y. 2021).................................................................16

*Omnicare v. Laborers District Council,*
   575 U.S. 175 (2015)..................................................................................................24

*Plumbers & Pipefitters v. Zimmer,*
   673 F. Supp. 2d 718 (S.D. Ind. 2009) ....................................................................14

*Saraf v. Ebix,*
   2022 WL 4622676 (S.D.N.Y. Sept. 30, 2022)........................................................16

*Tellabs v. Makor Issues,*
   551 U.S. 308 (2007)................................................................................................18

*In re Turquoise Hill Res. Sec. Litig.,*
   2022 WL 4085677 (S.D.N.Y. Sept. 2, 2022)..........................................................17

*Wochos v. Telsa,*
   985 F.3d 1180 (9th Cir. 2021) ..........................................................................14, 22

## Statutes & Rules

15 U.S.C. § 78u-4(b)(2)(A)...........................................................................................13

Fed. R. Civ. P. 9(b) .....................................................................................................13

Fed. R. Evid. 201(b)(2) ..................................................................................................3

**Preliminary Statement**

This securities fraud case arises out of Defendant Hecla Mining Company's July 2018 acquisition of Klondex Mines, Ltd., which owned the Fire Creek, Midas, and Hollister gold mines, in Nevada. This Court dismissed Plaintiffs' previous complaint for failure to state a claim, holding that (1) the principal alleged misstatements were forward-looking and protected by the statutory safe harbor because they were accompanied by meaningful cautionary language; (2) Plaintiffs failed to plead a strong inference of scienter; and (3) Plaintiffs failed to plead a false or misleading statement, both because Plaintiffs did not plead facts showing any statement was inaccurate when made and because Defendants disclosed both negative mine conditions and negative financial performance at the Nevada Mines. (Dkt. #116 ("Order")) The Court expressed skepticism that Plaintiffs could cure the complaint's deficiencies but granted them the opportunity to try. (*Id.* at 26)

Plaintiffs have now filed their second amended complaint (Dkt. #124 ("SAC")), and it does not cure those deficiencies. The new complaint largely repackages the previous one, including alleging the same purported misstatements that the Court already rejected, along with seven new alleged misstatements. Plaintiffs make a handful of new allegations from two new so-called confidential informants, alleging their supposed knowledge of operational difficulties at the Nevada Mines. However, the new allegations do not change the fact that Defendants' forward-looking statements are protected by the statutory safe harbor because they were accompanied by meaningful cautionary language. The new allegations also do not cure Plaintiffs' failure to plead facts creating the requisite strong inference that Defendants acted with scienter in issuing any alleged misstatement. Lastly, the new allegations do not cure Plaintiffs' failure to plead that any statement of existing fact was false or misleading.

As such, the SAC fails to state a claim and should be dismissed, this time with prejudice.

1

## Background

The central premise of Plaintiffs' allegations continues to be that Defendants "knowingly or at least recklessly made misleadingly positive representations about the Nevada Mines." (SAC ¶ 1) However, as the Court previously concluded, "reviewing the alleged misstatements in their full context reveals that Hecla did in fact disclose many of the challenge[s] it was encountering []at the Nevada Mines." (Order at 24) Plaintiffs' SAC continues to ignore these public disclosures.

### A.    Klondex's Disclosures About The Nevada Mines

As an initial matter, Plaintiffs fail to so much as mention that investors were aware of poor performance at the Nevada Mines from *Klondex*'s public disclosures, even before any Defendant said anything about the Mines. For example, five days *before* the announcement that Hecla would acquire Klondex, Klondex filed an SEC Form 10-K, which disclosed a *loss* from operations at the Hollister mine of $24.1 million and a loss from operations at the Midas mine of $8.8 million. (Dkt. #96-9 at 83) Klondex also disclosed negative performance trends for the Fire Creek mine—costs of production at Fire Creek of $37.4 million for 2015, $46.2 million for 2016, and $53.9 million for 2017. (*Id*. at 83-84) That is an increase in production costs of *44%* over just three years.

At the same time, Klondex also disclosed *positive* information about the "grade" of the Nevada Mines (which is important to Plaintiffs' allegations regarding Defendants' later statements about "grade," *infra* at 3-4). Klondex's 10-K stated: "Fire Creek is a high-grade epithermal vein deposit" (Dkt. #96-9 at 18); "Midas is a high-grade epithermal vein deposit" (*id*. at 19); and "[v]eins at Hollister contain the bulk of the high-grade mineralization known within the property" (*id*. at 21). Klondex also disclosed for all three Mines the specific "grade" metric: how many gold equivalent ounces, or "GEOs," per ton of ore each mine was producing. Fire Creek produced 0.90 GEOs/ton; Midas produced 0.33 GEOs/ton; and Hollister produced 0.38 GEOs/ton. (*Id*. at 30)

Still, Klondex's disclosures of negative performance at the Mines continued. On May 23,

2018—still two months before the acquisition—Klondex (not Hecla) disclosed its cash flow projections for Fire Creek, estimating cash flow of $57.4 million for 2018, $44.5 million for 2019, and $37.6 million for 2020. (Ex. 19 at 99)[1] That is, Klondex disclosed a projected *decrease* in Fire Creek's cash flows of *34%* in the next three years.

In addition to ignoring specific negative facts Klondex disclosed about the performance of all three Mines, Plaintiffs also omit the effect Klondex's poor performance had on Hecla's acquisition of Klondex. Specifically, on May 23, 2018, Klondex disclosed that Hecla had initially offered $630 million for Klondex, on January 24, 2018. (Ex. 19 at 48) However, "[d]uring February 2018, the trading price of Klondex Shares declined sharply … following the release of Klondex's production results for 2017 and production guidance for 2018, as well as an updated report on mineral reserves and resources at Fire Creek that was released by Klondex on February 6, 2018 … that showed a decline in both contained gold ounces and gold grade." (*Id*. at 50) The February disclosures led Hecla to significantly reduce its offer, and the parties ultimately agreed on a purchase price of $462 million. (SAC ¶ 1) This *27% reduction* in purchase price was publicly disclosed—and publicly attributed to disclosures of poor performance and production guidance at Fire Creek—months before Hecla acquired Klondex.

