**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ROBERT GLUCK, EMMA GLUCK and SARA GLUCK, on behalf of themselves and all others similarly situated,<br><br>          Plaintiffs,<br><br>  vs.<br><br>HECLA MINING COMPANY, PHILLIPS S. BAKER, JR., LINDSAY A. HALL, LAWRENCE P. RADFORD, and DEAN W.A. MCDONALD,<br><br>          Defendants. | Case No.: 19-cv-4883 (ALC)<br><br>(Consolidated with Case No.: 19-cv-5719 (ALC)) |

**LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT**

**KAPLAN FOX & KILSHEIMER LLP**
Robert N. Kaplan
Jeffrey P. Campisi
Jason A. Uris
800 Third Avenue, 38th Floor
New York, NY 10022

*Lead Counsel for Lead Plaintiffs and the Proposed Class*

Dated: June 21, 2023

## <u>TABLE OF CONTENTS</u>

**Page(s)**

Table of Authorities ............................................................................................ iii

PRELIMINARY STATEMENT ............................................................................ 1

I.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING
      STATEMENTS WERE MADE WITH SCIENTER ...................................... 2

      A.    Defendants' March 19, 2018 Statements. ........................................ 3

      B.    August 9, 2018 Statements ............................................................... 7

      C.    October 3, 2018 Statements .............................................................. 9

      D.    November and December 2018 Statements ...................................... 11

      E.    February 21, 2019 Statements and Partial Disclosure of the Fraud ...................... 12

      F.    April 18, 2019 Statement and Partial Disclosure of the Fraud ............................ 12

      G.    Defendants Disclose Negative, Adverse Conditions That They Had
            Covered Up During the Class Period and Shut Down the Nevada
            Mines ................................................................................................ 13

II.   LEGAL ARGUMENT .................................................................................. 14

      A.    Defendants' Statements Were False and Misleading at the Time
            They Were Made ............................................................................... 14

            1.    The Statements Were Not Forward-Looking and Not
                  Accompanied by Meaningful Cautionary Language ............... 14

            2.    Defendants' Argument That They Disclosed Negative
                  Information Ignores the New Allegations ............................... 16

      B.    The Complaint Adequately Alleges Defendants' Scienter ................ 20

            1.    Defendants Knew of, or at Least Recklessly Ignored,
                  Material Negative Conditions at the Nevada Mines That
                  Were Not Disclosed ............................................................... 21

            2.    Defendants' Additional Arguments Are Unavailing Because
                  They Ignore, Mischaracterize and Dispute Facts ................... 22

            3.    Defendants' Motive to Refinance its Outstanding Debt on
                  Favorable Terms Supports a Strong Inference of Scienter ...... 24

III.     CONCLUSION ........................................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abramson v. Newlink Genetics Corp.*,
965 F.3d 165 (2d Cir. 2020) ................................................................. 16

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544, 555 (2007) ...................................................................... 10

*Bristol Cnty. Ret. Sys. v. Adient PLC*,
No. 20-3846-cv, 2022 WL 2824260 (2d Cir. July 20, 2022) ................... 22

*Bondali v. Yum Brands*,
620 F. App'x 483 (6th Cir. 2015) ........................................................... 20

*Chapman v. Mueller Water Prod., Inc.*,
466 F. Supp. 3d 382 (S.D.N.Y. 2020) ................................................... 18

*Freudenberg v. E\*Trade Fin. Corp.*,
712 F. Supp. 2d 171 (S.D.N.Y. 2010) .............................................. 21, 24

*Gray v. Wesco Aircraft Holdings, Inc.*,
454 F. Supp. 3d 366 (S.D.N.Y. 2020) ................................................... 16

*In re Hain Celestial Group, Inc. Sec. Litig*,
20 F. 4th 131 (2d Cir. 2021) ............................................................ 20, 24

*In re MF Glob. Holdings Ltd. Sec. Litig.*,
982 F. Supp. 2d 277 (S.D.N.Y. 2013) ................................................... 23

*In re Sadia, S.A. Sec. Litig.*,
643 F. Supp. 2d 521 (S.D.N.Y. 2009) ................................................... 21

*In re Scholastic Corp. Sec. Litig.*,
252 F.3d 63 (2d Cir. 2001) ................................................................... 20

*In re Scottish Re Group Sec. Litig.*,
524 F. Supp. 2d 370 (S.D.N.Y. 2007) ................................................... 21

*In re Turquoise Hill Res. Sec. Litig.*,
No. 20-cv-08585 (LJL), 2022 WL 4085677 (S.D.N.Y. Sept. 2, 2022) ................. 16

*In re Vivendi, S.A. Sec. Litig.*,
838 F.3d 223 (2d Cir. 2016) ........................................................... 15, 16

*In re: EZCorp, Inc. Sec. Litig.*,
   181 F. Supp. 3d 197 (S.D.N.Y. 2016) ................................................................ 15

*Indiana Pub. Ret. Sys. v. SAIC, Inc.*,
   818 F.3d 85 (2d Cir. 2016) .................................................................................. 24

*Kuriakose v. Fed. Home Loan Mort. Corp.*,
   897 F. Supp. 2d 168 (S.D.N.Y. 2012) ............................................................... 24

*Local 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*,
   595 F.3d 86 (2d Cir. 2010) .................................................................................. 18

*Maloney v. Ollie's Bargain Outlet Holdings, Inc.*,
   518 F. Supp. 3d 772 (S.D.N.Y. 2021) ............................................................... 22

*Meyer v. Jinkosolar Holdings Co.*,
   761 F.3d 245 (2d Cir. 2014) ................................................................................ 18

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000) ........................................................................ 15, 23

*Nypl v. JPMorgan Chase & Co.*,
   No. 15 CIV. 9300 (LGS), 2017 WL 1133446 (S.D.N.Y. Mar. 24, 2017) ............ 25

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004) ........................................................................ 19, 20

*Setzer v. Omega Healthcare Inv'rs, Inc.*,
   968 F.3d 204 (2d Cir. 2020) ........................................................................ 18, 22

*Shupe v. Rocket Companies, Inc.*,
   No. 1:21-CV-11528, 2023 WL 2411002 (E.D. Mich. Mar. 8, 2023) ................... 15

*Skiadas v. Acer Therapeutics, Inc.*,
   No. 1:19-cv-6137-GHW, 2020 WL 4208442 (S.D.N.Y. July 21, 2020) .............. 24

*Speakes v. Taro Pharm. Indus., Ltd.*,
   No. 16-cv-08318 (ALC), 2018 WL 4572987 (S.D.N.Y. Sept. 24, 2018) .......... 5, 22

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ........................................................................................... 20

*Tongue v. Sanofi*,
   816 F.3d 199 (2d Cir. 2016) ................................................................................ 16

*Wang v. Cloopen Grp. Holding Ltd.*,
   No. 21-CV-10610 (JGK), 2023 WL 2534599 (S.D.N.Y. Mar. 16, 2023) ............. 16

*Wochos v. Tesla,*
   985 F.3d 1180 (9th Cir. 2021) ................................................................................ 20

**Statutes**

15 U.S.C. § 78u-4(b)(1)-(2) ........................................................................................ 2

15 U.S.C. § 78u-4(b)(2)(A) ...................................................................................... 20

## PRELIMINARY STATEMENT

The Second Amended Consolidated Class Complaint for Violations of Federal Securities Laws (ECF No. 124) (the "Complaint") addresses to the letter the deficiencies identified in the Court's February 22, 2023 Opinion and Order that dismissed the amended complaint without prejudice. ECF No. 116 ("Feb. 22 Order").  In response to the Feb. 22 Order, the Complaint adds detailed allegations, including allegations based on two additional confidential informants ("CIs") with first-hand knowledge and direct contact with the Individual Defendants that show they knew, or at least recklessly disregarded, that their statements concerning the Nevada Mines were materially false and misleading at the time they made them.[1]  In light of the new allegations, the inference of Defendants' scienter is cogent and compelling, and at least as plausible as the alternative inferences that Defendants suggest.