### B.     Defendants' Disclosures About The Nevada Mines Before The Acquisition

Hecla announced its agreement to acquire Klondex on March 19, 2018. (SAC ¶ 7) Hecla's CEO, Phillips Baker, predicted that the Nevada operations "will be cash flow positive for us." (*Id*. ¶ 22) Hecla also filed with the SEC a presentation that included a chart showing Fire Creek and

---

[1] The new exhibits cited herein are attached to the Declaration of Joshua Rabinovitz, filed with this brief. On a motion to dismiss, "a district court may take judicial notice of the contents of relevant public disclosure documents required to be filed with the SEC as facts 'capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.'" *Kramer v. Time Warner*, 937 F.2d 767, 774 (2d Cir. 1991) (quoting Fed. R. Evid. 201(b)(2)).

Midas were among the ten highest grade mines in North America. (Dkt. #96-2 at 13) It measured "grade" by "reserve grade"—the estimated ounces of gold per ton of ore not yet mined—and disclosed the specific estimates on which the statement was based: 0.71/ton for Fire Creek and 0.31/ton for Midas. (*Id*.) Both the announcement and the presentation included a warning to investors about the risks of forward-looking statements contained therein and directed investors to risk factors in both Hecla's and Klondex's SEC Form 10-Ks. (*Id*. at 2; Dkt. #96-3 at 5-6)

On May 10, 2018, Hecla disclosed in an SEC Form 10-Q risks specific to the Klondex acquisition, including that the acquisition itself "may cause a loss of management personnel and other key employees of Klondex"; that Hecla may not achieve the anticipated benefits of the acquisition for reasons including "higher than expected acquisition and operating costs or other difficulties"; and that Klondex's mines "may be in an unexpected condition." (Dkt. #96-4 at 62-63) It cautioned on this last point that due diligence of mines has significant limitations:

> Although we review properties prior to acquisition in a manner consistent with industry practices, such reviews are not capable of identifying all potential adverse conditions…. Even a detailed review of records and properties may not necessarily reveal existing or potential problems or permit a buyer to become sufficiently familiar with the properties to fully assess their condition, any deficiencies, and development potential. (*Id*. at 63)

Also before closing the acquisition, Defendants disclosed operational problems at the Nevada operations. On May 10, 2018, Hecla filed with the SEC on Form 8-K a presentation with information about the Nevada operations. It listed the strengths of the operations as well as disclosing weak areas that needed improvement, including "[r]eplacement of old equipment," "[r]educe turnover," and "[a]dvance tailings construction." (Dkt. #96-6 at 4) It specifically identified the need or intention to "lower [the] cost/ton." (*Id*.)

### C.    Defendants' Disclosures About The Nevada Mines After The Acquisition

Hecla announced it had closed the acquisition of Klondex on July 23, 2018. (SAC ¶115)

Defendants continued to disclose even more problems at the Nevada Mines. On August 9, 2018, only 17 days later, Hecla filed its Form 10-Q and held a public conference call. First, Baker disclosed that one of the newly acquired Mines, Midas, was being shut down entirely. (Dkt. #96-7 at 5) Second, Hecla's head of Operations, Lawrence Radford, disclosed that water was creating problems at Fire Creek: "In some areas of the mine, the road conditions are muddy" and "conditions would get bad enough that machines will get stuck and would have to get towed out." (*Id*. at 7) Third, Radford disclosed: "There has been a lot of turnover at Fire Creek," which "we need to remediate." (*Id*.) Fourth, Radford disclosed "the Hollister ore is carbonaceous." (*Id*. at 12) Finally, Hecla's head of Exploration, Dean McDonald, disclosed that "[t]he reserves for the Nevada assets have declined from last reporting," reflecting that Klondex had done "little, if any, drilling to improve reserves and resources during the latter part of 2017 and early in 2018." (*Id*. at 8) Ultimately, Baker acknowledged the Nevada Mines might "not generate returns immediately." (*Id*. at 10)

On November 8 and 9, 2018, Hecla disclosed results for the third quarter of 2018—the first quarter in which it owned the Nevada Mines. It disclosed a *loss* from Nevada of $13.7 million. (Dkt. #96-8 at 18) It also disclosed all-in sustaining costs ("AISC") for Nevada of $1,932 per gold ounce. (*Id*. at 57)[2] This was significant because Klondex's final AISC disclosure before the sale was $1,107 per ounce. (Dkt. #96-9 at 52) It was also significant because Hecla reported gold sales at an average price of $1,205 per ounce. (Dkt. #96-8 at 45) Thus, Hecla's disclosure meant that, after owning Nevada for only two months, its costs of production were *75% higher* than Klondex had disclosed immediately before the transaction, *and* that the difference in cost meant it now cost Hecla significantly more to produce gold from Nevada than the price at which it was selling it.

---

[2] AISC is a measure adopted by the World Gold Council in 2013 to more accurately capture all the costs of precious metals production. It has been widely adopted by gold mining companies. *See* https://www.gold.org/about-gold/gold-supply/responsible-gold/all-in-costs.

On a November 8 earnings call, Radford disclosed yet more problems. He explained regarding Fire Creek that "we encountered existing foreground conditions, many development phases were in unconsolidated tuff, which is basically clay rich, add a little bit of water and the conditions turn to mush." (Dkt. #96-10 at 6) He disclosed "the poor conditions of the mine" generally. (*Id*. at 7) Revising the pre-acquisition expectation that Nevada would generate positive cash flow, Radford stated: "Hecla is in the process of creating budgets for 2019 and our goal for Nevada operations is that the operations are cash neutral." (*Id*.) An analyst asked whether Hecla's expectation was that "the first little bit is really a challenge, and that's kind of what you're working through now, then kind of breakeven for a couple of years and then really start to hopefully see some gravy in 2021-type thing." (*Id*. at 12) Baker responded: "I think that's right." (*Id*.)