Before and during the Class Period, according to CIs 13 and 14, Defendants Radford and McDonald, who led Hecla's due diligence of the Nevada Mines on behalf of Defendants, knew, or at least recklessly ignored, that the Nevada Mines contained uneconomic refractory gold ore, did not have the necessary water discharge permits and infrastructure to handle the water, that gold production had declined and was expected to continuing declining, and of other material negative conditions, all of which had and would continue to materially hamper production and drain cash

---

[1] Exhibit A to the accompanying Declaration of Jeffrey P. Campisi in Support of Lead Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss Second Amended Complaint, dated June 21, 2023 ("Campisi Declaration"), is a version of the Complaint that highlights amendments to the Complaint in response to the Feb. 22 Order.  The "Individual Defendants" are Lawrence P. Radford ("Radford"), the Company's former Senior Vice President – Operations and Dean W.A. McDonald ("McDonald"), the Company's former Senior Vice President – Exploration—both of whom led Defendant Hecla Mining Company's ("Hecla") due diligence, management and oversight of the Nevada Mines and reported to Phillips S. Baker, Jr. ("Baker"), Hecla's President and Chief Executive Officer ("CEO") and Lindsay A. Hall ("Hall"), Hecla's former Vice President, Chief Financial Officer ("CFO"). ¶¶8-9, 41-45. Citations to "¶_" refer to paragraphs of the Complaint.

flows.  Defendants' positive statements that they could turn around the Nevada Mines and operate them on at least a cash flow neutral basis stood in stark contrast to the undisclosed negative conditions.  In truth, as Defendant Baker admitted after the Class Period, the acquisition of the Nevada Mines was an attempt "to take this plane that was flying and redesign it and rebuild it in the air, and it was just costing us way too much money."  ¶¶3, 22, 198.

At the start of the Class Period, notwithstanding Defendants' assertions that they could do a better job operating the Nevada Mines than its previous owners by improving costs and expanding production, Defendants had a duty to inform investors of the negative conditions that Defendants' knew of, or at least recklessly disregarded, that contradicted their positive statements that the Nevada Mines contained "high-grade" gold, had all permits needed, and could fund operations from the Nevada Mines' cash flows without investing new capital.  The material, negative facts covered up by the Individual Defendants throughout the Class Period—uneconomic refractory gold ore, insufficient permits to discharge water and inadequate infrastructure, declining gold production and unavoidable skyrocketing costs—were identified as the reasons that Defendants decided to effectively shut down the Nevada Mines and, when disclosed, caused Hecla's stock to decline, damaging investors.  Defendants' motion to dismiss should be denied.

## I.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS WERE MADE WITH SCIENTER

The Feb. 22 Order required additional details regarding the reasons Defendants' statements were false when made, and "why and how the knowledge of the CIs can be imputed to the knowledge of Defendants." Feb. 22 Order, at 19-26.  As set forth below, the Complaint satisfies the particularity requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b)(1)-(2), and alleges Defendants' statements misled investors about current or historical facts that were contradicted by specific, negative information known, or at least

recklessly disregarded, by Defendants, and were not forward-looking statements, or statements of belief or opinion.

A.    **Defendants' March 19, 2018 Statements.**

The Class Period begins on March 19, 2018 when Defendants disclosed the acquisition of the Nevada Mines.  Defendants represented that Hecla acquired three "high-grade" gold mines and that they had the ability to turn around the performance of the Nevada Mines, which had floundered under its past owners, by improving "costs, throughput and recoveries," and had the ability to make necessary improvements with the cash flow generated by the Nevada Mines without the need for additional capital investment. ¶¶96-102 (March 19 statements). The Fire Creek Nevada Mine was the "cornerstone" of the acquisition because of its purportedly "robust cash flows."  ¶96.  By this point in time, Defendants had engaged in due diligence for several months, and according to CIs 13 and 14, Defendants Radford and McDonald were informed, or at least turned a blind eye to, material negative facts that had hampered and would continue to hamper production and drain cash flows at the Nevada Mines, and which contradicted the March 19 statements.  CI 13 was a general manager at the Nevada Mines and CI 14 was a geologist, and both had first-hand interactions with the Individual Defendants before and throughout the Class Period. ¶¶9, 13.

Defendants' positive statement that Hecla acquired "Three High-Grade Gold Mines"[2] that "have the highest grade mines the U.S." (¶96) was materially misleading because Defendants failed to disclose that the purportedly "high-grade" gold at Fire Creek was refractory gold, which is ultra-fine gold particles that are difficult to extract because the gold is locked up among other minerals, and could not be processed on a cost-effective basis because the Nevada Mines did not

---

[2] Defendants repeated this statement on July 23, August 9, October 3, November 9, December 10, 2018, and January 22, 2019.  ¶¶115, 118, 130, 143, 147, 149.

have facilities to extract refractory gold ore, such as a roaster. ¶¶10, 13(b)(iv), 66, 78.[3]  While

refractory ore may be "high-grade," the costs to extract refractory gold can be astronomical.  ¶¶10-

12.  Capital and operational costs to extract gold from refractory ore are substantially higher than

extraction of gold from non-refractory ore: processing facilities cost over $1 billion to construct,

and operational costs are driven higher by labor, consumables, freight, mine overhead and energy

costs.  ¶11.

    According to CI 13, Hecla's plan to turn around the Nevada Mines was contingent on

obtaining a contract from Barrick Gold Corporation/Nevada Gold Mines to process the Nevada

Mines' refractory ore that was "way" below the price that Barrick/Nevada Gold offered. ¶13(a)(iv).

Defendant Radford tried, but failed, to obtain a milling or tolling agreement with Barrick Gold

Corporation/Nevada Gold Mines, which had a facility for processing refractory ore. *Id*. Upon

sending a test sample to Barrick, Defendant Radford learned that the cost per ton to mill was way

too high which negatively affected the ability to profitably mill refractory ore from the Fire Creek

Nevada Mines. *Id*.

    At the same time as Defendants stated that the gold in the Nevada Mines was "high-grade,"

Defendants knew of, or at least recklessly disregarded, specific contradictory information.