On December 4, 2018, Hecla's CFO, Lindsay Hall, presented at a public conference, and indicated that the Hollister mine "was a high-cost operation" with a "different kind of ore." (Dkt. #96-11 at 7) "So, we're taking the focus off Hollister." (*Id*.) He described Hecla's focus on the remaining Nevada mine, Fire Creek, explaining that "we've been working at refocusing the team, rehabilitating the mine, fixing a lot of the mining operations that is mining 101." (*Id*. at 7-8)

Hecla also disclosed negative information about Nevada in describing Hecla's full-year 2018 performance. Hecla's 2018 Form 10-K disclosed a *loss* from Nevada of $15.8 million. (Dkt. #96-1 at 74) It disclosed that cash flow from operations for the entire company had declined, attributing the decline in part to "a gross loss at the newly-acquired Nevada Operations." (*Id*. at 85) It disclosed AISC for Nevada of $1,950 (*id*. at 74), consistent with the third quarter's disclosure, which, again, was *much* higher than production costs Klondex had disclosed, and *much* higher than the $1,265/ounce average price at which Hecla was selling gold. (*Id*. at 62) It disclosed Hecla's net income for each quarter of 2018, showing positive $8.2 million and $12.1 million, respectively,

for the first two quarters of 2018—before Hecla acquired Klondex—and a net *loss* of $23.2 million and $23.7 million for the third and fourth quarters of 2018, after acquiring Klondex. (*Id*. at 94) On the public conference call discussing the 2018 results, Baker stated regarding Nevada that Hecla was "still trying different ways of dealing with different conditions in the mine[s]," but that it had "more questions than answers" and was "still in this learning phase." (Dkt. #96-12 at 5, 17) He said Hecla was "happy with our cost at our operating units *other than Nevada* [at] which we reported higher cost while we work through what we believe are transitional issue[s]." (*Id*. at 5, emphasis added) Radford referred to Hecla's plan for Fire Creek as a "turn around" plan. (*Id*. at 7)

On April 18, 2019, Hecla announced its first quarter 2019 results. It explained regarding Nevada that "[d]uring the quarter, the focus continued on establishing a robust development program in a variety of ground conditions at Fire Creek and Hollister, rather than on production which is expected to be second-half weighted this year." (Dkt. #96-13 at 2) On May 9, 2019, Hecla reported a $14 million quarterly loss at Nevada and suspended estimates of production and costs while it conducted a comprehensive review of Nevada. (SAC ¶172) Baker explained, "our original plan is not making enough progress fast enough." (Dkt. #96-15 at 5)

### D.     Plaintiffs' New Allegations

Plaintiffs' Second Amended Complaint continues to ignore all of the above, instead pushing the characterization that "Defendants made materially misleading positive statements throughout the Class Period." (SAC ¶ 1) Plaintiffs' primary new allegations are from two new so-called "confidential informants," whom Plaintiffs call CI 13 and CI 14.

**CI 13.** Plaintiffs allege 17 subparagraphs about CI 13. (SAC ¶ 13(a)(i)-(xvii)) They introduce those allegations with the statement: "According to CI 13, the following information was provided to Defendants, in particular Radford and McDonald, during due diligence (in or around November 2017 through March 2018)." (*Id*. ¶ 13(a)) As an initial matter, none of CI 13's supposed

allegations show that any statement Defendants made was inaccurate or misleading—that is, CI 13 never alleges the mine issues he identified meant Defendants' stated expectations were false.

Moreover, despite their assertion that all the subparagraphs are information provided to Defendants "during due diligence (in or around November 2017 through March 2018)," many of the subparagraphs concern later periods, *by their own explicit terms*. For example, ¶ 13(a)(xiv) alleges a "cave void" was found in "approximately September-December 2018." (*Id.*) Plainly, CI 13 could not have told Defendants during due diligence about something that was not found until six months after due diligence. Other of Plaintiffs' allegations regarding CI 13 suffer from the same infirmity. (*Id.* ¶ 13(a)(xii) (alleging a meeting in July 2018); ¶ 13(a)(xiii) (discussions "[a]fter the acquisition closed in July 2018"); ¶ 13(a)(xv) (budget meeting "in late 2018"); ¶ 13(a)(xvi) ("presentations in late 2018"))

Plaintiffs' allegations about CI 13 are insufficient in other ways as well. For instance, many of the allegations fail to allege which Defendant, if any, CI 13 told the alleged information to. (*Id.* ¶ 13(a)(v) (referring to unspecified "Defendants"); ¶ 13(a)(vi) (same)) Other allegations do not plead CI 13 told *any* Defendant the supposed information. (*Id.* ¶ 13(a)(iii) (no alleged connection to any Defendant); ¶ 13(a)(iv) (same); ¶ 13(a)(vii) (referring only to "Hecla management"); ¶ 13(a)(xiv) (no alleged connection to any Defendant); ¶ 13(a)(xvi) (same)) Still other allegations do not allege who supposedly said what, using the passive voice that has the effect of concealing what is supposed to have occurred. (*Id.* ¶ 13(a)(ii) ("Defendant Radford was informed…"); ¶ 13(a)(v) ("Defendants were informed…"); ¶ 13(a)(vi) ("Defendants were informed…"); ¶ 13(a)(vii) ("Hecla management was aware of…"); ¶ 13(a)(viii) ("Radford and Board were made aware of…")) Finally, other allegations fail to specify what information was supposedly conveyed. (*Id.* ¶ 13(a)(ii) (Radford informed of unspecified "material negative conditions"); ¶ 13(a)(ix) & (x)

(alleging access to information but failing to allege *what* information))

**CI 14.** Plaintiffs' allegations about CI 14 have the same problems. Yet CI 14 also supports *Defendants* in some ways. For example, CI 14 alleges McDonald was told that Fire Creek's ore was "of a moderate refractory basis." (*Id*. ¶ 13(b)(ii)) Plaintiffs do not allege what "moderate" refractory ore means, but public sources explain it means gold recoveries of 50% to 80%. (Ex. 20 at 204) Moreover, CI 14 alleges Defendants *did not* learn about refractory ore at Fire Creek during due diligence. He told Plaintiffs "Hecla did not conduct any metallurgical tests on the ore," that Hecla's metallurgists "had no interaction with the Klondex team," and that this "surprised" him because "a metallurgist played a crucial role working with geologists on ore characterization." (SAC ¶ 13(b)(iii)) He told Plaintiffs that Hecla's "senior leadership team" did not recognize the presence of refractory ore until after closing the acquisition. (*Id*. ¶ 13(b)(iv) ("After the closing in July 2018, Hecla's senior leadership team … recognized … the presence of refractory ore")) Although even then he does not allege how he knows that or how the team supposedly learned it.