According to CIs 13 and 14, Defendants Radford and McDonald were warned about refractory ore

and turned a blind eye.  ¶¶9, 13(a)(i), (b)(ii).  Thus, when Defendants stated that the gold at the

Nevada Mines was "high-grade," Defendants Radford and McDonald knew of, or at least

recklessly ignored, specific contradictory information that caused these statements to be materially

misleading because Fire Creek contained uneconomic refractory ore that could not be processed

---

[3] Defendant Baker's May 10, 2018 statement that "we saw extraordinary grades" of gold in the
Nevada Mines and McDonald's statement that the Defendants could "realize the potential" of the
Nevada Mines were misleading for the same reasons.  ¶¶103, 105.

on a cost-effective basis.  Defendants covered up this negative fact until the end of the Class Period, when Defendants admitted the existence of refractory gold ore, that the cost to develop it was "too high," and that Defendants were pursuing third-party processing arrangements to process refractory ore mined at Fire Creek.  ¶¶177, 185, 187 (Defendant Baker: "[t]hird party ore processing arrangements" are being pursued to "process ore that is considered refractory.").[4]

Moreover, at the same time as Defendants stated that the Nevada Mines contained "high-grade" gold, Defendants stated "[w]e can improve costs, grow reserves and expand production." ¶96. This statement was materially misleading because in addition to uneconomic refractory ore, Defendants Radford and McDonald had already been informed of unavoidable expenses and declining gold production (with further declines expected) that materially hindered Defendants' ability to improve costs, and contradicted Defendants' statements that they had the ability to grow reserves and expand production.  According to CI 13, Defendants Radford and McDonald were informed that the Nevada Mines were beholden to an expensive outsourcing contract with American Mining & Tunneling, LLC ("AMT") that was a key driver of the costs of production at Fire Creek.  ¶13(a)(v).  The costs were unavoidable because the Nevada Mines did not have the workforce or equipment to do the work performed by the outside contractors.  ¶¶13(a)(v), 83. Moreover, Defendants Radford and McDonald were informed of increasing costs and declining

---

[4] Defendants argue that because Defendants had disclosed the "oz/ton information . . . investors could reach their own conclusions" about the ore.  ECF No. 131 ("Def. Br."), at 21.  Defendants do not explain how or why the ounce per ton information could have alerted investors to the existence of uneconomic refractory ore, and Defendants' assertion raises questions of fact and expert issues that cannot be resolved on a motion to dismiss. *Speakes v. Taro Pharm. Indus., Ltd.*, 2018 WL 4572987, at *6 (S.D.N.Y. Sept. 24, 2018) (Carter Jr., J.). Moreover, the fact that Defendants announced that Hecla stopped mining the Midas mine and that the "Hollister ore is carbonaceous" has nothing to do with Defendants' misrepresentations about Fire Creek—the "cornerstone" of the acquisition—and that Defendants failed to disclose that it contained uneconomic refractory ore that could not be processed on a cost effective basis and that gold production had declined and was expected to continue declining.

gold production.  ¶¶13(a)(i), (viii).  It was not until after the Class Period that Defendant Radford admitted that it was "time to get control" and "demobilize" contractors in light of increased costs and declining revenue.  ¶¶13(a)(v), 176, 187.

Defendants' statements that the Nevada Mines required a "small amount of capital" (¶99) and "[t]here is no capital outlay that we're looking to, in Nevada, that's going to consume all of the cash flow that will be generated from the three mines" were materially misleading because, contrary to requiring "a small amount of capital," according to CIs 13 and 14, substantial capital was needed to improve the Nevada Mines.  According to CI 13, at least Defendants Radford and McDonald, who oversaw due diligence on behalf of Defendants and reported to Defendants Baker and Hall, were told that the Nevada Mines required substantial capital investment during due diligence.  ¶¶9, 13(a), 13(a)(vi-viii), ix), 54, 212. Due to the poor ground conditions, there was significant waste and capital expenses of at least $10-12 million per year.  ¶13(a)(iii).  The rapid infiltration basins, which were key infrastructure to handle water discharge, were designed defectively, did not discharge water as they were designed to do, contributed to excess water at Fire Creek, and needed to be rebuilt at a cost of approximately $2 million each.  ¶13(a)(vi).  Water was a chronic problem at Fire Creek, and due to permit limits on the amount of water that could be discharged, the Nevada Mines incurred unavoidable and wasteful expenses through makeshift and expensive workarounds like trucking the water offsite. ¶13(a)(vii).

Finally, Defendants' statements that "shareholders can benefit from the 162,000 gold equivalent ounces a year of production" (¶96) and "we're now acquiring 160,000 plus of production, and immediate cash flow" (¶99) were misleading at that time they were made because they created the false impression that the Nevada Mines would continue to produce 162,000 ounces per year, when in fact the production of gold ore had already materially declined and at that time

was expected to drop to mid-80,000 ounces in 2018.  ¶13(a)(viii).  According to CI 13, during due diligence, Defendant Radford and Board were informed of this negative material fact that contradicted Defendants' representation to investors.[5]  *Id.*

## B.     August 9, 2018 Statements

On July 23, 2018, Defendants closed the acquisition of the Nevada Mines and, according to CIs, including CIs 13 and 14, the Individual Defendants and other senior Hecla executives participated in meetings in July 2018 and were directly informed of the undisclosed material negative conditions that Defendants Radford and McDonald were warned of, or at least recklessly ignored, during due diligence—uneconomic refractory ore, massive capital needs, lack of necessary water discharge permits and lack of infrastructure to handle the water.  ¶13(b)(v) (permit limits created bottleneck and difficulties discharging water), ¶13(a)(xii) (July 2018 meeting where Defendant Radford was informed that costs of production were increasing and gold production was declining); ¶13(b)(iv) (uneconomic refractory gold ore); ¶13(a)(xiii) (runaway costs to discharge water).  CI 13 and 14's information is corroborated by CIs 9 and 10. ¶¶86-87.

According to CI 14, in response to learning about the negative conditions at the Nevada

---

[5] Defendants argue that "Plaintiffs do not allege any Defendant knew in March 2018 that gold equivalent ounces would decline from what Klondex produced in 2017."  Defendants' argument ignores the allegations in paragraph 13(a)(viii), which alleges that Defendant Radford was informed that gold production would decline in 2018.  Defendants further argue that the statement "shareholders can benefit from the 162,000 gold equivalent ounces a year of production" was not "inaccurate" because Defendant Baker further stated that "[w]e're not guiding.  That is what [Klondex] did in 2017."  Def. Br. at 23.  Defendants' argument ignores that the only way shareholders "can benefit from the 162,000 ounces a year of production" is if that rate of production continues.  If production drops below that rate, then shareholders *are not* benefiting from 162,000 ounces per year of production.  While Defendants represented that they could "expand production," Defendant Radford and McDonald had already been informed that gold production had already declined and was at that time expected to decline at least 50% in 2018 compared to production in 2017.  *Compare* ¶96, *with* ¶¶9, 13(a)(viii).  CI 13's information is corroborated by the fact that production in 2018 indeed fell off a cliff, to around 32,000 ounces, down from 162,000 ounces in 2017. ¶153.