**New Allegations From Existing CIs.** Plaintiffs also add a few new allegations about existing CIs, but these suffer from the same problems. Plaintiffs add allegations that CI 7 and CI 8 knew of "poor quality" ore at Hollister and Fire Creek and ore with "high levels of free carbon which needed to be removed" from Hollister and Midas. (*Id*. ¶¶ 71-72) As before, Plaintiffs do not allege Defendants had this information, much less when they learned it or how. (*Id*.) And the alleged timetable is critical—because, by August 9, 2018, Defendants announced they were shutting down Midas, and that Hollister ore was "carbonaceous." (Dkt. #96-7 at 6, 12)

Plaintiffs allege that "[d]uring due diligence, CI 10 believes that Hecla was given all the core photos for over 1,000 holes, including the holes with refractory ore." (SAC ¶ 78) CI 10 does not allege who at Hecla was given photos or by whom. He does not allege refractory ore can be

seen in photos, nor that anyone from Hecla actually looked at the photos and saw it. Plus, importantly, CI 10's allegation that he believes the photos "included" the holes with refractory ore means *not all the holes included refractory ore*—that is, that not all Fire Creek's ore was refractory—contrary to the impression Plaintiffs attempt to convey. (*Id*. ¶ 13) CI 10 does not allege how many photos showed refractory ore. In addition, CI 10 also newly alleges that, at the time of the acquisition, "[s]everal of the Company's most productive veins at Fire Creek [had] water exceeding the 100 gallon per minute permit limit." (*Id*. ¶ 77) CI 10 does not plead any Defendant knew that, much less when they learned it or what it meant for Fire Creek's performance.

Finally, Plaintiffs allege "[s]everal senior geologists … repeatedly stated there was no high-grade gold ore at the Hollister and Midas mines." (*Id*. ¶ 67) Plaintiffs do not allege there is any standard definition of "high grade." Nor do they allege any geologist said the specific gold ounce per ton disclosed for any mine was incorrect or that any Defendant knew this information, let alone when or how they supposedly learned it. *Supra* at 4.

<u>**Argument**</u>

Plaintiffs' new allegations do not alter the Court's prior conclusions that (1) Defendants' forward-looking statements were accompanied by meaningful cautionary language; (2) Plaintiffs do not plead with particularity facts that give rise to a strong inference of scienter; and (3) Plaintiffs do not plead with particularity facts showing any statement of fact was inaccurate or misleading. Nor do Plaintiffs plead a claim for the seven new supposedly fraudulent statements.

**I.    Plaintiffs' New Allegations Do Not Affect The Court's Dismissal Of The Claims Regarding Defendants' Forward-Looking Statements.**

This Court previously held that twelve alleged misstatements were forward-looking statements protected by the statutory safe harbor because they were accompanied by meaningful cautionary language. (Order at 12-16) Plaintiffs' new allegations do not affect the Court's conclusion.

As the Court explained, "[t]hese warnings, when read together, caution investors of the very risks that Plaintiffs allege ultimately occurred—namely that the Nevada Mines were not in the condition they were initially thought to be and that the cost of operating those mines would ultimately be higher than expected." (*Id*. at 16)[3]

## II.  Plaintiffs' New Allegations Do Not Give Rise To A Strong Inference Of Scienter.

Plaintiffs' new allegations also do not affect this Court's conclusion that Plaintiffs' allegations do not support a "cogent and compelling" inference of scienter. (Order at 17-22)

### A.  Plaintiffs' New Allegations Do Not Plead Motive And Opportunity.

Plaintiffs' new allegations do not plead Defendants had a motive and opportunity to commit fraud. The SAC attempts to support the previously-rejected theory that Defendants were motivated to defraud so as to increase Hecla's credit rating to enable Hecla to refinance its debt. The Court previously rejected that theory because Plaintiffs did "not allege that Defendants did in fact refinance Hecla's bonds while its credit rating was allegedly artificially inflated." (Order at 18) Plaintiffs now add the allegation that Hecla "plann[ed] to refinance Hecla's debt in or after May 2019" because refinancing before then would cause Hecla to "pay a premium." (SAC ¶¶ 15, 139)

This allegation makes Plaintiffs' story less cogent, not more. On Plaintiffs' current telling, Defendants intentionally wasted $462 million on an acquisition they knew would fail because they did not want to pay a premium to refinance before May 2019. This story alone is implausible absent an allegation (which Plaintiffs do not make) that the premium was materially larger than $462 million: After all, Plaintiffs allege *the entire debt* was $500 million. (*Id*. ¶ 2) But the story gets more implausible still. Plaintiffs allege Defendants began this plan in March 2018, knowing

---

[3] Moreover, as discussed in detail below, the statements are also protected by the safe harbor for the independent reason that Plaintiffs have failed to plead any alleged forward-looking statement was made with "actual knowledge" it was false or misleading. *Infra* at 13-17; *see Gray v. Wesco Aircraft*, 454 F. Supp. 3d 366, 385 (S.D.N.Y. 2020), *aff'd*, 847 F. App'x 35 (2d Cir. 2021).

they would have to maintain the deception for more than a year—and that Defendants did indeed maintain it as planned, until May 2019. Then, however, on Plaintiffs' telling, Defendants just gave up, correcting their prior misstatements *without actually refinancing Hecla's debt*. Plaintiffs do not allege any event occurred that required Defendants to suddenly give up the supposed deception. Instead, they ask the Court to deem it a cogent and compelling inference that individuals who were willing to burn nearly half a billion dollars and perpetrate a year-long deception with a sole purpose of refinancing debt suddenly abandoned the plan right when they could have achieved their goal.

This makes no sense—that is, it is not cogent and compelling. If Defendants had charted a fraudulent course and maintained it for a year so they could refinance "in or after May 2019" (SAC ¶ 139), surely they would have kept it up until after they achieved that goal, rather than voluntarily disclosing the truth the very same month they had planned to refinance all along.

Plaintiffs also newly allege Defendants "were paid huge cash salaries for 2018 and cash bonuses for 2018 that were based, in material part, on the purported benefits to the company as a result of the acquisition." (*Id.* ¶ 219) First, precedent rejects "[m]otives that are generally possessed by most corporate directors and officers," such as "the desire to keep stock prices high to increase officer compensation." *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001) Second, this allegation is not well-pled: Plaintiffs do not allege with particularity that the terms of any Defendant's compensation were based on the Klondex acquisition. Third, Plaintiffs do not allege any Defendant's compensation actually increased with the acquisition. To the contrary, Hecla's public filings show that Baker's, Hall's, and McDonald's salaries were the same before and after the acquisition, while Radford's increased 10%. (SAC ¶ 219; Ex. 21 at 42) (Baker's salary went up on July 1, 2017, before Hecla acquired Klondex. (*Id.*)) The filings show further that all four Defendants' cash bonuses (referred to as "STIP awards") went down *significantly* for 2018—as would be expected

when an acquisition did not succeed—yet again undercutting the strength of Plaintiffs' proposed inference that Defendants might have thought they could increase their personal compensation by making an acquisition they knew would fail. (Ex. 22 at 76)

**B.    Plaintiffs' New Allegations Do Not Plead Circumstantial Facts Of Scienter.**

Nor do Plaintiffs' new allegations satisfy the even higher standard to plead an inference of scienter by circumstantial allegations. (Order at 19-20 (articulating the standard))

**1.    Plaintiffs Do Not Allege Actual Knowledge Of Falsity.**

First, Plaintiffs' new allegations do not allege with particularity that any Defendant knew at the time he made any statement that the statement was inaccurate.