Mines and that Hecla paid a steep price to acquire them, rather than coming clean to investors, Defendants covered up the problems in an effort to portray the acquisition as a good investment. ¶13(b)(vi). For example, on August 9, 2018, during the first Hecla investor conference call after the acquisition closed, investors were keenly focused on Defendants' plan to turn around the Nevada Mines. In response to a question whether Defendants had all permits and "everything else you need," Defendant Baker stated "[w]e've got everything we need." ¶123. This was materially misleading. Defendants had already been informed that Fire Creek did not have adequate permits needed to discharge water at Fire Creek or the infrastructure to handle the water. ¶¶13(a)(vii), (b)(v), 68, 77, 79.[6]

On August 9, 2018, Defendant Baker stated Defendants' "expectation is this year that for the five months, it will be self-funding. We're not anticipating needing to contribute additional capital into it" (¶121), and Defendant Hall stated "[t]he Nevada assets are basically self-funding." ¶120. These statements were materially misleading because Defendants knew, or at least recklessly disregarded, contradictory facts. According to CIs 13 and 14, at least Defendant Radford was informed that increased costs due to poor mine conditions coupled with poor ore quality, such as refractory gold ore, were and would continue to be a drain on cash flows (¶¶13(a)(i)-(xiii), 13(b)(ii), (iv)-(v)), and massive capital investment was required to turn around the Nevada Mines. ¶¶13(a)(iii)-(vi), 58. On February 21, 2019, when disclosing Hecla's financial

---

[6] The Feb. 22 Order did not directly address this statement and Defendants' motion ignores it. Defendants previously argued that this statement was not false because it related to accessing another area of the Nevada Mines (Hatter Graben), not the Fire Creek mine. ECF No. 95 at 23. Defendants' argument ignores that they depended on cash flows from Fire Creek "to largely pay for" development of the Hatter Graben. ¶135. Assuming, *arguendo*, Baker's broad, unqualified statement is construed to relate only to Hatter Graben, it was misleading because the uneconomic refractory ore, lack of permits and inadequate infrastructure at that time were negatively affecting production needed to generate cash flows to fund development of the Hatter Graben, thus Defendants did not have "everything" needed.

results for 2018, Defendants admitted that in 2018 the Nevada Mines were cash flow negative and not self-funding, a partial disclosure that caused Hecla's stock price to decline 7%. ¶¶23, 155-56.

Moreover, Defendant Baker, rather than disclosing the problems known (or recklessly ignored) outlined above, misleadingly stated "Fire Creek has the best margin of the 3 mines" "so ramping it up is our priority." ¶118. At that time, Baker knew, or at least recklessly disregarded, that production at Fire Creek could not be "ramped up" and operated profitably, or at least on a cash flow neutral basis, because Fire Creek contained uneconomic refractory ore and the lack of necessary water permits and infrastructure to deal with the water materially hindered increased or "ramped up" production at Fire Creek without massive capital investment and changes to water permits. At the end of the Class Period, when Defendants later disclosed these negative conditions, Hecla's stock price declined. ¶¶169-78.

### C.    October 3, 2018 Statements

On October 3, 2018, Defendants caused Hecla to disseminate to investors a Hecla corporate update titled "Near-Term Value Drivers" that represented Fire Creek had at that time "Current reserves and resources provide mining inventory out to 2023." ¶130.[7]  This statement was materially false and misleading at the time it was made because it falsely represented that the Nevada Mines had five years of mining inventory, when in fact, there was three years of mining inventory. Ultimately, after the Class Period, Defendant Baker admitted the life of mine was one and one-half years. ¶176. This inconsistency was significant because it meant that the Nevada Mines reserves would be depleted sooner than publicly stated and Defendants would have to invest

---

[7] Defendants repeated this statement on November 9, December 10, 2018, and January 22 and March 22, 2019. ¶¶143, 147, 149, 167. The January 22 and March 22, 2019 statements—made just weeks before Defendant Baker disclosed that the life of mine for the Nevada Mines had contracted from 5 to 1.5 years (¶176)—further represented that the "Mine Life at our most important mines are long and getting longer," which was misleading because the life of mine at the Nevada Mines had, in fact, materially contracted at the time these statements were made.

capital sooner than publicly represented to extend the life of the mine.

Defendant Baker knew, or at least recklessly disregarded, that this statement was false and misleading. In or around September 2018, CI 14 attended a budget meeting (at Hecla's office in Coeur d'Alene, Idaho) where the Fire Creek managers proposed new spending for the 2019 drill programs. ¶13(b)(vii). According to CI 14, Defendant Baker was at the meeting and was concerned about the proposed spending on projects, was shocked by the proposed amount and that it was required to be invested so soon to extend the life of mine, and that more spending was needed to extend life of mine. ¶¶13(b)(vii), 131. According to CI 14, the life of mine, which provides an estimate of the amount of inferred and proven reserves left to mine, in reality, was closer to three years or 40% lower than Defendants represented to investors. *Id*.[8]

CI 14's first-hand account is consistent with information provided by CI 13, who in late 2018 presented budgets for the Nevada Mines to Hecla senior management, including Defendants Baker, Radford, Hall and McDonald, that showed cash flow at Fire Creek had extremely reduced year over year. ¶13(a)(xv). CI 13's presentations showed fewer ounces produced year-over-year at the Nevada Mines, that the veins at Fire Creek were dying, and that the Nevada Mines were running out of areas to drill. ¶¶13(a)(viii), (xv)-(xvi). As to the loss of reserves, CI 13 identified specific events that corroborate CI 14's account. According to CI 13, in or around September-December 2018, after mining an area of the Fire Creek Nevada Mine expected to contain substantial gold ore, the gold ore was about 20% of expected production, a loss of approximately

---

[8] Defendants' argument that the Complaint does "not allege the life of mine was discussed at that meeting or with Baker" relies on a crabbed interpretation of the Complaint that improperly considers the allegations in isolation. Def. Br. at 14, 24-25. The context and reasonable inference from the allegations in Paragraph 13(b)(vii) is that Defendant Baker was informed that the life of mine had contracted 40% and was shocked by the expenses required to reverse the decline. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

20,000 ounces of expected gold or approximately $24 million in lost cash flows.  ¶¶13(a)(xiv), 90.

### D.    November and December 2018 Statements

By November 2018, the Nevada Mines had been hemorrhaging cash for months due to skyrocketing costs and materially declining gold production, a trend expected to continue into 2019.  On November 8, 2018, knowing, or at least recklessly disregarding, the negative conditions at the Nevada Mines outlined above and just weeks before Defendant Hall admitted the Nevada Mines were, in fact, cash flow negative in 2018 and gold production had declined approximately 80% compared to 2017 (¶155), Defendant Baker falsely represented "we're not anticipating the need to make significant contributions into Nevada" and "[w]e think we can run it pretty close to cash flow neutral." ¶¶23, 135, 153, 155.  Then, on December 4, 2018, less than a month before the end of the year during which cash flow was negative, Defendant Hall falsely stated the Nevada Mines had "all the infrastructure, we just have to improve the mining operations. There's no major capital expenditures that we can't fund out of the Nevada operations." ¶145, ECF No. 96-11 at 8.