**a.    Plaintiffs' Allegations Are Not Pled With Particularity.**

As an initial matter, Plaintiffs' new allegations are not pled with particularity. 15 U.S.C. § 78u-4(b)(2)(A); FRCP 9(b); Order at 11. When a plaintiff seeks to use information from a "confidential" source to plead scienter, the "confidential source allegations must show that individual defendants actually possessed the knowledge highlighting the falsity of public statements; conclusory statements that defendants 'were aware' of certain information … is insufficient." *Glaser v. The9*, 772 F. Supp. 2d 573, 591 (S.D.N.Y. 2011). Further, the plaintiff must plead with particularity "the nature of the CW's contact with the individual defendants that would be probative of defendants' mental state." *Long Miao v. Fanhua*, 442 F. Supp. 3d 774, 779 n.19 (S.D.N.Y. 2020).

As shown above, Plaintiffs' new allegations do not satisfy this standard. *Supra* at 7-10. Plaintiffs often fail to allege *which* Defendant learned information, *when* they learned it, *who* they learned it from, or even *what* information they learned. *Id*. In many instances, Plaintiffs do not allege the information was provided to any Defendant whatsoever—including multiple instances where Plaintiffs place one allegation in proximity to another allegation in a way that *implies* they are alleging the information was provided to Defendants, but they do not actually allege it was.

13

*See Local No. 38 IBT v. AmEx*, 724 F. Supp. 2d 447, 461 (S.D.N.Y. 2010) ("[A] close examination … reveals the absence of any allegation that such data had been presented to management around the time of Defendants' allegedly misleading statements."). For example, ¶ 13(b)(vii) alleges supposed details of a budget meeting in September 2018, attended by Baker. It alleges Fire Creek managers proposed new spending at that meeting and Baker "was shocked by the proposed amount." (SAC ¶ 13(b)(vii)) It then alleges "[t]he LOM [life of mine] on the books was 5 years, but in reality, it was closer to three years." (*Id*.) However, although it is in a paragraph about a specific budget meeting, Plaintiffs do not allege the life of mine was discussed at that meeting or with Baker. Such an allegation is not particularized.

These failures are in addition to the fundamental flaw that the allegations are inconsistent among themselves, with Plaintiffs asserting "the following information was provided to Defendants … during due diligence (in or around November 2017 through March 2018)" (SAC ¶ 13(a)), and then alleging many supposed events that, by their own terms, did not occur until long after due diligence. *Supra* at 8. This inconsistency undermines all Plaintiffs' CI allegations. *Applestein v. Medivation*, 861 F. Supp. 2d 1030, 1038 (N.D. Cal. 2012) ("[T]he confidential witness statements in the TAC are unreliable because they contradict statements made by the same group of witnesses in the SAC."); *Plumbers & Pipefitters v. Zimmer*, 673 F. Supp. 2d 718, 737 (S.D. Ind. 2009) (dismissing action where allegations "are further weakened by the pleading's almost complete reliance upon vague and inconsistent confidential witness assertions").

Finally, Plaintiffs' allegations are not pled with particularity because they do not establish any Defendant agreed with any alleged assessment by an employee. *E.g.*, *Wochos v. Telsa*, 985 F.3d 1180, 1194 (9th Cir. 2021) ("Plaintiffs failed to plead any facts showing that [the CEO] ever accepted those employees' views that the goal was impossible."); *Anderson v. Spirit Aerosystems*,

827 F.3d 1229, 1244-45 (10th Cir. 2016) (witness's allegation that cost projections were unreasonable was insufficient to plead the defendant's knowledge of falsity because the allegation "d[id] not suggest [the defendant] believed his cost-control efforts were unrealistic"). Thus, even if Plaintiffs had pled with particularity that someone told a Defendant that some particular problem at the Mines would prevent Hecla from achieving a particular goal (which they have not done), Plaintiffs' failure to plead that Defendant agreed with that opinion would render the allegation insufficient.

### b. Plaintiffs Do Not Allege Any Fact Known By A Defendant That Is Inconsistent With Any Statement Made By That Defendant.

Even if Plaintiffs' new allegations were well-pled (which they are not), they still suffer from the same primary failure the Court previously identified: Plaintiffs do not allege that Defendants' supposed knowledge of specific operational issues, like "'problems with the ore body and water buildup at the mill' rendered Defendants' public statements about the acquisition … false and misleading." (Order at 21-22) Like their previous allegations, Plaintiffs' new allegations focus on negative conditions in the Mines but do not allege those conditions meant a specific outcome would occur that is inconsistent with the expectation any Defendant publicly stated. As the Second Circuit has held, "[t]he existence of obstacles is not incompatible with statements that [the business] was advancing toward its goals." *Bristol Cnty. Ret. Sys. v. Adient*, 2022 WL 2824260, *2 (2d Cir. July 20, 2022). That reasoning goes double where, as here, Defendants' public statements at the time were replete with negative information and trends.

For example, Plaintiffs allege CI 13 told Radford that "poor mine conditions coupled with poor ore quality, such as refractory ore, were and would continue to be a drain on cash flows." (SAC ¶ 13(i)) CI 13 supposedly informed Radford "that costs to operate were dramatically going up." (*Id*.) But all businesses have costs to operate—things that weigh cash flows down. And, most businesses also have revenue-generating activities that contribute positively to cash flows.

Alleging there were issues in Nevada weighing cash flows down says *nothing* about how those costs would net against revenues. In other words, Plaintiffs do not allege the increasing costs were inconsistent with any statement by Radford. *E.g.*, *Saraf v. Ebix*, 2022 WL 4622676, *5 (S.D.N.Y. Sept. 30, 2022) (a plaintiff must allege "specific contradictory information" to plead a statement was false or misleading); *Maloney v. Ollie's Bargain Outlet*, 518 F. Supp. 3d 772, 781 (S.D.N.Y. 2021) ("Even if the report did reflect a decline in inventory, it is not clear that such a decline would have undermined Ollie's overall sales projections or meant that 'Ollie's inventory pipeline and deal flow were not as described.'"); *Chapman v. Mueller Water Prods.*, 466 F. Supp. 3d 382, 399 (S.D.N.Y. 2020) (similar). Nor do Plaintiffs allege CI 13 told Radford that the drain on cash flows or increased costs would result in Fire Creek having negative cash flow. To the contrary, Plaintiffs now acknowledge Fire Creek was cash flow *positive* for 2018. (*Id*. ¶ 13(a)(xv) (Fire Creek's 2018 cash flow was positive $35-$50 million)) And Fire Creek's increasing costs and its declining cash flows were disclosed publicly. *Supra* at 2-3, 5-7.