By this point in time, the Nevada Mines were cash flow negative, a negative trend that CI 13 informed Defendants Radford and McDonald would continue into 2019. ¶13(a)(xv); *see also* ¶89 (alleging CI 8 attended meeting with Radford where negative cash flow discussed). According to CIs 8, 13 and 14, Defendants Baker, Hall and Radford had already learned at meetings that gold production at Fire Creek was in terminal decline and cash flows had rapidly declined and were trending negative for 2019 due to refractory gold, a permit cap on water discharge, and increased cost of production. ¶¶13(a)(i-iv), (vii), (xv), (b)(vii), 89. And contrary to Defendant Hall's statement, the Nevada Mines did not have "all the infrastructure" to mine refractory gold ore, such as a roaster or an agreement with a facility to process refractory ore, and the Nevada Mines lacked necessary water permits to discharge the water and infrastructure to deal with it, a material hindrance to improving production at Fire Creek. Given that the Nevada Mines

were cash flow negative at this time, it was impossible for Defendants to fund the capital improvements needed to improve performance at the Nevada Mines out of the Nevada operations.[9]

### E.    February 21, 2019 Statements and Partial Disclosure of the Fraud

On February 21, 2019, Defendants partially disclosed the truth about the Nevada Mines that they had been covering up for months—gold reserve losses, negative cash flow, and that gold production had declined approximately 80%, from approximately 162,000 ounces in 2017 to 32,887 ounces in 2018—causing Hecla stock to decline approximately 7%.  ¶¶153, 155.

Hecla's stock continued to trade at artificially inflated prices because Defendants misled investors by presenting the problems at the Nevada Mines as "transitional" and by downplaying the severity, persistence, and endemic nature of the material negative problems then plaguing the Nevada Mines that were negatively affecting operations, production and costs, including lack of permits to handle the water discharge and inadequate infrastructure and workforce, and uneconomic refractory ore, and because Defendants continued to misleadingly represent that the Nevada Mines contained "high-grade" gold ore. ¶¶157, 158-59, 167.

### F.    April 18, 2019 Statement and Partial Disclosure of the Fraud

On April 18, 2019, Hecla issued a press release that stated "[a] minor amendment to the water discharge permit for Fire Creek is expected in the second quarter which should enable a higher discharge rate." ¶169.  This statement partially disclosed that Defendants needed to amend the water discharge permits at Fire Creek, which caused Hecla stock to decline approximately 6%.

---

[9] Defendants argue that Hall's statement is not misleading because "nowhere do Plaintiffs allege there was some capital expenditure Defendants were planning that they knew Hecla could not fund from Nevada's cash flows."  Def. Br. at 21. Defendants' argument is specious because it is undisputed that the Nevada Mines were cash flow negative in 2018—as Defendant Hall admitted just weeks later—and therefore the capital investments and operating expenses that numerous CIs alerted the Individual Defendants were necessary to turn around the Nevada Mines, which Defendants later admitted were needed, could not at that time be paid for from the Nevada Mines cash flows, in direct contrast to Defendant Hall's representation.

¶171.  However, Defendants caused Hecla's stock to continue to trade at artificial prices because Defendants' statement created the misimpression that the water discharge problems were "minor." *Id*. By this point in time the Individual Defendants knew of, or at least recklessly ignored, specific contradictory information that showed that the Nevada Mines had major problems with water and lacked permits to handle the water discharge, were plagued with decrepit infrastructure and equipment that hindered production, and required massive capital and operational spending to improve operations. *Id*.

G.  **Defendants Disclose Negative, Adverse Conditions That They Had Covered Up During the Class Period and Shut Down the Nevada Mines**

On May 9, 2019, Defendants shocked investors when they disclosed that the Nevada Mines were "under review" because of increased costs, negative cash flow, and a loss of over $18 million. ¶¶172-74, 181.  Defendants Baker, Radford and McDonald identified the "challenges in Nevada": 1) high costs due to the expensive and unavoidable contract with contractor AMT, 2) uneconomic refractory gold ore and no way "to process it," 3) increased water that slowed the rate of production and "inadequate infrastructure to deal" with excess water, and the need to expand permitted water discharge limits, 4) further declines in gold production and lower revenue, and 5) that the mine life declined to 1.5 years, from 5 years (¶¶173-74, 176-77)—all of which according to CIs 13 and 14 and other CIs, the Individual Defendants had known, or at least recklessly ignored, before and during the Class Period.  These disclosures caused Hecla' stock to decline over 13%. ¶178.

Then, on June 6, 2019, Defendants effectively shut down operations at the Nevada Mines because they were cash flow negative and to this day operations have not resumed. ¶¶35, 185, 187. Notably, Defendants Baker and Radford admitted that Defendants encountered refractory ore that while "high-grade" the cost to develop was "too high," that Fire Creek had "very little reserves,"

that the Nevada Mines needed to increase the permit limits to discharge water by 150%, that

Defendants were seeking a third-party to lower the cost to process refractory gold ore, and cut

capital expenses by $25 million to operate at close to cash flow neutral.  ¶¶187-88.  Analysts

reacted harshly to Defendants' disclosures, calling the changes "desperate" and a "complete

reversal" since the acquisition. ¶¶181, 189.  Shortly after the Class Period, unsurprisingly,

Defendants Radford and McDonald resigned from their positions with Company.

## II.    LEGAL ARGUMENT

### A.    Defendants' Statements Were False and Misleading at the Time They Were Made

As set forth above, the Complaint alleges that Defendants made statements that were

materially false or materially misleading at the time they were made because Defendants were

aware of, or at least recklessly ignored, specific information that contradicted their statements to

investors, satisfying the particularity requirements of the PSLRA.  Defendants' arguments in

support of their motion to dismiss are meritless because (1) they mischaracterize and ignore facts

alleged in the Complaint, (2) dispute facts and raise questions of fact that cannot be resolved in

their favor on a motion to dismiss, and (3) rely on distinguishable authorities that involved different

facts.

### 1.    The Statements Were Not Forward-Looking and Not Accompanied by Meaningful Cautionary Language

Defendants' argument that certain of their alleged false and misleading statements are "not

actionable" because they were "forward-looking" and "accompanied by meaningful cautions" is

wrong.  Def. Br. at 23-25.  For example, on March 19, 2018, Defendant Baker stated that "[w]e

can improve costs, grow reserves and expand production . . . shareholders can benefit from the

162,000 gold equivalent ounces a year of production" (Def. Br. at 22), while he knew, or recklessly

ignored, contrary facts: the Nevada Mines would not produce 162,000 ounces of gold per year,

costs were unavoidable and increasing, gold production had decreased and was expected to continue declining, and the Nevada Mines did not have the necessary water permits and infrastructure to support expanded production. ¶¶13(a)(i)-(iv), (vii)-(viii); *Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000) (statements were false and misleading where "defendants stated that the inventory situation was "in good shape" or "under control" while they allegedly knew that the contrary was true."). Because the statement makes representations concerning Defendants' present ability to improve operations, while they knew of, or recklessly ignored, negative conditions that then were and would continue to negatively impact Defendants' ability to improve operations at the Nevada Mines, they are not protected by the PSLRA's safe harbor. *In re: EZCorp, Inc. Sec. Litig.*, 181 F. Supp. 3d 197, 207–08 (S.D.N.Y. 2016) (Carter, Jr., J.); *see also Shupe v. Rocket Companies, Inc.*, 2023 WL 2411002, at *14 (E.D. Mich. Mar. 8, 2023).