Similarly, Plaintiffs allege that unspecified "Defendants" were "informed" in some unspecified way that "rapid infiltration basins used to discharge water [] did not work properly" and that this equipment "costs approximately $2 million each to build." (SAC ¶ 13(v)) But Plaintiffs do not allege that cost was not included in whatever budget information supported Defendants' public statements, nor do they allege anyone knew in advance that the cost would lead to a financial or operational outcome that was inconsistent with what any Defendant stated publicly at the time. Alleging that an issue was a "drain" on cash flows is not inconsistent with Defendants' disclosures.

In yet another example, Plaintiffs newly allege that, in "late 2018," CI 13 gave a presentation in which he said that "cash flow at Fire Creek [was] extremely reduced year over year." (SAC ¶ 13(a)(xv)) But that is consistent with what was *public* at the time: Klondex had told investors

months before to expect a 34% reduction in cash flows. *Supra* at 3. And Hecla had disclosed on November 8, 2018, that Nevada had lost millions of dollars in the third quarter of 2018, with Baker explaining that Nevada was in a period that was a "challenge," after which he expected it to "break even for a couple of years" and then "hopefully" start to see profits around 2021. *Supra* at 6. For the same reasons, Plaintiffs' allegation about a "cave void" found within a vein at Fire Creek in "approximately September-December 2018" that decreased gold production and cash flows is not inconsistent with any public statement made by any Defendant. (SAC ¶ 13(a)(xiv)) Moreover, Plaintiffs fail to allege with specificity when this discovery was made, that any Defendant had knowledge of it, and its effect on any financial or operational outcome.[4]

### 2. Plaintiffs Do Not Allege Facts Establishing Conscious Recklessness.

Plaintiffs also fail to plead with particularity that Defendants acted with conscious recklessness. *Kalnit*, 64 F.3d at 138. Where a plaintiff tries to plead scienter by alleging a defendant's access to contrary facts, the plaintiff "must *specifically identify* the reports or statements that are contradictory to the statements made, or must provide specific instances in which Defendants received information that was contradictory to their public declarations." *Glaser*, 772 F. Supp. 2d at 588 (emphasis in original). And the allegations must establish that "specific contradictory information was available to the defendants *at the same time* they made their misleading statements." *Das v. Rio Tinto*, 332 F. Supp. 3d 786, 813 (S.D.N.Y. 2018) (emphasis in original).[5]

Plaintiffs' allegations do not meet this stringent standard. Plaintiffs newly allege that some

---

[4] Likewise, Plaintiffs allege that "mine models" provided to Radford "showed that due to the ore characteristics and increasing production costs, cash flows at Fire Creek were in decline and would continue to decline in 2018." (SAC ¶ 13(i)) But that is what Klondex disclosed publicly even before the acquisition was announced. *Supra* at 2-3.

[5] Moreover, conscious recklessness is never sufficient to plead scienter for forward-looking statements. *In re Turquoise Hill Res. Sec. Litig.*, 2022 WL 4085677, *25 (S.D.N.Y. Sept. 2, 2022).

unspecified Hecla managers had access to some types of documents. (*E.g.*, SAC ¶ 13(a)(x)) However, they do not allege who had access, when they had access, or—most critically—that the documents contained information that contradicted any alleged misstatement.

### C.    Weighing All The Facts, Scienter Is Not The Most Plausible Inference.

For the reasons explained above, Plaintiffs' allegations do not support a strong inference of scienter. Their proposed story simply makes no sense—it is implausible on its own terms. *Tellabs v. Makor Issues*, 551 U.S. 308, 324 (2007) (to be strong, an inference must be "cogent and compelling"). Moreover, the Supreme Court has instructed that the scienter analysis is necessarily comparative, requiring courts to compare, from the totality of the facts alleged, the inference of scienter versus other competing potential inferences. *Id*. Doing so here strengthens the conclusion that Plaintiffs' allegations do not give rise to a strong inference of scienter.

First, Defendants' disclosures of negative information about the operational and performance issues at the Nevada Mines is inconsistent with the supposed scheme to deceive investors about the Mines' performance. The disclosures are also inconsistent with a conclusion that Defendants made false statements with conscious recklessness: If Defendants were going to make false statements or avoid the truth in order to paint a rosy picture for investors, they would not also provide investors with so much negative information. "The bevy of truthful disclosures that [Defendants] made throughout the Class Period … negates an inference of scienter. It defies logic to conclude that executives who are seeking to perpetrate fraudulent information upon the market would make such fulsome disclosures." *Kuriakose v. Federal Home Loan*, 897 F. Supp. 2d 168, 185 (S.D.N.Y. 2012).

Second, if the Court were to accept Plaintiffs' contention that Defendants made inaccurate statements (which it should not), that would also mean *Klondex* had made inaccurate statements, which would render Plaintiffs' scienter story even less plausible. For instance, Plaintiffs now allege

"[s]everal senior geologists … repeatedly stated there was no high-grade gold ore at the Hollister and Midas mines." (SAC ¶ 67) But, just five days before the announcement of the acquisition, Klondex stated that Midas and Hollister had high-grade ore. *Supra* at 2. Indeed, the specific metrics that Hecla estimated in its public disclosure on March 19, 2018—0.71 oz/ton for Fire Creek; 0.31 oz/ton for Midas (Dkt. #96-2 at 13)—were *less* than what Klondex had disclosed just days earlier. *Supra* at 2 (0.90 oz/ton for Fire Creek; 0.33 oz/ton for Midas). Thus, the inference Plaintiffs propose is even more convoluted: Now the Court must infer that *Klondex* was deceiving investors; that Defendants discovered the fraud but rather than walking away from the acquisition they decided to adopt the fraud and continue it knowing in advance they would have to do so for a lengthy period until they could refinance Hecla's debt; that Defendants then followed their plan for the entire lengthy period but right when it came time to benefit from it they instead voluntarily abandoned it. This is not plausible, certainly not compared to competing inferences.