Similarly, the statements that "[c]urrent reserves and resources provide mining inventory out to 2023" (¶¶130, 143, 147) were statements of present fact. Defendants argue that because the statement was accompanied by cautions concerning their use of "Estimates or expectations of future events or results," it was a forward-looking statement. Def. Br. at 24. On their face, Defendants' statements concerning **current** reserves and resources is not an estimate or expectation. Nor do Defendants explain how it could be otherwise. Assuming, *arguendo*, the statement could be considered to contain some elements that look forward and others that do not (it cannot), the forward-looking elements are severable from non-forward-looking elements. *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 246 (2d Cir. 2016). For example, the statement represented to investors that Defendants, at that time, were expecting at least five years of inferred and proven gold reserves. But, as alleged in the Complaint, this was untrue because Defendant Baker and senior Hecla management were told at a budget meeting by Nevada Mines executives that the

Nevada Mines' life of mine, which is a statement of inferred and proven reserves was three years, and that substantial and uneconomic capital and operational costs would have to be incurred to extend the life of mine sooner than stated, as confirmed by CI 14.    ¶131.    Mixed present and future statements are not protected by the safe harbor with respect to the part of the statement that refers to the present.    *In re Vivendi*, 838 F.3d at 246.[10]

Moreover, even assuming, *arguendo*, current reserve and resource estimates are considered opinions, according to CI 14, Defendants were told by senior managers that the life of mine was three years, not five, a contrary fact that substantially undermines the conclusion a reasonable investor would reach from Defendants' statement.    *See Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 178 (2d Cir. 2020); *see also Wang v. Cloopen Grp. Holding Ltd.*, 2023 WL 2534599, at *10 (S.D.N.Y. Mar. 16, 2023) (stating "core inquiry is whether the omitted facts 'conflict with what a reasonable investor would take from the statement itself.'") (citing *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016)) (internal quotations omitted)).    Accordingly, Hecla investors were misled.

### 2.    Defendants' Argument That They Disclosed Negative Information Ignores the New Allegations

Defendants regurgitate arguments previously made and ignore the new allegations of the Complaint, asserting that "Hecla did in fact disclose many of the challenge[s] it was encountering []at the Nevada Mines."    Def. Br. at 2.    The purported disclosures that Defendants reference do not disclose that Hecla did not have the necessary water permits to expand production or adequate

---

[10] *Gray v. Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366, 390 (S.D.N.Y. 2020), cited by Defendants, is distinguishable because it involved "quintessentially forward-looking" projections. The Complaint does not implicate any projections of future events.    Defendants cite *In re Turquoise Hill Res. Sec. Litig.*, 2022 WL 4085677, *25 (S.D.N.Y. Sept. 2, 2022) in support of the argument that "conscious recklessness is never sufficient to plead scienter for forward-looking statements."    Def. Br. at 17 n.5.    This case is irrelevant because the statements alleged in the Complaint outlined above concern representations of present facts and are not forward-looking.

infrastructure to handle the water, that gold production had dropped and was expected to drop to the mid-80,000 ounces in 2018, or that the gold ore at Fire Creek was uneconomic refractory ore.

Moreover, Defendants ignore that at the same time the purported disclosures were made, Defendants' statements created the false impression that the Nevada Mines would be a net positive for investors and they then had the ability to put them on an "improvement path" to increase profitability and cash flow. ¶135. For example, Defendants argue that the previous owner, Klondex, had been poorly managed before the Class Period. Def. Br. at 2. But, at the same time, Defendants represented that, in effect, they could turn around the Nevada Mines because they had "high-grade" gold (which was misleading because it was refractory gold that could not be processed on a cost-effective basis), that they "can improve costs, grow reserves and expand production, that . . . shareholders can benefit from the 162,000 gold equivalent ounces a year of production" (which they knew they would not achieve) and that they "can improve costs, throughout and recoveries" with a "small amount of capital." ¶¶96-97. Defendants made these statements despite Defendants Radford and McDonald knowing at the time that Hecla did not have the necessary permits to expand production, the water treatment infrastructure was decrepit and needed massive capital improvements, that rather than providing a "benefit from the 162,000 gold equivalent ounces a year of production," production had declined and was expected to continue to decline to mid-80,000 ounces in 2018, and that Defendant Radford's turn-around plan was contingent on obtaining a contract from Barrick Gold to process refractory ore. ¶¶13(a)(i)-(ix), (b)(ii). These material facts were undisclosed to investors and would have alerted investors that the factual basis, if any, for Defendants' positive statements were misleading. That the poor performance of the Nevada Mines under its former owner had been disclosed only adds to investors' later surprise when, after Defendants' positive statements for many months, they

17

disclosed that the Nevada Mines were in terminal decline and shut them down. *See, e.g., Setzer v. Omega Healthcare Inv'rs, Inc*., 968 F.3d 204, 216 (2d Cir. 2020) ("That Defendants made several disclosures regarding Orianna's financial difficulties does not alter our conclusion. Indeed, those disclosures support a finding of recklessness here as they strongly suggest that Defendants sought to use Orianna's 'partial rental payments' to express optimism and underrepresent the extent of those very problems."); *Op. Local 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92 (2d Cir. 2010) (stating veracity of a statement or omission is measured by ability to mislead, not by literal truth).[11]

Defendants' boilerplate, generic warnings that Hecla may not achieve the anticipated benefits of the acquisition due to "higher than expected acquisition or operating costs or other difficulties" and that the mines "may be in unexpected condition" that accompanied their "disclosures" (Def. Br. at 3-4), do not insulate them from liability because Defendants failed to disclose then-existing facts that both Radford and McDonald knew, or at least recklessly ignored, according to CIs 13 and 14. *See Meyer v. Jinkosolar Holdings Co.*, 761 F.3d at 251 (2d Cir. 2014) ("A generic warning of a risk will not suffice when undisclosed facts on the ground would substantially affect a reasonable investor's calculations of probability."). As discussed in Section I, Defendants' statement that the gold at the Nevada Mines was "high-grade" was misleading because the purportedly "high-grade" gold was, in fact, uneconomical refractory gold ore and

---

[11] Risk disclosure language that warns a risk has already transpired and may cause additional expense in the future, which was at issue in *Chapman v. Mueller Water Prod., Inc.*, 466 F. Supp. 3d 382, 406 (S.D.N.Y. 2020), is different from Defendants' purported disclosures, none of which mention uneconomic refractory ore, insufficient water discharge permits or the infrastructure to deal with the water, and that gold production had declined and was expected to continue declining in 2018 and into 2019. Moreover, the court in *Chapman* discounted generalized CI allegations. Here, the CI allegations identify in detail the ongoing problems negatively impacting operations and cash flow at the Nevada Mines, such as refractory ore, which are corroborated by Defendants' admissions after the end of the Class Period. ¶¶13, 56, 58-59, 64-87.

could not be profitably mined. Indeed, as Defendants McDonald and Baker admitted after the Class Period, the refractory ore at Fire Creek, for example, was different than what had "historically . . . been mined." ¶¶177, 190. Likewise, Defendants' generic warning "that due diligence of mines has significant limitations" and "that such reviews are not capable of identifying all potential adverse conditions" (Def. Br. at 4), is unavailing because adverse conditions, including uneconomic refractory ore, had already been identified and were known to at least Defendants Radford and McDonald through due diligence, according to CIs 13 and 14.[12] *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) ("Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired.").[13]

Finally, Defendants' argument that they disclosed other problems at the Nevada Mines on August 9, 2018 (Def. Br. at 5) misses the point and ignores the Complaint's new allegations. Indeed, at the same time as Defendants assert they disclosed muddy roads, turnover and problems at Midas and Hollister, Defendants misled investors, for example, by falsely stating that the Nevada Mines had "high-grade" gold, that they were "not anticipating needing to contribute additional capital into [the Nevada Mines]," and that "[w]e've got [all the permits] we need."