Third, as this Court previously concluded, the more logical inference is that the issues at the Nevada Mines worsened over time. (Order at 19) Plaintiffs' own allegations support this inference. (*E.g.*, SAC ¶ 124 (alleging "excess water conditions that were growing worse throughout the Class Period")) This conclusion is bolstered by Plaintiffs' new allegation about Baker's statements following the Class Period, where he explained that "the water discharge in the first 5 months of this year is over 2x what it was over the same period last year" and that Hecla was "seeing more refractory ore and poor ground conditions than initially encountered." (SAC ¶ 187) The point is not that Defendants can assert on a motion to dismiss that Baker's explanation was true, but that it articulates a much more plausible inference than the unlikely scenario that Plaintiffs propose.

Fourth, another plausible inference from the facts alleged is that Defendants thought they could run the Nevada Mines better than Klondex. A larger corporation with more expertise and

sophistication might take that view. (*E.g.*, *supra* at 4; SAC ¶ 7 ("we see significant opportunity to improve costs, throughput and recoveries over time with our expertise")) And Plaintiffs' new allegations support that inference, with Plaintiffs acknowledging Hecla employees were able to solve problems that Klondex previously had not. (*Id.* ¶ 72 (a Hecla metallurgist "developed a procedure … to remove the free carbon" from Midas and Hollister ore)) Ultimately, Hecla was not successful—or not successful enough—but the inference Defendants may have thought they could improve performance in Nevada is more plausible than the convoluted story Plaintiffs propose.

## III. Plaintiffs' New Allegations Do Not Plead With Particularity Any False Or Misleading Statement.

The final reason to dismiss this case is that Plaintiffs' new allegations do not plead with particularity that Defendants made a false or misleading statement—not for any of the previously alleged misstatements nor for the seven newly alleged misstatements.

### A. Plaintiffs' New Allegations Do Not Plead Any Of The Previously Alleged Misstatements Were Inaccurate Or Misleading.

The Court previously held Plaintiffs had not pled any material misrepresentations. (Order at 22-26) Plaintiffs' new allegations do not undermine that conclusion.[6]

- Plaintiffs allege Defendants stated that all three Nevada Mines were high grade. (*E.g.*, SAC ¶¶ 103, 115) Plaintiffs contend these statements were false because Defendants "knew, or at least recklessly disregarded, and failed to disclose the material, negative fact that … Fire Creek contained refractory ore that could not be profitably extracted without substantial and uneconomical capital and operational costs." (*Id.* ¶ 104) But Plaintiffs conflate the ore's "grade" with whether it is economic to extract it. Indeed, Plaintiffs admit that ore grade and the economics of extracting it

---

[6] The following addresses the previously-alleged misstatements of fact about which Plaintiffs' new allegations could even arguably have an impact. Defendants do not repeat their arguments regarding previously-alleged misstatements that are not touched by the new allegations. (SAC ¶¶ 123, 133, 137, 162)

are separate things: "While refractory ore may be high grade, the costs to extract that gold can be astronomical." (SAC ¶ 11) In any event, Defendants did not just use the term "high grade," they expressly defined "grade" to mean ounces of gold per ton. (Dkt. #96-2 at 13) Plaintiffs do not allege facts establishing that the Nevada Mines were not high grade under this measure. Moreover, Defendants did not just assert a conclusion about grade, they disclosed specific oz/ton measurements on which their statement was based. *Supra* at 4. Plaintiffs do not allege there is a standard definition of "high grade" that rendered Defendants' statements inaccurate, but even if there were, Defendants' disclosures of oz/ton information meant investors could reach their own conclusions. In any event, only three weeks after acquiring Klondex, Hecla disclosed it had stopped mining entirely at the Midas mine and that "the Hollister ore is carbonaceous." *Supra* at 5. Thus, if anyone had thought "high grade" meant "could be mined profitably," they were disabused of the notion long before Plaintiffs allege the "truth" was disclosed and caused the stock price to decline.

- During a December 4, 2018 conference call, Hall stated: "There's no major capital expenditures that we can't fund out of the Nevada operations." (SAC ¶ 145) Plaintiffs contend this statement "gave investors the false impression that the Nevada Mines would not require financial investment to generate positive cash flows." (*Id.* ¶ 146) But Hall's statement was about capital expenditures, not performance generally—which was disclosed (negatively) elsewhere. Plaintiffs are not entitled to divorce the statement from all the other statements Defendants had made about problems at Nevada. And nowhere do Plaintiffs allege there was some capital expenditure Defendants were planning that they knew Hecla could not fund from Nevada's cash flows.

- Plaintiffs' new allegations also do not plead with particularity that Hecla's risk disclosures were inaccurate. (SAC ¶¶ 111-112, 129, 142, 165-66) Plaintiffs' theory appears to be that disclosing a risk that could materialize implicitly states the risk has not yet materialized. But it

does not, for risks that have materialized *can also get worse*. Moreover, Defendants disclosed throughout the Class Period that various risks had materialized—actual negative conditions and poor performance in Nevada. *Supra* at 3-7. That Hecla adhered to SEC regulations by also disclosing the possibility that additional adverse conditions could arise, or that current conditions could worsen, is not misleading. *Chapman*, 466 F. Supp. 3d at 406; *Bondali v. Yum Brands*, 620 F. App'x 483, 490-91 (6th Cir. 2015) ("a reasonable investor would be unlikely to infer anything regarding the current state of a corporation's … operations from a statement intended to educate the investor on *future* harms"); *Wochos*, 985 F.3d at 1196 (similar).[7]

**B.    Plaintiffs Do Not Allege With Particularity That Any Of The New Alleged Misstatements Are Actionable.**

The SAC also includes seven new alleged misstatements, none of which are actionable.[8]

- First, Plaintiffs allege the March 19, 2018 announcement of Hecla's agreement to acquire Klondex stated: "We can improve costs, grow reserves and expand production … shareholders can benefit from the 162,000 gold equivalent ounces a year of production" (SAC ¶ 96) Plaintiffs contend the statement was false and misleading because the Nevada Mines "were plagued with ongoing material, negative problems … and were expected to persist unless uneconomical capital and operational expenditures were made to cure the negative conditions." (*Id*. ¶ 102) But the first part

---

[7] Plaintiffs also continue to contend that Hecla violated Item 303 of Regulation S-K by failing to disclose "the ongoing material negative problems" in Hecla's 2018 SEC filings. (SAC ¶¶ 108, 127, 140, 164) "[D]isclosure [under Item 303] is necessary 'where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial conditions or results of operations.'" *Ind. Public Retirement Sys. v. SAIC*, 818 F.3d 85, 94 (2d Cir. 2016). Here, Hecla *did* disclose the negative trends regarding the Nevada Mines. As explained above, within weeks of the acquisition, Defendants disclosed negative conditions and performance. *Supra* at 3-7. Then with each quarterly SEC report, Hecla disclosed concretely the poor performance of the Mines. Item 303 does not require anything more.