---

[12] The allegation according to CI 14 that Hecla did not conduct any metallurgical tests on the ore and that Hecla's metallurgists had no interaction with the Klondex team suggests that Hecla's due diligence was, at a minimum, reckless. ¶13(b)(ii). Defendants distort these allegations and suggest they show Defendants "*did not* learn about refractory ore during due diligence." Def. Br. at 9 (emphasis in original). However, Defendants' argument is meritless because it contradicts and ignores allegations that Defendants Radford and McDonald were explicitly told by CIs 13 and 14 about the refractory ore. ¶¶13(a)(i), (iv), (b)(ii).

[13] Defendants' arguments regarding Hecla's risk disclosures (Def. Br. at 21-22) and Item 303 disclosure obligations (at 22, n.7) ignore the allegations of the known material adverse conditions that were not disclosed (but should have been disclosed under Item 303) and that were reasonably expected to and did have an adverse financial impact on the Company, particularly the lack of permits issues and refractory ore.

¶¶118, 121, 123. Likewise, Defendants' "disclosure" on November 8, 2018 of "the poor conditions of the mine" (Def. Br. 5-6), ignores that, at the same time, Defendants falsely represented that the Nevada Mines "are going to generate the cash flow necessary for it to do the ramp up of development in 2019 . . . ." ¶135. But, given Fire Creek's refractory ore, decrepit infrastructure and lack of permits, increasing costs, and declining production expected into 2019, Defendants had no reasonable basis to represent that the Nevada Mines were going to provide the necessary cash flows to ramp up development in 2019, and indeed, the Nevada Mines were cash flow negative in 2018 and could not ramp up development out of their cash flows. ¶136.[14]

### B.    The Complaint Adequately Alleges Defendants' Scienter

The PSLRA requires that a complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). "Plaintiffs can plead scienter by (a) alleging facts demonstrating that defendants had both the motive and an opportunity to commit fraud or (b) otherwise alleging facts to show strong circumstantial evidence of defendants' conscious misbehavior or recklessness." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 74 (2d Cir. 2001); *In re Hain Celestial Group, Inc. Sec. Litig,* 20 F. 4th 131, 137-38 (2d Cir. 2021) (holding court must assess cumulatively allegations of circumstantial evidence of intent together with alleged facts relating to motive and opportunity). When analyzing scienter, "the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 326 (2007).

---

[14] Defendants, relying on *Bondali v. Yum Brands*, 620 F. App'x 483 (6th Cir. 2015), and *Wochos v. Tesla*, 985 F.3d 1180 (9th Cir. 2021), both out-of-circuit decisions, argue that a statement disclosing potential, future harms generally would not mislead a reasonable investor about the current state of a corporation's operations. Def. Br. at 22. That is not the law in the Second Circuit. *Rombach*, 355 F.3d at 173.

### 1. Defendants Knew of, or at Least Recklessly Ignored, Material Negative Conditions at the Nevada Mines That Were Not Disclosed

The Complaint alleges the Individual Defendants had direct, first-hand knowledge of the material, negative conditions at the Nevada Mines. ¶¶9, 13. For example, the Complaint alleges that Defendants McDonald and Radford, who led due diligence on behalf of Defendants and reported to Defendants Baker and Hall, were each told of the permit limits on water discharge and that CI 13 spoke weekly with Defendant Radford about the need for permit changes, that Defendants McDonald and Radford were aware of the refractory ore at Fire Creek, and that Defendant Radford was aware that gold production had declined and would drop to mid-80,000 ounces in 2018, down from 162,000 ounces in 2017.[15] ¶¶13(a)(viii), (b)(ii). These allegations of direct knowledge are sufficient to show scienter. *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 200-01 (S.D.N.Y. 2010) ("direct knowledge and access to information" establishes scienter).[16]

Defendants ignore these allegations. Instead, Defendants generally argue that none of the particular allegations amount to what, in their view, is the necessary "specific contradictory information" to plead a statement false or misleading. Def. Br. at 16. As explained in Section I,

---

[15] At best, Defendants indirectly address this allegation, arguing "Plaintiffs' allegations are not pled with particularity because they do not establish any Defendant agreed with any alleged assessment by an employee." Def. Br. at 14. The refractory gold ore, insufficient water discharge permits and infrastructure, and that Defendants would not achieve production of 162,000 ounces of gold in 2018 were observable facts that existed at the time and were conveyed by knowledgeable executives (¶13(a) n. 3, 4), not subjective assessments. And, unlike in the cases cited by Defendants (Def. Br. at 14), Defendant Radford "acknowledged," rather than disagreed with, the information provided by CIs and employees. ¶86.

[16] Defendant Redford and McDonald's suspicious "resignations" after the Class Period is not surprising given CIs 13 and 14's information, and further support an inference of scienter. *In re Scottish Re Group Sec. Litig.*, 524 F. Supp. 2d 370, 394 n. 176 (S.D.N.Y. 2007); *In re Sadia, S.A. Sec. Litig.*, 643 F. Supp. 2d 521, 523–24, 534 (S.D.N.Y. 2009).

the Complaint tethers the specific undisclosed negative conditions and facts to Defendants' statements and alleges why the statements were false or misleading at the time they were made.[17] In light of the positive statements Defendants made about the Nevada Mines, their nondisclosure of contradictory information was "highly unreasonable" and was "an extreme departure from the standards of ordinary care to the extent that the danger" was either known to Defendants or so obvious that Defendants must have been aware of it. *Setzer*, 968 F.3d at 215.

### 2. Defendants' Additional Arguments Are Unavailing Because They Ignore, Mischaracterize and Dispute Facts

Recognizing that the new CI allegations directly address the Feb. 22 Order regarding the Individual Defendants' scienter, Defendants raise a series of meritless arguments that ignore the facts alleged in the Complaint. Defendants note that the introductory paragraph to certain of the Complaint's new CI allegations state that they pertain to the due diligence period, but that certain of the allegations "by their own explicit terms" concern later periods. Def. Br. at 8. Far from discrediting the allegations, it reflects the common sense notion that time is linear and that the CI allegations reflect information Defendants learned over time during due diligence and the Class Period. *Speakes*, 2018 WL 4572987, at *6 (rejecting defendants' attempts to "poke holes" in confidential witness allegations).[18]

Defendants further argue that "Plaintiffs' allegations about CI 13 [and CI 14] are insufficient . . . [because] many fail to allege which Defendant, if any, CI 13 told the alleged information to." Def. Br. at 8-9, 13. This is not true. Paragraph 9 states that Defendants Radford

---

[17] In contrast, the statements at issue in *Maloney v. Ollie's Bargain Outlet Holdings, Inc.*, 518 F. Supp. 3d 772, 781 (S.D.N.Y. 2021), and *Bristol Cnty. Ret. Sys. v. Adient PLC*, 2022 WL 2824260, at *2 (2d Cir. July 20, 2022), were not contradicted by undisclosed information.