[8] Five of the new alleged misstatements are addressed here. The remaining two (SAC ¶¶ 96, 130) are about statements of 'high-grade' gold and are addressed above. *Supra* at 20-21.

of the statement was forward-looking and accompanied by meaningful cautionary language, discussed above (*supra* at 4), so it is protected by the safe harbor. It is also protected by the safe harbor for the additional reason that Plaintiffs do not plead with particularity that Hecla concluded during due diligence that Hecla could not improve costs, grow reserves, and expand production.

And the second part of the statement is a fact that Plaintiffs do not allege was inaccurate. On the March 19, 2018 analyst call, an analyst asked why Hecla was estimating 162,000 gold equivalent ounces in 2018 and Baker explained: "We're not guiding. That is what [Klondex] did in 2017." (Ex. 23 at 15-16) Baker was correct: Just five days before Hecla's press release, Klondex filed its 2017 10-K, which indicated the Nevada Mines had produced 161,554 gold equivalent ounces in 2017. (Dkt. #96-9 at 17) Plaintiffs do not allege any Defendant knew in March 2018 that gold equivalent ounces would decline from what Klondex produced in 2017.

- On May 10, 2018, McDonald said on an earnings call: "I'm very excited about the exploration opportunities in northern Nevada once the acquisition of Klondex is concluded … [I]t is rare that you can acquire 110 square miles of exploration ground in northern Nevada that lies within or at the intersection of prolific trends or rifts. They have a great team of geologists, with a significant understanding of the properties, and we look forward to working together to realize the potential of this ground." (SAC ¶ 105) Plaintiffs contend the statement was misleading because "McDonald was told by Klondex geologist and executives of the material, negative fact that … Fire Creek[] contained refractory ore … and about the poor ore characteristics and that water permits limited water removal and hampered production." (*Id.* ¶ 106) But McDonald's statement was not about Fire Creek; it was about "exploration opportunities" in the "110 square miles of exploration ground" that Hecla acquired from Klondex in addition to the three Mines. As Plaintiffs allege, McDonald was Hecla's head of *Exploration*. (*Id.* ¶ 44) Exploration is "[t]he search for coal,

mineral or ore." (Ex. 24) It is a separate activity from extracting ore and "aims at *locating* the presence of economic deposits and establishing their nature, shape and grade." (*Id.*, emphasis added) Plaintiffs do not allege that the exploration ground Hecla acquired in the Klondex transaction did not have strong exploration potential, as McDonald stated.

Moreover, McDonald's statement that he was "excited" and "look[ing] forward to" opportunities was a statement of opinion. Under *Omnicare v. Laborers District Council*, 575 U.S. 175 (2015), "liability for making a false statement of opinion may lie only under limited circumstances." *Gray*, 454 F. Supp. 3d at 400. "For an omissions case, '[t]he investor must identify particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context.'" *Id.* Plaintiffs' allegations do not satisfy this standard.

- In October-December 2018, Hecla published presentations that stated about Fire Creek: "Current reserves and resources provide mining inventory out to 2023." (SAC ¶¶ 130, 143, 147) Plaintiffs contend the statement was false because CI 14 said the life of mine was three years, not five. (*Id.* ¶ 131) However, the statement was forward-looking and was accompanied by meaningful cautions, including: "Estimates or expectations of future events or results are based upon certain assumptions, which may prove to be incorrect. Such assumptions include … the accuracy of our current mineral reserve and mineral resource estimates." (Ex. 25 at 2) Further, Plaintiffs do not allege facts showing the statement was false. As Plaintiffs allege, life of mine refers to "*reserves* left to mine." (SAC ¶ 131, emphasis added) But the alleged misstatement describes "reserves *and resources*." (Ex. 19 at 18 (describing the difference between reserves and resources)) Plaintiffs do not allege any facts about reserves and resources combined (which are obviously greater than

reserves alone). Finally, Plaintiffs do not plead that any Defendant knew of this information about the life of mine. To the contrary, Plaintiffs allege the information an officer might have seen—"the books"—showed five years, *not* three. (*Id*. ¶13(b)(vii))

- On November 8, 2018, Baker stated: "we don't believe we will need to make significant new financial investment to put the mine on the same improvement path that we have seen at Greens Creek and Casa Berardi." (SAC ¶ 135) Plaintiffs contend this was false because Baker "gave investors the false impression that the Nevada Mines would not require new financial investment to generate positive cash flows." (*Id*. ¶ 136) First, this statement was forward-looking and was accompanied by meaningful cautions: "Estimates or expectations of future events or results are based upon certain assumptions, which may prove to be incorrect. Such assumptions include … operations and expansions of the Company's projects being consistent with current expectations and mine plans." (Ex. 26 at 16) It also included a description of problems at Nevada. (*Id.* at 9-10) Second, the statement disclosed that Hecla *had just made* a significant new investment—"$15 million in capital and $4.5 million in exploration expense was invested in Nevada." (*Id*. at 9) Plaintiffs do not allege the amount Hecla had invested was considered to be insufficient at the time of Baker's statement. Finally, "improvement path" does not mean "positive cash flows."

- A January 2019 investor presentation stated: "Mine Life at our most important mines are long and getting longer." (SAC ¶ 151) Plaintiffs contend this was false because "in truth, the LOM at the Nevada Mines … was not getting longer." (*Id*. ¶ 152) However, Plaintiffs do not allege the statement had anything to do with Nevada. The presentation is about Hecla's business overall, and the very same page identifies Hecla's "Best Mines" as "Greens Creek and Casa." (Ex. 27 at 3)

## <u>Conclusion</u>

For the foregoing reasons, the Court should dismiss this action with prejudice.

Dated: May 12, 2023

Respectfully submitted,

/s/ Joshua Z. Rabinovitz

Stefan Atkinson, P.C.
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-4800
Stefan.Atkinson@kirkland.com

Joshua Z. Rabinovitz
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 389-5000
Joshua.Rabinovitz@kirkland.com

Kate Guilfoyle
KIRKLAND & ELLIS LLP
300 N. LaSalle
Chicago, IL 60654
(312) 862-2000
Kate.Guilfoyle@kirkland.com

*Counsel for Defendants*