[18] Defendants' authorities (Def. Br. at 14) are distinguishable because, unlike here, the informants in those cases contradict each other. Defendants do not, because they cannot, make that argument.

and McDonald "were directly informed." *See also* ¶¶13(a)(i), (b)(ii). Unlike the facts in Defendants' authorities, the Complaint alleges what CIs 13 and 14 observed, their direct contacts with Defendants, and that they were in a position to make such observations. *Novak*, 216 F.3d at 314.

Regarding Defendant Baker's November 8, 2018 statement that "we don't believe we will need to make significant new financial investment to put the mine on the same improvement path that we have seen at Greens Creek and Casa Berardi" (Hecla's Alaska and Canadian cash flow positive mines), Defendants dispute facts, asserting that "improvement path" does not mean "positive cash flows." Def. Br. at 25. Defendants ignore that they repeatedly (including at this time) represented that the Nevada Mines would be cash flow positive, or at least cash flow neutral, and that one of the key reasons for the acquisition was the purportedly robust cash flows from Fire Creek, the "cornerstone" property. ¶¶96, 99, 115, 135, 145. Moreover, the "improvement path that [was] seen at Greens Creek and Casa Berardi" did result in positive cash flows, and therefore a reasonable investor would have understood Defendant Baker to be referring to positive cash flows. For example, the November 9, 2018 Corporate Update, alleged in paragraph 143, states Hecla's strategy to benefit shareholders resulted in Greens Creek generating "substantial free cash flow every year for over two decades" and Casa Berardi consistently generating "free cash flow."[19]

Finally, Defendants argue that the Complaint fails to plead with particularity that Defendants acted with "conscious recklessness" because it fails to "specifically identify the reports or statements that are contradictory to the statements made, or must provide specific instances in which Defendants received information that was contradictory to their public declarations." Def.

---

[19] Because this document is cited in the Complaint, it is incorporated by reference and the Court can consider its entire contents. *In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 289 (S.D.N.Y. 2013). *See* Campisi Declaration, Exhibit B, at 5.

Br. at 17. This argument is meritless and should be rejected out of hand because it ignores the Complaint's allegations that show the Individual Defendants received information that was contradictory to their public statements.[20] ¶¶9, 13, 13(x) (identifying reports), 84.

### 3. Defendants' Motive to Refinance its Outstanding Debt on Favorable Terms Supports a Strong Inference of Scienter

While "personal pecuniary motive is not required to plead scienter," the Complaint alleges Defendants' motive and opportunity which, viewed holistically with the allegations of circumstantial evidence of intent, supports a strong inference of scienter. *Freudenberg*, 712 F. Supp. 2d at 199; *Hain Celestial*, 20 F. 4th at 137-38. Defendants acquired the Nevada Mines using inflated Hecla shares in order to "improve" the Company's credit rating and this was important because of the impending need in or after May 2019 for Hecla to refinance $500 million in outstanding Hecla bonds—an improved credit rating would lower Hecla's borrowing costs. ¶¶2, 218-19.

Defendants argue that the Complaint's motive allegation is implausible. Def. Br. at 11-13. However, Defendants' argument confuses expected with realized benefits. It is just as plausible that Defendants thought they could continue operating the Nevada Mines long enough to complete the refinancing, but the massive influx of water and persistent negative cash flow forced Defendants to shut down operations before they could take advantage of the fraud. That their plan ultimately failed does not cause the motive to be implausible. *See Skiadas v. Acer Therapeutics, Inc.*, 2020 WL 4208442, at *7-8 (S.D.N.Y. July 21, 2020); *Indiana Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d at 97 (2d Cir. 2016). Defendants ignore that the Complaint alleges an event "that required

---

[20] Defendants' reliance on *Kuriakose v. Fed. Home Loan Mort. Corp.*, 897 F. Supp. 2d 168, 182, 184 (S.D.N.Y. 2012), is misplaced because defendants "fully disclosed" the adverse facts alleged to be concealed. In contrast, Defendants did not disclose the refractory ore, lack of water discharge permits and adequate infrastructure, and declining gold ore production and negative cash flows, and when they were disclosed, Hecla's stock price declined. ¶¶153-56, 169-70, 172-78.

Defendants to suddenly give up the supposed deception": Defendant Baker disclosed that water discharge had doubled at Fire Creek that limited access to Fire Creek mines and that it could not be dealt with fast enough "to effectively move forward."    ¶¶172, 176, 187.    That Defendants reached a breaking point at which they were required to publicly acknowledge that they needed to take actions to staunch the "negative cash flow," including "construct[ing] some infrastructure, and "get[ting] some permit limits changed," does not weigh against scienter.  ¶¶172-73.[21]

Finally, even assuming, *arguendo* that "Defendants were [not] motivated to defraud" from the start of the Class Period (Def. Br. at 11), but rather, acquired the Nevada Mines with the mistaken belief that they could improve costs, grow reserves and expand production, by the time Defendants closed the deal, took possession and assessed the Nevada Mines in July-August 2018, such argument no longer applies because Defendants were directly informed of the negative conditions. ¶¶13(a)(xii)-(xiii), (b)(iv)-(vi), 86-88.  By this point in time, based on what the Individual Defendants knew, or at least recklessly ignored, according to multiple CIs, including CIs 13 and 14, it was at least reckless for Defendants to continue to make positive statements that the Nevada Mines were at the very least "self-funding," had "high-grade" gold ore and that Defendants had the ability to turn around the Nevada Mines.

### III.    CONCLUSION

For the reasons set forth above, Defendants' motion should be denied in its entirety.[22]

---

[21] Defendants distort the Complaint's motive allegation, asserting it implies that "Defendants intentionally wasted $462 million."  Def. Br. at 11. The Complaint does not allege the Nevada Mines were worthless.

[22] If the Court finds any deficiencies in the new CI allegations or any of the other amendments, Plaintiffs respectfully request leave to amend to address them. Fed. R. Civ. P. 15(a)(2); *Nypl v. JPMorgan Chase & Co.*, 2017 WL 1133446, at *7 (S.D.N.Y. Mar. 24, 2017) (granting leave to file third amended complaint).

Dated: June 21, 2022

**KAPLAN FOX & KILSHEIMER LLP**

By: /s/   *Jeffrey P. Campisi*

Robert N. Kaplan
Jeffrey P. Campisi
Jason A. Uris
800 Third Avenue, 38th Floor
New York, NY 10022
Tel: (212) 687-1980
Fax: (212) 687-7714
rkaplan@kaplanfox.com
jcampisi@kaplanfox.com
juris@kaplanfox.com

*Lead Counsel for Lead Plaintiffs and the
Proposed Class*